John A. Yanchunis (*Pro Hac Vice*)
*JYanchunis@ForThePeople.com*
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
T: 813-223-5505
F: 813-223-5402 (fax)

Ariana J. Tadler (*Pro Hac Vice*)
*ATadler@Milberg.com*
**MILBERG TADLER PHILLIPS**
**GROSSMAN LLP**
One Penn Plaza
New York, New York
T: 212-594-5300
F: 212-868-1229

Andrew N. Friedman (*Pro Hac Vice*)
*AFriedman@CohenMilstein.com*
**COHEN MILSTEIN SELLERS & TOLL,**
**PLLC**
1100 New York Ave, 5th Floor
Washington, DC 20005
T: 202-408-4600
F: 202-408-4699

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLA ECHAVARRIA, an individual and California resident, and DERRICK WALKER, an individual and Virginia resident,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>Defendant. | No.  18-05982 WHA<br>*Related to:*<br>No.  18-06022 WHA<br>No.  18-06172 WHA<br>No.  18-06246 WHA<br>No.  18-06263 WHA<br>No.  18-06511 WHA<br>No.  18-06583 WHA<br>No.  18-06657 WHA<br>No.  18-06887 WHA<br>No.  18-06953 WHA<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................1

II. PARTIES ...........................................................................................................3

III. JURISDICTION AND VENUE ...........................................................................5

IV. FACTUAL ALLEGATIONS ...............................................................................5

    A.    The Facebook Profile and Terms of Service.............................................5

    B.    Facebook Has Been on Notice of Privacy Issues and Misuse of its Data But Has Repeatedly Failed to Prevent Data Incursions ...........................................12

    C.    Facebook's Privacy Features Result in Unwanted Disclosures ...................18

    D.    Despite Repeated Assurances of the Public and its Users, Facebook Suffered Another Preventable Data Breach .......................................................20

    E.    Facebook Failed to Adequately Protect Users Tokens ................................23

    F.    Facebook's Lax Security Resulted in Yet Another Breach ..........................26

    G.    Impacted Users Have Been Greatly Harmed and Face Significant Ongoing Risks as a Result of the Data Breach..........................................................26

    H.    Plaintiffs' Experiences ................................................................31

V. CLASS ALLEGATIONS ...................................................................................35

VI. CAUSES OF ACTION......................................................................................40

    COUNT I (Breach of Contract) .........................................................40

    COUNT II (Breach of Implied Contract) ..............................................42

    COUNT III (Breach of Implied Covenant of Good Faith and Fair Dealing) .......44

    COUNT IV (Quasi-Contract Claim for Non-Restitutionary Damages) ...............45

    COUNT V (Negligence) ..................................................................45

    COUNT VI (Negligence Per Se)........................................................48

**COUNT VII (Violation of the Unfair Competition Law)**..........................................50

**COUNT VIII (California Consumer Legal Remedies Act)**....................................53

**COUNT IX (Breach of Confidence)** ..........................................................................56

**COUNT X (Declaratory Judgment)** ..........................................................................59

**VII. PRAYER FOR RELIEF**..........................................................................................60

**VIII. JURY TRIAL DEMAND**.......................................................................................61

ii

1
2

## INTRODUCTION

3

     1.     Facebook is a social networking site founded by Mark Zuckerberg. Over the decades,

4

Facebook has amassed approximately 2.2 billion users.[1]

5

     2.     On September 28, 2018, Facebook disclosed that a breach of the company's network

6

resulted in hackers obtaining direct access to the accounts of approximately 30 million Facebook users

7

and all of the information accessible in and through those accounts (the "Data

8

Breach").[2] The Data Breach was the result of software vulnerabilities that permitted access tokens—

9

which enable people to stay logged into Facebook without reentering their password—to be taken.[3]

10

     3.     According to Facebook, the vulnerabilities permitting the Data Breach began in July

11

2017 and continued, undetected by Facebook, until September 2018.[4]

12

     4.     When Facebook initially discovered that hackers had exploited these vulnerabilities,

13

it invalidated the access tokens of almost 90 million accounts that were potentially impacted.

14

     5.     Facebook ultimately conceded that 30 million users had their access tokens stolen.

15
16

     6.     Facebook further conceded that 29 million of those users had additional personally

17

identifiable information ("PII") taken: For 15 million users, name and contact details (phone number,

18

email, or both, depending on what people had on their profiles) were accessed. For 14 million users,

19
20

---

[1] *Ad Targeting*, Facebook, Inc., https://www.facebook.com/business/products/ads/ad-targeting (last accessed Feb. 7, 2019).
[2] Brian Fung, *Facebook Says Millions of Users had Phone Numbers, Search History and Location Data Stolen in Recent Hack*, THE WASHINGTON POST (Oct. 12, 2018), *available at*: https://www.washingtonpost.com/technology/2018/10/12/facebook-says-fewer-users-were-affected-by-data-breach-more-information-was-taken/ (last accessed Oct. 24, 2018). Facebook originally reported that 50 million accounts were affected by the Data Breach, but later revised that number to 30 million. Plaintiffs reserve the right to pursue relief for all Facebook users affected by the "View As" vulnerabilities revealed in discovery.
[3] *Id.*
[4] Guy Rosen, *An Update on the Security Issue,* Facebook Newsroom (Oct. 12, 2018), https://newsroom.fb.com/news/2018/10/update-on-security-issue/ (last accessed Jan. 29, 2019).

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

the attackers accessed the same two sets of information (name and contact details), as well as username, gender, locale/language, relationship status, religion, hometown, self-reported current city, birthdate, device types used to access Facebook, education, work history, the last 10 places they checked into or were tagged in, website, people or pages they follow, and their 15 most recent searches.[5] Facebook has acknowledged a third set of users were affected by the Data Breach, but has not provided details of what was breached beyond users' tokens.[6]

7.     The stolen PII has great value to criminals, researchers, advertisers, and political campaigns.

8.     Specifically, experts say that these personal details "can be just as important to consumers—and valuable to criminals—as financial data."[7] In fact, such details may be *more* valuable than a Social Security Number or credit card information. Justin Brookman, director of privacy and technology policy for Consumers Union, the policy and mobilization division of Consumer Reports, said of the Data Breach, "Most data breaches involve financial information, but your Facebook account can be misused in a number of ways that are harmful. Accessing your private communications and posts by itself is pretty invasive, but that information could also be used to crack account security questions or to scam you and your friends."[8]

9.     The PII certainly has great value to Facebook.

10.    While Facebook offers a free social networking service, its ability to monetize the data of its users garner it great wealth.

---

[5] *Id.*

[6] *Id.*

[7] Allen St. John, *Facebook Breach Exposed Personal Data of Millions of Users: Hackers could find out your birthplace, religion, gender, and relationships. What you can do about it*, CONSUMER REPORTS (Oct. 12, 2018), https://www.consumerreports.org/digital-security/facebook-data-breach-exposed-personal-data-of-millions-of-users/ (last accessed Oct. 22, 2018).

[8] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

11.     In 2017, Facebook's annual revenue was $40.65 billion, and the clear majority of Facebook's revenue—approximately 96%—originated from the sale of targeted advertising based on the extensive data Facebook collects, analyzes, and maintains about its users.[9] Facebook users effectively make a deal with Facebook: in exchange for their data (that Facebook monetizes), Facebook will honor privacy settings and protect that data from others. Plaintiffs and users then share PII in their profiles or on Facebook messenger, creating a fiduciary relationship between Facebook and its users.

12.     Facebook had previously agreed to a 2011 Federal Trade Commission Consent Order to better protect user privacy and prevent third parties from misappropriating personal information.

13.      Plaintiffs bring these actions on behalf of all persons who registered for Facebook in the United States and whose PII was compromised in the Data Breach as a result of Facebook's failure to: (i) adequately protect its users PII, (ii) warn users of its inadequate information security practices, and (iii) effectively monitor and control those on Facebook's network that present a threat. Facebook's conduct amounts to breach of contract, breach of implied contract, breach of implied covenant of good faith and fair dealing, breach of quasi-contract, breach of confidence, negligence, negligence per se, and the violation of several California statutes.

14.     All Plaintiffs and similarly situated Facebook users ("Class members") have suffered injury as a result of Facebook's conduct. Injuries include: (i) the loss of the opportunity to control how their PII is used; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended and the loss

---

[9] Annual Reports, Facebook, Inc., (2012, 2014, 2017); 10-K Quarterly Reports, Facebook, Inc., (Q2 2018).

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (v) costs associated with placing freezes on credit reports; (vi) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of customers and former customers in their continued possession; (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class members; (viii) the diminished value of Plaintiffs' and Class members' PII, and (ix) expectation damages as a result of Facebook not protecting their PII as asserted in Facebook's explicit and implicit promises to users, in exchange for its monetizing Plaintiffs' data.

15.    In addition, Facebook has been unjustly enriched by its deceitful conduct—promising protection of PII but not providing the adequate resources to stop the hack. Facebook should disgorge that money back to Plaintiffs and users.

**PARTIES**

16.    Plaintiff Jasper Schmidt is a citizen and resident of California, and over the age of eighteen years. Plaintiff Schmidt has had a Facebook account since 2008.

17.    Plaintiff William Bass Jr. is a citizen and resident of California, and over the age of eighteen years. Plaintiff Bass has had a Facebook account since at least 2014.

18.    Plaintiff Jill Herr is a citizen and resident of New York, and over the age of eighteen years. Plaintiff Herr has had a Facebook account since 2008.

19.    Plaintiff Stephen Adkins is a citizen and resident of Michigan, and over the age of eighteen years. Plaintiff Adkins has had a Facebook account since 2009.

20.    Plaintiff Denise Brown-Wells is a citizen and resident of Florida, and over the age of

4

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

eighteen years. Plaintiff Brown-Wells has had a Facebook account since 2011.

21. Defendant Facebook, Inc. ("Facebook"), is incorporated in Delaware, and its principal place of business is 1601 Willow Road, Menlo Park, CA 94025; it is thus a citizen of Delaware and California.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

23. This Court has personal jurisdiction over Defendant because Facebook is headquartered in California and conducts business in the state of California.

24. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in, were directed to, and/or emanated from this District. Venue is also proper because Facebook's terms of service require that claims are resolved "exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County . . ."[10]

## FACTUAL ALLEGATIONS

A.     **The Facebook Profile and Terms of Services**

25. When a person opens a Facebook account, he or she is prompted to include certain information on his or her profile page.

---

[10] *Terms of Service*, Facebook, Inc., https://www.facebook.com/terms.php (last accessed Feb. 7, 2019). The Terms of Service for "Disputes" also state that "the laws of California will govern these Terms and any claim, without regard to conflict of law provisions."

1

2

3

4

5

6

7

8

9

10

11

12



13   26.   To create an account, a person is required to share his/her name, email address or

14   mobile phone number, date of birth, and gender.

15   27.   Most of the other requested information can be called historical PII, such as hometown,

16   employment, and educational history.

17   28.   This information helps Facebook connect those viewing the site with "friends," and

18   increase its user base.

19   29.   The "privacy" settings for this PII defaults to "public" unless the user toggles it to a

20

21   higher privacy setting. Below, pictured together (instead of single screen shots) are some of the

22   screens a user would see:

23

24

25

26

27

28

6



30.     The user will also receive prompts from Facebook to "update info" and to add this additional PII, as well as email addresses and phone numbers, to his or her profile page.

31.     Also, when a user opens a Facebook account, he or she must agree to a "Terms of Service" ("Terms").[11] These Terms create mutual obligations for Facebook and its users.

32.     The Terms set out what services Facebook provides ("Our Services"), stating, in part:

   a.   "… a personalized experience for you …"

   b.   "Connect you with people and organizations you care about …"

   c.   "Help you discover content, products, and services that may interest you …"

   d.   "Combat harmful conduct and protect and support our community…"

   e.   "Enable global access to our services; to operate our global services, we need to store

---

[11] *Id.*

and distribute content and data in our data centers and systems around the word., including outside your country of residence."[12]

33.     The Terms set out "Commitments" or obligations of the Facebook user, including that the user provides the same name used in everyday life, provide accurate information, and "Not share their password or give access to their Facebook account to others." (the "Commitments").[13]

34.     The Commitments require that the user adhere to "Community Standards" and the Terms, not engage in fraud or upload viruses or malicious codes, and "not access or collect data from our Products using automated means (without our prior permission) or attempt to access data you do not have permission to access."

35.     Facebook explains that the user provides his or her data and content in consideration for his or her social networking experience.

36.     For example, the Terms set out that the user gives Facebook permission to use content that the user creates and shares, and to share information about the user's action with ads and sponsored content.[14]

37.     Finally, the Terms state that the laws of California govern the Terms and any claims and designate the Northern District of California as the venue for any dispute.[15]

38.     Within the Terms is a link to Facebook's "Data Policy." It states that Facebook collects significant and sensitive information. This includes:

> a.     **Information and content you provide**. We collect the content, communications and other information you provide when you use our Products, including when you sign up for an account, create or share content, and message or communicate with others. This can include information in or about the content you provide (like metadata), such as the

---

[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

location of a photo or the date a file was created. It can also include what you see through features we provide, such as our camera . . . Our systems automatically process content and communications you and others provide to analyze context and what's in them . . .

b.      **Network and connections**. We collect information about the people, Pages, accounts, hashtags and groups you are connected to and how you interact with them across our Products, such as people you communicate with the most or groups you are part of. We also collect contact information if you choose to upload, sync or import it from a device (such as an address book or call log or SMS log history) . . .

c.      **Your usage**. We collect information about how you use our Products, such as the types of content you view or engage with; the features you use; the actions you take; the people or accounts you interact with; and the time, frequency and duration of your activities. For example, we log when you're using and have last used our Products, and what posts, videos and other content you view on our Products. We also collect information about how you use features like our camera.

d.      **Information about transactions made on our products.** If you use our Products for purchases or other financial transactions (such as when you make a purchase in a game or make a donation), we collect information about the purchase or transaction. This includes payment information, such as your credit or debit card number and other card information; other account and authentication information; and billing, shipping and contact details.

e.      **Things others do and information they provide about you.** We also receive and analyze content, communications and information that other people provide when they use our Products. This can include information about you, such as when others share or comment on a photo of you, send a message to you, or upload, sync or import your contact information.

f.      We collect information from and about the computers, phones, connected TVs and other web-connected devices you use that integrate with our Products, and we combine this information across different devices you use. For example, we use information collected about your use of our Products on your phone to better personalize the content (including ads) or features you see when you use our Products on another device, such as your laptop or tablet, or to measure whether you took an action in response to an ad we showed you on your phone on a different device.

g.      Advertisers, app developers, and publishers can send us information through Facebook Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the

9

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

Facebook pixel. These partners provide information about your activities off Facebook—including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services— whether or not you have a Facebook account or are logged into Facebook. For example, a game developer could use our API to tell us what games you play, or a business could tell us about a purchase you made in its store. We also receive information about your online and offline actions and purchases from third-party data providers who have the rights to provide us with your information.[16]

39.     In its section entitled "Sharing with Third-Party Partners," Facebook explains that, while it does not sell any of the user's information to third parties, it does provide advertisers with reports about the kinds of people seeing their ads and information about users to measurement partners and facilitates payments with vendors who sell to users on Facebook.

40.     Facebook justifies this use by noting this sharing "makes it possible to operate our companies and provide free service to people around the world."[17]

41.     Facebook actively solicits as much information as possible from its users and monetizes that information.[18]

42.     In addition, some users' accounts also contain payment card information, and Facebook has actively encouraged banks to join its Messenger app and bring "users' financial information, like credit card transactions and checking account balances" along with them.[19]

43.     Facebook acknowledges that with the information it holds comes a responsibility to protect it. Facebook specifically promises that "[w]hen it comes to your personal information, we

---

[16] *Data Policy*, Facebook, Inc., https://www.facebook.com/about/privacy (last accessed Feb. 7, 2019).
[17] *Id.*
[18] John Constine, *Facebook's Revenue Growth Strategy: Ad Targeting by In-App Behavior*, TECHCRUNCH (Feb. 1, 2012), *available at*: https://techcrunch.com/2012/02/01/action-spec-ad-targeting.
[19] Sara Salinas, *Facebook is asking more financial institutions to join Messenger*, CNBC (Aug. 6, 2018), *available at*: https://www.cnbc.com/2018/08/06/facebook-messenger-could-soon-feature-your-bank-information.html.

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

don't share it without your permission (unless required by law)."[20]

44.   Facebook further represents in its "Privacy Principles," in relevant part, that:

**We design privacy into our products from the outset**
We design privacy into Facebook products with guidance from experts in areas like data protection and privacy law, security, interface design, engineering, product management, and public policy. Our privacy team works to build these diverse perspectives into every stage of product development.

**We work hard to keep your information secure**
We work around the block to help protect people's accounts, and we build security into every Facebook product. Our security systems run millions of time per second to help catch threats automatically and remove them before they ever reach you . . .

**You own and can delete your information**
You own the information you share on Facebook. This means you decide what you share and who you share it with on Facebook, and you can change your mind . . .

**Improvement is constant**
We're constantly working to develop new controls and design them in ways that explain things to people clearly. We invest in research and work with experts beyond Facebook including designers, developers, privacy professionals and regulators.

**We are accountable**
In addition to comprehensive privacy reviews, we put products through rigorous security testing. We also meet with regulators, legislators and privacy experts around the world to get input on our data practices and policies.[21]

45.   Facebook's Data Policy further represents that Facebook "[p]romotes safety, integrity, and security" by "us[ing] the information we have to verify accounts and activity, combat harmful conduct, detect and prevent spam and other bad experiences, maintain the integrity of our Products, and promote safety and security on and off of Facebook Products."

---

[20] *Privacy Basics*, Facebook, Inc., https://www.facebook.com/about/basics/stay-safe-and-secure/how-youre-protected (last accessed Feb. 7, 2019).
[21] *Id.*

46.     Facebook's Data Use Policy, updated in January 2015, also provides, in relevant part:

> Granting us permission to use your information not only allows us to provide Facebook as it exists today, but it also allows us to provide you with innovative features and services we develop in the future that use the information we receive about you in new ways. While you are allowing us to use the information we receive about you, you always own all of your information. Your trust is important to us, which is why we don't share information we receive about you with others unless we have:
> - received your permission
> - given you notice, such as by telling you about it in this policy; or
> - removed your name and any other personally identifying information from it.[22]

**B.      Facebook Has Been on Notice of Privacy Issues and Misuse of its Data But Has Repeatedly Failed to Prevent Data Incursions.**

47.     Facebook has a long history of misleading users about the adequacy of its data protection.

48.     Facebook's founder Mark Zuckerberg infamously stated that Facebook's motto was "Move fast and break things," often plastered across Facebook's campus as a reminder that non-conformist hackers were running the social network company.[23] That motto was axed in 2014, when Mr. Zuckerberg shifted the motto to "Move fast with stable infrastructure."[24]

49.     However, in November 2007, Facebook faced backlash from its then-57 million users for its privacy abuses with the now-defunct "Beacon" feature.[25] Zuckerberg admitted that Facebook

---

[22] *2015 Data Policy*, Facebook, Inc., https://web.archive.org/web/20141223083330/https://www.facebook.com/full_data_use_policy (last accessed Feb. 7, 2019).

[23] Nick Statt, *Zuckerberg: 'Move Fast and Break Things' isn't how Facebook Operates Anymore*, C|Net (April 30, 2014), *available at*: https://www.cnet.com/news/zuckerberg-move-fast-and-break-things-isnt-how-we-operate-anymore/

[24] *Id.*

[25] Andrew Clark, *Facebook Apologies for Mistakes over Advertising*, The Guardian (Dec. 6, 2007), *available at*: https://www.theguardian.com/technology/2007/dec/06/facebook.socialnetworking.

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

and its team of engineers "made a lot of mistakes building [Beacon], but we've made even more with how we've handled them. We simply did a bad job with this release, and I apologize for it."[26] The apology came after a groundswell of users complaining that Facebook deceived its users and tracked far more information with Beacon than originally represented, prompting a petition with MoveOn.org and a $9.5 million class action settlement concerning Facebook's privacy practices.[27]

50.     In July 2008, a "glitch" in Facebook's code exposed the birthdates of approximately 80 million users.[28]

51.     Facebook did not identify the "glitch" internally; rather, a third-party technology consultant discovered the "glitch" when he was reviewing Facebook's new design and noticed that the birthdates "of his privacy-obsessed acquaintances were popping up when they should have been hidden."[29]

52.      Although Facebook purportedly allowed users to control the audience of users who could see aspects of a user's profile, Facebook's new design made the information public to other Facebook users, essentially ignoring the users' privacy settings.[30]

53.     At the time, Facebook could not determine how long the data was exposed, or identify how many people viewed the data, because even though the new design was in beta form and supposed to be shielded from public access, non-beta-tester users still had access.[31]

54.     In 2011, Facebook settled with the Federal Trade Commission over charges it had

---

[26] Id.
[27] David Kravets, *Facebook's $9.5 Million "Beacon" Settlement Approved*, WIRED (Sept. 21, 2012), *available at* https://www.wired.com/2012/09/beacon-settlement-approved/
[28] Robert McMillan, *Facebook Bug Leaks Members' Birthday Data*, CSO ONLINE (July 17, 2008), *available at*: https://www.csoonline.com/article/2123018/identity-theft-prevention/facebook-bug-leaks-members--birthday-data.html.
[29] Id.
[30] Id.
[31] Id.

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

deceived users by "telling them they could keep their information on Facebook private, and then repeatedly allowing it to be shared and made public."[32] Facebook agreed to make its privacy and data sharing policies more prominent and was "barred from making misrepresentations about the privacy or security of consumers' personal information" while also being "required to establish and maintain a comprehensive privacy program designed to address privacy risks associated with the development and management of new and existing products and services, and to protect the privacy and confidentiality and consumers' information."[33] This program was specifically required to be "appropriate to [Facebook's] size and complexity, the nature and scope of [Facebook's] activities, and the sensitivity of the covered information, including . . . . the identification of reasonably foreseeable, material risks, both internal and external, that could result in . . . disclosure of covered information . . ."[34]

55. Around the same time, following a legal complaint by a European privacy campaigner, Facebook was urged by the Irish Data Protection Commissioner to tighten up app permissions to avoid "friends" data leakage. However, Facebook did not tighten permissions until 2015.[35]

56. In 2013, Facebook exposed six million users' contact information (email addresses and phone numbers) to unauthorized third parties.[36] Like with prior privacy violations and the

---

[32] *Facebook Settles FTC Charges that it Deceived Consumers by Failing to Keep Privacy Promises*, THE UNITED STATES OF AMERICA FEDERAL TRADE COMMISSION (Nov. 29, 2011), *available at*: https://www.ftc.gov/news-events/press-releases/2011/11/facebook-settles-ftc-charges-it-deceived-consumers-failing-keep

[33] *Id.*

[34] Order Containing Consent Order, *In the Matter of Facebook, Inc.*, File No. 092 3184, THE UNITED STATES OF AMERICA FEDERAL TRADE COMMISSION, *available at*: https://www.ftc.gov/sites/default/files/documents/cases/2011/11/111129facebookagree.pdf

[35] Natasha Lomas, *Facebook Data Misuse Scandal Affects 'Substantially' More than 50M, Claims Wylie*, TECHCRUNCH (March 27, 2018), *available at*: https://techcrunch.com/2018/03/27/facebook-data-misuse-scandal-affects-substantially-more-than-50m-claims-wylie

[36] Billy Gallagher, *Facebook Security Bug Exposed Personal Account Information, Emails and Phone Numbers, Six Million Accounts Affected*, TECHCRUNCH (June 21, 2013), *available at*:

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

violations at issue in this litigation, the vulnerability existed for at least five months before a third party identified the vulnerability and brought it to Facebook's attention.[37]

57.     Not only did the vulnerability permit unauthorized access to those six million users' contact information, it also permitted unauthorized third parties access to non-users' contact information—that is, contact information Facebook collected related to individuals who never signed up for, logged into, or used the Facebook platform.[38]

58.     In 2015, Facebook detected that political firm Cambridge Analytica was misusing personal data to create, among other things, targeted political ads. Its lawyers sent a letter to Cambridge Analytica in August of 2016 asking for verification that any such data be deleted. Facebook accepted a letter from Cambridge Analytica that it had done so but did not bother to follow up or conduct a forensic audit.[39]

59.     When identifying Cambridge Analytica as the entity that misappropriated Facebook data, Facebook founder and CEO Mark Zuckerberg admitted Facebook's negligence in the scandal: "But it's clear now that we didn't do enough to prevent [our] tools from being used for harm as well. That goes for the fake news, foreign interference in elections, and hate speech, as well as developers and *data privacy*. We didn't take a broad enough view of our responsibility, and that was a big mistake." (Emphasis added.)

---

https://techcrunch.com/2013/06/21/facebook-security-bug-exposed-personal-account-information-emails-and-phone-numbers-six-million-accounts-affected/

[37] Alexis Kleinman, *Facebook Bug Exposed Email Addresses, Phone Numbers of 6 Million Users*, THE HUFFINGTON POST (June 21, 2013), *available at*: https://www.huffingtonpost.com/2013/06/21/facebook-bug_n_3480739.html

[38] Gallagher, *supra* n.36.

[39] Natasha Lomas, *Facebook Data Misuse Scandal Affects 'Substantially' More than 50M, Claims Wylie*, TECHCRUNCH (March 27, 2018), *available at*: https://techcrunch.com/2018/03/27/facebook-data-misuse-scandal-affects-substantially-more-than-50m-claims-wylie

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

60.     Zuckerberg made further admissions regarding Facebook's failure to protect the PII of

its users:

> We have a responsibility to protect your data, and if we can't then we don't deserve to serve you. I've been working to understand exactly what happened and how to make sure this doesn't happen again.[40]

> I'm sorry we didn't do more at the time. We're now taking steps to ensure this doesn't happen again.[41]

61.     When called to testify before a joint session of the Senate Commerce Committee and

Judiciary Committee, in April 2018, Zuckerberg was chastened by many congresspeople, including

Senator Bill Nelson of Florida, who said, "Let me just cut to the chase. If you and other social media

companies do not get your act in order, none of us are going to have privacy anymore . . . We're

talking about personally identifiable information that, if not kept by the social media . . . companies

from theft, a value that we have in America, being our personal privacy – we won't have it

anymore."[42]

62.     Zuckerberg admitted that "we need to now take a more active view in policing the

ecosystem" and that, "at the end of the day, this is going to be something where people will measure

us by our results . . ."[43]

63.     Zuckerberg was specifically questioned by Senator Tammy Baldwin of Wisconsin

regarding whether "Facebook [could] be vulnerable to a data breach or hack . . ." He answered, "there

are many kinds of security threats that a company like ours faces, including people trying to break in

---

[40] Sam Meredith, *Facebook-Cambridge Analytica: A Timeline of the Data Hijacking Scandal*, CNBC (Apr. 10, 2018), *available at*: https://www.cnbc.com/2018/04/10/facebook-cambridge-analytica-a-timeline-of-the-data-hijacking-scandal.html
[41] *Id*.
[42] *Transcript of Mark Zuckerberg's Senate Hearing*, THE WASHINGTON POST (Apr. 10, 2018), *available at*: https://www.washingtonpost.com/news/the-switch/wp/2018/04/10/transcript-of-mark-zuckerbergs-senate-hearing/?noredirect=on&utm_term=.c7f29f9a3e4d
[43] *Id*.

16

to our security systems" and stated that if Facebook was hacked, he believed that he would have the duty to inform those impacted.[44]

64.     In a recognition of culpability, Zuckerberg further told the Joint Committees:

> We didn't take a broad enough view of our responsibility, and that was a big mistake.  And it was my mistake.  And I am sorry. I started Facebook, I run it, and I'm responsible for what happens here.
>
> So, now, we have to go through our — all of our relationship with people and make sure that we're taking a broad enough view of our responsibility. It's not enough to just connect people. We have to make sure that those connections are positive. It's not enough to just give people a voice. We need to make sure that people aren't using it to harm other people or to spread misinformation. And it's not enough to just give people control over their information. We need to make sure that the developers they share it with protect their information, too. Across the board, we have a responsibility to not just build tools, but to make sure that they're used for good.[45]

65.     Zuckerberg stated plainly in response to a question from Senator Cantwell, "Senator, I think everyone in the world deserves good privacy protection." Facebook committed to "putting stronger protections in place to prevent future abuse of our platform."[46]

66.     However, as recently as January 2019, Facebook has again been under fire for its disregard for both user privacy and developer protocols.

67.     Apple banned Facebook from offering apps and updates on Apple's platform after discovering that Facebook had "violat[ed] Apple's rules with a research app that allowed Facebook to snoop on users' online activity."

68.     The app at issue was reportedly part of a Facebook program known as Project Atlas

---

[44] *Id*.
[45] *Id*.
[46] *How is Facebook Working to Keep its Community Safe?*, Facebook, Inc., *available at*: https://www.facebook.com/help/208040513126776?helpref=popular_topics (last accessed Feb. 7, 2019).

17

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

which paid users $20 to install an app on their Apple devices called "Facebook Research." The app was offered to minors as well as adults and permitted Facebook "to track app use, the websites visited, the Amazon purchases they made and other intimate data."

69.     The app also circumvented Apple's usual download process through the App Store and was uploaded through a process that trusted web developers are only permitted to use for internal testing under their agreements with Apple.[47]

70.     A longtime consultant to Facebook and former mentor to Mark Zuckerberg, Roger McNamee, wrote an op-ed in TIME magazine in January lamenting what has happened to Facebook, and how it developed to something which brought him shame:

> To feed its AI and algorithms, Facebook gathered data anywhere it could. Before long, Facebook was spying on everyone, including people who do not use Facebook. Unfortunately for users, Facebook failed to safeguard that data. Facebook sometimes traded the data to get better business deals. These things increased user count and time on-site, but it took another innovation to make Facebook's advertising business a giant success.
>
> From late 2012 to 2017, Facebook perfected a new idea-growth hacking-where it experimented constantly with algorithms, new data types and small changes in design, measuring everything. Growth hacking enabled Facebook to monetize its oceans of data so effectively that growth-hacking metrics blocked out all other considerations. In the world of growth hacking, users are a metric, not people.[48]

## C.     Facebook's Privacy Features Result in Unwanted Disclosures

71.     As noted by McNamee, Facebook's primary revenue model relies on users to share as much PII as possible with as few hurdles and limitations for sharing that PII on the Facebook platform

---

[47] Kevin Roose, *Maybe Only Tim Cook Can Fix Facebook's Privacy Problem*, THE NEW YORK TIMES (Jan. 30, 2019), *available at*: https://www.nytimes.com/2019/01/30/technology/facebook-privacy-apple-time-cook.html.

[48] Roger McNamee, *I Mentored Mark Zuckerberg. I Loved Facebook. But I Can't Stay Silent About What's Happening*, TIME (Jan. 17. 2019), *available at*: http://time.com/5505441/mark-zuckerberg-mentor-facebook-downfall/.

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

as possible. To maximize revenue, Facebook has not always honored the privacy settings of its users.

72.     Many users depend on user-to-user privacy within the Facebook platform (i.e., only sharing posts with friends or certain subgroups of friends).

73.     Nevertheless, Facebook violated its own policy in October 2015 when it updated its search engine, at the expense of users' privacy, without alerting users.[49]

74.     Facebook's new internal search engine made searching within the Facebook platform easier but, in the process, all private profiles were publicly searchable—even for non-users and on platforms outside of Facebook, such as Google's or Yahoo's search engines.[50]

75.     Although users' privacy settings permitted them to set their profiles so that only certain users could see their profiles and information contained therein, the updated search function switched these profiles to public.[51]

76.     Without the benefit of an "opt out" option, users' posts, photos, and other activity not specifically set to the most private setting (a setting the user would have to manually check for each post, photo, and other activity) were now exposed beyond the Facebook platform, despite users having limited their privacy settings to prevent such disclosure of their personal information.[52]

77.     This meant those posts—previously limited to a small group of people—were now completely visible and searchable and, worse, Facebook's new search feature would scan the user's profile and use that information to autocomplete another user's search.[53]

78.     For example, if hypothetical user Sally Smith "liked" the band "Tom Petty & the

---

[49] Alex Hern, *Facebook is Chipping away at Privacy – and my Profile has been Exposed*, THE GUARDIAN (June 29, 2016), *available at*: https://www.theguardian.com/technology/2016/jun/29/facebook-privacy-secret-profile-exposed.
[50] *Id.*
[51] *Id.*
[52] *Id*.
[53] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

Heartbreakers" in her private profile, and another user (not necessarily her friend) searched for "Sally Smith Tom Pe," Facebook's new search feature would autocomplete the search to "Sally Smith Tom Petty & the Heartbreakers," thus revealing Sally Smith's otherwise and believed-to-be private information.

79.    Users may "like" or "post" items related to several particularly sensitive topics, e.g., health issues, religion, politics, familial issues.

80.    These examples are not limited to individual users' searches; game developers, application developers, marketers, and other third-party vendors had access to this search function and could use it to exploit information that users otherwise believed to be private.[54]

**D.    Despite Repeated Assurances to the Public and its Users, Facebook Suffered Another Preventable Data Breach.**

81.    When a user logged into Facebook with his or her username and password, Facebook then generated an access token for that user. This access token permitted that user to subsequently access Facebook without providing her or his username and password. This practice streamlined logins and reduced the barriers for users to access the Facebook platform and provide PII.

82.    Industry-standard information and data security best practices demand that companies that utilize access tokens should limit the lifespan of those access tokens to a reasonable period (e.g., an hour, a day, a week, a month).

83.    Once Facebook provided a user with an access token, however, Facebook did not subsequently expire the access token—the access tokens remained valid for months or even years. Facebook never required the user subsequently to provide her or his username and password (e.g., an

---

[54] Amy X. Wang, *How to Keep Facebook's Powerful new Search Engine from Unearthing your Old, Embarrassing Posts*, QUARTZ (Oct. 22, 2015), *available at*: https://qz.com/531244/how-to-keep-facebooks-powerful-new-search-engine-from-unearthing-your-old-embarrassing-posts/.

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

hour, a day, a week, or a month later) to reissue the access token. The access token remained valid for an indefinite period.

84.     According to Facebook, it first became aware of a potential data breach on September 14, 2018, when it noticed "an unusual spike of activity."[55]

85.     Facebook allowed the attackers to gain access to over 400,000 Facebook accounts, and steal 30 million Facebook users' "access tokens," which are "the equivalent of digital keys."[56]

86.     With access to users' tokens, the attackers siphoned purportedly 29 million users' PII without any form of intervention, interruption, or difficulty until September 25, 2018, when Facebook allegedly first determined the increased network traffic was actually an attack.[57]

87.     On September 25, 2018, 11 days after the attack allegedly began, Facebook's engineering team discovered the security issues that resulted in the Data Breach.

88.     Three separate vulnerabilities in Facebook's code had permitted unauthorized individuals to utilize Facebook's "View As" feature—which permits users to see what their profile looks like to others—to steal access tokens (which are designed to enable users to stay logged into Facebook without reentering their password).[58]

89.     With these access tokens, the unauthorized individuals were able to take over users' accounts.[59]

90.     Access tokens are used by Facebook to authenticate users. Facebook describes them

---

[55] Allen St. John, *supra* n.7.
[56] Guy Rosen, *supra* n.4.
[57] *Id. See also* "Facebook' Statement", Dkt No. 61 at 5.
[58] Mike Isaac & Sheera Frenkel, *Facebook Security Breach Exposes Accounts of 50 Million Users*, THE NEW YORK TIMES (Sept. 28, 2018), *available at*: https://www.nytimes.com/2018/09/28/technology/facebook-hack-data-breach.html.
[59] *Security Update*, Facebook, Inc., *available at*: https://newsroom.fb.com/news/2018/09/security-update/ (last accessed Feb. 7, 2019).

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

as "the equivalent of digital keys that keep people logged in to Facebook so they don't need to re-enter their password every time they use the app."[60]

91.     Ironically, two of the software vulnerabilities were the result of Facebook introducing an online tool to *improve* privacy for users, while the third was introduced to ease the uploading of birthday videos. Once Facebook discovered the Data Breach, it claims it "invalidated the access tokens of almost 90 million accounts that were potentially impacted by the vulnerability" while it investigated the breach. This resulted in a forced logout of these users, requiring them to reenter their passwords.[61]

92.     Beginning on September 28, 2018, Facebook notified users who were logged out of their accounts of the Data Breach, explaining that the forced logouts were a precaution related to the Data Breach.

93.     Facebook claims that it has determined that the Data Breach took place between September 14 and 27, 2018, during which time unauthorized individuals gained access to 30 million users' access tokens.[62]

94.     Facebook also claims that it has fixed the vulnerability and temporarily disabled the "View As" feature, but reports suggest the vulnerability existed for over a year, from July 2017 to September 2018, before it was discovered.[63]

95.     According to Facebook, the Data Breach compromised the following PII:

For approximately 15 million users: name and basic contact information (phone number and/or email address).

---

[60] *Id.*

[61] *An Important Update about Facebook's Recent Security Incident*, Facebook, Inc., *available at*: https://www.facebook.com/help/securitynotice?ref=sec (last accessed Feb. 7, 2019).

[62] *Id.*

[63] Chance Miller, *How to Find Out if your Data was Included in Facebook's Latest Security Breach*, 9 TO 5 MAC (Oct. 13, 2018), *available at*: https://9to5mac.com/2018/10/13/facebook-data-breach-account-check/.

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

> For approximately 14 million users: name, basic contact information, username, date of birth, gender, device types used to access Facebook, language selected to use Facebook in, certain other profile fields if the user had chosen to add them to their profile (relationship status, religion, hometown, self-reported current city, work, education, and website), the last 10 places the user checked into or were tagged in, the 15 most recent searches the user entered into the Facebook search bar, and the People or Pages followed by the user on Facebook.[64]

96.   Of the Data Breach, Zuckerberg said, "We're taking it really seriously. I'm glad we found this, but it definitely is an issue that this happened in this first place."[65]

97.   Indeed, Facebook provides free and subscription-based resources for third-party developers and general users, which provide advice, community forums, and best practices related to privacy and security settings. These resources also serve as a medium for Facebook to promote its latest security efforts.

98.   However, none of the privacy and security tools or settings Facebook provides and recommends would have prevented the Data Breach—which was the result of Facebook releasing multiple features prematurely, with vulnerabilities, and without ensuring they met industry-standard security best practices.

**E.   Facebook Failed to Adequately Protect Users' Tokens**

99.   Facebook's user access tokens are human-readable (i.e., non-encrypted) lines of letters, numbers, and symbols that are transmitted between Facebook and the users' browsers. These tokens can be extracted with free software tools. Facebook failed to include expirations on its access tokens.

100.   Once someone can compromise the user access token of a Facebook user the Facebook

---

[64] "Facebook's Statement," Dkt No. 61, at 6.
[65] Isaac & Frenkel, *supra* n.58.

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

Explorer page allows that individual to then access all tokens from the user's shared or connected web applications, such as Microsoft Azure cloud platform, SalesForce, Skype, Uber, and others.

101.    In addition, anyone with access to the token can reset all other user data permissions and steal the tokens of all connected applications with no alert provided to the original user.

102.    Facebook claims that three design vulnerabilities led to the exposure of the users' access tokens.

103.    Facebook has yet to make any claim that it performed basic security testing of its code or exposure-testing of tits access tokens.

104.    Such basic security testing is a fundamental procedure that has been considered an industry-standard best practice since 2004, and implementation of such testing would have revealed the problems which permitted the Data Breach to occur.

105.    The Open Web Application Security Project ("OWASP"), the International Standards Organization ("ISO"), and the National Institute for Standards in Technology ("NIST") have all developed what are considered the global industry standards for web application security development and testing, and have emphasized and reiterated the need to test for exposed cookies and access tokens that could lead to unauthorized access to secure websites.

106.    Cross-Site Scripting ("XSS") enables attackers to inject client-side scripts, bypass access controls such as the same-origin policy, stealing visible tokens and cookies.

107.    Cross-Site Request Forgery (CSRF) is an attack that forces an end user to execute unwanted actions on a web application in which they're currently authenticated.

108.    XSS and CSRF have been consistently ranked in the top-ten security risks since 2004. OWASP described XSS as "the most prevalent web application security flaw" which occurs when an

application includes user-supplied data without properly validating that content.[66] The detection of most XSS flaws, including flawed access tokens practices, "is fairly easy via testing or code analysis."[67]

109.   XSS and CSRF are used in tandem to exploit exposed user access tokens. In the security industry, it is acknowledged and generally accepted that an exposed user access token will usually enable an attacker to impersonate a victim and illegitimately gain access to the application and thus, that victim's personal data.

110.   Once a malicious actor is able to gain access to and compromise that user's access token, Facebook's lack of security and safeguards allowed that malicious actor to then use that access token to gain access to and compromise all tokens from that user's shared or connected web applications (i.e., those applications that utilize the "Facebook Login" system, such as Microsoft Azure cloud platform, SalesForce, etc.). Worse, that malicious actor could then reset all user permissions, passwords, and other safeguards (such as two-factor authentication) not only in Facebook, but also any third-party accounts that utilize Facebook's authentication login features and do so in such a manner that the user is not provided an alert or any other notification. From there, the malicious actor can syphon PII and other personal data from those accounts without hindrance. To prevent unauthorized users from eavesdropping, there is free software to validate the data transferred between the client browser and the application servers. Most hackers also utilize the free software as a simple method to detect and identify easy areas of exploit.

---

[66] *OWASP Top Ten Project*, OWASP, *available at*:
https://www.owasp.org/index.php/Category:OWASP_Top_Ten_Project.
[67] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

1

### F.    Facebook's Lax Security Resulted in Yet Another Breach

2    111.    In December of 2018, Facebook had another security breach.[68] A flaw allowed third-

3    party application providers to see, through the social network's "Facebook Login" system, photos

4    that had been uploaded but not published on Facebook, as well as photos published to Facebook's

5    "Marketplace" and to its Stories feature. The bug also impacted photos that people uploaded to

6    Facebook but chose not to post. Facebook said the breach "affected up to 6.8 million users and up to

7    1,500 apps built by 876 developers."

8    112.    The photo vulnerability was initially introduced on September 13, 2018—meaning

9    developers could have accessed users' photos for 12 days.[69] Like the user access token flaw, this

10    vulnerability demonstrates a failure to test and correct flaws before launch.

11

### G.    Impacted Users Have Been Greatly Harmed and Face Significant Ongoing Risks as a Result of the Data Breach.

12

13    113.    There are serious implications related to the theft of access tokens, including that

14    someone with a user's token can access a user's account and impersonate the user online. This would

15    enable unauthorized individuals not only to download the entire archive of personal and profile data

16    to use at any time in the future, including all historical account activity and private messages sent and

17    received by the user since the account was created, but also send messages from a user's account and

18    send and request money to other users through Facebook Payments.[70]

19    114.    Further, it appears that the Data Breach impacted Facebook Login, which permits users

20    to use their Facebook accounts and credentials to sign into accounts with third parties such as Netflix,

21

22

23

24

25    [68] Michael Cappetta, *Facebook Apologizes After Security Flaw Exposes Unpublished Photos*, NBC
26    NEWS (Dec. 14, 2018), *available at*: https://www.nbcnews.com/tech/security/facebook-apologizes-
after-security-flaw-exposes-unpublished-photos-n948051.
27    [69] *Id.*
28    [70] Allen St. John, *supra* n.7.

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

1   Ancestry.com, ESPN, and Spotify.[71]

2   115.    There are tens of thousands of additional websites and services (including apps, online

3   retailers, and games) that permit Facebook users to take advantage of a "Login with Facebook" feature

4   including: Instagram and WhatsApp (both owned by Facebook), Uber, eBay, LinkedIn, dating

5   websites, Airbnb, and Yelp.

6   116.    With access to the user tokens, unauthorized users could also take over these accounts

7   and use them as if they were the accountholders without having to enter a password.

8

9   117.    Activities could include accessing personal and private information—including

10  photos, personal messages, search histories, purchase histories, professional networks and job-search

11  information; accessing information that could compromise the users' safety, including travel and

12  lodging plans, routine travel routes, and frequently visited addresses, including home and work;

13  changing permissions and privacy settings; posting or viewing information shared by those accounts

14  and any users connected to them; and accessing financial information.

15  118.    Facebook noted the attackers were from a known group it was watching, and thus  the

16  attack was foreseeable.

17

18  119.    Facebook has attempted to minimize the hack, claiming (without evidence) that the

19  unauthorized individuals who gained access to users' accounts "were spammers looking to make

20  money through deceptive advertising . . . that present themselves as a digital marketing company, and

21  whose activities were previously known to Facebook's security team . . ."[72]

22  120.    While Facebook claims that it has fixed the problem, that seems unlikely for impacted

23  users. While Facebook forcibly logged approximately 90 million users out of their accounts to reset

24

25

26

27  [71] *Id.*
    [72] Robert McMillan & Deepa Seetharaman, *supra* n.28.

28

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

the access tokens that permitted unauthorized individuals to access PII during the Data Breach, that reset does not log users out of all active sessions; in other words, if a user was logged out of her active session on her iPhone with the Facebook application, that user may not have been logged out of other devices, such as her tablet, laptop, or desktop computers that also had Facebook sessions active.

121.   In fact, Facebook leaves users logged in to unused apps (e.g., the app on the user's tablet) unless and until the user logs out.

122.   This is particularly true for mobile devices, which account for over 70% of all active Facebook users.[73]

123.   Active sessions may also be open on devices long abandoned by the users, such as an iPhone that a user subsequently replaced, and which is now in the possession of a third party.

124.   To log out of all active sessions, Facebook users must take additional steps and drill through their "Settings" menu and elect to "Log Out of All Sessions" through their account. Without completing this step—and possibly even with this additional step—unauthorized individuals may still have access to users' profiles to continue to take PII in connection with the Data Breach.[74]

125.   Further, the reset did not address the "Facebook Login" issue and does not protect users whose tokens were already stolen or whose information was already accessed.

126.   The information in a Facebook account contains, at a minimum, all posts, photos and

---

[73] *See, e.g., The Top 10 Valuable Facebook Statistics – Updated January 2019*, ZEPHORIA, *available at*: https://zephoria.com/top-15-valuable-facebook-statistics/ (last accessed Feb. 7, 2019); Napier Lopez, *90% of Facebook's Daily Active Users access it via Mobile*, THE NEXT WEB (Jan. 27, 2016), *available at*: https://thenextweb.com/facebook/2016/01/27/90-of-facebooks-daily-and-monthly-active-users-access-it-via-mobile/; *Share of Facebook users worldwide who accessed Facebook via Mobile from 2013 to 2018*, STATISTA, *available at*: https://www.statista.com/statistics/380550/share-of-global-mobile-facebook-users/.

[74] Anna Brading, *Big Facebook data breach: 50 million accounts affected*, NAKED SECURITY BY SOPHOS (Sept. 28, 2018), *available at*: https://nakedsecurity.sophos.com/2018/09/28/big-facebook-breach-50-million-accounts-affected/.

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

videos, all replies, likes and reactions, all friends and friend history, all games, every "follow" including individuals, event, activity, service, application, group, web sites, advertisements, all followers of the same, all messages exchanges, event RSVPs, all profile information (username, devices, authentication methods, recoverable email accounts and credentials, encryption settings, phone numbers, challenge response information, biometric information and settings, birth date, major events, employment, education, education history,  personal preferences, "about me," religion and political preferences, work history, book preferences, fitness data, news feed preferences, musical preferences), GPS locations where messages, photos, and posts were made, all "pokes," all advertisements, all calls and messages and associated event logs, and all security and login information including all devices used to access Facebook.

127.    This stolen data is valuable to wrongdoers, who can use the information taken for, *inter alia*, "knowledge-based authentication"—which is important to setting up and breaking into accounts.[75]

128.    For instance, banks and other holders of PII have moved toward using personal data to safeguard accounts, including information such as a consumer's mother's maiden name, pets' names, or the street the consumer grew up on.

129.    As a result of the Data Breach, such authentication information is now in the hands of unauthorized individuals who can use it to access or create accounts and circumvent the safeguards based on consumers' compromised personal data.

130.    Further, so-called "phishing" schemes seeking to extort money appear more legitimate to the targeted victim when a cybercriminal employs PII in the scheme.

---

[75] Dave Lee, *Facebook hack victims will not get ID theft protection*, BBC NEWS (Oct. 12, 2018), *available at*: https://www.bbc.com/news/technology-45845431.

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

131.    Phishing schemes have a much greater likelihood of success when personal, non-public information is used to spoof or fool the recipient.

132.    The Data Breach also makes users susceptible to ransomware or blackmailing attacks, because people use Facebook to "talk about things they wouldn't want their employer or their spouse to know. Hackers can do nasty stuff with that." [76]

133.    This information is found in, for example, users' private messages and in their Facebook-connected web services.

134.    For example, Microsoft's Azure cloud platform is a connected web service that uses Facebook to authenticate logins (i.e., a user uses her or his Facebook account to login to the service, instead of using a username and password provided by the connected web service). With access to Microsoft's Azure cloud platform via the user's Facebook credentials, an unauthorized third party then has access to that user's account and can continue to exfiltrate data beyond the PII Facebook stored.

135.    The Microsoft Azure cloud platform login is not the only example where users may utilize Facebook's authentication login feature. SalesForce, Skype, Uber, and myriad services use this Facebook's authentication login feature. Thus, the Facebook user's compromised token serves not only as a digital key to the Facebook platform, but also any other service that user connected to Facebook's authentication login feature.

136.    The Electronic Frontier Foundation has noted that the type of information exposed in the Data Breach is "extra-valuable to criminals" given that it is highly accurate, having been entered by users themselves, whereas personal information stolen from prior data breaches was inferred from

---

[76] Allen St. John, *supra* n..

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

consumer behavior.[77]

137.    Despite its clear misfeasance in protecting consumers from unlawful data breaches and the significant harms consumers face as a result, Facebook has already announced that it will not be providing the bare minimum relief that many companies provide after a breach—identity theft protection services.[78]

138.    Moreover, although Facebook users were notified within the application that they their PII was compromised in the Data Breach, Facebook does not appear to have provided any notifications outside of the Facebook platform.

139.    Thus, if a user has a dormant Facebook profile she or he never uses, or the user deleted her or his Facebook profile leading up to the Data Breach but the user's profile still existed on Facebook's servers, those individuals did not receive any notification concerning the compromise of their PII. Notwithstanding possessing those individuals' emails, phone numbers, and other information sufficient to identify and notify the users, Facebook's efforts ceased with notifications within the Facebook platform, and no efforts have been made to use that contact information to inform users that their PII was compromised.

H.    **Plaintiffs' Experiences**

1.    *Dr. Jasper Schmidt*

140.    Plaintiff Jasper Schmidt is a resident of the state of California.

141.    Plaintiff Schmidt has had a Facebook account since 2008.

142.    Plaintiff Schmidt provided Defendant with PII including his name, email address, telephone number, date of birth, locations, work and education history, and photographs. The

---

[77] *Id.*
[78] *Id.*

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

photographs provided to Facebook included not only those posted to his page, but those kept to personal privacy settings and those on the camera roll of his phone.

143.    Plaintiff Schmidt has always maintained his Facebook account security settings at the highest level possible, including the use of two factor authentication.

144.    On September 28, 2018, Plaintiff received a notification from Facebook that his Facebook account and PII were compromised. Plaintiff Schmidt was required to create a new password to log back into his account.

145.    Plaintiff Schmidt visited the "Security Incident" Facebook page related to his account, and was informed that the following categories of his personal information have been compromised: Name, Primary email address, most recently added phone number, username, date of birth, gender, types of devices used to access Facebook, language preference, relationship status, religion, hometown, current city, work, education, website, the 10 most recent locations he checked in to or tagged in, the 15 most recent searches he entered into the Facebook search bar, people or pages he follows on Facebook, timeline posts, friends list, Facebook Message conversation names, group page messages, and group membership.

146.    Plaintiff Schmidt was also informed by Facebook that the breach resulted in the "attacker" having access to view his page as him—meaning all of his private photographs were accessible to unknown third parties.

147.    As a result of the 2018 Data Breach, Plaintiff Schmidt suffered exposure of what had been a very tightly maintained, secure Facebook account, including private information and photographs; he also received multiple friend requests from unknown persons.

148.    Plaintiff Schmidt has spent considerable time attempting to manage these problems with his Facebook account and restore his privacy, including the privacy of his Facebook account.

    2.    *William Bass Jr.*

149.     Plaintiff William Bass Jr. is a resident of the state of California.

150.     Plaintiff Bass has been a Facebook User since approximately 2014.

151.     Plaintiff Bass provided Defendant with PII including his name, email address, telephone number, date of birthday, locations, work and education history, and photographs.

152.     Plaintiff Bass has actively maintained locked down privacy settings and made efforts to keep his Facebook account private.

153.     Plaintiff Bass became aware of the breach when he was forcibly logged out of his Facebook account and concurrently learned about the breach through public news sources. Plaintiff Bass was required to create a new password to log back into his Facebook account.

154.     As a result of the 2018 Data Breach, Plaintiff Bass received multiple friend requests from unknown persons, received impersonating calls from people purporting to be his relatives, and also spent considerable time trying to regain access to his Facebook account after he was forcibly logged out of his account.

155.     Plaintiff Bass has also spent considerable time attempting to manage these problems with his Facebook account and restore the privacy of his Facebook account.

**3.     *Jill Herr***

156.     Plaintiff Jill Herr is a resident of the state of New York.

157.     Plaintiff Herr has maintained an active Facebook account since 2008.

158.     Plaintiff Herr provided Defendant with PII including her name, email address, telephone number, date of birthday, locations, work and education history, and photographs.

159.     Plaintiff Herr has actively maintained locked down privacy settings and made efforts to keep her Facebook account private.

160.     Plaintiff Herr became aware of the breach when she was forcibly logged out of her Facebook account and concurrently learned about the breach through public news sources. Plaintiff

33

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

Herr was required to change her password to log back into her account.

161.    As a result of the 2018 Data Breach, Plaintiff Herr began to receive friend requests, via text, from people she was already friends with, including her father.  Because these additional text messages slowed down data transmission on her cell phone, she was forced to switch to an unlimited data program on her smart phone, increasing the cost of her service plan by $19 per month.

162.    Plaintiff Herr spent considerable time attempting to manage the problems the breach created with her Facebook account and restore the privacy of her Facebook account.

### 4.    *Stephen Adkins*

163.    Plaintiff Stephen Adkins is a resident of the state of Michigan.

164.    Plaintiff Adkins has been a Facebook User since March 2009.

165.    Plaintiff Adkins provided Defendant with PII including his name, email address, telephone number, date of birthday, locations, work and education history, and photographs.

166.    On October 12, 2018, Plaintiff Adkins saw a news article online discussing the Facebook data breach and attempted to access his account, however he had been forcibly logged out. Plaintiff Adkins was required to create a new password to log in.

167.    Once he logged back in to his account, Plaintiff Adkins received a notification at the top of his Facebook NewsFeed discussing the breach.

168.    Plaintiff Adkins visited the "Security Incident" Facebook page related to his account, and was informed that the following categories of information have been compromised:  name, primary email address, most recently added phone number, username, date of birth, gender, types of devices used to access Facebook, language preference, relationship status, religion, hometown, current city, work, education, website, 10 most recent locations he checked into or had been tagged in, 15 most recent searches he entered into the Facebook search bar, and People or Pages he follows on Facebook.

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

169.    As a result of the 2018 Data Breach, Plaintiff Adkins had difficulty logging back into his Facebook account, and received extensive "phishing" email and text messages.

170.    Plaintiff Adkins spent considerable time attempting to manage these problems with his Facebook account and to restore his privacy.

### 5.    *Denise Brown-Wells*

171.    Plaintiff Denise Brown-Wells is a resident of the state of Florida.

172.    Plaintiff Brown-Wells has been a Facebook User since 2011.

173.    Plaintiff Brown-Wells provided Defendant with PII including her name, email address, telephone number, date of birthday, locations, work and education history, and photographs.

174.    Plaintiff Brown-Wells actively maintained locked down privacy settings on her Facebook Account and made efforts to keep her Facebook account private.

175.    Plaintiff Brown-Wells became aware of the Data Breach when she was forcibly logged out of her Facebook account and concurrently learned about the Data Breach through public news sources. Plaintiff Brown-Wells was required to change her password to log back into her account.

176.    As a result of the 2018 Data Breach, Plaintiff Brown-Wells received multiple friend requests from unknown persons and also spent considerable time trying to regain access to her Facebook account after she was forcibly logged out of her account. Plaintiff Brown-Wells spent considerable time attempting to manage these problems with her Facebook account and finally was forced to de-activate it, losing contact with several friends and relatives.

177.    Because she de-activated her account, Plaintiff Brown-Wells was unable to visit the "Security Incident" Facebook page, and has not received any subsequent notifications from Facebook regarding the Data Breach.

### CLASS ALLEGATIONS

178.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained

35

1  in paragraphs 1 through 177.

2       179.   Plaintiffs bring this nationwide class action pursuant to Rule 23(b)(2), 23(b)(3), and

3  23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all members of the

4  following class (the "Nationwide Class"):

5              **All Facebook users  whose PII was compromised in the data breach**
              **announced by Facebook on September 28, 2018.**

6

7       180.   Excluded from the Class are the following individuals and/or entities: Defendant and

8  its parents, subsidiaries, affiliates, officers and directors, current or former employees, and any entity

9  in which Defendant has a controlling interest; all individuals who make a timely election to be

10  excluded from this proceeding using the correct protocol for opting out; any and all federal, state or

11  local governments, including but not limited to their departments, agencies, divisions, bureaus,

12  boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of

13  this litigation, as well as their immediate family members.

14

15      181.   Plaintiffs reserve the right to modify or amend the definition of the proposed Class

16  before the Court determines whether certification is appropriate.

17      182.   **Numerosity**: The Class is so numerous that joinder of all members is impracticable.

18  Facebook has identified millions of Facebook users whose PII was accessed in the Data Breach, and

19  the Class is apparently identifiable within Facebook's records.

20

21      183.   **Commonality**: Questions of law and fact common to the Class exist and predominate

22  over any questions affecting only individual class members. These include:

23           a.  Whether Facebook and Plaintiffs and Class members had a contract for Facebook to

24               protect Plaintiffs' and Class members' PII from unauthorized disclosure to third parties;

25           b.  Whether Facebook breached its contract to protect its users' PII;

26           c.  Whether and when Facebook learned of the Data Breach and whether its response was

27

28
                                              36

adequate;

d.   Whether Facebook owed a duty to the Class to exercise due care in collecting, storing, safeguarding and/or obtaining their PII;

e.   Whether Facebook breached that duty;

f.   Whether Facebook's violation of the FTC Act constitutes negligence per se;

g.   Whether Facebook acted unfairly, unlawfully, deceptively, or fraudulently with respect to the Data Breach and representations about its data protection;

h.   Whether Facebook implemented and maintained reasonable security procedures and practices appropriate to the nature of storing Plaintiffs' and Class members' PII;

i.   Whether Facebook acted negligently in connection with the monitoring and/or protecting of Plaintiffs' and Class members' PII;

j.   Whether Facebook misrepresented the safety and security of its computer systems and networks, particularly the security of PII obtained, maintained, and stored on Facebook's networks;

k.   Whether Facebook's misrepresentations concerning the safety and security of its computer systems and networks were material with regard to storing, maintaining, and safeguarding Plaintiffs' and Class members' PII;

l.   Whether Facebook concealed from Plaintiffs and Class members crucial information about its inadequate data security measures;

m.  Whether Facebook knew or should have known that it did not employ reasonable measures to keep Plaintiffs' and Class members' PII secure and prevent loss or misuse of that PII;

n.   Whether Facebook adequately addressed and fixed the "View As" vulnerabilities which permitted the Data Breach to occur;

o.   Whether Facebook caused Plaintiffs and Class members damages; and

p.   Whether Plaintiffs and the other Class members are entitled to actual, statutory, or other forms of damages, and other monetary relief.

184.   **Typicality**: Plaintiffs' claims are typical of those of other Class members because all had their PII compromised accessed as a result of the Data Breach, due to Facebook's misfeasance.

185.   **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs' Counsel are competent and experienced in litigating privacy-related class actions.

186.   **Superiority and Manageability**: Under 23(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Individual damages for any individual Class member are likely to be insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendant's misconduct would go unpunished. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action. The Terms of Service for Facebook accounts requires all "Disputes" be governed by "the laws of California" that further facilitates a nationwide class action.[79]

187.   Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

---

[79] *Terms of Service*, Facebook, Inc., https://www.facebook.com/terms.php (last accessed Feb. 7, 2019).

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

188.   Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.   Whether Defendant owed a legal duty to Plaintiffs and the Class members to exercise due care in collecting, storing, using, and safeguarding their PII;

b.   Whether Defendant breached a legal duty to Plaintiffs and the Class members to exercise due care in collecting, storing, using, and safeguarding their PII;

c.   Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d.   Whether an implied contract existed between Defendant and the Class members and the terms of that implied contract;

e.   Whether Defendant breached the implied contract;

f.   Whether Defendant adequately, and accurately informed Class members that their PII had been compromised;

g.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.   Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Class members; and,

i.   Whether Class members are entitled to actual damages, statutory damages, injunctive relief, and/or punitive damages as a result of Defendant's wrongful conduct.

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT

189.   Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 188.

190.   Plaintiffs and Class members had agreements with Facebook through one or more of Facebook's policies and practices interfaces when they created an account with Facebook.

191.   Plaintiffs and Class members met all or substantially all of their contractual obligations, including providing certain PII required to create an account.

192.   There is not one integrated contract that spells out Facebook's obligations to the Class, but those obligations can be determined by reference to Facebook's course of dealing with the Class, industry practice, and from various webpages created by Facebook, including Facebook's "Terms of Service" section (https://www.facebook.com/terms.php); "How You're Protected" section (https://www.facebook.com/about/basics/stay-safe-and-secure/how-youre-protected); Facebook's Privacy Principles (https://www.facebook.com/about/basics/privacy-principles), and Facebook's Data Use Policy (https://www.facebook.com/full_data_use_policy).

193.   One of Facebook's obligations is to provide Class members with a secure platform that gives users control over who can view their activities.

194.   Another of Facebook's obligations is to protect users and their data from unwanted intrusions by maintaining adequate safety and security measures.

195.   Through these policies and principles, as discussed above, Facebook has promised among other things that it would use "top-rate security measures"[80] in place to protect user data and

---

[80] *Privacy Basics*, Facebook, Inc., https://www.facebook.com/about/basics/stay-safe-and-secure/how-youre-protected (last accessed Feb. 7, 2019).

promotes its products as designed with help from data protection and security experts.

196.   Under California law, Facebook was required to perform its contractual obligations competently and with reasonable care. Facebook breached that duty by taking inadequate security measures to protect user data, even after being on notice that unauthorized individuals were seeking to gain access to user data.

197.   Had Facebook used reasonable care, it would have identified the threats and prevented the Data Breach.

198.   Facebook enjoyed the financial benefits of an advertising platform provided by its social network. Users enjoyed the benefit of the network with limitations placed on how their PII can be shared.

199.   Plaintiffs' and Class members' PII on Facebook is of considerable value. This is demonstrated by the billions paid by advertisers to Facebook to access information Facebook collects.

200.   Facebook failed to adhere to its policies and keep its promises to Plaintiff and Class members, when it failed to maintain adequate safeguards to protect user's PII, breaching its agreement to users.

201.   As a result of Facebook's failure to provide its privacy and security services competently and using reasonable care, Plaintiffs and Class members have suffered injuries, including, (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach,

including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of customers and former customers in their continued possession; (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class members; (ix) the diminished value of Plaintiffs' and Class members' PII, and (x) expectation damages.

## COUNT II
## BREACH OF IMPLIED CONTRACT

202.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 188.

203.    Plaintiffs and Class members had agreements with Facebook through one or more of Facebook's policies and practices interfaces when they created an account with Facebook.

204.    To the extent the court finds these policies and practices do not create an express contract to provide data security protection, they created an implied contract between the Defendant and the users.

205.    Plaintiffs and Class members met all or substantially all of their contractual obligations, including providing certain PII required to create an account.

206.    There is not one integrated contract that spells out Facebook's obligations to the Class, but those obligations can be determined by reference to Facebook's course of dealing with the Class, industry practice, and from various webpages created by Facebook, including Facebook's "Terms of Service" section (https://www.facebook.com/terms.php); "How You're Protected"

section (https://www.facebook.com/about/basics/stay-safe-and-secure/how-youre-protected);

Facebook's Privacy Principles (https://www.facebook.com/about/basics/privacy-principles), and

Facebook's Data Use Policy (https://www.facebook.com/full_data_use_policy).

207.    One of Facebook's obligations is to provide Class members with a secure platform

that gives users control over who can view their activities.

208.    Another of Facebook's obligations is to protect users and their data from unwanted

intrusions by maintaining adequate safety and security measures.

209.    Under California law, Facebook was required to perform its contractual obligations

competently and with reasonable care. Facebook breached that duty by taking inadequate security

measures to protect user data, even after being on notice that unauthorized individuals were seeking

to gain access to user data.

210.    Had Facebook used reasonable care, it would have identified the threats and

prevented the Data Breach.

211.    As a result of Facebook's failure to provide its privacy and security services

competently and using reasonable care, Plaintiffs and Class members have suffered injuries,

including, (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the

compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the

prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their

PII; (v) lost opportunity costs associated with effort expended and the loss of productivity

addressing and attempting to mitigate the actual and future consequences of the Data Breach,

including but not limited to efforts spent researching how to prevent, detect, contest, and recover

from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii)

the continued risk to their PII, which remains in Defendant's possession and is subject to further

unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures

43

to protect the PII of customers and former customers in their continued possession; (viii) future

costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair

the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of

Plaintiffs and Class members; (ix) the diminished value of Plaintiffs' and Class members' PII, and

(x) expectation damages.

**COUNT III**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

212.    Plaintiffs re-allege and incorporate by reference herein all of the allegations

contained in paragraphs 1 through 188.

213.    Under California law, every contract has an implied covenant of good faith and fair

dealing that neither party will do anything which will impair the right of the other to receive the

benefits of the agreement.

214.    Under the express and implied terms of the agreements between the Plaintiffs and

Class members and the Defendant, Plaintiffs and Class members were to receive a benefit through

the use of Defendant's services, while the Defendant received the benefit of limited access to users'

PII for advertising and product enhancement purposes.

215.    Plaintiffs and Class members did all they were required to do under the terms of the

agreements.

216.    Defendant acted in bad faith by its conscious disregard and deliberate indifference of

the risk to Class members' PII when it failed to provide adequate safeguards to protect that data.

217.    By exposing users to the increased risk that their PII could be exploited by third

parties, Defendant breached the implied covenant of good faith and fair dealing with respect to the

express and implied terms of the agreements between the parties.

218.    Plaintiffs and Class members were harmed by the Defendant's breach of its duty of

44

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

good faith and fair dealing. Plaintiffs and Class members have seen diminution of the value of their PII, have been exposed to a higher risk of identity theft, and failed to receive the benefit of their bargain. They are entitled to damages in an amount to be proven at trial.

<u>**COUNT IV**</u>
**QUASI-CONTRACT CLAIM FOR NON-RESTITUTIONARY DAMAGES**

219.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 188.

220.    As an alternative to Counts I - III, and in the events the parties' agreements are found not to cover Facebook's securing of users' data, Plaintiffs seek damages in quasi-contract.

221.    Facebook's representations made its data privacy and security appear more robust and effective than it really was—leading Plaintiffs and the Class members to lose the value of their PII.

222.    Facebook knew about, accepted, and benefitted from Plaintiffs' and Class members' use of its platform.

223.    Under the circumstances, it would be inequitable for Facebook to benefit from its failure to secure users' data.

224.    Through its action, Defendant has been unjustly conferred a benefit through mistake, fraud, coercion, or request, and it would be unjust to allow the Defendant to keep the benefit it unjustly obtained.

225.    To avoid injustice, Plaintiffs and the Class members accordingly seek disgorgement in profits in an amount to be proven at trial.

<u>**COUNT V**</u>
**NEGLIGENCE**

226.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 188.

45

227.     Facebook owed a duty to Plaintiffs and Class members to exercise reasonable care in obtaining, using, and protecting their PII from unauthorized third parties.

228.     The legal duties owed by Defendant to Plaintiffs and Class members include, but are not limited to the following:

a.     To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII of Plaintiffs and Class members in its possession;

b.     To protect PII of Plaintiffs and Class members in its possession using reasonable and adequate security procedures that are compliant with industry-standard practices; and

c.     To implement processes to quickly detect a data breach and to timely act on warnings about data breaches, including promptly notifying Plaintiffs and Class members of the Data Breach.

229.     In addition, Cal. Civ. Code §1798.81.5 requires Facebook to take reasonable steps and employ reasonable methods of safeguarding the PII of Plaintiffs and the Class.

230.     Facebook's duty to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interested and enforced by the FTC, the unfair practices of failing to use reasonable measures to protect PII by companies such as Facebook. Various FTC publications and data security breach orders further form the basis of Facebook's duty.[81]

231.     In addition, given the nature of the information, Facebook had a special relationship with Plaintiffs and the Class members. Plaintiffs and the Class members signed up for Facebook's

---

[81] See, e.g., *Data Protection: Actions taken by Equifax and Federal Agencies in Response to the 2017 Breach*, UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE (Aug. 30, 2019), *available at*: https://www.gao.gov/products/GAO-18-559 (regarding the Equifax data breach).

services and agreed to provide their PII with the understanding that Facebook would undertake to safeguard the PII and would promptly inform Plaintiffs and the Class of any privacy intrusions that might compromise the PII which it represented it would maintain privately and safely. There representations by Facebook induced Plaintiffs and Class members to disclose PII in their profiles.

232.   Facebook breached its duties to Plaintiffs and Class members. Facebook knew or should have known the risks of collecting and storing PII and the importance of maintaining secure systems.

233.   Facebook knew or should have known that its security practices did not adequately safeguard Plaintiffs' and the other Class members' PII, including, but not limited to, the failure to include expirations on access tokens.

234.   Through Facebook's acts and omissions described in this Complaint, including Facebook's failure to provide adequate security and its failure to protect the PII of Plaintiffs and the Class from being foreseeably captured, accessed, exfiltrated, stolen, and misused, Facebook unlawfully breached its duty to use reasonable care to adequately protect and secure Plaintiffs' and Class members' PII during the period it was within Facebook's possession and control.

235.   Facebook breached the duties it owes to Plaintiffs and Class members in several ways, including:

a.   Failing to implement adequate security systems, protocols, and practices sufficient to protect Facebook users' PII and thereby creating a foreseeable risk of harm;

b.   Failing to comply with the minimum industry data security standards during the period of the data breach; and

c.   Failing to timely and accurately disclose to Facebook users that their PII had been improperly acquired or accessed.

236.     As a result of Defendant's negligence, Plaintiffs and Class members suffered injuries, including (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of customers and former customers in their continued possession; (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class members; and (ix) the diminished value of Plaintiffs' and Class members' PII.

237.     These injuries were reasonably foreseeable given the history of security breaches at Facebook, detailed above and the purported high number of attempted data breaches it and other similar social media providers face daily. Facebook even claims that the hackers are a digital marketing company "whose activities were previously known to Facebook's security team."[82]

238.     The injury and harm that Plaintiffs and the other Class members suffered was the direct and proximate result of Facebook's negligent conduct.

## COUNT VI
## NEGLIGENCE PER SE

---

[82] Robert McMillan & Deepa Seetharaman, *supra* n.28.

239.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 188.

240.    Plaintiffs and Class members are consumers under the FTC Act.

241.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair … practices in or affecting commerce" including, as interpreted and enforced by the Federal Trade Commission ("FTC"), the unfair act or practice by companies such as Facebook of failing to use reasonable measures to protect PII. Various FTC publications and orders also form the bases of Facebook's duty.

242.    Plaintiffs and Class members are consumers under the FTC Act.

243.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, the previous consent decree by the FTC regarding user privacy, and the Cambridge Analytica theft of user data for which Facebook had just recently apologized.

244.    Facebook's violation of Section 5 of the FTC Act constitutes negligence per se.

245.    Plaintiffs and Class members are within the class of persons Section 5 of the FTC Act was intended to protect as they are engaged in trade and commerce and bear primary responsibility for reimbursing consumers for fraud losses. The FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class members.

246.    Defendant is also liable to Plaintiffs and the other Class members for negligence *per se* for violating Cal. Civ. Code § 1709, and Cal. Civ. Code § 1798.81.5.

247.    As a direct and proximate result of Facebook's negligence *per se*, the Plaintiffs and Class members have suffered and continue to suffer injury including (i) actual identity theft; (ii) the

loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of customers and former customers in their continued possession; (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class members; and (ix) the diminished value of Plaintiffs' and Class members' PII.

### COUNT VII
### VIOLATION OF THE UNFAIR COMPETITION LAW (UCL),
### Cal. Bus. & Prof. Code § 17200, *et seq*.

248.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 188.

249.    Facebook is a "person" as defined by Cal. Bus. & Prof Code § 17200.

250.    California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 prohibits "any unlawful, unfair or fraudulent business act or practice."

251.    Facebook monitors, collects, and records users' habits and other information in order to sell it to third parties for profit, and does so without adequately protecting the information collected, in violation of all three prongs of the UCL.

252.    A business act is "unfair" where it is immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious, contrary to legislatively declared public policy and the harm it caused to consumers outweighed its utility. Facebook's "unfair" acts and practices include:

a.      Failing to implement and maintain reasonably security measures to protect Plaintiffs' PII from unauthorized disclosure, release, data breaches, and theft, and was a direct and proximate cause of the Facebook data breach. Facebook failed to identify foreseeable security risks, remediate identified security following previous data security incidents;

b.      Facebook's failure to implement and maintain reasonable security measures also was contrary to legislatively-declared public policy that seeks to protect consumers' data and ensure that entities that are trusted with it use appropriate security measures. These policies are reflected in laws, including the FTC Act (15 U.S.C. Sec. 45);

c.      Facebook's failure to implement and maintain reasonable security measures also lead to substantial consumer injuries, as described above, that are not outweighed by any countervailing benefits to consumers or competition. Moreover, because consumers could not know of Facebook's inadequate security, consumers could not have reasonably avoided the harms Facebook caused.

253.    Facebook's conduct was also unlawful under the UCL. A business act or practice is "unlawful" when it is proscribed by some other statute, regulation or constitutional provision.

a.      Facebook's terms of service required it to undertake safeguards to protect Plaintiffs' and Class member's data from being disclosed to unauthorized individuals; and

b.      Facebook engaged in business acts or practices that were proscribed by law, including the 2011 FTC Consent Decree; Cal. Civ. Code §§ 1798.80, *et seq*. (the California Customer Records Act); and the FTC Act, 15 U.S.C. § 45.

51

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

254.    Facebook's conduct was also fraudulent under the UCL. Under that law, a practice is fraudulent where material information is withheld or misrepresented by a seller. Here, Facebook engaged in fraudulent practices including:

a.    Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs' and class members' PII, by implementing and maintaining reasonable security measures;

b.    Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and class members' PII

c.    Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and class members' PII; and

d.    Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and class members' PII;

255.    Facebook's representations and omissions were material because they were likely deceive reasonable consumers about the adequacy of Facebook's data security and ability to protect the confidentiality of consumer's PII.

256.    As a direct and proximate result of Facebook's fraudulent, unlawful, and unfair business acts and practices, Plaintiffs and the Class suffered injury including: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with

placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of customers and former customers in their continued possession; (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class members; and (ix) the diminished value of Plaintiffs' and Class members' PII.in fact and lost money or property, including their loss of the benefit of their bargain (secured data for a social networking experience), and (x) the failure to obtain the benefit of the bargain in exchange for their data.

257.    Because of Facebook's fraudulent, unlawful, and unfair business acts and practices, Plaintiffs and Class members are entitled to relief, including attorneys' fees and costs, restitution, declaratory relief, and a permanent injunction enjoining Facebook from its fraudulent, unlawful, and unfair practices. Plaintiffs also seeks reasonable attorneys' fees and costs under applicable law, including Federal Rule of Civil Procedure 23 and California Code of Civil Procedure § 1021.5.

### COUNT VIII
### CALIFORNIA CONSUMER LEGAL REMEDIES ACT,
### Cal. Civ. Code §§ 1750, *et seq*.

258.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 188.

259.    The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq, ("CLRA") is a comprehensive statutory scheme that is to be liberally construed to protect consumers against unfair and deceptive business practices in connection with the conduct of businesses providing goods, property, or services to consumers primarily for personal, family, or household use.

260.    Facebook is a "person" as defined by Civil Code §§ 1761(c) and 1770 and has provided "services" as defined by Civil Code §§ 1761(b) and 1770. Facebook provides online social media and

social networking on its social media platform and through its social media accounts. Facebook is one of the oldest and popular social media services. Plaintiffs and Class members have signed up for accounts on a web-based platform, maintained by Facebook, where they can engage in social media and networking activities ranging from connecting with other users and their accounts, privately communicating with them, accessing other users' postings, messages and internet links, joining forums, and engaging in personalized content and programming. Facebook continually upkeeps and updates their online system for consumers' social media and networking use and sets forth formal Terms of Use for use of its services.

261.    Plaintiffs and Class members are "consumers" as defined by Civil Code §§ 1761(d) and 1770. Plaintiffs and Class members provided Facebook with valuable information, including highly personal and intimate details of their lives, personalities, identities, and social and media interests and activity, and/or highly sensitive financial information, which Defendant would then harvest and monetize to its great financial advantage, in exchange for use of Facebook's social media and networking platform.

262.    Plaintiffs and Class members have engaged in a "transaction" as defined by Civil Code §§ 1761(e) and 1770. Facebook's Terms of Use, Data Policy, and Privacy Choices and Policy provided to Plaintiffs and Class members are agreements between consumers and Facebook and constitute "transactions" within the meaning of Civil Code §1761(e).

263.    Facebook's acts and practices were intended to and did result in the sales of services to Plaintiffs and class members in violation of Civil Code § 1770, including: a) representing its services have characteristics it does not have; and b) representing that services are of a particular standard, quality, or grade when they were not. Facebook misrepresented that its services were safe from breaches and Facebook would adequately protect the PII of its users from hackers. Plaintiffs and

Class members created Facebook accounts and used Defendant's social media site bases inter alia on these representations.

264.    Facebook's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Facebook's data, security, and ability to protect the confidentiality of consumer's PII.

265.    Facebook, operating in California, has violated the CLRA by engaging in unlawful, unfair and deceptive practices as defined in Civil Code § 1770 with respect to the social media and social networking services provided to Plaintiff and the Class, including, but not limited to, its failure to disclose that it was providing a social media platform which contained security vulnerabilities and exposed Class members' PII to risks of hackers and identity theft. By failing to disclose its network's security risks, and even affirmatively representing that it maintained a secure and safe social media platform, Facebook misrepresented the standard, quality and grade of its consumer services.

266.    Facebook had exclusive knowledge about the inadequacy of its security and contemporaneous knowledge about its dissemination of Plaintiffs' and Class members' social media and private information, but actively concealed those facts from customers. Had Facebook disclosed the breaches, the significant media and expert attention would have alerted Plaintiffs and Class members and they would not have provided their PII or agreed to use Facebook's service on those terms. Facebook was thus obligated to disclose these material facts. If Facebook had disclosed their security inadequacies and dispersing of consumers' private information, Plaintiffs would have become aware of the security risks and would not have willingly provided Facebook with their PII or agreed to use Facebook's service on those terms.

267.    Plaintiffs have standing to pursue this claim as they have suffered injury in fact and have lost monetary value as a result of Facebook's actions as set forth herein.

268.     As a direct and proximate result of Facebook's violations of Cal. Civ. Code § 1770, Plaintiffs and Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and non-monetary damages, failure to receive the benefit of their bargain, increased risk of fraud and identity theft, and diminishment of the value of their PII.

269.     Pursuant to Cal. Civ. Code § 1780(a)(2) and (a)(5), Plaintiffs seeks an order of this court enjoining Defendant from continuing to engage its unlawful, unfair, or deceptive business practices and any other unlawful conduct. Plaintiffs and Class members seek all non-monetary relief allowed by law, including an order enjoining the acts and practices described above, attorneys' fees, and costs, under the CLRA.[83]

270.     Plaintiffs and Class members will be irreparably harmed and/or denied an effective remedy if such an order is not granted.

271.     The unfair and deceptive practices of Defendant as described in the Complaint present a serious threat to Plaintiffs and Class members.

**COUNT IX**
**BREACH OF CONFIDENCE**

272.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 188.

273.     At all times during Plaintiffs' and Class members' interactions with Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiffs' and Class members' PII that Plaintiffs and Class members provided to Defendant.

---

[83] Plaintiff Schmidt provided notice of his and the class' claims to Facebook via registered letter on January 28, 2019, in compliance with Cal. Civ. Code § 1782(a). Plaintiffs will amend to seek monetary damages if Facebook does not provide the requested financial redress to the class.

274.     As alleged herein and above, Defendant's relationship with Plaintiffs and Class members was governed by terms and expectations that Plaintiffs' and Class members' PII would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

275.     Plaintiffs and Class members provided their respective PII to Defendant with the explicit and implicit understandings that Defendant would protect and not permit the PII to be disseminated to any unauthorized parties.

276.     Plaintiffs and Class members also provided their respective PII to Defendant with the explicit and implicit understandings that Defendant would take precautions to protect Plaintiffs' and Class members' PII from unauthorized disclosure, such as following basic principles of information security practices.

277.     Defendant voluntarily received in confidence Plaintiffs' and Class members' PII with the understanding that their PII would not be disclosed or disseminated to the public or any unauthorized third parties.

278.     Due to Defendant's failure to prevent, detect, and avoid the Data Breach by, *inter alia*, following best information security practices to secure Plaintiffs' and Class members' PII, Plaintiffs' and Class members' PII was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and Class members' confidence, and without their express permission.

279.     As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiffs and Class members have suffered damages.

280.     But for Defendant's disclosure of Plaintiffs' and Class members' PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendant's Data Breach was the direct and legal cause of the theft of Plaintiffs' and Class members' PII, as well as the resulting damages.

281.    The injury and harm Plaintiffs and Class members suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiffs' and Class members' PII. Defendant knew its technologies for accepting and securing Plaintiffs' and Class members' PII had numerous security vulnerabilities because Defendant failed to follow basic information security practices, including but not limited to, including expirations on access tokens, and discovering the three vulnerabilities that were exploited by hackers before its "View As" feature became available.

282.    As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and Class members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of customers and former customers in their continued possession; (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class members; and (ix) the diminished value of Plaintiffs' and Class members' PII.

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

**COUNT X**
**DECLARATORY JUDGMENT**

283.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 188.

284.     Plaintiffs and Class members entered into either an actual or implied contract that required Defendant to provide adequate security for the PII it collected from Plaintiffs and Class members.

285.     Defendant owes duties of care to Plaintiffs and Class members which would require it to adequately secure PII.

286.     Defendant still possesses PII regarding Plaintiffs and Class members.

287.     Although Facebook claims it has identified who was harmed by the breach and the extent and corrected the vulnerabilities in its systems which permitted the intrusions to prevent further attacks, there is no detail on what, if any, fixes have occurred.

288.     Plaintiffs and Class members are at risk of harm due to the exposure of their PII and Defendant's failure to address the security failings that lead to such exposure.

289.     There is no reason to believe that Defendant's security measures are any more adequate than they were before the breach to meet Defendant's contractual obligations and legal duties, and there is no reason to think Defendant has no other security vulnerabilities that have not yet been knowingly exploited. Defendant faced security breaches, conducted an "apology tour" before Congress and many media outlets, and then this breach occurred, followed by another announced in December 2018.

290.     Plaintiffs, therefore, seek a declaration that  (1) Facebook' existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide adequate security, and (2) to comply with its explicit or implicit contractual obligations and duties of

care, Facebook must implement and maintain reasonable security measures, including, but not limited to:

    a.    Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Facebook' systems on a periodic basis, and ordering Facebook to promptly correct any problems or issues detected by such third-party security auditors;

    b.    Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

    c.    Ordering that Facebook audit, test, and train its security personnel regarding any new or modified procedures;

    d.    Ordering that Facebook user applications be segmented by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

    e.    Ordering that Facebook conduct regular database scanning and securing checks;

    f.    Ordering that Facebook routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

    g.    Ordering Facebook to meaningfully educate its users about the threats they face as a result of the loss of their financial and Private Information to third parties, as well as the steps Facebook users must take to protect themselves.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs, on behalf of themselves and all Class members, requests judgment against the Defendant and that the Court grant the following:

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

A.      An order certifying a class or classes and appointing Plaintiffs and their Counsel to represent the Class;

B.      An order enjoining Facebook from engaging in the wrongful conduct alleged herein concerning disclosure and inadequate protection of Plaintiffs' and Class members' PII;

C.      An award of compensatory, statutory, and punitive damages, in an amount to be determined;

D.      An award of reasonable attorneys' fees, costs, and litigation expenses, as allowable by law;

E.      Disgorgement of Facebook's profits to Plaintiffs and Class members; and

F.      Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial for all issues so triable of right.

DATED this 7th day of February, 2019.

Respectfully submitted,

s/ *Andrew N. Friedman*

Andrew N. Friedman (*Pro Hac Vice*)
AFriedman@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW
East Tower, 5th Floor
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:   (202) 408-4699

John A. Yanchunis (*Pro Hac Vice*)
JYanchunis@ForThePeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
T: 813-223-5505
F: 813-223-5402 (fax)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ariana J. Tadler (*Pro Hac Vice*)
*ATadler@Milberg.com*
**MILBERG TADLER PHILLIPS GROSSMAN
LLP**
One Penn Plaza
New York, New York
T: 212-594-5300
F: 212-868-1229

***Attorneys for Plaintiffs***

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

**CAPSTONE LAW, APC**
Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Trisha K. Monesi (SBN 303512)
Trisha.Monesi@capstonelawyers.com
Capstone Law APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone: (310) 556-4811
Facsimile: (310) 943-0396

**CASEY GERRY SCHENK FRANCAVILLA BLATT & PENFIELD, LLP**
David S. Casey, Jr. (SBN 060768)
dcasey@cglaw.com
Gayle M. Blatt (SBN 122048)
gmb@cglaw.com
Jeremy Robinson (SBN 188325)
jrobinson@cglaw.com
110 Laurel Street
San Diego, California 92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232 fax

**CLAYEO C. ARNOLD, A PROFESSIONAL LAW CORPORATION**
Clayeo C. Arnold (SBN 65070)
carnold@justice4you.com
Joshua H. Watson (SBN 238058)
jwatson@justice4you.com
865 Howe Avenue
Sacramento, California 95825
Telephone: 916-777-7777
Facsimile: 916-924-1829

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Douglas J. McNamara
dmcnamara@cohenmilstein.com
Sally Handmaker Guido (SBN 281186)
shguido@cohenmilstein.com
1100 New York Ave. NW
East Tower, 5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

**FINKELSTEIN, BLANKENSHIP, FREI-PEARSON & GARBER LLP**
Jeremiah Frei-Pearson
Jfrei-pearson@fbfglaw.com
Andrew C. White
awhite@fbfglaw.com
445 Hamilton Ave., Suite 605
White Plains, New York 10601
Telephone: (914) 298-3281
Facsimile: (914) 908-6709

**FRANKLIN D. AZAR & ASSOCIATES**
Ivy Ngo (SBN 249860)
ngoi@fdazar.com
Kelly Hyman
hymank@fdazar.com
14426 East Evans Ave
Aurora, CO 80014
Telephone: 303-757-3300
Facsimile: 720-213-5131

**GLANCY PRONGAY & MURRAY LLP**
Marc Godino
mgodino@glancylaw.com
Brian Murray
bmurray@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: 310-201-9150
Facsimile: 310-432-1495

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JONES WARD PLC**
Jasper D. Ward
jasper@jonesward.com
1205 E Washington St, Suite 111
Louisville, Kentucky 40206
Telephone: 502-882-6000

**KANTROWITZ GOLDHAMER &
GRAIFMAN, P.C.**
Gary S. Graifman
ggraifman@kgglaw.com
Jay Brody
jbrody@kgglaw.com
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
Telephone: (845) 356-2570
Facsimile: (845) 356-4335

**KOHN, SWIFT & GRAF, P.C.**
Jonathan Shub (SBN 237708)
jshub@kohnswift.com
Kevin Laukaitis
klaukaitis@kohnswift.com
1600 Market Street, Suite 2500
Philadelphia, PA 19103-7225
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

**LAW OFFICE OF PAUL C. WHALEN,
P.C.**
Paul C. Whalen
paul@paulwhelan.com
768 Plandome Road
Manhasset, NY 11030
Telephone: (516) 426-6870
Facsimile: (212) 658-9685

**LAW OFFICES OF CHARLES
REICHMANN**
Charles Reichmann
Cpreichmann@yahoo.com
16 Yale Circle
Kensington, CA 94708
Telephone: (415) 373-8849

**LOCKRIDGE GRINDAL NAUEN PLLP**
Karen Hanson Riebel
khriebel@locklaw.com
Kate M. Baxter-Kauf
kmbaxter-kauf@locklaw.com
Arielle S. Wagner
aswagner@locklaw.com
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 596-4097
Facsimile: (612) 339-0981

**MIGLIACCIO & RATHOD LLP**
Nicholas A. Migliaccio
nmigliaccio@classlawdc.com
Jason S. Rathod
jrathos@classlawdc.com
412 H Street N.E., Ste. 302
Washington, DC 20002
Telephone: (202) 470-3520

**MILBERG TADLER PHILLIPS
GROSSMAN LLP**
David Azar
dazar@milberg.com
11766 Wilshire Blvd, Suite 500
Los Angeles, CA 90025
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
Henry J. Kelston
hkelston@milberg.com
Jennifer Czeisler
jczeisler@milberg.com
A.J. De Bartolomeo
ajdebartolomeo@milberg.com
Melissa Clarke
mclarke@milberg.com
One Pennsylvania Plaza, Suite 1920
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA

1

**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**

2

Ryan J. McGee
rmcgee@ForThePeople.com

3

Jean S. Martin
jeanmartin@ForThePeople.com

4

Kenya J. Reddy
kreddy@forthepeople.com

5

201 N. Franklin Street, 7th Floor

6

Tampa, Florida 33602
Telephone: (813) 223-5505

7

Facsimile: (813) 223-5402

8

**ROBINSON CALCAGNIE, INC.**

9

Daniel S. Robinson (SBN 244245)
drobinson@robinsonfirm.com

10

Wesley K. Polischuk (SBM 254121)
wpolischuk@robinsonfirm.com

11

Michael W. Olson (312857)

12

19 Corporate Plaza Drive
Newport Beach, California 92660

13

Telephone: (949) 720-1288
Facsimile: (949) 720-1292

14

**STULL, STULL & BRODY**

15

Patrice L. Bishop (SBN 182256)

16

pbishop@ssbla.com
Melissa R. Emert

17

memert@ssbny.com

18

9430 W. Olympic Blvd., Suite 400
Beverly Hills, CA 90212

19

Telephone: (310) 209-2468
Facsimile: (310) 209-2087

20

*Other Plaintiffs' Counsel*

21

22

23

24

25

26

27

28

65

CONSOLIDATED CLASS ACTION COMPLAINT
No. 18-05982 WHA