John A. Yanchunis (*Pro Hac Vice*)
JYanchunis@ForThePeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
T: 813-223-5505
F: 813-223-5402 (fax)

Ariana J. Tadler (*Pro Hac Vice*)
ATadler@Milberg.com
**MILBERG TADLER PHILLIPS GROSSMAN**
**LLP**
One Penn Plaza
New York, New York
T: 212-594-5300
F: 212-868-1229
*Attorneys for Plaintiffs*

Andrew N. Friedman (*Pro Hac Vice*)
AFriedman@CohenMilstein.com
**COHEN MILSTEIN SELLERS & TOLL,**
**PLLC**
1100 New York Ave, 5th Floor
Washington, DC 20005
T: 202-408-4600
F: 202-408-4699

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| JASPER SCHMIDT, an individual and California resident, WILLIAM BASS JR., an individual and California resident, JILL HERR, an individual and New York resident, STEPHEN ADKINS, an individual and Michigan resident, and DENISE BROWN-WELLS, an individual and Florida resident,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>Defendant. | No. C 18-05982 WHA<br>*Consolidated Cases*:<br>No. C 18-06022 WHA<br>No. C 18-06953 WHA<br>No. C 19-00117 WHA<br><br>**Plaintiffs' Response to Facebook's Supplemental Brief in Support of its Motion to Dismiss the Consolidated Class Action Complaint** |

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ............................................................................................... 1

II. ARGUMENT ................................................................................................... 3

    A.    Facebook's Claim that the Information Taken in the Breach Was Not Sensitive Because it Was Publicly Available is False ……………………………………….. 4

        i)    Facebook Overstates the Availability of Adkins PII …………………….. 4

        ii)    Bass suffered damages from the breach and, in any event, that is a merits determination not suited for resolution at the pleadings ……………………….. 4

        iii)    Facebook's claims about Bass's PII are simply false …………………… 5

        iv)    Plaintiffs' Experts Have Provided Damage Estimates Further Supporting Standing Based on Lost Time, Lost Value, or Facebook's Unjust Enrichment …………………………………………………………………….. 6

        v)    Facebook's aggregation of its users' PII has tremendous value ………. 7

    B.    Plaintiffs Adkins and Bass Have Suffered Several Forms of Compensable Harm from Facebook's Lax Data Security, Affording Them Standing ……………… 9

        i)    Plaintiffs have shown a substantial risk of future identity theft ………. 9

        ii)    Plaintiffs' lost time and effort involved in mitigating the potential effects of the breach provides standing ……………………………………… 11

        iii)    Plaintiffs do not need to have intended to sell their PII to state a claim for loss in value of that PII …………………………………………….. 12

        iv)    Facebook's failure to provide promised data security caused plaintiffs to lose the benefit of their bargain ………………………………… 14

V.    CONCLUSION ……………………………………………………………… 16

1

## TABLE OF AUTHORITIES

2  **Cases**                                                                          **Page(s)**

3

4  *Ainsworth v. Owenby,*
   326 F. Supp. 3d 1111 (D. Or. 2018) ..................................................................... 14
5

6  *Clark v. City of Seattle,*
   899 F.3d 802 (9th Cir. 2018) .................................................................... 10, 11

7

8  *Copelan v. Infinity Ins. Co.,*
   728 F. App'x 724 (9th Cir. 2018) .......................................................................... 14

9

10 *Dieffenbach v. Barnes & Noble, Inc.,*
   887 F.3d 826 (7th Cir. 2018) ............................................................................... 12

11 *Facebook Privacy Litig.,*
   572 F. App'x 494 (9th Cir. 2014) ..................................................................... 3, 12
12

13 *Galaria v. Nationwide Mut. Ins. Co.,*
   663 F. App'x 384 (6th Cir. 2016) ......................................................................... 10
14

15 *Garfield Beach CVS LLC v. Mollison Pharmacy,*
   No. 17-CV-00879-AJB-MDD, 2017 WL 3605452 (S.D. Cal. Aug. 22, 2017) ........................ 5
16

17 *Hameed-Bolden v. Forever 21 Retail, Inc.,*
   No. CV1803019SJOJPRX, 2018 WL 6802818 (C.D. Cal. Oct. 1, 2018) ..................... 13
18

19 *Hinojos v. Kohl's Corp.,*
   718 F.3d 1098 (9th Cir. 2013) .......................................................................... 7

20

21 *In re Adobe Sys., Inc. Privacy Litig.,*
   66 F. Supp. 3d 1197 (N.D. Cal. 2014) ........................................................... 3, 10

22 *In re Anthem, Inc. Data Breach Litig.,*
   162 F. Supp. 3d 953 (N.D. Cal. 2016) ..................................................... 13, 14
23

24 *In re Arby's Rest. Grp. Inc. Litig.,*
   No. 1:17-CV-0514-AT, 2018 WL 2128441 (N.D. Ga. Mar. 5, 2018) .......................... 12
25

26 *In re Equifax, Inc., Customer Data Sec. Breach Litig.,*
   362 F. Supp. 3d 1295 (N.D. Ga. 2019) ....................................................... 8, 10, 12
27

28 *In re Facebook Privacy Litig.,*

ii

192 F. Supp. 3d 1053 (N.D. Cal. 2016) ........................................................ 3, 14, 15

*In re SuperValu, Inc.,*
   No. 14-MD-2586 ADM/TNL, 2016 WL 81792 (D. Minn. Jan. 7, 2016)............................. 15

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.,*
   313 F. Supp. 3d 1113 (N.D. Cal. 2018) ........................................................ 3

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.,*
   No. 16-MD-02752-LHK, 2017 WL 3727318 (N.D. Cal. Aug. 30, 2017).................... 10, 12, 14

*In re Zappos.com, Inc.,*
   888 F.3d 1020 (9th Cir. 2018) .................................................... 1, 2, 9, 10

*Krottner v. Starbucks Corp.,*
   628 F.3d 1139 (9th Cir. 2010) ...................................................... 9

*Patel v. Facebook Inc.,*
   290 F. Supp. 3d 948 (N.D. Cal. 2018) .............................................. 5

*Remijas v. Neiman Marcus Grp., LLC,*
   794 F.3d 688 (7th Cir. 2015) ...................................................... 8

*Safe Air for Everyone v. Meyer,*
   373 F.3d 1035 (9th Cir. 2004) ..................................................... 5

*Skaff v. Meridien N. Am. Beverly Hills, LLC,*
   506 F.3d 832 (9th Cir. 2007) ..................................................... 11

*Spokeo, Inc. v. Robins,*
   136 S. Ct. 1540 (2016)........................................................... 10

1    **I.    INTRODUCTION**

2         Facebook's Supplemental Brief (Doc. No. 122) (hereinafter, "Supp. Brief") distorts the

3    evidence and parses language from distinguishable or irrelevant authorities to make it seem like

4    the theft of one's most personal details by determined cybercriminals is, at best, a trivial

5    annoyance for which there is no legal remedy. That is simply untrue. *See, e.g.*, *In re Zappos.com,*

6    *Inc.*, 888 F.3d 1020, 1030, n. 7 (9th Cir. 2018) ("The injury from the risk of identity theft is …

7    redressable by relief that could be obtained through this litigation.")

8         To arrive at its desired result, Facebook purposefully conflates distinct concepts, equating

9    Plaintiffs' giving trusted partners discrete snippets of data with Facebook's massive breach of

10   millions of users' personally identifiable information ("PII"). For example, Facebook contends

11   Plaintiff Adkins' phone number was "publicly available" because he posted it on the timeline of

12   a close friend—"[s]omebody I trust," (Deposition of Stephen Adkins ("Adkins Dep."), Ex. 1, at

13   331)—who has some Facebook connections Adkins does not know. Supp. Brief, 5. That is not

14   "publicly available" as it means only a very small group of Facebook users, numbering at best in

15   the hundreds, might see it. Likewise, Facebook crows that Adkins "allowed at least his hundreds

16   of Facebook friends to see his posts" as if that suggests he did not care about privacy. Supp.

17   Brief, 5. Quite the opposite, Adkins *limited* that information to people he has personally given

18   permission to view his posts. And he relied on Facebook's alleged privacy capabilities to do so[1].

19        Facebook tried to minimize the value of the data stolen in the breach by scouring the

20   internet—including ████████████████████████████████████████████

21   ████████████████████ Supp. Brief, 5, n. 3, 6—for instances where some of the named Plaintiffs[2]

---

22   [1]  Facebook's Data Policy represents that Facebook "[p]romotes safety, integrity, and security"
     by "us[ing] the information we have to verify accounts and activity, combat harmful conduct,

23   detect and prevent spam and other bad experiences, maintain the integrity of our Products, and

24   promote safety and security on and off of Facebook Products." Complaint, ¶ 45. Facebook's
     "Privacy Basics" and "Privacy Principles" state: "We design privacy into our products from the

25   outset," "We work around the clock to help protect people's accounts," and "We are
     accountable[.]" *Id.*, ¶ 44.

26   [2]  Three of the original named plaintiffs have either voluntarily withdrawn or have been

27   withdrawn as potential class representatives for a variety of reasons. Facebook trumpets this as
     showing they have conceded they cannot show injury, but that is, like most of Facebook's

28   claims, false. Indeed, one of the plaintiffs, Schmidt, was among the people Facebook has
     admitted had their information stolen in the breach.

1

1   information may have been partially disclosed, and then ambushing the current named Plaintiffs

2   at their depositions. This heavy-handed maneuver only demonstrates the harms caused by the

3   breach, i.e., armed with Facebook users' PII in a nicely aggregated format, one can create

4   dossiers on the victims using that PII as a springboard. And, to appreciate the worth of this kind

5   of data aggregation in general, this Court need look no further than Facebook itself, which makes

6   billions of dollars a year selling access to it. (Doc. No. 76) (hereinafter, "Complaint"), ¶¶ 9–11,

7   41, 71.

8          The kind of private data contained in a social media profile, e.g., date of birth, home

9   town, names of relatives, education and work history, and social activities, is often more valuable

10  to cybercriminals than bank account or credit card numbers because the latter can be easily and

11  quickly changed post-breach. Jan. 9, 2019 tutorial, Doc. No. 71, at 15:5–16:13; 16:15–17:23;

12  18:2–22; 18:23–19:18; 23:17–24:11; 25:16–26:13. Tellingly, when given the opportunity to

13  designate as confidential portions of the deposition of Mr. Bream, their employee who submitted

14  a declaration with Facebook's motion, Facebook chose only two items to redact from the public:

15  his date of birth and home address.[3] It is disingenuous of Facebook to argue the same

16  information about Plaintiffs warrants no protection, especially considering Mr. Bream's

17  information is equally available on much of the sites Facebook used to confront named Plaintiffs

18  at their respective depositions in this matter[4].

19         As to Plaintiffs' injuries, Facebook blithely dismisses the time and effort Adkins and

20  Bass have spent and will continue to spend dealing with the consequences of the breach as "de

21  minimis." Supp. Brief, 3. Hardly. Facebook may not care about its users' time, but anyone who

22  has had to monitor accounts, reset passwords, or navigate bogus phishing efforts knows these

23  efforts take time, energy, and attention. Facebook also brushes aside the damages relating to

24  increased risk of identity theft, loss in value of PII, and loss of benefit of the bargain by

25  overlooking the pertinent authority on each of those issues. The Ninth Circuit has squarely held

26  that actual injury can be shown by either an increased risk of identity theft, *In re Zappos.com,*

27

28  [3]  Email from Alexander Reicher, dated April 19, 2019, Ex. 3.
     [4]  Declaration of Jeremy Robinson ("Robinson Dec."), ¶ 5.

2

1   *Inc.*, 888 F.3d at 1027 (finding standing where plaintiffs alleged theft of the type of information

2   that can be used to commit identity theft, including by placing them at higher risk of "phishing"

3   and "pharming"), and has specifically admonished Facebook that a loss of value of PII

4   establishes standing, *In re In re Facebook Privacy Litig.*, 572 F. App'x 494 (9th Cir. 2014).

5   Contrary to what Facebook claims, relinquishing one's PII in exchange for access to Facebook

6   and Facebook's privacy promises and then having those promises materially breached by

7   Facebook creates standing for both loss of the benefit of the bargain, *In re Facebook Privacy*

8   *Litig.*, 192 F. Supp. 3d 1053, 1059 (N.D. Cal. 2016), and for declaratory relief as to Facebook's

9   obligations under its Terms of Service. *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197,

10  1220–1221 (N.D. Cal. 2014) (finding extent of defendant's liability limiting provision supported

11  declaratory relief); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113,

12  1139 (N.D. Cal. 2018).

13  **II.    ARGUMENT**

14  
15  **A.    Facebook's Claim that the Information Taken in the Breach Was Not
        Sensitive Because it Was Publicly Available is False**

16  In a marvel of mischaracterization, Facebook says its arguments have been confirmed by

17  "[p]laintiffs' deposition testimony and additional documents they have produced …" Supp.

18  Brief, 4. Not so. Instead, what those materials show is both Adkins and Bass made efforts to

19  keep their PII private, but, like anyone, occasionally chose to provide bits of their PII to sources

20  they trusted, such that someone determined enough to find it (and armed with enough

21  introductory information to ensure the bits of PII scraped up all belong to the same person)[5]

22  might chance upon it.

23  
24  
25  

26  _____
    [5] For example, "Stephen Adkins" is a common name and a basic Google search reveals many
27  people listed under that name. Robinson Dec., ¶ 4. Thus, someone trying to find out information
    about a particular Stephen Adkins would have to cull through a tremendous amount of
28  information and have enough data at the outset to be able to eliminate all the other people also
    named Stephen Adkins.

3

i)      **Facebook Overstates the Availability of Adkins PII**

In the case of Plaintiff Adkins, Facebook notes he ███████████████████ ██████████████████ Adkins Dep. 330-31, ███████████████████ ████████████████████████, Adkins Dep. 337-38, █████████ ███████████████████████ Adkins Dep. 353-55, and has made various posts about █████████████ Adkins Dep. 301-02. Adkins also has another social media profile (which he erroneously believed was private), Adkins Dep. 394, and had an account on a ██████ ███ (which he also thought was private), Adkins Dep. 345.

From this, Facebook somehow concludes that all of Adkins' biographical information "was publicly available" due to Adkins' own actions. Supp. Brief, 5. Not so. First, █████ █████████████████████████████████ and thus viewable *only by that person's Facebook friends*. That is not "publicly available." Second, while Adkins' ██████ was technically public, only someone knowing to look through posts on a ██████ ███ page to locate it would find it. Facebook found it because, like the hackers, Facebook has unrestricted access to Adkins' Facebook page and its contents. Facebook conflates the ability of its investigators to scour the internet for Adkin's information with packaging it for dedicated and sophisticated hackers.

ii)      **Bass suffered damages from the breach and, in any event, that is a merits determination not suited for resolution at the pleadings**

Facebook disregards the testimony of Bass himself who says that after the breach, he began receiving more calls from people pretending to be extended family members living in Mexico, an increase in "friend requests" from strangers, and more phishing emails. Deposition of ██████ Bass ("Bass Dep."), Ex. 2, at 57-61, 67-68, 128-130. Instead, Facebook again parades before the Court the declaration of Chris Bream, a Facebook employee who did not read the Complaint, and who recites information from summary documents and other Facebook employees of a truncated investigation that has not yet been provided to Plaintiffs in discovery. Deposition of Christopher Bream ("Bream Dep.") at 47:12-48:5; 55:19-25; at 79:23-80:25; 84:5-

4

1    10; 91:1-17; 92:1-9; 96:6-98:13; 133:7-135:13; 137:17-138:19; 139:20 to 140:23; 153:19-156[6].

2            As noted in Plaintiffs' Opposition, Plaintiffs have made specific allegations that

3    Facebook's notice was woefully inadequate, Comp., ¶¶ 138–139. Regardless, this issue should

4    not be resolved now. Whether Bass's data was exposed in this breach is an issue of ultimate fact

5    and not a basis for dismissal at this stage. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035,

6    1039 (9th Cir. 2004) ("a jurisdictional finding of genuinely disputed facts is inappropriate when

7    the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction

8    is dependent on the resolution of factual issues going to the merits of an action.") (internal

9    punctuation and citation omitted); s*ee also Garfield Beach CVS LLC v. Mollison Pharmacy*, No.

10   17-CV-00879-AJB-MDD, 2017 WL 3605452, at *3 (S.D. Cal. Aug. 22, 2017) (same). Indeed, a

11   court in this District rejected a nearly identical attempt by Facebook to defeat standing in a

12   biometric privacy case. *See*, *Patel v. Facebook Inc.*, 290 F. Supp. 3d 948, 956 (N.D. Cal. 2018)

13   (denying 12(b)(1) motion based on Facebook's submission of documents, deposition excerpts,

14   and other extrinsic evidence to show certain notice requirements were satisfied because "notice

15   and consent are inextricably intertwined with the merits of plaintiffs' claims").

16           Here, whether any plaintiff's PII was breached is both a question of standing and merits.

17   As such, Ninth Circuit precedent dictates these issues cannot be resolved at this juncture. *Safe*

18   *Air for Everyone*, 373 F.3d at 1039. And, in any event, Bream's credibility on these issues is

19   open to question. Facebook's entire investigation of the breach was done in-house, *Id.* at 55:19-

20   25; and the investigation did not span the time of the alleged vulnerability (after July of 2017),

21   but rather focused only on the weeks leading up to Facebook's public acknowledgement of the

22   breach. Bream Dep. at 96:6-98:13; 137:17-138:19.

23           **iii)    Facebook's claims about Bass's PII are simply false**

24           As it does with Plaintiff Adkins, Facebook spins or entirely disregards the facts of Bass's

25   testimony to make it seem like he gladly spread his PII all over the internet. Facebook argues,

26   "Mr. Bass testified that the information he shared on Facebook is publicly available on two other

27   ─────────────────

28   [6]  All the excerpts from Mr. Bream's deposition were attached to Plaintiffs' original Opposition
     to the Motion to Dismiss, ECF 108.

Facebook accounts he maintained." Supp. Brief, 8. That, however, is simply untrue. As shown in the referenced testimony and exhibits, Bass only had **one** public profile, not two, and that one was a work profile he believed he deleted because he left the job it was set up for. Bass Dep. 31-32, 37. The other profile to which Facebook refers ███████████████████████████████ ███████ and that Bass testified he does not remember. Bass Dep. 46-47. Bass's only active profile is his personal one, which is not publicly accessible. Bass Dep. 33.

Facebook also overstates Bass's presence on other social media sites. He does have █ ███████████ but the only information Facebook could cull from that was some abstract ████████ Bass's offering ███████████████████████████████████████ and him posting pictures of some of the ████████████ Bass Dep. 100-07. He also has been on ██████████████████████████████ As with Adkins, the fact that Bass has shared discrete pieces of information on certain platforms does not show he does not value the privacy of his PII, or that his PII was readily accessible to hackers by alternate means.

### iv)   Plaintiffs' Experts Have Provided Damage Estimates Further Supporting Standing Based on Lost Time, Lost Value, or Facebook's Unjust Enrichment

It is clear from its Supplemental Brief that Facebook no longer is simply considering the Consolidated Complaint in assessing the damages asserted by Plaintiffs, or the value of the stolen PII. Neither should this Court. Consistent with this Court's directive, Plaintiffs provided Facebook intricately detailed initial disclosures. *See, e.g.*, Plaintiffs' Amended Initial Disclosures, Ex. 4. This Court ordered Plaintiffs to include in their Rule 26(a) disclosures "the dollar amount of their damages. … No, you've got to tell me what the dollar amount is now. That's what the rule says." Jan. 9, 2019 hearing at 101, Doc. No. 71.

Plaintiffs abided. Plaintiffs' disclosures provide multiple bases for class-wide and individual damages resulting from the breach. There are individual damages related to the annoyance and convenience of dealing with the immediate aftermath of the breach, which have been calculated by experts to be $18.70 per hour. Ex. 4 at 19, 23. Specific time spent by Adkins

and Bass are included as Exhibits 5 and 6.

Plaintiffs' experts also estimated the loss of value of PII for the breach at $15 to $1200 per class member. Ex. 4 at 20-21. This is based on expert analysis of what was taken, its value on the Dark Web, and the value that Facebook implicitly gave to similar PII when it acquired Instagram and WhatsApp. Another model estimates the damages at $11.49 to $15.63 based on Facebook's savings by failing to provide adequate cyber security. *Id.* at 21-22.

Plaintiffs' experts also calculated the value of the PII based on the $12.6 billion decline in Facebook's market capitalization after the announcement of the breach. From this figure, damages are estimated at $25.30 to $422 per class member. *Id.* at 22-23.

Finally, the harm to Plaintiffs is evaluated as the value of increased risk of future identity theft and stress, nuisance, inconvenience and annoyance associated with the ongoing risks. That is premised on the market rate for third-party monitoring services and subscription insurance services and is estimated at between $1,900 to $2,900 per class member. *Id.* at 24-25.

These damage estimates arise at the embryonic stages of discovery before Facebook had to produce a single document. The merits of these models and their findings should be accepted as true at this stage and evaluated after rigorous fact and expert discovery. These disclosures support concrete and particular injuries under Article III that contradict Facebook's 12(b)(1) motion[7].

          **v)**      **Facebook's aggregation of its users' PII has tremendous value**

Even if Facebook can unearth the named Plaintiffs' birthday, employer, or current location somewhere on the internet, it does not follow that Facebook's aggregation of their PII has no value. First, the attack itself strongly suggests otherwise. As explained in the Complaint (and not disputed by Facebook), the breach involved a sophisticated exploitation of access tokens and Facebook's discrete technologies. Meaning, someone or some group went to a fair amount of trouble to carry out the data breaches and access users' PII; not the kind of effort one goes to for

---

[7] Contrary to Facebook's 12(b)(6) motion, these detailed damage estimates also show a "loss of value and failure to receive benefit of the bargain" and "also provide standing under the Unfair Competition Law." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 (9th Cir. 2013).

7

Plaintiffs' Reply to Facebook's Supplemental Brief in
Support of Motion To Dismiss The Consolidated Class
Action Complaint   Case No. C 18-05982 WHA (JSC)

1   information that is useless or readily available anywhere. See *Remijas v. Neiman Marcus Grp.,*

2   *LLC*, 794 F.3d 688, 693 (7th Cir. 2015) ("Why else would hackers break into a store's database

3   and steal consumers' private information? Presumably, the purpose of the hack is, sooner or

4   later, to make fraudulent charges or assume those consumers' identities.")

5        Second, it is not difficult to see how aggregated PII under one profile is far more useful

6   than scattered bits of data strewn about the internet. *See, e.g.*, Jan. 9, 2019 tutorial, Doc. No. 71,

7   at 15:5–16:13; 16:15–17:23; 18:2–22; 18:23–19:18; 23:17–24:11; 25:16–26:13 (Expert Mary

8   Frantz discussing the aggregate value of PII). Facebook itself, one of the largest and most

9   powerful internet-based business in the world, went to the trouble of scouring every corner of the

10  web for information on Adkins to challenge his standing, and the best it could present this Court

11  with was a ███████████████████████████████████ And,

12  unlike anyone else looking, Facebook already had Mr. Adkins' complete profile and knew

13  exactly what to look for. That information would be of little value to cybercriminals, assuming

14  they even knew to look for it. There is simply no comparison between that and complete access

15  to Adkins' full Facebook profile and all the PII in it.

16       Finally, as mentioned above, Facebook itself monetizes its users' aggregated PII to an

17  extraordinary degree. Complaint, ¶¶ 9–11, 41, 71. Advertisers are willing to pay Facebook (and

18  many other data aggregators) billions of dollars a year for access to this aggregated data,

19  undermining any claim that the information is worthless. *See, e.g.*, *In re Equifax, Inc., Customer*

20  *Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1309 (N.D. Ga. 2019) ("Equifax's business model

21  entails aggregating data relating to consumers from various sources, compiling that data into

22  credit reports, and selling those reports to lenders, financial companies, employers, and others.")

23  Plaintiffs' experts have evaluated the value of PII both from the standpoint of criminals on the

24  Dark Web and corporate behemoths like Facebook who gobble up other tech companies that

25  accumulate PII. Ex. 4 at 20-21. Those experts have estimated a value of $15 to $1200 per class

26  member. *Id.*

27

28

**B.      Plaintiffs Adkins and Bass Have Suffered Several Forms of Compensable Harm from Facebook's Lax Data Security, Affording Them Standing**

Plaintiffs Adkins and Bass have four separate categories of damage, any one of which confers Article III standing: (1) substantial risk of future harm; (2) lost time and effort addressing issues caused by the breach; (3) loss of value of personal information, and (4) failure to receive the benefit of their bargain with Facebook. Complaint, ¶¶ 14, 148, 155, 162, 170, 176. See also Ex. 4 at 19-25. Facebook struggles to downplay these damages and make them seem insignificant, but in the end cannot refute they show standing.

**i)      Plaintiffs have shown a substantial risk of future identity theft**

As alleged in the Complaint, the personal information compromised here was significant, and includes, for at least half of the class: "Name, Primary email address, most recently added phone number, username, date of birth, gender, types of devices used to access Facebook, language preference, relationship status, religion, hometown, current city, work, education, website, the 10 most recent locations he checked in to or tagged in, the 15 most recent searches he entered into the Facebook search bar, people or pages he follows on Facebook." Complaint, ¶¶ 145, 168.

Facebook's feeble attempt to minimize the risk of identity fraud caused by the theft of this information—the very information that Facebook used to create dossiers on the named Plaintiffs for their depositions—is largely a rehash of its deficient Motion to Dismiss argument. As before, Facebook suggests only data breaches involving social security numbers or sensitive financial information can convey Article III standing. Supp. Brief, 9-10, citing *In re Zappos.com, Inc.*, 888 F.3d 1020. As before, that argument is baseless.

Although the *Zappos* court found theft of credit card numbers may be enough to confer standing, nowhere did the court say it was a prerequisite. Indeed, both *Zappos* and *Krottner v. Starbucks Corp.*, 628 F.3d 1139 (9th Cir. 2010) involved exposure of much of the same information as here: names, telephone numbers, email addresses, and physical addresses. *In re Zappos.com, Inc.*, 888 F.3d at 1023; *Krottner*, 628 F.3d at 1140. Neither found that, absent the exposure of credit card information and Social Security Numbers, the plaintiffs would have

9

1    lacked standing. In fact, not even full credit card data was exposed in *Zappos,* yet "the

2    information taken in the data breach [even absent social security numbers] still gave hackers the

3    means to commit fraud or identity theft . . ." 888 F.3d at 1022, n. 2, 1027.

4          The fact remains that hackers would not target this kind of PII if it did not provide a way

5    to commit identity theft, a point numerous courts have recognized. *See, e.g.*, *Galaria v.*

6    *Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 388 (6th Cir. 2016) ("Where a data breach targets

7    personal information, a reasonable inference can be drawn that the hackers will use the victims'

8    data for the fraudulent purposes alleged in Plaintiffs' complaints."); *In re Equifax, Inc.,*

9    *Customer Data Security Breach Litigation*, 362 F. Supp. 3d 1295 ("the compromise of a huge

10   amount of personally identifying information by criminal hackers presents a much more

11   significant risk of identity fraud"); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-

12   MD-02752-LHK, 2017 WL 3727318, at *13 (N.D. Cal. Aug. 30, 2017) (finding risk of future

13   identity theft where hackers stole names, email addresses, telephone numbers, birth dates, hashed

14   passwords, and answers to security questions of Yahoo account holders); *In re Adobe Systems,*

15   *Inc. Privacy Litigation*, 66 F. Supp. 3d at 1214–15 (finding increased risk of data theft and cost

16   to mitigate after hackers stole PII constituted cognizable injury-in-fact).

17         Facebook's repeated references to *Clark v. City of Seattle*, 899 F.3d 802 (9th Cir. 2018)

18   and *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) are inapt and misleading. Neither case so

19   much as mentions identity theft. *Spokeo* does not even involve exposure of PII. Facebook falsely

20   implies the *Spokeo* court made a holding about disclosure of zip codes, Supp. Brief, 10, 11 ("The

21   compromise of this information creates no more of a risk of harm than the ZIP code in *Spokeo*

22   …"), but that is wrong. Justice Alito was illustrating a point about inaccurate data, musing "It is

23   difficult to imagine how the dissemination of an incorrect zip code, without more, could work

24   any concrete harm…" *Spokeo, Inc.*, 136 S. Ct. at 1550. The key word there is "incorrect"; the

25   issue in *Spokeo* was not that information was disclosed but rather the information was *wrong*. *Id*.

26         *Clark* is also inapposite. Like *Spokeo*, that case did not involve potential identity theft;

27   instead it was a dispute between gig economy drivers and the City of Seattle over a collective

28   bargaining ordinance. *Id.* at 807–08. The drivers argued, among other things, the ordinance was

10

Plaintiffs' Reply to Facebook's Supplemental Brief in
Support of Motion To Dismiss The Consolidated Class
Action Complaint   Case No. C 18-05982 WHA (JSC)

preempted by the National Labor Relations Act, but the Ninth Circuit found the preemption issue was not ripe because the drivers had not shown Article III standing. *Id.* at 813. Risk of future identity theft was not even in the universe of matters considered in that case. And, as the Court noted at the April 29th Hearing, the information supplied by the drivers was the same information publicly given to the City by for-hire drivers.

Facebook also repeats the argument that there can be no risk of identity theft because some bits of Plaintiffs' PII can be dug up from other websites, but as explained above, that point is meaningless.

Finally, Facebook veers off on a tangent about the tort of public exposure of private facts, which allows for tort damages for unauthorized disclosure of private facts that "would be highly offensive to a reasonable person." Supp. Brief, 11. But, that is not a factor in whether Plaintiffs now face an increased risk of identity theft and Facebook's discussion of it is wholly irrelevant to the issue of future identity theft.

As many courts have recognized, theft of troves of PII by hackers who specifically targeted that information creates a significant risk of future identity theft. Plaintiffs and all other Facebook users affected by the breach will forever have to look over their shoulder, worried fraud is right around the corner. That satisfies Article III standing.

### ii) Plaintiffs' lost time and effort involved in mitigating the potential effects of the breach provides standing

Facebook concedes, as it must, that Adkins and Bass spent time remedying problems they believed were associated with the data breach, such as re-setting passwords, contending with phishing emails and scam phone calls, and monitoring financial accounts. Supp. Brief, 2-3, 8, Adkins Dep. 21, 25-26, 32-34, 69-72, 76-77, 113-114, 198, 200-01, 226-236, 241-244, Bass Dep. 35-36, 56, 64-68, 95, 139, 155-158. Since it cannot refute these facts, Facebook resorts to disparaging them, claiming the Plaintiffs' troubles are "too trifling an injury to support constitutional standing."[8] That is not Facebook's judgment to make.

---

[8] Facebook extracts this quote from *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 840 (9th Cir. 2007) (per curiam), an ADA case where standing was lacking because the

11

1    Although Facebook may not value Plaintiffs' time and effort, Plaintiffs do. *See* Adkins

2    Dep. 236-237. And courts have regularly found that following a data breach "the value of one's

3    own time needed to set things straight is a loss from an opportunity-cost perspective."

4    *Dieffenbach v. Barnes & Noble, Inc.*, 887 F.3d 826, 828 (7th Cir. 2018); *see also In re Equifax,*

5    *Inc., Customer Data Security Breach Litigation*, 362 F. Supp. 3d 1295 (finding standing where

6    "Plaintiffs here have alleged that they have been harmed by expending time and effort to monitor

7    their credit and identity."); *In re Arby's Rest. Grp. Inc. Litig.*, No. 1:17-CV-0514-AT, 2018 WL

8    2128441, at *11 (N.D. Ga. Mar. 5, 2018) ("[I]n the Court's view, a consumer's time and effort to

9    remediate the effects of a breach is not an abstract notion of actual damages and is one that is

10   susceptible to proof and validation by a jury."). Here, Plaintiffs have already used experts to

11   provide preliminary calculations of $18.70 per hour for the time spent by Adkins and Bass to

12   deal with the headaches of the breach precipitated by Facebook's lax security. Ex. 4 at 19, 23,

13   Ex. 5 (Adkins), Ex. 6 (Bass).

14   Facebook offers not a single case holding otherwise. Facebook may argue to a jury that

15   its users' time is worthless, but that is not proper here and Facebook cannot legitimately claim

16   Plaintiffs lack standing on this ground.

17          **iii)**    **Plaintiffs do not need to have intended to sell their PII to state a claim for**

18                   **loss in value of that PII**

19   As discussed in Plaintiffs' Opposition to the Motion to Dismiss, courts, including the

     Ninth Circuit, have found loss of value of PII is an injury-in-fact for data breach victims. *See,*

20   *e.g.*, *In re Facebook Privacy Litigation*, 572 F. App'x 494 ("Plaintiffs allege that the information

21   disclosed by Facebook can be used to obtain personal information about plaintiffs, and that they

22   were harmed both by the dissemination of their personal information and by losing the sales

23   value of that information . . . these allegations are sufficient to show the element of damages for

24   their breach of contract and fraud claims."); *In re Yahoo! Inc. Customer Data Security Breach*

25   *Litigation*, 2017 WL 3727318, at *13 ("Plaintiffs also argue that all Plaintiffs have suffered an

26

27

28   defendant corrected the alleged shower access problems nearly instantly. Clearly, that has no
     bearing on this case.

1   injury in fact because the Data Breaches caused all Plaintiffs to suffer a loss of value of their PII

2   as a result of the Data Breaches . . . . Again, the Court agrees with Plaintiffs."); *In re Anthem,*

3   *Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 994 (N.D. Cal. 2016) ("'Loss of value of PII'

4   constitutes a cognizable injury . . .").[9]

5          And certainly, Facebook cannot dispute PII has value, since, as noted previously,

6   Facebook monetizes PII; that is its business model. Moreover, Facebook has spent billions

7   buying up entities like Instagram and WhatsApp to get more PII and attract more advertisers. Ex.

8   4 at 20-21. Instead, Facebook insists Plaintiffs do not believe their PII had any value because

9   Adkins allegedly so testified. On the contrary, Adkins said just the opposite:

10         Q.     Have you ever given Facebook personal information about yourself that you

11         believe has value?

12         A.     Yes.

13   Adkins Dep. 404. *See also* Bass Dep. 29 (he provided his personal information to use Facebook,

14   which was something of value).

15          The testimony extracted by Facebook relates to monetary payments. During a string of

16   questions focused on Adkins' desire that Facebook not bombard him with advertising,

17   Facebook's lawyer asked Adkins if he paid for Facebook, and he said he did not. Adkins Dep.

18   121. Facebook's lawyer then followed that up by saying "You've never given Facebook anything

19   of value to use its services, correct?" Adkins said "Yes." *Id.*

20          Taken in context, this question can be construed as asking if he had provided some other

21   form of monetary compensation to Facebook, not whether he thought his PII had any value.

22          Facebook also argues that because Plaintiffs had no immediate plans to sell their PII, they

23   cannot claim damage for loss in value. Supp. Brief, 13. But, most courts recognizing loss of

24

25   [9] Although certain earlier-decided cases found loss of value of PII, by itself, was not enough to
     create standing, more recent decisions have recognized the consensus on that issue has shifted.
26   *See, e.g.*, *Hameed-Bolden v. Forever 21 Retail, Inc.*, No. CV1803019SJOJPRX, 2018 WL
     6802818, at *5 (C.D. Cal. Oct. 1, 2018) (citing recent decisions and noting "these authorities
27   establish that loss of value in PII may represent 'property damages' as a legal matter …")

28

13

Plaintiffs' Reply to Facebook's Supplemental Brief in
Support of Motion To Dismiss The Consolidated Class
Action Complaint   Case No. C 18-05982 WHA (JSC)

1   value in PII as a damage do not require an intent to sell as a prerequisite. *See, e.g.*, *In re Yahoo!*

2   *Inc. Customer Data Security Breach Litigation*, 2017 WL 3727318, at *13, *In re Anthem, Inc.*

3   *Data Breach Litigation*, 162 F. Supp. 3d at 994. Such a holding would indeed be odd since

4   diminution in value "is an accepted way of measuring damage" regardless of any plan to sell the

5   damaged property. *Copelan v. Infinity Ins. Co.*, 728 F. App'x 724, 725 (9th Cir. 2018). And, in

6   any event, it is not an issue that would relate to standing. Plaintiffs need only demonstrate legal

7   standing, not also prove up each theory of damage. *Ainsworth v. Owenby*, 326 F. Supp. 3d 1111,

8   1120 (D. Or. 2018) ("Defendants cite no case, and the Court can find none, holding that once a

9   plaintiff demonstrates that she has standing to bring a claim for damages, she must also produce

10  evidence of the injury underlying each *theory* of her damages" (italics in original).) *See also id.*

11  at 1119 ("Defendants' challenge to the jurisdictional facts underlying Plaintiffs' alleged property

12  value injury is both irrelevant and premature.")

13

14          **iv)    Facebook's failure to provide promised data security caused plaintiffs to lose
                      the benefit of their bargain**

15          As set forth in the Complaint, in exchange for Plaintiffs providing their valuable PII to

16  Facebook, Facebook promised, *inter alia*, "[to n]ot . . . give access to their Facebook account to

17  others," "[w]hen it comes to your [PII], we don't share it without your permission . . .," and that

18  it employs "top-rate security measures." Comp., ¶¶ 33, 43, 195; *see also id.*, ¶¶ 35–36, 44–46,

19  190–225. That promise was not honored. Indeed, as Adkins testified, had he known that

20  Facebook not only would not honor this promise, but also disclaimed most of its liability for any

21  breach, he would not have signed up with Facebook in the first place. Adkins Dep. 404-05. Now,

22  Facebook users face the stress and annoyance of their PII being in the hands of sophisticated

23  cyber criminals – a plight valued by Plaintiffs' experts at $1,900 to $2,900 per class member. Ex.

24  4 at 24-25.

25          Plaintiffs' loss of benefit of the bargain has already been recognized in this District. In *In*

26  *re Facebook Privacy Litig.*, the court found standing for loss of benefit of the bargain on

27  allegations that "Plaintiffs and each class member gave up something of value, PII, in exchange

28  *for access to Facebook and Facebook's privacy promises*[,]" and "Facebook materially breached

14

the contracts by violating its privacy terms, thus depriving Plaintiffs and Class members the benefit of the bargain." *In re Facebook Privacy Litig.*, 192 F. Supp. 3d at 1059 (italics in original).

Further, a plaintiff need not pay for a service to have a cognizable injury. *See, e.g.*, *In re Facebook Privacy Litigation*, 192 F. Supp. 3d at 1058–59 (allegation that plaintiff "did not receive the promised confidentiality for which she bargained" is an injury-in-fact). This makes sense in the modern internet age, given that in many cases the user is not the consumer but rather the product being monetized. Social media platforms provide free access because it is the users' PII and content that drives traffic, and traffic drives ad revenue. Indeed, Facebook pocketed millions by skimping on security while taking in PII that could be used by advertisers – an estimated damage of $11.49 to $15.63 per class member. Ex. 4 at 22.

Facebook provides no reason to depart from this logic here and instead argues there is no benefit of the bargain because it not possible to apportion some specific amount of PII provided in exchange for data security, i.e., those users who provided more PII did not get better security in exchange. Supp. Brief, 14. To support this position, Facebook cites *In re SuperValu, Inc.*, No. 14-MD-2586 ADM/TNL, 2016 WL 81792, at *8 (D. Minn. Jan. 7, 2016), *aff'd in part, rev'd in part and remanded*, 870 F.3d 763 (8th Cir. 2017), a decision noting only that benefit of the bargain damages are generally unavailable "where plaintiffs have not alleged that the value of the goods or services they purchased was diminished as a result of the data breach."

Even assuming that decision reflects the law in this Circuit, it does not support Facebook's position. Here, the "goods or services" bargain for *were diminished* because Facebook did not provide the security for which Facebook's user bargained. See, e.g., Ex. 4 at 20-21 (estimating loss of PII value at $15 to $1,200 per user). The amount of that loss is not a standing question, it is a merits issue. And, it is not one to be decided before merits discovery has even started.

15

1

## V.   CONCLUSION

2    Plaintiffs' deposition testimony and Initial Disclosures prove Plaintiffs can establish

3  Article III standing here under a variety of different damage theories. Accordingly, the Court

4  should deny Defendant's Motion to Dismiss.

5

6

7  Dated: June 5, 2019                              **COHEN MILSTEIN SELLERS & TOLL PLLC**

8                                                   By:_____/s/ *Andrew N. Friedman*_____
                                                     Andrew N. Friedman (Pro Hac Vice)
9                                                    *AFriedman@CohenMilstein.com*
                                                     1100 New York Avenue NW, Suite 500
10                                                   Washington, DC 20005
                                                     Telephone: 202-408-4600
11                                                   Facsimile: 202-408-4699

12                                                  **MORGAN & MORGAN**
                                                    **COMPLEX LITIGATION GROUP**
13
                                                     By:_____/s/ *John A. Yanchunis*_____
14                                                   John A. Yanchunis (Pro Hac Vice)
                                                     *JYanchunis@ForThePeople.com*
15                                                   201 N. Franklin Street, 7th Floor
                                                     Tampa, Florida 33602
16                                                   Telephone: 813-223-5505
                                                     Facsimile: 813-223-5402

17                                                  **MILBERG TADLER PHILLIPS**
                                                    **GROSSMAN LLP**
18                                                   By:*/s/ Ariana J. Tadler*_____
                                                     Ariana J. Tadler
19                                                   ATadler@milberg.com
                                                     One Penn Plaza
20                                                   New York, NY 10119
                                                     Telephone: 212-594-5300
21                                                   Facsimile: 212-868-1229

22
                                                     *Counsel for Plaintiffs*
23

24

25

26

27

28

**CAPSTONE LAW, APC**
Tarek H. Zohdy (SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Trisha K. Monesi (SBN 303512)
Trisha.Monesi@capstonelawyers.com
Capstone Law APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone: (310) 556-4811
Facsimile: (310) 943-0396

**CASEY GERRY SCHENK**
**FRANCAVILLA BLATT & PENFIELD,**
**LLP**
David S. Casey, Jr. (SBN 060768)
dcasey@cglaw.com
Gayle M. Blatt (SBN 122048)
gmb@cglaw.com
Jeremy Robinson (SBN 188325)
jrobinson@cglaw.com
110 Laurel Street
San Diego, California 92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232 fax

**CLAYEO C. ARNOLD, A**
**PROFESSIONAL LAW**
**CORPORATION**
Clayeo C. Arnold (SBN 65070)
carnold@justice4you.com
Joshua H. Watson (SBN 238058)
jwatson@justice4you.com
865 Howe Avenue
Sacramento, California 95825
Telephone: 916-777-7777
Facsimile: 916-924-1829

**COHEN MILSTEIN SELLERS & TOLL**
**PLLC**
Douglas J. McNamara
dmcnamara@cohenmilstein.com
Sally Handmaker Guido (SBN 281186)
shguido@cohenmilstein.com
1100 New York Ave. NW
East Tower, 5th Floor
Washington, DC 20005

Telephone: (202) 408-4600
Facsimile: (202) 408-4699

**FINKELSTEIN, BLANKENSHIP, FREI-**
**PEARSON & GARBER LLP**
Jeremiah Frei-Pearson
Jfrei-pearson@fbfglaw.com
Andrew C. White
awhite@fbfglaw.com
445 Hamilton Ave., Suite 605
White Plains, New York 10601
Telephone: (914) 298-3281
Facsimile: (914) 908-6709

**FRANKLIN D. AZAR & ASSOCIATES**
Ivy Ngo (SBN 249860)
ngoi@fdazar.com
Kelly Hyman
hymank@fdazar.com
14426 East Evans Ave
Aurora, CO 80014
Telephone: 303-757-3300
Facsimile: 720-213-5131

**GIRARDI KEESE**
Thomas V. Girardi (SBN 36603)
Keith D. Griffin (SBN 204388)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: 213-977-0211
Facsimile: 213-481-1554

**GLANCY PRONGAY & MURRAY LLP**
Marc Godino
mgodino@glancylaw.com
Brian Murray
bmurray@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: 310-201-9150
Facsimile: 310-432-1495

**JONES WARD PLC**
Jasper D. Ward
jasper@jonesward.com
1205 E Washington St, Suite 111
Louisville, Kentucky 40206
Telephone: 502-882-6000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**KANTROWITZ GOLDHAMER &
GRAIFMAN, P.C.**
Gary S. Graifman
ggraifman@kgglaw.com
Jay Brody
jbrody@kgglaw.com
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
Telephone: (845) 356-2570
Facsimile: (845) 356-4335

**KOHN, SWIFT & GRAF, P.C.**
Jonathan Shub (SBN 237708)
jshub@kohnswift.com
Kevin Laukaitis
klaukaitis@kohnswift.com
1600 Market Street, Suite 2500
Philadelphia, PA 19103-7225
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

**LAW OFFICE OF PAUL C. WHALEN,
P.C.**
Paul C. Whalen
paul@paulwhelan.com
768 Plandome Road
Manhasset, NY 11030
Telephone: (516) 426-6870
Facsimile: (212) 658-9685

**LAW OFFICES OF CHARLES
REICHMANN**
Charles Reichmann
Cpreichmann@yahoo.com
16 Yale Circle
Kensington, CA 94708
Telephone: (415) 373-8849

**LIVINGSTON BAKHTIAR**
Ebby S. Bakhtiar (SBN 215032)
3435 Wilshire Boulevard, Suite 1669
Los Angeles, CA 90010
Telephone: 213-632-1550
Facsimile: 213-632-3100

**LOCKRIDGE GRINDAL
NAUEN PLLP**
Karen Hanson Riebel
khriebel@locklaw.com
Kate M. Baxter-Kauf
kmbaxter-kauf@locklaw.com
Arielle S. Wagner
aswagner@locklaw.com
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 596-4097
Facsimile: (612) 339-0981

**MIGLIACCIO & RATHOD LLP**
Nicholas A. Migliaccio
nmigliaccio@classlawdc.com
Jason S. Rathod
jrathos@classlawdc.com
412 H Street N.E., Ste. 302
Washington, DC 20002
Telephone: (202) 470-3520

**MILBERG TADLER PHILLIPS
GROSSMAN LLP**
Henry J. Kelston
hkelston@milberg.com
Melissa Clark
mclark@milberg.com
One Pennsylvania Plaza, Suite 1920
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
A.J. de Bartolomeo
ajdebartolomeo@milberg.com
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (212) 631-8689
Facsimile: (510) 350-9701

**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
Ryan J. McGee
rmcgee@ForThePeople.com
Jean S. Martin
jeanmartin@ForThePeople.com
Kenya J. Reddy
kreddy@forthepeople.com
201 N. Franklin Street, 7th Floor

1    Tampa, Florida 33602
     Telephone: (813) 223-5505                    **STULL, STULL & BRODY**
2    Facsimile: (813) 223-5402                    Patrice L. Bishop (SBN 182256)
                                                  pbishop@ssbla.com
3    **ROBINSON CALCAGNIE, INC.**                 Melissa R. Emert
4    Daniel S. Robinson (SBN 244245)              memert@ssbny.com
     drobinson@robinsonfirm.com                   9430 W. Olympic Blvd., Suite 400
5    Wesley K. Polischuk (SBM 254121)             Beverly Hills, CA 90212
     wpolischuk@robinsonfirm.com                  Telephone: (310) 209-2468
6    Michael W. Olson (312857)                    Facsimile: (310) 209-2087
7    19 Corporate Plaza Drive
     Newport Beach, California 92660              *Other Plaintiffs' Counsel*
8    Telephone: (949) 720-1288
     Facsimile: (949) 720-1292
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**SIGNATURE ATTESTATION**

2          I am the ECF User whose identification and password are being used to file Plaintiffs'

3   Opposition to Defendant Facebook's Motion to Dismiss Plaintiffs' Consolidated Complaint.  I,

4   Andrew N. Friedman, attest that service has been effectuated via ECF.

5

6   DATED:  June 5, 2019                              */s/ Andrew N. Friedman*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28