Andrew N. Friedman (*pro hac vice*)
afriedman@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

John A. Yanchunis (*pro hac vice*)
jyanchunis@forthe people.com
**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
201 N. Franklin St., 7th Floor
Tampa, FL  33602
Telephone: 813/223-5505
Facsimile:  813/223-5402

Ariana J. Tadler (*pro hac vice*)
atadler@tadlerlaw.com
**TADLER LAW, LLP**
One Penn Plaza
New York, NY  10119
Telephone: (212) 946-9453
Facsimile:  (212) 273-4375

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| STEPHEN ADKINS, an individual and Michigan resident, on behalf of himself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> FACEBOOK, INC., <br><br> Defendant. | No.  C 18-05982 WHA (JSC) <br> ***Consolidated Cases:*** <br> No.  C 18-06022 WHA (JSC) <br> No.  C 19-00117 WHA (JSC) <br><br> **PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO FILE FIRST AMENDED CONSOLIDATED COMPLAINT** <br><br> Date:   August 22, 2019 <br> Time:  8:00am <br> Court: Courtroom 12, 19th Floor <br> Hon. William Alsup |

# TABLE OF CONTENTS

Page

REPLY MEMORANDUM IN SUPPORT ................................................................................. 1

I.      INTRODUCTION ............................................................................................................ 1

II.     ARGUMENT .................................................................................................................... 2

        A.      The PFAC Demonstrates that Facebook's Adhesive and Self-Contradictory
                Terms Render its Liability-Limitation Provision Unconscionable. ...................... 2

        B.      The PFAC Adequately Pleads Facebook Promised to Protect User PII ................ 6

        C.      The PFAC Adequately Pleads Breach of Implied Contract, Implied Covenant
                of Good Faith and Fair Dealing, and Quasi Contract Claims in the Alternative ........... 8

        D.      The PFAC Pleads a Viable Breach of Confidence Claim Based Upon
                Facebook's Unauthorized Dissemination of PII to Hackers ............................... 9

        E.      Because Plaintiff Expended Valuable Consideration for Facebook's Services
                and was Forced to Deal with Facebook's Malfeasance, Plaintiff's UCL Claim
                May Proceed ............................................................................................... 10

                1.      Plaintiff Has Established Standing for UCL ...................................... 10

                2.      The PFAC Properly Pleads the Unlawful Prong of UCL .................. 11

                3.      The PFAC Properly Pleads the Unfair Prong of UCL ...................... 11

                4.      The PFAC Pleads Equitable Relief under the UCL .......................... 12

        F.      Plaintiff's Negligence Claim Remains Properly Pleaded and the Relief
                Requested – Credit Monitoring – is Well-Supported Given the Risks Related to
                Facebook's Negligence and the Utility of Preventing Future Harm ..................... 13

III.    CONCLUSION ............................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
  24 Cal. 4th 83 (2000) ................................................................................................ 4

*Baba v. Hewlett-Packard Co.*,
  No. C 09-05946 RS, 2010 WL 2486353 (N.D. Cal. June 16, 2010) ........................... 11

*Berkla v. Corel Corp.*,
  302 F.3d 909 (9th Cir. 2002) ...................................................................................... 9

*Berkla v. Corel Corp.*,
  66 F.Supp.2d 1129 (E.D. Cal. 1999).......................................................................... 9

*Block v. eBay, Inc.*,
  747 F.3d 1135 (9th Cir. 2014) .................................................................................... 7

*Caraccioli v. Facebook, Inc.*,
  167 F. Supp. 3d 1056 (N.D. Cal. 2016) ...................................................................... 5

*Castro v. ABM Industries, Inc.*,
  No. 17-CV-3026-YGR, 2018 WL 2197527 (N.D. Cal., May 14, 2018) ......................... 6

*Congdon v. Uber Techs., Inc.*,
  291 F. Supp. 3d 1012 (N.D. Cal. 2018) ...................................................................... 4

*Copeland v. Baskin Robbins U.S.A.*,
  96 Cal. App. 4th 1251 (2002) ..................................................................................... 6

*Corona v. Sony Pictures Entm't, Inc.*,
  No. 14-CV-09600-RGK, 2015 WL 3916744 (C.D. Cal. June 15, 2015) .......... 12, 13, 14

*Daniel v. Ford Motor Co.*,
  806 F.3d 1217 (9th Cir. 2015) .................................................................................... 4

*Darnaa, LLC v. Google LLC*,
  756 F. App'x 674 (9th Cir. 2018) ................................................................................ 5

*Diffenbach v. Barnes & Noble, Inc.*,
  887 F.3d 826 (7th Cir. 2018) ...................................................................................... 6

*Enter. Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
  122 F.3d 1211 (9th Cir. 1997) .................................................................................. 10

ii

*In Re Facebook Privacy Litigation*,
   572 Fed. Appx. 494 (9th Cir. 2014) ........................................................ 10

*In Re iPhone Application Litigation*,
   No. 11-MD-02250-LHK, 2011 WL 4403963 (N.D. Cal. Sept. 20, 2011) ...................... 10

*Fitz v. NCR Corp.*,
   118 Cal. App. 4th 702 (2004) ............................................................... 5

*Folgelstrom v. Lamps Plus, Inc.*,
   195 Cal. App. 4th 986 (2011) .............................................................. 10

*Genesis Ins. Co. v. BRE Properties*,
   916 F.Supp.2d 1058 (N.D. Cal. 2013) ...................................................... 6

*Harper v. Ultimo*,
   113 Cal. App. 4th 1402 (2003) ............................................................. 5

*Hodson v. Mars, Inc.*,
   891 F.3d 857 (9th Cir. 2018) ........................................................... 11, 12

*Kwikset Corp. v. Superior Court*,
   51 Cal. 4th 310 (2011) ................................................................... 12

*Lewis v. YouTube, LLC*,
   244 Cal. App. 4th 118 (2015) .............................................................. 5

*Lhotka v. Geographic Expeditions, Inc.*,
   181 Cal. App. 4th 816 (2010) .............................................................. 5

*McBride v. Boughton*,
   123 Cal. App. 4th 379 (2004) .............................................................. 8

*Morris v. Redwood Empire Bancorp*,
   128 Cal. App. 4th 1305 (2005) ............................................................. 4

*Neal v. State Farm Ins. Companies*,
   188 Cal. App. 2d 690 (Ct. App. 1961) ..................................................... 4

*Nevin v. Salk*,
   45 Cal. App. 3d 331 (Ct. App. 1975) ...................................................... 7

*Petito v. A.H. Robins, Co., Inc.*,
   750 So.2d 103 (Fla. App. Ct. 1999) ...................................................... 14

*Potter v. Firestone Tire & Rubber Co.*,
   6 Cal. 4th 965 (1993) ............................................................ 2, 13, 14

iii

*Ruiz v. Gap, Inc.*,
   No. 08-5739 SC, 2009 WL 250481 (N.D. Cal. Feb. 3, 2009) ........................................ 14

*Ruiz v. Gap, Inc.*,
   380 F.App'x 689 (9th Cir. 2010) ..................................................................................... 14

*Russell v. Citigroup*,
   748 F.3d 677 (6th Cir. 2014) ........................................................................................6-7

*Rutherford Holdings, LLC v. Plaza Del Rey*,
   223 Cal. App. 4th 221 (2014) .......................................................................................... 8

*Silicon Valley Self Direct, LLC v. Paychex, Inc.*,
   2015 WL 4452373 (N.D. Cal. July 20, 2015) ................................................................... 5

*Stollenwerk v. Tri-West. Health Care Alliance*
   254 F. App'x 664 (9th Cir. 2007) ................................................................................... 15

*SocialApps, LLC v. Zynga, Inc.*,
   No. 4:11-CV-04910 YGR, 2012 WL 381216 (N.D. Cal. Feb. 6, 2012) ........................... 8

*Tele-Count Engineers, Inc. v. Pac. Tel. & Tel. Co.*,
   168 Cal. App. 3d 455 (Ct. App. 1985) ............................................................................. 9

*Xavier v. Philip Morris USA Inc.*,
   No. C 10-02067 WHA, 2010 WL 3956860 (N.D. Cal. Oct. 8, 2010) ....................... 2, 15

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
   313 F. Supp. 3d 1113 (N.D. Cal. 2018) ........................................................................... 5

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
   No. 16-MD-02752-LHK, 2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) ................... 8, 9

**STATUTES**

Cal. Civ. Code § 1642 ........................................................................................................ 7

Cal. Civ. Proc. Code § 1668 ............................................................................................... 4

**RULES**

Fed. R. Civ. P. 8 ............................................................................................................. 9, 13

iv

## REPLY MEMORANDUM IN SUPPORT

### I.   INTRODUCTION

Contrary to Facebook's opposition, Plaintiff's Proposed First Amended Consolidated Complaint ("PFAC") addresses both Facebook's previous arguments and the Court's June 21st Order on the motion to dismiss. (ECF No. 153). Plaintiff Adkins bolstered his factual allegations with facts borne from discovery, which highlight the discrepancy between Facebook's insincere claim it is devoted to data protection while it simultaneously arguing a sentence fragment from its Terms of Service immunize it from common law actions for its misconduct. This double-speak is unexpected, unfair, and unconscionable. Plaintiff seeks a declaration of such, and to proceed with sound contract-based claims. Further, the PFAC bolsters Plaintiff's claims that: (1) Facebook explicitly obligates itself to protect its users' personally identifiable information ("PII") in exchange for users providing this valuable asset; (2) Facebook implicitly obligates itself to protect PII that it converts into billions of dollars in annual revenue; (3) Facebook has a duty to protect that data as part of its contractual obligations; or (4) failing the prior three, Facebook is unjustly enriched when it obtains PII but fails to protect it. Plaintiff should be permitted to pursue those theories in this litigation.

Plaintiff's other proposed amendments shore up shortcomings this Court noted in its June 21st Order. Plaintiff includes theories of lost money and property supported by experts to meet the statutory standing for an Unlawful Competition Law claim. And, consistent with the Order, Plaintiff eschews rehabilitating the CLRA and fraud-based claims.

While the Court found the negligence claim could proceed, Plaintiff provides additional facts to support that cause and the relief sought.[1] This includes the costs of credit monitoring for Plaintiff and similarly situated class members who, due to Facebook's negligence, must now look over their proverbial shoulders for the criminals who stole or now possess their PII. Facebook asserts credit

---

[1] Facebook mentions "substantial discovery" and "voluminous discovery" Opp. at 1:16 and 25:17). In reality, Facebook has produced only 9,788 documents (22,614 pages). Facebook has produced over 42,000 pages are printouts of Plaintiffs' Facebook profiles and other social media that Facebook produced in connection with Plaintiffs' depositions and in response to Plaintiffs' Requests. Moreover, most of the produced documents are near-duplicates containing no unique substantive information. Plaintiff has moved before the Magistrate Judge to compel Facebook to respond to those requests. (ECF No. 170).

monitoring cannot be a separate cause of action (Plaintiff did not plead it as such) and is not available because Mr. Adkins has not already paid for it. But credit monitoring—like medical monitoring—is a recognized economic damage that prevents further injury and does not require the wrongly injured party to first pay for it.[2] Similarly, Facebook lacks a basis to deny Plaintiff's request for punitive damages in the PFAC (which Facebook did not move to strike in the original complaint).

Facebook does not complain of any other shortcoming under Rule 15, save futility. Since the amendments are substantively sufficient and not futile, Plaintiff asks the Court to permit Plaintiff to file the PFAC and proceed with class certification on all causes of action so pled.

## II.    ARGUMENT

### A.    The PFAC Demonstrates that Facebook's Adhesive and Self-Contradictory Terms Render its Liability-Limitation Provision Unconscionable.

Facebook's Opposition ignores several key points that render the liability limitation it seeks to invoke both procedurally and substantively unconscionable. Instead Facebook resorts to manufacturing false arguments about Mr. Adkins' now claiming "surprise," solely to refute them.[3]

Facebook continues to assert that a one-sentence fragment buried in an adhesion contract completely negates all of Plaintiff's contract-based claims. That is incorrect under California law. The section, in its entirety, reads as follows:

---

[2]  *Xavier v. Philip Morris USA Inc.,* No. C 10-02067 WHA, 2010 WL 3956860, at *2 (N.D. Cal. Oct. 8, 2010) ("A plaintiff seeking medical monitoring in California must show "that the ***need for future monitoring*** is a reasonably certain consequence of the plaintiff's toxic exposure and that the recommended monitoring is reasonable.") (emphasis added) (quoting *Potter v. Firestone Tire & Rubber Co*., 6 Cal. 4th 965, 974 (1993).

[3]  To be clear, Mr. Adkins has never claimed he relied on Facebook's Privacy Principles when signing up. Rather, he said he generally expected Facebook to keep his information safe and was surprised to learn at his deposition that there was a liability disclaimer.

### 3. Limits on liability

We work hard to provide the best Products we can and to specify clear guidelines for everyone who uses them. Our Products, however, are provided "as is," and we make no guarantees that they always will be safe, secure, or error-free, or that they will function without disruptions, delays, or imperfections. To the extent permitted by law, we also DISCLAIM ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT. We do not control or direct what people and others do or say, and we are not responsible for their actions or conduct (whether online or offline) or any content they share (including offensive, inappropriate, obscene, unlawful, and other objectionable content).

We cannot predict when issues might arise with our Products. Accordingly, our liability shall be limited to the fullest extent permitted by applicable law, and under no circumstance will we be liable to you for any lost profits, revenues, information, or data, or consequential, special, indirect, exemplary, punitive, or incidental damages arising out of or related to these Terms or the Facebook Products, even if we have been advised of the possibility of such damages. Our aggregate liability arising out of or relating to these Terms or the Facebook Products will not exceed the greater of $100 or the amount you have paid us in the past twelve months.

Clearly, Facebook disclaims all warranties (that part is in all caps), does not guarantee its products will always be error-free, and tries to limit the kinds of damages that can be recovered. But Facebook says this section supposedly also forces users to disclaim all claims for breach of express or implied contract. The word "contract" does not appear anywhere in the section, yet, Facebook wants to drastically expand the reach of § 3 by reading a fragment of a different sentence into a sweeping waiver. Specifically, Facebook relies on the first part of the sentence: "<u>Accordingly, our liability shall be limited to the fullest extent permitted by applicable law</u>, and under no circumstance will we be liable to you for any lost profits, revenues, information, or data, or consequential, special, indirect, exemplary, punitive, or incidental damages arising out of or related to these Terms or Facebook Products, even if we have been advised of the possibility of such damages." (ECF No. 173 ("Opp.") at 4; (ECF No. 96 at 17) (emphasis added).

That the preamble to that sentence equates to a knowing waiver of every conceivable contract-based claim (according to Facebook) would be the epitome of "surprise" under California's

unconscionability doctrine.[4] *Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305, 1321 (2005) ("Procedural surprise focuses on whether the challenged term is hidden in a prolix printed form or is otherwise beyond the reasonable expectation of the weaker party."). Here, not only is the limitation language hidden in the section, but if one accepts Facebook's interpretation, it is beyond the reasonable expectations of its users.[5] Given that § 3 has bolded language relating to warranties and specific language on damages, a user reading this section cannot be expected to understand that the fragment "shall be limited to the fullest extent permitted by applicable law" means the user waives all common law claims—such an interpretation is patently unreasonable. Indeed, by Facebook's reading, the much more conspicuous warranty disclaimer would be entirely superfluous because it would be subsumed in this broader, although hidden, disclaimer. The limitation language is, at best, ambiguous, *see*, *Congdon v. Uber Techs., Inc.*, 291 F. Supp. 3d 1012, 1021 (N.D. Cal. 2018). As such, it must be construed against its drafter, Facebook. *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1224 (9th Cir. 2015).[6]

The unfair surprise does not end with the alleged broad scope. It also requires the reader to divine that the "applicable law" means California Code of Civil Procedure § 1668—and then understand what that provision allows a company to disclaim. Further, the language does not specify a time frame for the "applicable law," so even a legally sophisticated user would not know if it means the law at the time the agreement was consummated or some later time. Finally, the interpretation Facebook urges contradicts Facebook's much more prominent representations, such as "we are accountable" when it comes to protecting user's privacy. PFAC, ¶ 52.

California law holds such clauses to be procedurally unconscionable and unenforceable. *See*, *Harper v. Ultimo*, 113 Cal. App. 4th 1402, 1405–1407 (2003) (finding unconscionable arbitration

---

[4]  Facebook implies procedural unconscionability requires both "oppression" and "surprise." Not so. "[U]nconscionability has both a 'procedural' and a 'substantive' element," the former focusing on "oppression" **or** "surprise" due to unequal bargaining power, the latter on "overly harsh" or "one-sided" results. *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000) (emphasis added).

[5]  Facebook cites to this Court's statements in the June 21st Order that the clause was "not buried," "above board," and "contained clear enough language." Opp. at 5:4-5; 1:19-20. But those statements relate to the clause as a whole, not the specific liability language.

[6]  Indeed, this rule "applies with peculiar force in the case of the contract of adhesion. Here the party of superior bargaining power not only prescribes the words of the instrument but the party who subscribes to it lacks the economic strength to change such language." *Neal v. State Farm Ins. Companies*, 188 Cal. App. 2d 690, 695 (Ct. App. 1961).

4

clause that invoked the arbitration rules of a different organization but did not attach them, forcing "the customer to go to another source to learn that the arbitration agreement curtailed his ability to receive full relief" and because "the clause failed to state whether arbitration would be conducted under the … rules as of the time of contracting or at the time of arbitration"); *Fitz v. NCR Corp.*, 118 Cal. App. 4th 702, 721 (2004) (same).

The liability limitation provision is also substantively unconscionable because it is unfairly one-sided. *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113, 1136–37 (N.D. Cal. 2018) (one-sided, non-negotiated liability limiting provision providing email as "AS IS" and disclaiming all warranties as to data safety was unconscionable); *Silicon Valley Self Direct, LLC v. Paychex, Inc.*, 2015 WL 4452373, at *6 (N.D. Cal. July 20, 2015) (provision unconscionable that "exempts under all circumstances 'special, indirect, incidental, or consequential or punitive damages, including any theory of liability (including contract, tort or warranty).'"); *Lhotka v. Geographic Expeditions, Inc.*, 181 Cal. App. 4th 816, 825 (2010) (provision unconscionable when it "guaranteed that plaintiffs could not possibly obtain anything approaching full recompense for their harm.").

Facebook disregards this as a revisiting of the Court's June 21st Order. Opp. at 7:21–27. Not so. Plaintiff provides factual allegations in the PFAC and additional authorities not previously presented to the Court. *See, e.g.,* PFAC, ¶¶ 53-59, 62-76. *See* n. 9, *infra*. Meanwhile, Facebook repeats its inapposite citations from its prior briefing. *Lewis v. YouTube, LLC*, 244 Cal. App. 4th 118 (2015), did not involve any unconscionability analysis. *Caraccioli v. Facebook, Inc*., 167 F. Supp. 3d 1056 (N.D. Cal. 2016), did not involve the liability limitation at issue here and instead dealt with Facebook's liability for images posted by third parties. *Darnaa, LLC v. Google LLC*, 756 F. App'x 674 (9th Cir. 2018) concerned YouTube's ability to take down content for violating the site's rules. Unlike in *Darnaa*, Plaintiff here could not prevent or limit the scope of the data breach or the ensuing harm because Facebook's security was entirely outside of Plaintiff's control. *See In re: Yahoo!,* 313 F.Supp.3d at 1137 (distinguishing *Darnaa*).

### B.    The PFAC Adequately Pleads Facebook Promised to Protect User PII

Facebook offers strident but insubstantial arguments against Plaintiff's contract-based claims. For example, Facebook argues Plaintiff "does not allege any facts specifying what Facebook should have done differently…" Opp. at 10:4–5. To the contrary, the PFAC is replete with allegations of what Facebook should have done differently: for instance, using more secure access tokens and limiting their lifespan, ¶¶ 114–15, 132–39; and conducting security testing of its code or exposure testing of its access tokens. ¶¶ 140–41. In fact, the PFAC alleges Facebook knew about the vulnerability well before the breach but did not correct it because the fix would supposedly create other headaches for Facebook. PFAC, ¶¶ 148–54, 157–59, 161–65.

Likewise, Facebook contends Plaintiff has not alleged "lost opportunity costs," even though this Court already ruled he has: "the value of one's own time needed to set things straight is a loss from an opportunity cost perspective." (ECF No. 153 at 7) (quoting *Diffenbach v. Barnes & Noble, Inc.,* 887 F.3d 826, 828 (7th Cir. 2018)).[7] And finally, Facebook misstates the evidence to suggest Plaintiff never received "phishing" emails after the breach when his testimony was that he no longer has any record of them in his email inbox. (ECF No. 174-6 (Def. Ex. 6)).

Facebook's arguments are indicative of Facebook's cavalier attitude, both toward its users' PII and this Court. Facebook continues to ignore its "Privacy Principles" that aver that "we design privacy into our products from the outset," "we build security into every Facebook product," "we put products through rigorous data security testing" and "we are accountable." PFAC, ¶ 52. Facebook contends, in Court, that these representations are meaningless because they are "present-tense" and "written in an informal, conversational style." Opp. at 5:21–23. Facebook's "present tense argument is not well-taken." *Genesis Ins. Co. v. BRE Properties*, 916 F.Supp.2d 1058, 1068 (N.D. Cal. 2013). There is nothing about the use of present tense that defeats formation of a binding contract. *See, Castro v. ABM Industries, Inc.*, No. 17-CV-3026-YGR, 2018 WL 2197527, at *4 (N.D. Cal., May 14, 2018) (holding use of present tense in contract binding as to acts happening after contract created); *see also Russell v.*

---

[7] Facebook denies such costs can support a breach of contract. Opp. at 10:19-20:14. Facebook cites only one case for this proposition, *Copeland v. Baskin Robbins U.S.A.*, 96 Cal. App. 4th 1251 (2002). *Copeland* dealt with allegations of failure to negotiate in good faith and barely mentions lost opportunity costs, much less limits them in the way Facebook argues. *See id.* at 1263. As this Court correctly noted, *Diffenbach* offers the proper analysis.

1

2   *Citigroup*, 748 F.3d 677, 679 (6th Cir. 2014) (same). Indeed, it would make no sense for Facebook to

3   say, "we were accountable." In the same vein, Facebook's lawyers deny in legal papers any obligation

4   to protect PII, while its personnel proclaim the opposite. PFAC,¶ 90 (CEO Zuckerberg: "We have a

5   responsibility to protect your data, and if we can't then we don't deserve to serve you."). This

6   sentiment was repeated under oath by Facebook's Brad Hill:

7

8   

9

10

11

12

13   The *Block* case cited by Facebook, holds no differently. *Block v. eBay, Inc.*, 747 F.3d 1135

14   (9th Cir. 2014). There, the court denied a breach of contract claim relating to a statement that was

15   "simply a general description of how eBay's auction system works." *Id.* at 1138. Hence, there was no

16   promissory language. *Id*. Here, Facebook claims it designs and builds security into its products,

17   rigorously tests them, and is accountable if things go wrong—these are promises made to users.

18   Facebook continues to insist its Privacy Basics are not part of the contract because they are not

19   contained within the Terms of Service. But under California law, "[s]everal contracts relating to the

20   same matters, between the same parties, and made as parts of substantially one transaction are to be

21   taken together." Cal. Civ. Code § 1642; *see, Nevin v. Salk*, 45 Cal. App. 3d 331, 338 (Ct. App. 1975)

22   ("[I]t is the general rule that several papers relating to the same subject matter and executed as parts

23   of substantially one transaction, are to be construed together as one contract."). Further, if Facebook

24   insists that Plaintiff be bound by terms on its website regardless of whether he read them, Opp. at 5:6–

25   9, then Facebook should be bound by the language it drafts and puts on the website as well.

26

27   [8] Declaration of Douglas J. McNamara ("McNamara Decl."), Ex. A, (Aug. 8, 2019 Dep. of Brad Hill)
    at 37:10-38:1 (uncertified rough transcript; emphasis added, objections omitted). Other depositions
    have included similar statements. This acknowledged promise supports both the unconscionability of
28   the limitation of liability, and Plaintiff's implied contract claim. If granted leave, Plaintiff will include
    this testimony in his amended complaint to support that count.

7

That Facebook's Terms of Service include a clause saying Facebook cannot guarantee its products will always be safe or secure, Opp. at 9:20–22, is immaterial. Facebook still has made enforceable affirmative promises related to data security. In addition to the statements set forth above, Facebook's Data Policy incorporates a European Commission Decision requiring "technical and organisational security measures . . . to ensure a level of security appropriate to the risks represented by the processing and the nature of the data to be protected." PFAC, ¶¶ 42–44. And Facebook's Privacy Basics says, "when it comes to your personal information, we don't share it without your permission (unless required by law)." PFAC, ¶ 49. These terms form a valid, binding contract. *See, In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2017 WL 3727318, at *45 (N.D. Cal. Aug. 30, 2017).

### C.  The PFAC Adequately Pleads Breach of Implied Contract, Implied Covenant of Good Faith and Fair Dealing, and Quasi Contract Claims in the Alternative

"[W]here appropriate, the law will imply a contract (or rather, a quasi-contract), without regard to the parties' intent, in order to avoid unjust enrichment." *McBride v. Boughton*, 123 Cal. App. 4th 379, 388 (2004). Having spilled significant ink contending Plaintiff cannot state claims for breach of express contract because there is no contract containing the terms that were breached, Opp. at 9–12, Facebook then exclaims that Plaintiff cannot state claims for breach of implied contract or quasi contract because they are redundant and rendered moot when there is an express contract "embracing the same subject matter." Opp. at 12:15–28.

Facebook cannot have it both ways. It cannot deny that there is an express contract and then argue that implied and quasi contract claims are barred by the terms of an express contract. And, in any event, Plaintiff may plead those theories in the alternative. *SocialApps, LLC v. Zynga, Inc.*, No. 4:11-CV-04910 YGR, 2012 WL 381216, at *3 (N.D. Cal. Feb. 6, 2012); *see also*, *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 231 (2014) ("A claim for restitution is permitted even if the party inconsistently pleads a breach of contract claim that alleges the existence of an enforceable agreement."). Likewise, even if an express obligation is not in the Terms of Service, because Plaintiff has alleged Facebook failed to fix a known security flaw that led to the breach, he has stated a valid claim for breach of the implied covenant of good faith and fair dealing. *In re Yahoo!*,

2017 WL 3727318, at *49 (breach of implied covenant claim stated where defendant "engaged in bad faith by failing to employ minimal reasonable safeguards to protect users' PII in violation of Defendants' contractual duties.")

### D. The PFAC Pleads a Viable Breach of Confidence Claim Based Upon Facebook's Unauthorized Dissemination of PII to Hackers

In a paragraph, Facebook condemns Plaintiff's breach of confidence claim as precluded by the contract claims. Opp. at 13. The breach of confidence tort is not predicated solely on an express agreement protecting the confidence, but is an obligation created by law for reasons of justice where no contract otherwise exists. *Tele-Count Engineers, Inc. v. Pac. Tel. & Tel. Co.*, 168 Cal. App. 3d 455, 466 (Ct. App. 1985). Facebook argues that one cannot have both a contract claim, and breach of confidence claim under *Berkla v. Corel Corp.*, 302 F.3d 909, 917–18 (9th Cir. 2002). But the *Berkla* court simply found that after trial, a plaintiff could not recover twice for the same underlying misconduct; the breach of the non-disclosure agreement and the breach of confidence claims were redundant. *Id.* at 918. The district court permitted both claims to go to the jury. *Berkla v. Corel Corp.*, 66 F.Supp.2d 1129, 1151 (E.D. Cal. 1999). Pleading in the alternative is not prohibited by Rule 8(a)(3). *Berkla*, 302 F.3d at 918 n.9 ("Although the facts here do not permit Berkla to pursue remedies under both the breach of contract and the breach of confidence claims, this is not to say that a party will necessarily plead itself out of court if, in the face of a breach of an express NDA, it elects also to assert a breach of confidence claim arising out of a common nucleus of fact."). Plaintiff can plead both counts, and if a jury finds that—unlike in an NDA—there are no explicit contractual provisions that precluded Facebook's disclosure of user's PII to those who exploited Facebook's vulnerabilities, the breach of confidence claim can serve as a basis for Plaintiff's relief.

Also unpersuasive is Facebook's argument that it cannot have breached the confidence of Plaintiff because it did not knowingly disclose the material. Opp. at 13:16. *Berkla* set out the elements for breach of confidence as follows: "under California law, a plaintiff must demonstrate that: (1) the plaintiff conveyed 'confidential and novel information' to the defendant; (2) the defendant had knowledge that the information was being disclosed in confidence; (3) there was an understanding between the defendant and the plaintiff that the confidence be maintained; and (4) there was a

disclosure or use in violation of the understanding." 302 F.3d at 917 (citing *Enter. Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1226–27 (9th Cir. 1997)). Thus, Plaintiff has to allege Facebook knew that the PII was confidential and not to be disclosed, not that it knowingly disclosed it. PFAC, ¶¶ 304-306.

    **E.**    **Because Plaintiff Expended Valuable Consideration for Facebook's Services and was Forced to Deal with Facebook's Malfeasance, Plaintiff's UCL Claim May Proceed**

        **1.**    **Plaintiff Has Established Standing for UCL**

Facebook's argument that diminution of value in PII is not an "economic injury" ignores economic reality: the only reason that companies like Facebook can offer their services "for free" is because users are paying in PII. While the present-day understanding of the value of PII is rapidly evolving, Facebook largely relies on nearly decade-old case law.[9] For instance, the court in *In Re iPhone Application Litigation* held that PII is not "money or property" for purposes of UCL standing because the service at issue was "free of charge." No. 11-MD-02250-LHK, 2011 WL 4403963, at *14 (N.D. Cal. Sept. 20, 2011) (also defining a "consumer" as one who "paid fees" for the service); *see also Folgelstrom v. Lamps Plus, Inc.,* 195 Cal. App. 4th 986, 993 (2011) (plaintiff does not allege that he made a purchase or otherwise parted with money). Meanwhile, Facebook helped change the value of PII; it went public in 2012, and now seven years later, is converting the PII it receives "for free" into $56 billion dollars a year. PFAC, ¶11. The extrinsic and intrinsic value of PII to the consumer is now widely recognized. PFAC, ¶¶ 23-25. This court, too, has rejected the notion that Facebook's services are "free" and that Plaintiff gives up nothing of value to use the platform. *See* May 2, 2019 Hrg. Tr. at 24:2-24, 35:14-17. Plaintiff sufficiently alleges that PII functions as currency and that as a result of Facebook's conduct, his PII was obtained by hackers with no compensation to Plaintiff. Therefore, Plaintiff has standing to sue under the UCL.

---

[9] Contrary to Facebook's claim, Plaintiff did not cite to *In re Facebook Privacy Litigation,* 572 Fed. Appx. 494, 494 (9th Cir. 2014) for the proposition that the decision held PII to be "money or property" for the purposes of the UCL. Rather, Plaintiff cited it to show that plaintiffs "are not required to plead that there was a market for their PII *and* that they somehow also intended to sell their own PII" in order to plead damages for loss of value of PII. (ECF No.160 at 17).

### 2.     The PFAC Properly Pleads the Unlawful Prong of UCL

Facebook's claim that Plaintiff's UCL allegations are "threadbare," Opp. at 16, strains credulity. First, Plaintiff articulates the basis for the violation of the FTC Act, ¶¶ 132-168, incorporated by reference in Count VI (UCL). Over the course of thirty-six paragraphs, Plaintiff describes how Facebook fails to protect users' PII, and knowingly ignored a serious security vulnerability contrary to its obligations under the FTC Act. These allegations surpass the requirement that facts supporting the violation be pleaded with "reasonable particularity." *Compare with Baba v. Hewlett-Packard Co.*, No. C 09-05946 RS, 2010 WL 2486353, at *6 (N.D. Cal. June 16, 2010) (dismissing UCL claim where plaintiff put forth a single paragraph consisting of three conclusory statements to support violations of six California statutes, five of which were for fraud or deceit).

Second, Plaintiff also articulates a CRA violation. While Mr. Adkins is not a California resident, by Facebook's own admission, of the 70,000 tokens that were stolen in the data breach, at least some belonged to California residents. May 2, 2019 Hrg. Tr. at 51:19-23, 12:22 (defense counsel contending only that "most of the class are not California residents[.]"). This Court has already determined that an access token is a "password." (ECF No. 153 at 3). And contrary to Facebook's claim that one "cannot steal an access token from one site and reuse it on another," access tokens *can* be used on other sites. PFAC, ¶¶ 133, 147 (a "malicious actor could then reset all user permissions, passwords, and other safeguards (such as two-factor authentication) not only in Facebook, but also any third-party accounts that utilize Facebook's authentication login features without any additional verification and do so without alerting or notifying the users in any manner"). That Facebook allegedly invalidated these tokens later has no bearing on the fact that the violation occurred, forming a second predicate for the UCL claim.

### 3.     The PFAC Properly Pleads the Unfair Prong of UCL

Facebook's claim that Plaintiff's allegations are insufficient under the *South Bay* test and the "tethering" test for "unfair" conduct also lacks merit. *See* Opp. at 18; *see also Hodson v. Mars, Inc.*, 891 F.3d 857, 866 (9th Cir. 2018). First, the data breach was "substantially injurious" to Plaintiff because it resulted in diminished value of PII, time lost addressing the consequences of the breach,

and a future of "worrying whether or not this Facebook breach is going to come back to haunt [plaintiff] in ten years, or five years, or three years of his life." *Hodson*., 891 F.3d at 866; PFAC, ¶¶ 201-214; Jan. 1, 2019 Tutorial Proceeding Tr. at 108:16-19. Nor can Facebook credibly claim that Plaintiff failed to "offer any support" for the conclusion that Facebook engaged in unfair practices. *See* Opp. at 19. The practice at issue is not simply the use of access tokens, but the use of *non-expiring* access tokens that were already a *known* security risk. PFAC, ¶¶ 132-168. These same allegations also suffice under the "tethering" test: the FTC Act's[10] and CRA's[11] policies of adequately safeguarding personal information create a "nexus" with the challenged actions of not only failing to protect PII but knowingly ignoring a glaring security vulnerability. *See id.*; *see also Hodson*, 891 F.3d at 866.

### 4.    The PFAC Pleads Equitable Relief under the UCL

Facebook's lax security practices caused Plaintiff's information to be exposed for free (without compensation) whereas typically it would be shared as part of an exchange of PII for the use of services. It is undisputed that Facebook benefitted from acquiring Plaintiff's PII without having to expend the resources necessary to adequately protect it from the attack that occurred. Thus, as detailed above in Section II.E.1, Plaintiff both lost money or property on one hand and Facebook acquired money (saved on security) on the other. *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 336 (2011). He is therefore entitled to seek injunctive relief under the UCL.

Facebook's claim that injunctive relief is inappropriate because the data breach already occurred is similarly misguided. Plaintiff alleges that Facebook continues to have flawed security practices that invited the breach. Facebook is free to contest Plaintiff's evidence or present its own evidence to the contrary at a later stage; but the adequacy of Facebook's current security practices is a factual dispute that cannot be decided at the pleading stage.

---

[10] *See, e.g., Protecting Personal Information: A Guide for Business* (FTC Oct. 2016), available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf

[11] The CRA "regulates businesses with regard to treatment and notification procedures relating to their customers' personal information." *Corona v. Sony Pictures Entm't, Inc*., No. 14-CV-09600-RGK, 2015 WL 3916744, at *6 (C.D. Cal. June 15, 2015).

**F.    Plaintiff's Negligence Claim Remains Properly Pleaded and the Relief Requested – Credit Monitoring – is Well-Supported Given the Risks Related to Facebook's Negligence and the Utility of Preventing Future Harm**

The PFAC exhaustively details how Facebook's affirmative negligence caused the breach and unauthorized disclosure of PII. This included several admissions after the fact. *See* PFAC, ¶¶ 148-168.[12] Facebook wrongly demands that the Court deny leave to add credit monitoring or punitive damages to the negligence claim. Opp. at 21. Facebook hinges its demand as to credit monitoring on Mr. Adkins' decision not to purchase credit monitoring after the breach. *Id.* at 22. According to Facebook, "this is dispositive." That conclusion, however, is wrong. While Facebook cites to a 40-year-old decision that holds future harm does not create a cause of action for negligence, it ignores that the PFAC seeks credit monitoring *as a relief* to deal with the future harm created by Facebook's misconduct and not a separate cause of action. PFAC, ¶¶ 225(i), 286; at 69, ¶ C. This coincides with California law and the analogue to credit monitoring: medical monitoring.

The connection between credit monitoring and medical monitoring was established in *Corona v. Sony Pictures Entertainment, Inc.*, 2015 WL 3916744 (C.D. Cal. June 15, 2015). There, plaintiffs sued their employer for its negligence regarding their personal data that was hacked. Among the relief sought was the costs for credit monitoring. *Id.* at *4. The court then looked to California law and found that monitoring to diminish or prevent future harm was permissible relief for a negligence claim in toxic exposure cases. *Id.* (citing *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965 (1993)). The court examined the five factors that would support this relief, and re-articulated them for the data breach context as: (1) the significance and extent of the compromise to Plaintiffs' PII; (2) the sensitivity of the compromised information; (3) the relative increase in the risk of identity theft when compared to (a) Plaintiffs' chances of identity theft had the data breach not occurred, and (b) the chances of the public at large being subject to identity theft; (4) the seriousness of the consequences

---

[12] Facebook directs this Court to PFAC, ¶ 167 and claims is "an outright false" accusation. Opp. at 24:20. The paragraph at issue is not "false," but did contain a typo in the Bates number of a document that supports the paragraph's conclusion. *See* McNamara Decl. at ¶ 3. Plaintiff apologizes that this mistake was not noted sooner. Of course, this is all peripheral to this motion to amend: no citations are required for allegations in a complaint. Fed. R. Civ. P. 8(a)(2). To avoid distraction from the motion at hand, should the Court grant leave, Plaintiff will file the PFAC *without* the sentence at issue in ¶ 167 and *without* the corresponding reference in ¶ 282. *See* McNamara Decl. ¶ 8.

13

resulting from identity theft; and (5) the objective value of early detection. *Id*. The *Corona* court noted that among the sensitive data stolen was not only Social Security numbers and bank account information, but "names, home and email addresses[.]" *Id*. The court agreed that the breach exposed sensitive data to the public, increased the risk of identity theft, that the "risk of identity theft" can be "both serious and long-lasting," and that early detection was valuable. *Id*.

Neither *Potter* nor *Corona* require the injured party to have already purchased monitoring in order to claim it as relief. And for good reason: why should the injured party be required upfront to absorb the costs of defendant's negligence? In one Fen-Phen case, where plaintiffs demanded the drug maker pay for expensive echocardiograms, the court flatly rejected a process that burdened the victim with costs first before pursuing relief:

> Although one might suggest that plaintiffs should wait until after the expenses of monitoring have been incurred before a cognizable claim arises, such a holding would foreclose countless economically disadvantaged individuals from obtaining the supervision that they need, and, regardless of financial need, simply force the victims, rather than the wrongdoers, to initially bear these great expenses. Such a result is untenable in a court of equity.

*Petito v. A.H. Robins, Co., Inc.*, 750 So.2d 103, 105 (Fla. App. Ct. 1999).

Adkins testified he lacked not the interest in purchasing credit monitoring, but the funds. PFAC, ¶ 211. While Facebook reads *Corona* as rejecting relief for "future harm", that language addressed the inability of the plaintiff to show that "increased risk in harm that has no yet occurred" constituted a *cognizable injury*, not whether credit monitoring must be purchased before it could be part of the relief. *Corona*, 2015 WL 3916744 at *4. This Court already found a cognizable injury from identity theft. (ECF No. 153 at 10) ("As a result of this data breach, this information can now forever be wielded to identify Adkins and target him in fraudulent schemes and identity theft attacks.").[13] Where the plaintiff has already shown malfeasance, monitoring is recognized as a compensable

---

[13] Facebook also cites *Ruiz v. Gap, Inc.* as a basis for rejecting credit monitoring when it was not already purchased. 380 F.App'x 689, 691 (9th Cir. 2010). But that case is factually distinguishable because "Gap sent Plaintiff and the putative class members a notice letter offering twelve months of credit reporting and fraud assistance without charge." *Ruiz v. Gap, Inc.*, No. 08-5739 SC, 2009 WL 250481, at *3 (N.D. Cal. Feb. 3, 2009).

expense under California law. *Xavier v. Philip Morris USA Inc.,* 2010 WL 3956860, at *4 (N.D. Cal. Oct. 8, 2010).

Facebook relies, in error, on *Stollenwerk v. Tri-West. Health Care Alliance* to contend that Plaintiff has not shown that credit monitoring is needed, and that a free option might suffice. *See* Opp. at 23; *see also* 254 F. App'x 664, 665 (9th Cir. 2007). *Stollenwerk* addressed the sufficiency of evidence on summary judgment—not at the pleading stage. 254 F. App'x at 665. Here, Plaintiff alleges that "some experts recommend that data breach victims obtain credit monitoring services for at least ten years following a data breach. Annual subscriptions for credit monitoring plans range from $219 to $329 per year." PFAC, ¶ 200. Plaintiff's expert(s) will testify to this, and the Court can make the determination if Plaintiff has demonstrated sufficient grounds for credit monitoring beyond simply placing fraud alerts or repeatedly examining their credit reports. *Stollenwerk's* critique that the plaintiff's expert had not shown why additional credit monitoring was necessary is simply inapplicable here. *See* 254 F. App'x at 667.

Finally, Facebook demands that the Court deny leave to add punitive damages. Opp. at 23. Among the flaws in this argument, Plaintiff had already included punitive damages as among the relief sought in the original complaint, and Facebook did not move to strike. (ECF No. 76 at 60, ¶ C). While this relief is not contingent on the negligence claim, affirmative negligence, as pleaded in the PFAC, can provide a basis for punitive damages where there is conscious disregard for a risk. (ECF No. 160 at 15). The PFAC cites to documents received from Facebook that indicate Facebook's pre-breach knowledge of the risk, and post-breach admissions that Facebook could have acted sooner but did not. PFAC, ¶¶ 149-168. Plaintiff concurs with Facebook that the "veracity of the allegations are not at issue for present purposes." Opp. at 24. The Court should not strike any potential punitive damages remedy at this juncture in response to Plaintiff's motion.

## III.   CONCLUSION

The PFAC addresses and remedies, where possible, the deficiencies in its initial consolidated complaint, including the issues noted by this Court in its June 21st Order. Plaintiff's Motion for Leave to File the First Amended Consolidated Complaint should therefore be granted.

DATED: August 8, 2019

Respectfully submitted,

By: /s/ Andrew N. Friedman
Andrew N. Friedman (*pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
dmcnamara@cohenmilstein.com
kputtieva@cohenmilstein.com

John A. Yanchunis (pro hac vice)
jyanchunis@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin St., 7th Floor
Tampa, FL  33602
Telephone:  813/223-5505
Facsimile:  813/2223-5402

Ariana J. Tadler (*pro hac vice*)
atadler@tadlerlaw.com
**TADLER LAW, LLP**
One Penn Plaza
New York, NY  10119
Telephone: (212) 946-9453
Facsimile: (212) 273-4375

*Counsel for Plaintiff*

1

2

**SIGNATURE ATTESTATION**

3       I am the ECF User whose identification and password are being used to file Plaintiff's Reply

4 Memorandum In Support of Plaintiff's Motion for Leave to File First Amended Consolidated

5 Complaint. I, Andrew N. Friedman, attest that service has been effectuated via ECF.

6 DATED: August 8, 2019                              /s/ Andrew N. Friedman

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28