Andrew N. Friedman (*pro hac vice*)
afriedman@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
201 N. Franklin St., 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402

Ariana J. Tadler (*pro hac vice*)
atadler@tadlerlaw.com
**TADLER LAW, LLP**
36th Floor
One Penn Plaza
New York, NY 10119
Telephone: (212) 946-9453
Facsimile: (212) 273-4375

*Attorneys for Plaintiff Stephen Adkins*

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| STEPHEN ADKINS, an individual and Michigan resident, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>FACEBOOK, INC.,<br><br>    Defendant. | No.  C 18-05982 WHA (JSC)<br>***Consolidated Cases:***<br>No.  C 18-06022 WHA (JSC)<br>No.  C 19-00117 WHA (JSC)<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT FACEBOOK, INC.'S MOTION TO EXCLUDE THE DECLARATION AND OPINIONS OF PLAINTIFF'S EXPERT JAMES VAN DYKE**<br><br>Date: November 6, 2019<br>Time: 8:00am<br>Court: Courtroom 12, 19th Floor<br>Hon. William Alsup |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

RELEVANT BACKGROUND ....................................................................................... 2
    A.    Plaintiff's Claims .................................................................................. 2
    B.    Mr. Van Dyke's Experience and Top-Line Conclusions ..................... 2
    C.    Mr. Van Dyke Concluded That All Class Members Are at an Increased Risk of Identity Fraud ............................................................... 4
    D.    Mr. Van Dyke Proposed Several Measures to Mitigate the Risk Created by the Breach ............................................................................ 5
    E.    In His Deposition and Reply Declaration, Mr. Van Dyke Reiterated and Clarified His Findings ................................................................... 5
    F.    The Present Motion ............................................................................... 6

LEGAL STANDARD ..................................................................................................... 6

ARGUMENT .................................................................................................................. 7

I.    MR. VAN DYKE'S TESTIMONY MEETS THE REQUIREMENTS OF RULE 702 AND *DAUBERT* ............................................................................. 7
    A.    Mr. Van Dyke Is Qualified and Relied on Sufficient Facts and Data .... 7
    B.    Mr. Van Dyke's Testimony is Reliable ............................................... 8
    C.    Mr. Van Dyke's Testimony is Relevant to Questions of Causation, Damages and Remedies ...................................................................... 10

II.    FACEBOOK'S ARGUMENTS FOR EXCLUDING MR. VAN DYKE'S TESTIMONY FAIL ............................................................................................. 11
    A.    Mr. Van Dyke Discussed the Facts of This Case Rather than Focus on SSNs ....... 11
    B.    Mr. Van Dyke's Analysis of a Typical Class Member is Proper ............ 13
    C.    The Analysis Was Grounded in Knowledge, Experience, and Reputable Sources ............................................................................... 16
    D.    Mr. Van Dyke's Testimony is Relevant to American Class Members .................. 17
    E.    Mr. Van Dyke Did Not Intend to Offer an Opinion as to the Value of Compromised PII ............................................................................... 18

CONCLUSION ............................................................................................................. 18

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Anthem, Inc. Data Breach Litigation,*
  Case No. 15-md-02617 (N.D. Cal.) ...................................................................3, 12

*City of Pomona v. SQM N. Am. Corp.,*
  750 F.3d 1036 (9th Cir. 2014)..........................................................................7

*Daubert v. Merrell Dow Parhma. (Daubert II),*
  43 F.3d 1311 (9th Cir. 1995)............................................................................9

*Daubert v. Merrell Dow Pharma., Inc.,*
  509 U.S. 579 (1993) ............................................................................... *passim*

*In re Equifax, Inc. Customer Data Security Breach Litig.,*
  Case No. 17-md-2800 (N.D. Ga.) ...................................................................3

*Fero v. Excellus Health Plan, Inc.*
  Case No. 15-cv-06569 (W.D.N.Y.)...................................................................3

*In re Graphics Processing Units Antitrust Litig.,*
  253 F.R.D. 478 (N.D. Cal. 2008) ...................................................................15

*Hopkins v. Dow Corning Corp.,*
  33 F.3d 1116 (9th Cir. 1994).............................................................................9

*Ileto v. Glock Inc.,*
  349 F.3d 1191 (9th Cir. 2003)..........................................................................10

*Int'l Bhd. of Teamsters v. U.S.,*
  431 U.S. 324 (1977) ........................................................................................14

*Kumho Tire Co., Ltd. v. Carmichael,*
  526 U.S. 137 (1999) ....................................................................................8, 10

*Larson v. Kempker,*
  414 F.3d 936 (8th Cir. 2005)............................................................................16

*Lavender v. Driveline Retail Merchandising Inc.,*
  Case No. 18-cv-02097 (C.D. Ill.) ....................................................................3

*Mangold v. Cal. Pub. Utils. Comm'n,*
  67 F.3d 1470 (9th Cir.1995).............................................................................14

*Martinez v. Pacific Bell,*
  275 Cal. Rptr. 878 (1990).................................................................................10

ii

*Moench v. Marquette Transp. Co. Gulf-Inland*,
    838 F.3d 586 (5th Cir. 2016)...................................................................16

*Obrey v. Johnson*,
    400 F.3d 691 (9th Cir. 2005)............................................................. *passim*

*In re: Premera Blue Cross Customer Data Security Breach Litig.*,
    Case No. 15-md-2633 (D. Or.)...................................................................3

*Primiano v. Cook*,
    598 F.3d 558 (9th Cir. 2010).............................................................7, 17

*Schwab v. Philip Morris USA, Inc.*,
    449 F. Supp. 2d 992 (E.D.N.Y. 2006), *rev'd on other grounds sub nom*
    *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008)...........16, 18

*Smith v. Ford Motor Co.*,
    215 F.3d 713 (7th Cir. 2000)............................................................10, 17

*Stilwell v. Smith & Nephew, Inc.*,
    482 F.3d 1187 (9th Cir. 2007)....................................................................7

*U.S. v. Hankey*,
    203 F.3d 1160 (9th Cir. 2000)........................................................8, 10, 17

*U.S. v. Hansen*,
    262 F.3d 1217 (11th Cir. 2001)................................................................16

*In re: Yahoo! Inc. Customer Data Security Breach Litig.*,
    Case No. 16-md-02752 (N.D. Cal.) ............................................................3

**STATUTES**

Fed. R. Evid. 702.............................................................................. *passim*

# INTRODUCTION

This case concerns a data breach that compromised the personally identifiable information ("PII") of 29 million Facebook users. In the course of this litigation, several key questions must be answered: Are these users—who make up the putative class—now exposed to an increased risk of identity fraud? If so, how did the Facebook data breach lead to such a risk? And what measures can be taken to mitigate the risk that has resulted?

Plaintiff's expert James Van Dyke has provided a Declaration to shed light on these questions. The Declaration concludes that all class members face an increased risk of identity fraud as a result of the breach. Mr. Van Dyke explains how fraudsters can use stolen PII to reconstruct a person's identity, gain access to even more information, and commit identity fraud. He also recommends several remedial measures to reduce the risk that has been created. Defendant Facebook moves to exclude all of his Declaration and testimony under *Daubert*.

The *Daubert* inquiry focuses on the qualifications of a proposed expert, and the reliability and relevance of his testimony. Mr. Van Dyke satisfies all three of these requirements. He is qualified to opine on data breaches, having consulted with the Federal Trade Commission and with big businesses while at Javelin Strategy & Research and through his latest venture with the Identity Theft Resource Center. In fact, Facebook does not even challenge his qualifications.

In addition, his testimony is reliable and relevant. His analysis is based on those aforementioned experiences and undisputedly reputable sources. He applied a methodology well-accepted in the field and copied by Defendant's own professed experts. And his testimony is relevant, as it helps to establish both the harm done to the class and the appropriate remedy.

Facebook attempts to discredit Mr. Van Dyke on multiple fronts. It claims that Mr. Van Dyke ignores the specific facts of this case, even though he clearly analyzes the risk associated with the specific types of PII at issue here. It criticizes him for focusing on the typical class member while ignoring both his stated justifications and relevant precedent. It accuses him of "[p]ure [c]onjecture" despite the research and professional experience supporting his conclusions. Most importantly, Facebook nitpicks Mr. Van Dyke's testimony while largely ignoring his central

claim—that all class members suffer from an increased risk of identity fraud—a claim that is both reliable and relevant in accordance with *Daubert*. For the reasons that follow, Facebook's Motion to Exclude should be denied.

## RELEVANT BACKGROUND

### A.  Plaintiff's Claims

On September 14, 2018, hackers began pilfering the personally identifiable information ("PII") of Facebook users. *See* Doc. 198, Mem. ISO Class Cert. at 8. They did so by exploiting "NoConfidence" tokens, a type of access token posing serious security risks that Facebook recognized but failed to address. *Id.* at 2–7. Although Facebook first learned of a potential data breach on September 17, its failure to staunch the attack until September 27 led to victimization of 29 million Facebook users. *Id.* at 9. Plaintiff Stephen Adkins was one of those victims. Group 2 users—of whom Mr. Adkins was a part—had not only their user name and phone number or email address compromised, but also a category of PII including their date of birth, IP address, hometown, education, and list of people and places "liked" on Facebook. Doc. 213 (Mem. Supporting Mot. to Exclude) at 5 (internal citations omitted); Van Dyke Decl. ¶ 4.b, Doc. 197-32. Mr. Adkins asserts that Facebook was grossly negligent, and seeks class-wide relief against Defendant Facebook for, among other things, credit monitoring as a damage remedy. Doc. 198 at 10–11.

### B.  Mr. Van Dyke's Experience and Top-Line Conclusions

As one of Plaintiff's experts, James Van Dyke evaluated whether class members face an increased risk of identity fraud as a result of the 2018 Facebook data breach, and if so what remedial measures they should take to mitigate the risk created. *See generally* Van Dyke Decl.

Mr. Van Dyke has more than a decade of experience conducting and publishing primary research on consumer identity theft. Van Dyke Decl. ¶ 1.d. He is the CEO and Founder of both "a research-based consulting firm specializing in . . . consumer identity fraud and security" and the CEO of a company providing services for consumers after publicly-reported U.S. data breaches. *Id.* ¶ 1.b. He also founded and was the CEO of a research provider whose studies "represent the largest body of available identity-theft research." *Id.* ¶¶ 1.c, 1.h. He serves on the board of directors

2

of the Identity Theft Resource Center ("ITRC") and previously served on the Consumer Advisory Board of the Consumer Financial Protection Bureau ("CFPB"), *id.* ¶ 1.c, among many other qualifications, *see generally id.* ¶ 1. He is in contact with law enforcement officials and others involved in the field of consumer identity fraud. *See* Pl. Ex. 42, Van Dyke Dep. at 134:5–7. Mr. Van Dyke has served as an expert in several past cases, in federal court and elsewhere. Van Dyke Decl. ¶ 1.l; *see also* Decl. of James Van Dyke in *In re Equifax, Inc. Customer Data Security Breach Litig.*, ("Equifax Decl."), Doc. 217-11.[1]

Mr. Van Dyke's Declaration had two overarching conclusions:

(1) The data breach meaningfully increased the risk of identity fraud for all class members. Van Dyke Decl. ¶¶ 4.c, 5.

(2) To mitigate that risk, class members should obtain call blocker services; digital security software; and identity protection services ("IDPS") that include three-bureau credit monitoring, new account monitoring, and web scanning. *Id.* ¶ 7.a–d.

Mr. Van Dyke noted that breach victims have been divided into Group 1 (whose access tokens, names, phone numbers, and email addresses were compromised) and Group 2 (who, in addition, have had their date of birth, gender, IP address, hometown, current city,[2] work, and other PII compromised). *Id.* ¶¶ 4.a–b.[3] Nevertheless, Mr. Van Dyke determined that he would evaluate

---

[1] His testimony has never been excluded under *Daubert* in any of these cases. *See Lavender v. Driveline Retail Merchandising Inc.*, Case No. 18-cv-02097 (C.D. Ill.) (not challenged); *In re Equifax, Inc. Customer Data Security Breach Litig.*, Case No. 17-md-2800 (N.D. Ga.) (not challenged); *In re: Yahoo! Inc. Customer Data Security Breach Litig.*, Case No. 16-md-02752 (N.D. Cal.) (motion filed, case settled before ruling); *Kimpton Hotels/IHG*, Case No. 16-cv-05387 (N.D. Cal.) (not challenged); *Fero v. Excellus Health Plan, Inc.* Case No. 15-cv-06569 (W.D.N.Y.) (not challenged); *In re Anthem, Inc. Data Breach Litigation*, Case No. 15-md-02617 (N.D. Cal.) (motion filed, case settled before ruling); *In re: Premera Blue Cross Customer Data Security Breach Litig.*, Case No. 15-md-2633 (D. Or.) (not challenged).

[2] Contrary to Facebook's assertions, *see* Doc. 213 at 4, Mr. Van Dyke did not believe that class members' physical home addresses were exposed. Pls. Ex. 42, Sep. 17, 2019 Van Dyke Dep. at 295:5–15; Pls. Ex. 32, Oct. 9, 2019 Reply Decl. of James Van Dyke ("Van Dyke Reply") ¶ 2.f. All citations to exhibits are to the October 10, 2019 Declaration of Douglas J. McNamara filed with the Plaintiff's Reply in Support of Class Certification and the opposition to Defendant's motion to exclude the testimony of James Van Dyke (Doc. 213) and Ian Ratner (Doc. _).

[3] The Class Certification Motion also discusses a relatively smaller group, Group 3, from whom attackers obtained the same PII as for Group 2. *See* Doc. 198 at 10.

3

the victims as a whole because they have been exposed to the same pattern of risks and because simplicity in recommending remedial measures is important. *Id.* ¶¶ 4.d–f.

> ### C.   Mr. Van Dyke Concluded That All Class Members Are at an Increased Risk of Identity Fraud

Mr. Van Dyke's Declaration begins by noting trends in identity fraud. *Id.* ¶¶ 3.a–j. Specifically, he cites data from LexisNexis, the ITRC, and the Federal Trade Commission to conclude that "[c]onsumer victims of data breaches are much more likely to become victims of identity fraud." *Id.* ¶¶ 3.d–e. He then points to data showing that each data breach a person experiences increases her chances of being a victim of identity fraud, with each successive breach linked to greater risk. *Id.* ¶¶ 3.f–g.

Mr. Van Dyke also described the mechanisms by which a data breach leads to an increased risk of identity fraud:

> More damaging forms of misuse often result from criminals amassing more elements of any one consumer's data—akin to assembling all pieces of a puzzle. As an example of how initial data exposure can steadily increase risk (which no doubt increases as more data is made available), a starting-set of breached data may first enable criminals to identify victims by address or other method, while also providing the starting-point of PII that will eventually be used to successfully impersonate the possible targets. Information from multiple points of exposure can be combined to gain an identity-holder's confidence that the criminal is an authorized service provider and thus persuade the victim to reveal missing high-value data, such as a password or financial account payment information.

*Id.* ¶ 3.n. He explained that fraudsters can build a full identity profile by piecing together PII acquired in data breaches and from other sources. *Id.* ¶¶ 3.k–p. In addition to obtaining PII on the dark web, *id.* ¶¶ 3.k–m, criminals may engage in social engineering (using PII to gain a victim's or a third-party's trust, obtaining more PII and eventually committing fraud), *id.* ¶ 3.o. Mr. Van Dyke also explained that data breaches only occur if the PII obtained has "real monetary value" to the criminals who obtain it. *Id.* ¶ 3.s.

Mr. Van Dyke then discussed several ways in which the breach of the types of PII gained in this case increases the risk of identity fraud. For example, employment data can be used to create and access bank accounts, *id.* ¶ 5.e, PII can be used to gain approval for large overseas bank

transfers, *id.* ¶ 5.f, biographical information can be used to answer knowledge-based authentication ("KBA") questions in perpetration of new account fraud, *id.* ¶ 5.h, and PII can be used to accomplish account takeover, *id.* ¶¶ 5.*l*–m. And he discussed how identity fraud creates "significant monetary, emotional, and other injuries." *Id.* ¶¶ 5.m–r. From all this, Mr. Van Dyke determined that class members face an elevated risk of identity fraud.

**D.**    **Mr. Van Dyke Proposed Several Measures to Mitigate the Risk Created by the Breach**

Mr. Van Dyke then explored possible remedial measures. He summarized the three types of action that could be taken: prevention, detection, and resolution. *Id.* ¶¶ 6.b–e. He then surveyed various measures: credit monitoring with the three major credit bureaus, *id.* ¶¶ 6.g–h, fraud alerts, *id.* ¶¶ 6.i–k, new deposit account fraud detection, *id.* ¶ 6.l, vigilance towards social engineering scams, *id.* ¶¶ 6.m–n, web monitoring, id. ¶ 6.o, use of secondary authentication, *id.* ¶ 6.p, and account monitoring, *id.* ¶ 6.q. While discussing each possible measure, Mr. Van Dyke identified some measures that, in his opinion, were too costly to justify their benefits. *Id.* ¶¶ 6.r, 7.d.

Mr. Van Dyke ultimately concluded that class members should be provided with call blocker services; digital security software; and a single IDPS solution that includes three-credit-bureau monitoring, new deposit account monitoring, and web monitoring. *Id.* ¶¶ 7.a–d. He valued these measures at $274–415 per person per year and $1,370–$2,295 for five years. *Id.* ¶ 7.h.

Mr. Van Dyke explained that a complicated recommendation can confuse a victim and therefore limit the efficacy of a remedial measure. *Id.* ¶¶ 4.f, 7.c. For this reason, he proposed a uniform and simple solution for the entire class.

**E.**    **In His Deposition and Reply Declaration, Mr. Van Dyke Reiterated and Clarified His Findings**

Mr. Van Dyke was deposed on September 17, 2019. Van Dyke Dep. at 1:16–19. At his deposition, he largely reiterated the findings made in his Declaration. He explained in detail the mechanisms by which the type of PII breached in this case could lead to identity fraud. *See id.* at 131:9–137:6, 286:25–287:17, 350:12–351:15. He also emphasized that all victims of fraud face a similar pattern of increased risk, *id.* at 37:3–21, and that a simple solution is necessary to avoid

confusion and increase participation. *id.* at 116:9–21. He also clarified that he did not analyze risk exposure for class members outside the United States, *id.* at 145:13–14, nor did he intend to calculate the value of the PII that was stolen, *id.* at 377:12–16.

Mr. Van Dyke also wrote a Reply Declaration to respond to criticism from both Facebook and its experts. Pls. Ex. 32, Oct. 9, 2019 Reply Decl. of James Van Dyke ("Van Dyke Reply"). Among other things, Mr. Van Dyke reiterated his credentials, *id.* ¶ 1.c, emphasized one of his central findings that all class members are now at an increased risk of identity fraud, *id.* ¶ 2.a, explained how the PII acquired in the Facebook data breach could be used to perpetrate identity fraud, *id.* ¶ 2.b, and clarified that neither physical addresses nor maiden names were among the PII acquired, and that he did not attempt to measure the value of PII that was compromised, *id.* ¶ 2.f–g, i. He also explained that, although he did not initially quantify the level of increased risk caused by the breach, an algorithm from his company Breach Clarity estimated that risk at a 6 out of 10. *Id.* ¶¶ 2.h.

**F.     The Present Motion**

On September 26, 2019, Facebook filed a Motion to Exclude the Declaration and Opinions of Plaintiff's Expert James Van Dyke. Doc. 213. Facebook seeks to exclude "Van Dyke's entire report and opinions." *Id.* at 1.

## LEGAL STANDARD

The Federal Rules of Evidence provide that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Thus, the admissibility of expert testimony depends on (1) the expert's qualifications, (2) the helpfulness of the expert's knowledge to the factfinder, (3) the sufficiency of the facts or data used, (4) the reliability of the principles and methods applied, and (5) the expert's reliable application of the principles and methods to the facts of the case. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014) (citing Fed. R. Evid. 702). The central concerns of Rule 702 are reliability and relevance (sometimes called "helpfulness"). *See Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 590–91 (1993); *City of Pomona*, 750 F.3d at 1043–44 ("The trial court must assure that the expert testimony both rests on a reliable foundation and is relevant to the task at hand." (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010))); *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) ("Rule 702 embodies the twin concerns of reliability and helpfulness." (citation, quotation marks, and brackets omitted)).

"[T]he rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury." *City of Pomona*, 750 F.3d at 1044.

## **ARGUMENT**

### I.    MR. VAN DYKE'S TESTIMONY MEETS THE REQUIREMENTS OF RULE 702 AND *DAUBERT*

#### A.    Mr. Van Dyke Is Qualified and Relied on Sufficient Facts and Data

An expert must be "qualified . . . by knowledge, skill, experience, training, or education," and his testimony must be "based on sufficient facts or data." Fed. R. Evid. 702. Both requirements are easily met in this case.

Facebook does not question Mr. Van Dyke's qualifications. His experience conducting and publishing research, founding and running organizations focused on identity fraud protection, and his service with the ITRC and the CFPB place his qualifications as an expert beyond reproach. *See* Van Dyke Decl. ¶ 1.

7

Mr. Van Dyke relied on sources of a high caliber. Throughout his Declaration, Mr. Van Dyke used data from government agencies including the Federal Trade Commission, Department of Justice, and Government Accountability Office, *see, e.g.*, *id.* ¶¶ 3.e, 3.q, 5.k, and organizations like Javelin Strategy & Research, LexisNexis and the ITRC, *see, e.g.*, *id.* ¶¶ 3.d, 3.e. Facebook does not dispute the quality of the data Mr. Van Dyke utilized.

### B.   Mr. Van Dyke's Testimony is Reliable

An expert's testimony must be "the product of reliable principles and methods," and the expert must "reliably appl[y] the principles and methods to the facts of the case." Fed. R. Evid. 702(c), (d). The reliability inquiry is "a flexible one." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (quoting *Daubert*, 509 U.S. at 594). It focuses on whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. In areas less susceptible to the scientific method, reliable opinions may be based on "data gathered from years of experience and special knowledge." *See U.S. v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (allowing testimony on gang practices by a veteran police officer who had worked undercover with gang members).

The first major conclusion in Mr. Van Dyke's Declaration is that the class was exposed to increased risk of identity fraud. *See* Van Dyke Decl. ¶ 5. He arrived at this conclusion by:

(1) noting the correlation between data breaches and reported identity fraud over the course of eleven years, *id.* ¶¶ 3.d–e;[4]

(2) showing that those who are the victim of multiple data breaches have a higher incidence of identity fraud, *id.* ¶¶ 3.f–g;[5]

---

[4] Catherine Tucker points out that correlation does not necessarily establish causation. Tucker Decl. ¶ 71. This does not mean, however, that examining correlations is an unacceptable method under *Daubert*. *See, e.g.*, *Obrey v. Johnson*, 400 F.3d 691, 695–97 (9th Cir. 2005) (allowing an expert to present evidence of correlation).

[5] Mr. Van Dyke obtained this data from his former company – Javelin Strategy & Research – that has a subscription service regarding data breach risks. Decl. ¶ 3.f–g; Van Dyke Reply ¶ 1.c.iii. Javelin uses this data to advise digital banking clients in the area of fraud and security trends. *See* Javelin, *Fraud & Security Research*, https://www.javelinstrategy.com/coverage-area/fraud-security (last visited Oct. 3, 2019).

8

(3) describing the mechanisms by which criminals use PII to perpetrate identity fraud, *id.* ¶¶ 3.b–c, 3.k–p;

(4) explaining that criminals would not attempt to scrape PII if they could derive no benefit from it, *id.* ¶ 3.s;

(5) summarizing the specific types of PII acquired in this case, *id.* ¶¶ 4a–b,

(6) discussing several specific methods of using the kind of PII gathered in this case to conduct identity fraud, including employment information compromise, new account fraud, and account takeover, *id.* ¶¶ 5.d–n; and

(7) explaining how a victim incurs harms such as loss of time and money, *id.* ¶¶ 5.o–q.

Mr. Van Dyke's methodology is straightforward and clearly reliable. He drew upon statistical data and his knowledge and experience in the field to show that victims of the Facebook data breach are at an increased risk of identity fraud, and he explained exactly how such a breach leads to that increased risk.

Facebook's own witnesses—Austin Berglas and Catherine Tucker—also analyze whether or not the Facebook data breach leads to an increased exposure to identity fraud by discussing how criminals might use the PII that was scraped in the breach. *See* Doc. 227 (Berglas Decl.), ¶¶ 15–43; Doc. 226-4 (Tucker Decl.), ¶¶ 15–51. To the extent that the Court finds their methodology admissible—though Plaintiff does not necessarily agree with that position[6]—it should recognize that Mr. Van Dyke's testimony uses a similar approach. Moreover, evaluating the risk of harm to which a group is exposed is not controversial. In fact, epidemiological evidence often takes this form. *See, e.g., Daubert v. Merrell Dow Parhma.* (*Daubert II*), 43 F.3d 1311, 1321 (9th Cir. 1995) (stating that evidence "show[ing] that children whose mothers took Bendectin are more than twice as likely to develop limb reduction birth defects as children whose mothers did not" would be admissible); *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1124-25 (9th Cir. 1994) (admitting evidence linking silicone implants to mixed connective tissue disease). Finally, Mr. Van Dyke's

---

[6] Plaintiff has not filed a motion to disqualify Mr. Berglas or Dr. Tucker. If he chooses to, he would file any such motion closer to the end of discovery, consistent with the Court's orders. *See* Case Mgmt. Order ¶ 6 (setting the expert discovery deadline in February 2020).

1    concerns were echoed by one of Facebook's own software engineers, who noted that ███████
2    ████████████████████████████████████████████████████████████████████████████
3    ████████████████████████████████████████████████████████████ Pls. Ex. 34, FB-
4    SCHMIDT-000099557.

5         After concluding that the class suffers from an elevated risk of identity fraud, Mr. Van Dyke
6    discussed how that risk could be mitigated. Van Dyke Decl. ¶ 6. He analyzed half a dozen
7    categories of measures that could be taken. Van Dyke Decl. ¶¶ 6.g–q. He arrived at his ultimate
8    recommendations after thoroughly explaining the benefits of each remedial measure, *id.* ¶¶ 6.b–q,
9    and after rejecting some measures that do not offer meaningful value for their price, *id.* ¶¶ 6.r, 7.d.
10   His opinions as to a proper remedy for the data breach draw on years of experience working in the
11   field of consumer identity fraud prevention, and his testimony reliably reflects the knowledge
12   acquired through that experience.

13        Mr. Van Dyke's testimony rested on his experience in the field of consumer identity fraud.
14   He rigorously analyzed both the mechanisms by which the Facebook data breach increased the risk
15   of identity fraud and the most appropriate remedial measures. His testimony bears the hallmarks of
16   reliability and is admissible. *See Kumho Tire Co.*, 526 U.S. at 152; *Hankey*, 203 F.3d at 1169.

17   **C.   Mr. Van Dyke's Testimony is Relevant to Questions of Causation, Damages and Remedies**

18        The question of relevance is whether the testimony "relate[s] to an[] issue in the case,"
19   *Daubert*, 509 U.S. at 591 (citation omitted), and "will help the trier of fact to understand the
20   evidence or to determine a fact in issue." Fed. R. Evid. 702(a). An expert's testimony is not required
21   to definitively prove a fact at issue; whether it does so is a question of weight, not admissibility.
22   *Obrey v. Johnson*, 400 F.3d 691, 696–97 (9th Cir. 2005). Rather, "expert testimony need only be
23   relevant to evaluating a factual matter in the case." *Smith v. Ford Motor Co.*, 215 F.3d 713, 720
24   (7th Cir. 2000); *Obrey*, 400 F.3d at 696–97.

25        Plaintiff asserts a claim of negligence against Facebook; causation and damages are two
26   elements of a negligence cause of action. *Ileto v. Glock Inc.*, 349 F.3d 1191, 1203 (9th Cir. 2003)
27   (citing *Martinez v. Pacific Bell*, 275 Cal. Rptr. 878, 883 (1990)); *see also* Doc. 198 at 13 (raising
28

10

as a common issue "[w]hether Facebook's negligence caused harm to Plaintiff and class members"). Mr. Van Dyke's testimony speaks directly to those elements, as it helps to establish how the Facebook data breach caused harm to the class in the form of an increased risk of identity fraud. *See* Van Dyke Decl. ¶ 5.

Additionally, Mr. Van Dyke's testimony is relevant to the question of remedies. Plaintiff seeks, as one remedy in this case, credit monitoring, Am. Compl. ¶ 211, and Mr. Van Dyke's Declaration explains why credit monitoring is an appropriate remedy. Van Dyke Decl. ¶¶ 6.g–h. He also discusses various other measures that the class could take to protect themselves from identity fraud and explains why they may (or may not) redress the harm done by the breach. *Id.* ¶¶ 6–7. Finally, by estimating the monetary value of the measures he suggests, Mr. Van Dyke provides testimony that is relevant to a calculation of damages. *Id.* ¶ 7.h.

Clearly, Mr. Van Dyke's testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," because his testimony pertains directly to the issues of causation, damages, and remedies. Fed. R. Evid. 702(a).

## II.   FACEBOOK'S ARGUMENTS FOR EXCLUDING MR. VAN DYKE'S TESTIMONY FAIL

### A.   Mr. Van Dyke Discussed the Facts of This Case Rather than Focus on SSNs

In some other cases where Mr. Van Dyke has testified as an expert, social security numbers ("SSNs") were stolen. *See, e.g.*, Equifax Decl.  No SSNs were stolen in this case. *See* Van Dyke Decl. ¶¶ 4.a–b. As a result, Mr. Van Dyke's testimony here contains only a limited conversation about SSNs. Facebook uses these innocuous facts to launch a series of criticisms at Mr. Van Dyke's testimony. All are meritless.

"SSNs were *not* exposed in this breach." Doc. 213 at 3 (emphasis in original). One would think, then, that an expert in this case should (must, even) limit his discussion of SSNs and focus on the actual facts of the case. *See* Fed. R. Evid. 702(a), 402 (requiring that expert testimony be relevant). Yet Facebook argues just the opposite. It faults Mr. Van Dyke for "excis[ing] from his Facebook report any past reference to the importance of SSNs." Doc. 213 at 3. Mr. Van Dyke not discussing what did not get stolen here cannot be a serious basis to exclude his testimony.

Facebook accuses Mr. Van Dyke of "offer[ing] the very same conclusions as he did in prior cases" where SSNs were exposed. *Id.* at 3. This mischaracterizes his findings.[7] Mr. Van Dyke concluded here that class members are at an increased risk due to the Facebook data breach. Van Dyke Decl. ¶ 5. He did not conclude that this risk was greater, or less, or the same, as the risk exposure of other people in other cases; he could not have meaningfully done so, because he did not attempt to quantify the increased risk in his Declaration. *See* Van Dyke Dep. at 30:20–24; *see also* Van Dyke Reply ¶ 2.h (clarifying that Mr. Van Dyke did not place a numerical estimate on the increased risk, though later using an algorithm to show an increased risk level). Facebook misses the obvious: that Mr. Van Dyke opines that theft of the PII here can support an extensive credit-monitoring regime, as can the theft of PII that includes SSNs like in past cases. Those conclusions are no less alarming than a doctor who recommends a tetanus shot for a patient who stepped on one rusty nail and while also recommending a tetanus shot for a patient who stepped on several, bigger rusty nails.

Finally, it is simply incorrect to state that "Van Dyke's entire report and opinions are untethered to the data actually taken in this case." Doc. 213 at 4. Mr. Van Dyke's declaration addresses why non-SSN PII creates a risk of identity fraud:

> While breaches of Social Security or payment card numbers often garner primary attention . . . the exposure of all manner of personal identifying data represent[s] increased risk. This is true for a number of reasons, including an increase in digital commerce across all industry sectors and corresponding growth in the variety of personal data used to authenticate individuals as transactions are conducted in their name.

Van Dyke Decl. ¶ 5.b. He then gives many specific examples of how the PII stolen in this case could be used to commit identity fraud. *See, e.g.*, *id.* ¶ 5.e (use of employment data to create and access accounts); *id.* ¶ 5.h (using biographical information to pass KBA schemes and commit new

---

[7] Mr. Van Dyke stated in his deposition that a paragraph of his Declaration in this case is identical to a paragraph from his expert report in a past case, with the only difference being reference to SSNs. Van Dyke Dep. at 164:19–25. But a comparison of the two documents shows that they actually have several differences. *Compare* Report of James Van Dyke ¶ 19, *In re Anthem, Inc. Data Breach Litigation*, Case No. 15-md-02617 (N.D. Cal.), Doc. 744-24, *with* Decl. ¶ 3.n.

12

account fraud); *id.* ¶¶ 5.*l*–m (using personal data to change account settings or take over an account).

SSNs have limited relevance to this case.[8] As such, Mr. Van Dyke largely did not discuss SSNs, and instead focused on the kinds of PII actually acquired here and how their breach increases identity fraud risk for class members. That choice was entirely proper.

### B.    Mr. Van Dyke's Analysis of a Typical Class Member is Proper

The essence of Mr. Van Dyke's testimony is that *all* class members are at an elevated risk of identity fraud as a result of their PII being scraped under Facebook's watch. *See* Van Dyke Decl. ¶ 4.c. As he explained:

> More damaging forms of misuse often result from criminals amassing more elements of any one consumer's data—akin to assembling all pieces of a puzzle. As an example of how initial data exposure can steadily increase risk (which no doubt increases as more data is made available), a starting-set of breached data may first enable criminals to identify victims by address or other method, while also providing the starting-point of PII that will eventually be used to successfully impersonate the possible targets. Information from multiple points of exposure can be combined to gain an identity-holder's confidence that the criminal is an authorized service provider and thus persuade the victim to reveal missing high-value data, such as a password or financial account payment information.

*Id.* ¶ 3.n. Given these facts, Mr. Van Dyke concluded that each class member faces the same pattern of risks, *id.* ¶ 4.e; *see also* Van Dyke Dep. at 37:18–21 ("[D]espite some completely expected small differences, the risk was still raised . . . in the pattern that . . . my  report concluded."). He has further clarified that the threshold risk of identity fraud follows from Facebook's negligence, and each class member now faces risks that differ merely in degree rather than kind. Van Dyke Reply ¶ 2.a.iii.

Facebook's arguments on this front do not provide reason to exclude Mr. Van Dyke's testimony. First, Facebook quibbles with Mr. Van Dyke's analysis of the "average victim" because he did not calculate any mathematical average. Doc. 213 at 5. Mr. Van Dyke is not claiming to

---

[8] This Court itself recognized in evaluating standing that one should not look at the minutia of what is stolen but whether what was taken could give the hackers the means to commit identity fraud. Doc. 153 (Order Deciding Mot. to Dismiss) at 10.

13

1    have made a mathematical calculation; he is simply using the term "average" to mean "typical."

2    Van Dyke Reply ¶ 2.a.ii. That is a perfectly acceptable use of the term.[9]

3          Second, Facebook criticizes Mr. Van Dyke for "ignor[ing]" differences among class

4    members. Doc. 213 at 5–7. "[O]bjections to a study's completeness generally go to the weight, not

5    the admissibility of the statistical evidence, and should be addressed by rebuttal, not exclusion."

6    *Obrey*, 400 F.3d at 695 (citing *Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1476 (9th

7    Cir.1995); *Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 340 (1977)) (internal quotation marks

8    omitted). As explained above, Mr. Van Dyke reliably uses research and his experience to show

9    why all class members suffer an increased risk of identity fraud. *See supra* Section I.B. He explains

10   the mechanisms that tie together the breach and the resulting risk. *Id.* He also explains that, because

11   each data breach increases the risk of identity fraud, all class members face the same pattern of

12   risks, despite the differences between them. Van Dyke Decl. ¶¶ 3.f–g, 4.e; Van Dyke Dep. at 37:18–

13   21. His findings are reliable and obviously relevant to the questions of causation and damages.

14   Facebook's objection goes to weight; it does not undermine admissibility. *See Obrey*, 400 F.3d at

15   695 (statistical evidence showing link between race and promotion was admissible even though it

16   failed to account for the qualifications of each applicant); *Mangold*, 67 F.3d at 1476 (study on age

17   discrimination was admissible despite failing to isolate a 40-and-above category).[10]

18         Third, according to Facebook, Mr. Van Dyke is wrong to recommend that each class

19

20   [9] *See Average* (adj.) definition 2b, Merriam-Webster Dictionary, https://www.merriam-
     webster.com/dictionary/average (last visited Oct. 2, 2019), ("not out of the ordinary: common");
21   *see also* Franklin D. Roosevelt, *Fireside Chat 1: On the Banking Crisis*, U. Va. Miller Ctr.,
     https://millercenter.org/the-presidency/presidential-speeches/march-12-1933-fireside-chat-1-
22   banking-crisis (last visited Oct. 2, 2019) (twice evoking "the average citizen").

23   [10] Facebook pulls a portion of Mr. Van Dyke's deposition out of context to argue that he "admitted
     that Group 1 users 'would be at no increased risk of identity theft as a result of the data breach' if
24   their names, emails, and phone numbers were already public." Doc. 213 at 6 (quoting Van Dyke
     Dep. at 70:1–21.) Mr. Van Dyke quickly qualified his testimony by adding "[a]s long as when you
25   define publicly available, that means like widely available to anyone, without significant or
     specialized effort." Van Dyke Dep. at 70:18–20; *accord id.* at 72:12–15. Moments later, he
26   explained that those whose information was publicly available before the data breach are still
27   exposed to elevated risk post-breach. *Id.* at 73:4–74:8.

28

---

14

member be given call blocker services, digital security software, and a single IDPS solution. Doc. 213 at 6.[11] Mr. Van Dyke explained why he recommended a uniform remedy to all class members:

> When considering the strongest potential value from the prophylactic solution that should be offered to victims of the Facebook breach, simplicity must be given high priority. Individuals care about protecting all their assets—with those of a digital and identity nature being no exception—and it is my research-based conclusion that any appearance to the contrary generally is the fault of the identity-holder simply not being able to comprehend or even prioritize the relationship between risks and mitigative solutions.

Van Dyke Decl. ¶ 7.c; *see also id.* ¶ 4.f ("I prefer to choose a protective solution that brings the least amount of potential confusion and complexity for victims. [E]ven the slightest degree of solution complexity can prevent consumers from acting on provided solutions."); Van Dyke Dep. at 116:9–21 ("I'm particularly concerned about simplicity of a solution where people don't have to wade through the confusion of what protection solution might apply to them[.]").[12] He further explained in his Reply Declaration that he recommended measures that will help each class member because the measures represent a basic level of protection from identity fraud. Van Dyke Reply ¶ 2.a.v.

Finally, Facebook shoehorns its arguments against class certification into arguments for excluding expert testimony. *See, e.g.*, Doc. 213 at 5 ("Van Dyke's 'average' cannot establish class-wide proof.").[13] Mr. Van Dyke's testimony meets the *Daubert* test; it uses reliable methodology to help the trier of fact determine the issues of causation, damages, and remedy. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 590–91. Facebook contends that his testimony fails to support class certification; Plaintiff obviously disagrees, but in any case the class certification standard and the

---

[11] Facebook asks, "Why, for example, should call blocker services be purchased for every affected user (many of whom did not have their phone number compromised in the attack)[?]" Doc. 213 at 6. Facebook does not define "many," nor has it produced documents as to how many phone numbers were stolen in this attack.

[12] These quotes provide context for Mr. Van Dyke's concerns about "simplicity." *See* Doc. 213 at 6. As the excerpt makes clear, Mr. Van Dyke is concerned about simplicity for the average consumer trying to mitigate risk, not simplicity for himself in conducting the analysis.

[13] Facebook analogizes this case to *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 493–94 (N.D. Cal. 2008), which decided a class certification motion, not a *Daubert* motion. Doc. 213 at 5–6.

*Daubert* standard for admissibility are different things. *See Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1170 (E.D.N.Y. 2006) ("The survey conducted by Dr. Hauser may not perfectly represent the class; that does not make it irrelevant or unhelpful."), *rev'd on other grounds sub nom McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008); *cf. Obrey*, 400 F.3d at 695 ("A statistical study may fall short of proving the plaintiff's case, but still remain relevant to the issues in dispute."). Plaintiff will address Facebook's class certification arguments in its reply brief to the Class Certification Motion.

C.      **The Analysis Was Grounded in Knowledge, Experience, and Reputable Sources**

Facebook argues that "Van Dyke offers speculative theories, supported only by his imagination, about how identity theft *could* occur." Doc. 213 at 7 (emphasis in original). Mr. Van Dyke's testimony is certainly "about how identity theft *could* occur," since that is what risk analysis is, and Mr. Van Dyke was retained in part to evaluate "risks faced by those whose information was compromised in the 2018 Facebook data breach." Van Dyke Decl. ¶ 2.a. Mr. Van Dyke's testimony is "speculative" only in the sense that it assesses future possibilities. Experts testify about the future all the time. *See, e.g.*, *Moench v. Marquette Transp. Co. Gulf-Inland*, 838 F.3d 586, 592–93 (5th Cir. 2016) (costs to repair a vessel); *Larson v. Kempker*, 414 F.3d 936, 941–42 (8th Cir. 2005) (health effects of second-hand smoke); *U.S. v. Hansen*, 262 F.3d 1217, 1233–34 (11th Cir. 2001) (risks resulting from unsafe industrial plant).

Mr. Van Dyke's Declaration describes several mechanisms by which a criminal could use the PII acquired in the data breach to perpetrate identity fraud. *See, e.g.*, Van Dyke Decl. ¶¶ 3.o (making payment requests that appear to come from family and friends), 5.e (using employment data to create and access accounts), 5.f (using PII to gain approval for a large overseas bank transfers); 5.h (using PII to pass KBA questions and commit new account fraud). In his deposition, he provided further detail on how this PII could lead to identity fraud. Van Dyke Dep. at 131:9–137:6 (employing social engineering techniques to obtain SSNs and commit tax fraud), 286:25–287:17 (using PII to elicit fraudulent person-to-person digital payments), 350:12–351:15 (using email addresses to obtain IP addresses, and eventually redirecting direct deposits into fraudsters'

1    bank accounts).[14]

2        These explanations are based on his experience in the field, Van Dyke Decl. ¶ 1 (describing

3    relevant experience); *see also* Van Dyke Dep. at 134:5–7 ("[T]his is based on real examples that

4    I'm getting from people that work in law enforcement and the IRS and other places like this."), and

5    an expert's experience in the field—particularly on the subject about the practices of criminal

6    organizations—is an adequate basis upon which to provide testimony. *See Hankey*, 203 F.3d at

7    1169–70 (allowing a veteran police officer to testify about "gang membership and tenets"). To the

8    extent that Facebook finds Mr. Van Dyke's testimony implausible, it is of course free to cross-

9    examine him and to provide its own experts, *see Primiano*, 598 F.3d at 564, but it has failed to

10   demonstrate that the testimony is unreliable or irrelevant.

11       **D.    Mr. Van Dyke's Testimony is Relevant to American Class Members**

12       Facebook criticizes Mr. Van Dyke because he did not analyze risk exposure for class

13   members outside the United States. Doc. 213 at 8 (citing Van Dyke Dep. at 145:13–14). Plaintiff

14   does not dispute this and is not seeking a credit-monitoring regime for non-U.S. class members.

15   Class Reply at 13. Mr. Van Dyke's testimony remains relevant for American class members. Expert

16   testimony is admissible as long as it "will help the trier of fact to understand the evidence or to

17   determine a fact in issue." Fed. R. Evid, 702(a); *see also Smith*, 215 F.3d at 720 (requiring only

18   relevance). It need not definitively address an issue, nor must it comprehensively cover all class

19   members or all possible issues. *See Obrey*, 400 F.3d at 695 ("A statistical study may fall short of

20   proving the plaintiff's case, but still remain relevant to the issues in dispute."); *see also id.* at 696–

21

22   ―――――――――――――――

     [14] Facebook states that, "Van Dyke . . . speculates that 'criminal gangs' lurking across the U.S. might

23   send 'bogus sweepstake' emails to solicit personal data, combine any information received with
     other datasets until they locate the target's street address, and then stake out the target's home to

24   pilfer their mailbox for sensitive data." Doc. 213 at 7 (quoting Van Dyke Dep. at 329:23–333:4).
     Some context is helpful here. First, Mr. Van Dyke uses the term "gang" simply to mean "a group."

25   Van Dyke Dep. at 332:25; *see also id.* at 330:15–17 ("[I]dentity criminal groups often work . . . in
     gangs, work in association with one another"). Second, Mr. Van Dyke has repeatedly explained that

26   criminals combine PII from a data breach with data obtained from other sources, "akin to assembling
     all pieces of a puzzle." Decl. ¶ 3.n. There are "many different" ways of obtaining additional

27   information, Van Dyke Dep. at 331:21–22, and using bogus sweepstakes and pilfering mailboxes
     each represent just "one approach," *id.* at 331:19–22, 335:13–16.

28
                                                      17

97 (holding that expert evidence on the race of managers and managerial applicants is admissible to help establish discrimination even if "by itself, this cannot constitute proof" of discrimination); *Schwab*, 449 F. Supp. 2d at 1170 ("The survey conducted by Dr. Hauser may not perfectly represent the class; that does not make it irrelevant or unhelpful."). Because Mr. Van Dyke's testimony remains relevant to American class members, it is admissible.

### E. Mr. Van Dyke Did Not Intend to Offer an Opinion as to the Value of Compromised PII

Facebook objects to the statement, at the end of Mr. Van Dyke's Declaration, that "As a direct result of the Facebook data breach, victims now suffer reduced value of personal information related to its confidentiality, and through no fault of their own." Doc. 213 at 8; Van Dyke Decl. ¶ 8.a. Mr. Van Dyke made clear in his deposition that he did not intend to calculate a value for compromised PII. Van Dyke Dep. at 377:12–16; *accord* Van Dyke Reply ¶ 2.i. The one sentence in the Declaration suggesting otherwise should be disregarded. It has no bearing on the substance or admissibility of the remainder of Mr. Van Dyke's testimony.

## CONCLUSION

For the reasons stated above, Facebook's Motion to Exclude the Declaration and Opinions of Plaintiff's Expert James Van Dyke should be denied.

DATED: October 10, 2019

Respectfully submitted,

By: /s/ Andrew N. Friedman
Andrew N. Friedman (*pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com

John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**

201 N. Franklin St., 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402

Ariana J. Tadler (*pro hac vice*)
atadler@tadlerlaw.com
**TADLER LAW, LLP**
One Penn Plaza
New York, NY  10119
Telephone: (212) 946-9453
Facsimile: (212) 273-4375

*Interim Co-Lead Counsel for Plaintiff*

19

1

2

3  **CAPSTONE LAW, APC**
Tarek H. Zohdy (SBN 247775)
4  Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)
5  Cody.Padgett@capstonelawyers.com
Trisha K. Monesi (SBN 303512)
6  Trisha.Monesi@capstonelawyers.com
Capstone Law APC
7  1875 Century Park East, Suite 1000
Los Angeles, California 90067
8  Telephone: (310) 556-4811
Facsimile: (310) 943-0396
9

10

11  **CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD,
LLP**
12  David S. Casey, Jr. (SBN 060768)
dcasey@cglaw.com
13  Gayle M. Blatt (SBN 122048)
gmb@cglaw.com
14  Jeremy Robinson (SBN 188325)
jrobinson@cglaw.com
15  110 Laurel Street
San Diego, California 92101
16  Telephone: (619) 238-1811
Facsimile: (619) 544-9232 fax
17

18

19  **CLAYEO C. ARNOLD, A
PROFESSIONAL LAW
CORPORATION**
20  Clayeo C. Arnold (SBN 65070)
carnold@justice4you.com
21  Joshua H. Watson (SBN 238058)
jwatson@justice4you.com
22  865 Howe Avenue
Sacramento, California 95825
23  Telephone: 916-777-7777
Facsimile: 916-924-1829
24

25

26  **COHEN MILSTEIN SELLERS & TOLL
PLLC**
Douglas J. McNamara
27  dmcnamara@cohenmilstein.com

28

Karina G. Puttieva (SBN 317702)
kputtieva@cohenmilstein.com
1100 New York Ave. NW
East Tower, 5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

**FINKELSTEIN, BLANKENSHIP, FREI-
PEARSON & GARBER LLP**
Jeremiah Frei-Pearson
Jfrei-pearson@fbfglaw.com
Andrew C. White
awhite@fbfglaw.com
445 Hamilton Ave., Suite 605
White Plains, New York 10601
Telephone: (914) 298-3281
Facsimile: (914) 908-6709

**FRANKLIN D. AZAR & ASSOCIATES**
Ivy Ngo (SBN 249860)
ngoi@fdazar.com
14426 East Evans Ave
Aurora, CO 80014
Telephone: 303-757-3300
Facsimile: 720-213-5131

**GLANCY PRONGAY & MURRAY LLP**
Marc Godino
mgodino@glancylaw.com
Brian Murray
bmurray@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: 310-201-9150
Facsimile: 310-432-1495

**JONES WARD PLC**
Jasper D. Ward
jasper@jonesward.com
1205 E Washington St, Suite 111
Louisville, Kentucky 40206
Telephone: 502-882-6000

20

**KANTROWITZ GOLDHAMER & GRAIFMAN, P.C.**
Gary S. Graifman
ggraifman@kgglaw.com
Jay Brody
jbrody@kgglaw.com
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
Telephone: (845) 356-2570
Facsimile: (845) 356-4335

**KOHN, SWIFT & GRAF, P.C.**
Jonathan Shub (SBN 237708)
jshub@kohnswift.com
Kevin Laukaitis
klaukaitis@kohnswift.com
1600 Market Street, Suite 2500
Philadelphia, PA 19103-7225
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

**LAW OFFICE OF PAUL C. WHALEN, P.C.**
Paul C. Whalen
paul@paulwhelan.com
768 Plandome Road
Manhasset, NY 11030
Telephone: (516) 426-6870
Facsimile: (212) 658-9685

**LAW OFFICES OF CHARLES REICHMANN**
Charles Reichmann
Cpreichmann@yahoo.com
16 Yale Circle
Kensington, CA 94708
Telephone: (415) 373-8849

**LOCKRIDGE GRINDAL NAUEN PLLP**
Karen Hanson Riebel
khriebel@locklaw.com
Kate M. Baxter-Kauf
kmbaxter-kauf@locklaw.com
Arielle S. Wagner
aswagner@locklaw.com
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 596-4097

Facsimile: (612) 339-0981

**MIGLIACCIO & RATHOD LLP**
Nicholas A. Migliaccio
nmigliaccio@classlawdc.com
Jason S. Rathod
jrathos@classlawdc.com
412 H Street N.E., Ste. 302
Washington, DC 20002
Telephone: (202) 470-3520

**TADLER LAW LLP**
Ariana J. Tadler (*pro hac vice*)
ATadler@Tadlerlaw.com
One Penn Plaza
New York, New York
New York, NY  10119
Telephone: (212) 946-9453
Facsimile: (212) 273-4375

**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
Ryan J. McGee
rmcgee@ForThePeople.com
Jean S. Martin
jeanmartin@ForThePeople.com
Kenya J. Reddy
kreddy@forthepeople.com
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402

**ROBINSON CALCAGNIE, INC.**
Daniel S. Robinson (SBN 244245)
drobinson@robinsonfirm.com
Wesley K. Polischuk (SBM 254121)
wpolischuk@robinsonfirm.com
Michael W. Olson (312857)
19 Corporate Plaza Drive
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

**STULL, STULL & BRODY**
Patrice L. Bishop (SBN 182256)
pbishop@ssbla.com
Melissa R. Emert
memert@ssbny.com

21

9430 W. Olympic Blvd., Suite 400          Facsimile: (310) 209-2087
Beverly Hills, CA 90212
Telephone: (310) 209-2468                *Other Plaintiff's Counsel*

**SIGNATURE ATTESTATION**

I am the ECF User whose identification and password are being used to file Plaintiffs' Administrative Motion to File Under Seal Portions of Plaintiff's Memorandum of Points And Authorities In Opposition To Defendant Facebook, Inc.'s Motion To Exclude The Declaration And Opinions Of Plaintiff's Expert James Van Dyke. I, Andrew N. Friedman, attest that service has been effectuated via ECF.

DATED:  October 10, 2019                    */s/ Andrew N. Friedman*