Andrew N. Friedman (*pro hac vice*)
afriedman@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Ariana J. Tadler (*pro hac vice*)
atadler@tadlerlaw.com
**TADLER LAW LLP**
One Penn Plaza
36th Floor
New York, NY 10119
Telephone: (212) 946-9453
Facsimile: (212) 273-4375

*Attorneys for Plaintiff*

John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin St., 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| STEPHEN ADKINS, an individual and Michigan resident, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>Defendant. | No. C 18-05982 WHA (JSC)<br>***Consolidated Cases:***<br>No. C 18-06022 WHA (JSC)<br>No. C 19-00117 WHA (JSC)<br><br>**PLAINTIFF'S AMENDED REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:   November 6, 2019<br>Time:  8:00am<br>Court:  Courtroom 12, 19th Floor<br>Hon. William Alsup |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.    FACEBOOK STILL CANNOT DEFEAT STANDING ....................................... 2
      A.    As Previously Held, The Breach Created a Concrete Risk of Identity Theft ............ 2
      B.    That Adkins' Credit Card Provides Free and Less Comprehensive Credit
            Monitoring Services to Him Does Not Deprive Him of Standing to Seek the
            Premium Monitoring Recommended Here ................................................................ 4
      C.    Plaintiff Has Standing for Declaratory Relief ......................................................... 5

II.   THE COURT SHOULD CERTIFY PLAINTIFF'S NEGLIGENCE CLAIM ................... 6
      A.    Adkins Claims are Typical and He is an Adequate Class Representative ................ 6
      B.    Issues Surrounding Facebook's Behavior Predominate ........................................... 7
            1.    Facebook's Negligence Can be Proved Through Common Evidence. ......... 7
            2.    The Damage Models Support 23(b)(3) Certification .................................. 9
            3.    The Economic Loss Rule Does Not Countermand Class Treatment. .......... 12
      C.    The Damages Class is Manageable ......................................................................... 13

III.  GROUNDS FOR CLASS-WIDE INJUNCTIVE RELIEF REMAIN FOR ALL
      USERS ................................................................................................................... 14

VI.   THE COURT CAN CERTIFY LIABILITY UNDER 23(C)(4) FOR LOST TIME .......... 15

CONCLUSION .................................................................................................................. 15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Am. Council of the Blind v. Astrue*,
    No. C 05-04696 WHA, 2008 WL 4279674 (N.D. Cal. Sept. 11, 2008) ....................................6

*Andrews v. Plains All Am. Pipeline, L.P.*,
    No. 18-55850, 2019 WL 2880970, (9th Cir. July 3, 2019) ......................................................13

*Backhaut v. Apple Inc.*,
    No. 14-CV-02285-LHK, 2015 WL 4776427 (N.D. Cal. Aug. 13, 2015) ................................6

*Bilbrey by Bilbrey v. Brown*,
    739 F.2d 1462 (9th Cir. 1984) .............................................................................................14

*Castillo v. Seagate Tech*,
    LLC, 2016 WL 9280242 (N.D. Cal. Sept. 14, 2016) ..........................................................13

*Cherry v. City Coll. of San Francisco*,
    No. C 04-04981 WHA, 2005 WL 6769124 (N.D. Cal. June 15, 2005) ................................15

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ..................................................................................................................5

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*,
    No. 1:04-CV-3066-JEC, 2009 WL 856306 (N.D. Ga. Feb. 9, 2009) ..................................13

*Corona v. Sony Pictures Entertainment, Inc.*,
    2015 WL 3916744 (C.D. Cal. Jun. 15, 2015) ..................................................................7, 11

*Doe v. Match.com*,
    789 F. Supp. 2d 1197 (C.D. Cal. 2011)..................................................................................6

*Donovan v. Phillip Morris USA, Inc.*,
    65. F. Supp. 3d 251 (D. Mass. 2014) .....................................................................................7

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) ..............................................................................................................14

*Elsea v. U.S. Engineering Co*,
    463 S.W.3d 409, 420 (Mo. Ct. App., 2015) .........................................................................11

*In re Facebook Inc. Consumer Privacy User Profile Litig.*,
    19-md-02843, 2019 WL 4261048 .......................................................................................10

*Frlekin v. Apple Inc.*,
    309 F.R.D. 518 (N.D. Cal. 2015) .........................................................................................15

ii

*Helfend v. Southern Cal. Rapid Transit Dist.*,
    456 P.2d 61 (Cal. 1970) ......................................................................................7

*hiQ Labs v. LinkedIn Corp.*,
    2019 WL4251889 (Sept. 9th Cir. 2019)............................................................10

*J'Aire Corp. v. Gregory*,
    24 Cal.3d 799 (1979).........................................................................................12

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
    634 F.3d 883 (7th Cir. 2011).............................................................................14

*Krottner v. Starbucks Corp.*,
    406 F.App'x 129 (9th Cir. 2010)........................................................................9

*Krottner v. Starbucks Corp.*,
    628 F.3d 1139 (9th Cir. 2010).......................................................................5, 9

*Mejdrech v. Met-Coil Sys. Corp.*,
    319 F.3d 910 (7th Cir. 2003).............................................................................15

*Nitsch v. Dreamworks Animation SKG Inc.*,
    315 F.R.D. 270 (N.D. Cal. 2016)......................................................................12

*Potter v. Firestone Tire & Rubber Co.*,
    6 Cal.4th 965 (1993)....................................................................................10, 11

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015).............................................................................12

*Matter of Rhone-Poulenc Rorer, Inc.*,
    51 F.3d 1293 (7th Cir. 1995).............................................................................15

*Ruiz v. Gap, Inc.*,
    380 F. App'x 689 (9th Cir. 2010)........................................................................9

*Sali v. Corona Reg'l Med. Ctr.*,
    889 F.3d 623 (9th Cir. 2018)...............................................................................4

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
    903 F. Supp. 2d 942 (S.D. Cal. 2012) ..............................................................13

*In re U.S. Office of Personnel Management Data Security Breach Litigation*,
    928 F.3d 42 (D.C. Cir. 2019) ..............................................................................5

*Updike v. Multnomah Cty.*,
    870 F.3d 939 (9th Cir. 2017)...............................................................................6

*Walters v. Reno*,
    145 F.3d 1032 (9th Cir. 1998).............................................................................6

iii

*In re Yahoo Mail Litig.*,
    308 F.R.D. 577 (N.D. Cal. 2015) .............................................................................4

*In re Yahoo! Inc. Customer Data Sec. Litig.*,
    313 F. Supp. 3d 1113 (N.D. Cal. 2018) ...............................................................12

*In re Zappos.com, Inc.*,
    888 F.3d 1020 (9th Cir. 2018) .................................................................................3

**STATUTES**

Fed. R. Civ. P. 23 ................................................................................................ *passim*

Fed. R. Civ. P. 56 ...............................................................................................................9

**OTHER AUTHORITIES**

Doug. McNamara et. al., *Reexamining the Seventh Amendment Argument Against
    Issue Certification*, 34 Pace L. Rev. 1041, (2014) ..................................................15

# INTRODUCTION

Facebook's negligence directly led to the exfiltration of millions of its customers' personally identifiable information. Faced with indisputable evidence of its malfeasance in protecting its customers and then its inept response to clear indicia of an attack, Facebook contradicts its documents and experts as to whether any harm can be shown, revisits previously rejected standing arguments, and argues that access to other credit monitoring programs alleviates Facebook from the consequences of its own actions.

As to standing, Facebook argues again that the stolen PII cannot alone directly lead to identity theft, precluding any suit, finding of economic loss or need for a credit monitoring program. But the stolen PII can significantly increase the likelihood of identity theft. Plaintiffs' expert Jim Van Dyke provided data affirmatively supporting that a data breach such as this one correlates with an increased risk of identity theft supporting a premium credit monitoring program at Facebook's expense. Facebook's own proposed expert once warned *New York Times* readers that phone numbers in the hands of hackers may be as dangerous as social security numbers.[1]

As to class, Plaintiff Stephen Adkins' experience is common and typical of the 4 million United States Facebook users whose sensitive PII was exfiltrated as a result of Facebook's gross negligence.[2] That some of the same (if not more) PII is publicly available through scraping or Dark Web searches by those whose intent to search for *him* (like Facebook's proposed experts), does not make him an inadequate representative, as Facebook does not identify individual defenses that predominate over the common questions. Similarly, Plaintiff's potential access to some lesser free credit monitoring services through his credit card company (accompanied by upsell messages) does not undercut class treatment here. The credit monitoring recommended here is far more substantial,

---

[1] See Decl. of D. McNamara at Pls. Ex. 30, Steve Lohr, "A 10-Digit Key Code to Your Private Life: Your Cellphone Number," *The New York Times,* Nov. 12, 2016, as seen at https://www.nytimes.com/2016/11/13/business/cellphone-number-social-security-number-10-digit-key-code-to-private-life.html, last accessed Oct. 2, 2019. For clarity, Plaintiff continues exhibit numbering from the McNamara Declaration (Doc. 198-2) filed with Plaintiff's Motion for Class Certification motion.

[2] Plaintiff seeks to conform the Rule 23(b)(3) relief sought to the testimony of Plaintiff's damages experts which address lost value and credit monitoring for only U.S. victims of the breach. As for the Rule 23(b)(2) motion, Plaintiff maintains the declaratory relief sought is appropriate for all users, regardless of country or jurisdiction.

1

1  and Facebook's self-serving argument would conflict with tort law principles of deterrence and the

2  collateral source rule. Further, class relief is still warranted for Adkins and the 29 million other

3  users put at risk in the September 2018 Breach under Rule 23(b)(2), so that Facebook may be forced

4  to fix its security deficiencies that permitted this hack. Finally, the Court may still certify Mr.

5  Adkins' lost time claim under Rule 23(c)(4) to resolve common class-wide issues.

6  **ARGUMENT**

7  **I.     FACEBOOK STILL CANNOT DEFEAT STANDING**

8      **A.     As Previously Held, The Breach Created a Concrete Risk of Identity Theft**

9         Facebook has already argued against Adkins' Article III standing in three briefs. *See* Docs.

10  96 at 6-12, 131 at 8-16, and 172 at 1, 14-16. In its class opposition, Facebook attempts a fourth bite

11  at the apple. But Adkins aptly explained his concerns about future exploitation of his stolen PII

12  which supports standing. Pls. Ex. 31, May 9, 2019 Dep. of S. Adkins Dep. ("Adkins Dep.") at

13  341:23-342:5-7; 403:7-404:2. Jim Van Dyke, founder of Futurion.Digitial, Inc., opined why those

14  fears are concrete. Mr. Van Dyke has advised the Federal Trade Commission and other businesses

15  on data breaches and has developed an algorithm to assess data breaches.[3] His algorithm comports

16  with his opinion that the information taken here (phone and/or email and name for all users; phone

17  and/or email and name and 10 other categories for Group 2 users like Adkins) presents a 6 out of

18  10 overall risk level for identity theft.[4]

19         Facebook attempts to misdirect this Court (again) that because social security numbers were

20  not included in the breach, there is no standing. Doc. 215, Facebook's Opp. to Pls. Mot. For Class

21  Cert. ("Opp.") at 8. It is true that the presence of social security numbers increases the risk and

22  speed with which identity theft and its negative consequence (new account fraud, tax return fraud,

23  etc.) may occur.[5] That is why a breach like the 2015 Anthem breach (which included SSN's)

24  presented a higher risk.[6] But the risks are one of degree, not of kind. As Facebook's own "expert"

---

25  [3] *See, e.g.,* https://www.idtheftcenter.org/breachclarity; Pls. Ex. 32, Oct. 9, 2019 Reply Decl. of Jim Van Dyke ("Van Dyke Reply"), ¶¶ 1.c & 2.h

26  [4] *Id.* at ¶ 2.h. *See also* Pls. Ex. 33, Screenshot of Facebook 2018 Data Breach Risk Assessment as seen at https://www.idtheftcenter.org/breachclarity/, last accessed, Oct. 9, 2019.

27  [5] Van Dyke Reply, ¶ 2.h

28  [6] *Id.*

2

recognized (outside of this litigation), criminal hackers possessing only a phone number present a

concrete risk:

> "With just your cellphone number and name, I know they can get all sorts of information about you," Ms. Gallanter said. **In fact, investigators find that a cellphone number is often even more useful than a Social Security number because it is tied to so many databases and is connected to a device you almost always have with you, said Austin Berglas, a former F.B.I. agent who is senior managing director of K2 Intelligence, a private investigator.** "The point is the cellphone number can be a gateway to all sorts of other information," said Robert Schoshinski, the assistant director for privacy and identity protection at the Federal Trade Commission. "People should think about it."[7]

In addition, the Group 2 user PII that Mr. Adkins and millions of others supplied can

divulge information useful to steal passwords. While Facebook's lawyers deny this, Opp. at 8,

Facebook's employees saw the stolen PII as Van Dyke did – valuable to obtain passwords:[8]



Facebook incorrectly suggests that without a direct link to identity theft there can be no

standing. Opp. at 8, citing *In re Zappos.com, Inc.,* 888 F.3d 1020, 1026-27 (9th Cir. 2018). But as

previously noted, full social security numbers were not even exposed in *Zappos*. Doc. 111 at 10,

citing *Zappos.com*, 888 F.3d at 1022, n.2, 1027. This Court already held that standing requires the

Court "not to look at the minutia of what information had been taken — such as credit card

information or social security numbers — but to specifically determine whether the data taken 'gave

hackers the means to commit fraud or identity theft.'" Doc. 153 at 10 (*citing Zappos.com, supra*).

And this Court found that the amount of information taken here sufficed that standard. *Id.* at 11.

That finding is now further girded by Mr. Van Dyke, by Austin Berglas (when quoted outside of

this litigation), and by Facebook's employees (at least in private documents). The sensible step now

[7] Pls. Ex. 30, Lohr, *supra.* (emphasis added).
[8] Pls. Ex. 34, FB-SCHMIDT-000099557.

is to let a jury decide whether the PII stolen merits that Facebook fund the credit monitoring sought by Plaintiff, and possesses the value assessed by Plaintiff's expert.

Rather than let a jury decide facts, Facebook demands in response to a procedural motion, that the Court improperly delve deeper into the facts. Facebook assails Mr. Adkins' allegations that he dealt with a rise in phishing emails after the breach, costing him time. Opp. at 5. Facebook clings to deposition testimony about "measurable time" dealing with phishing emails (a vague term to which Plaintiff's counsel objected) to rewrite Adkin's testimony as conceding no time. *Id.*[9] While Facebook decries that there is no documentary evidence of the emails or the time Adkins spent dealing with them, Facebook simply disregards Adkin's testimony on these matters. Doc. 198-32 (Pls. Ex. 29), Adkins Dep. at 15-17. At class certification, the Court's task is not to weigh testimony or conduct a mini-trial. *Sali v. Corona Reg'l Med. Ctr.*, 889 F.3d 623, 631 (9th Cir. 2018); *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 586 (N.D. Cal. 2015) (noting a "rigorous analysis" does not require or warrant "a mini-trial."). Facebook can repeat its snide attacks on one of its user's time and privacy interests at the class trial if it so wishes but doing so here is of no moment.[10]

In its ill-conceived attempt to force a mini-trial, Facebook also denigrates Plaintiff's produced emails as not demonstrating phishing but "spam." Opp. at 1, 8. Yet, the emails include sales messages where the email sender is not at all affiliated with the product/service for sale. *See, e.g.,* Def. Ex. 13. The last invites a click to a suspicious link and contains misspellings and a ".ru" addressee. *Id.* at ADKINS_0006955; Adkins Dep. II at 506:13-509:8. Plaintiff viewed these as phishing emails; whether or not they are should be decided by the class jury.

### B.   That His Credit Card Provides Free and Less Comprehensive Credit Monitoring Services to Adkins Does Not Deprive Him of Standing to Seek the Premium Monitoring Recommended Here

Finally, Facebook wrongly tries to upend this Court's ruling on standing by citing to Mr. Adkins' access to the free CreditWise program he currently receives, and to his rejection of credit monitoring in the Equifax settlement. Opp. at 6, 9. First, Facebook's argument contradicts the Ninth

---

[9] *See also* Pls. Ex. 35, Sept. 23, 2019 Dep. of S. Adkins ("Adkins Dep. II") at 537:4 – 538:4.

[10] Facebook implies that because Mr. Adkins' did not identify a business opportunity passed up dealing with the breach he therefore suffered no injury. Opp. at 6. That is not a standard for standing, and this Court rejected this argument already. Doc. 111 at 13; Doc. 153 at 11-12.

4

Circuit's holding that standing based on the threat of future identity theft existed even though the plaintiffs had enrolled in a free credit monitoring program provided by the defendant. *Krottner v. Starbucks Corp.,* 628 F.3d 1139, 1143 (9th Cir. 2010). Second, Facebook neglects Mr. Adkins' testimony that CreditWise—a free service offered by his credit card company—seems more a vehicle for Capital One to upsell him its products.[11] The application for CreditWise notes in its terms that Capital One will email customers offers for other useful products and services.[12] And Mr. Adkins regularly received emails coaxing him to go to the CreditWise site and download the mobile app.[13] Mr. Van Dyke opines that the services provided by CreditWise (limited bureau monitoring; no spam blocker; no malware protection, etc.) do not approach the credit monitoring and additional services he recommends for the class.[14] The D.C. Circuit rejected a similar argument that free monitoring (offered there by the defendants) precluded standing for credit monitoring. *In re U.S. Office of Personnel Management Data Security Breach Litigation*, 928 F.3d 42, 65 (D.C. Cir. 2019) (noting that even though the defendant offered free credit monitoring after the data breach, it did not negate damages because the sufficiency and time period of the coverage remained at issue). Also uncited by Facebook is Adkins' testimony that he understandably turned down a more significant credit monitoring regime (albeit lesser than recommended here) in the Equifax settlement because he did not trust previously-hacked Equifax.[15] The more limited services provided by Capital One or offered through the Equifax settlement suffice the credit monitoring criteria sought here and cannot negate standing.

### C.      Plaintiff Has Standing for Declaratory Relief

Facebook also contends that its conduct since the breach leaves no real and immediate threat of repeated injury. Opp. at 10, citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). This

---

[11] Adkins Dep. II at 621:14-625:18; 666:4-667:19.
[12] Pls. Ex. 36, Application for CreditWise found at https://creditwise.capitalone.com/enroll/personal, last accessed Oct. 9, 2019.
[13] Pls. Ex. 37, April 2019 email from Capital One to Adkins, ADKINS_0007004. Adkins has also received numerous offers from LifeLock for premium services but had to turn them down. Adkins Dep. II at 672:1-675:20.
[14] See Doc. 198-30, Pls. Ex. 27, Van Dyke Decl. at ¶¶ 6g-o; Van Dyke Reply at ¶ 2.d.
[15] Adkins Dep. II at 618:7-619:22.

1  Court has already ruled otherwise. Doc. 153 at 19. Facebook's renewed argument hangs on

2  Plaintiff's expert Dr. Mary Frantz's testimony that Facebook improved "a whole bunch of different

3  things since the attack." Opp. at 10. But Facebook ignores Dr. Frantz's recommendations for

4  improvements that specifically address Facebook's security shortcomings that would protect the

5  class from being "wronged in a similar way" again.[16] Facebook still has not

6  

7  [17] Only two months ago, a Facebook security engineer testified

8  that Facebook still lacked people dedicated to resolving security tasks.[18] Facebook relies on

9  inapposite cases in which the issue giving rise to future injury was indisputably resolved.[19]

10         Facebook also contends that fixing security practices would not "provide relief to each

11  member of the class" because some users deleted their accounts. Opp. at 24 n.17. This argument

12  proves too much. Under this reasoning, relief is improper any time a class has members who die

13  during the pendency of the case and thus cannot benefit from the injunction. Further, injunctive

14  relief can proceed "[e]ven if some class members have not been injured by the challenged

15  practice[.]" *Am. Council of the Blind v. Astrue,* No. C 05-04696 WHA, 2008 WL 4279674, at *6

16  (N.D. Cal. Sept. 11, 2008) (Alsup, J.) (citing *Walters v. Reno,* 145 F.3d 1032, 1047 (9th Cir. 1998)).

17  Because Facebook's security practices remain deficient, standing for declaratory relief remains.

18  **II.     THE COURT SHOULD CERTIFY PLAINTIFF'S NEGLIGENCE CLAIM**

19         **A.     Adkins Claims are Typical and He is an Adequate Class Representative**

20         Facebook argues that Mr. Adkins' prior breaches and extant access to credit monitoring

---

21  [16] *See* Doc. 198-4, Pls. Ex. 2, Frantz Decl. at ¶ 105.
22  [17] Frantz Decl. at ¶ 105; *see also* Pls. Ex. 38, Sept. 18, 2019 Dep. of M. Frantz ("Frantz Dep.") at 270:23-271:16, 273:23-277:6.
23  [18] Doc. 198-15, Pls. Ex. 12, July 25, 2019 Deposition of Kyle Minshall at 265:24- 266:15 ("There just aren't enough people to, I would say, resolve some of these things very quickly.").
24  [19] *See Backhaut v. Apple Inc.,* No. 14-CV-02285-LHK, 2015 WL 4776427, at *8 (N.D. Cal. Aug. 13, 2015) (Plaintiff conceded that issue with iPhone messages was resolved); *Updike v. Multnomah Cty.,* 870 F.3d 939, 948 (9th Cir. 2017) (deaf plaintiff alleged inability to communicate in custody but evidence showed that a County officer had communicated with other deaf people in custody by writing notes, and that another officer knew how to get an ASL interpreter if he had difficulties communicating with a deaf inmate); *Doe v. Match.com,* 789 F. Supp. 2d 1197, 1199 (C.D. Cal. 2011) (plaintiff admitted that she cancelled her subscription to defendant's service after an assault by one of defendant's users).

precludes class certification seeking credit monitoring. Opp. at 11. First, past breaches—along with the Facebook breach—support credit monitoring as breaches increase the risks of identity theft.[20] Van Dyke relies on data used by businesses in a subscription service regarding data security.[21]

Second, Facebook repeats its erroneous argument that Adkins lacks typicality and adequacy because he has some form of credit monitoring and opted for cash in the Equifax settlement. Opp. at 11. Plaintiff already addressed this as to standing. *See* Section I.B, *supra*. There is a second and broader reason to reject Facebook's argument that access to some credit monitoring prevents class treatment here: it would insulate tortfeasors from paying for its mistakes and contradict California's collateral source rule. *Helfend v. Southern Cal. Rapid Transit Dist.*, 456 P.2d 61, 66-67 (Cal. 1970) (holding a "tortfeasor should not garner the benefits of his victim's providence. … Defendant should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance.") As noted, courts in California have analogized medical monitoring and credit monitoring essentially the same for purposes of determining injury. *Corona v. Sony Pictures Entertainment, Inc.,* 2015 WL 3916744, at *4 (C.D. Cal. Jun. 15, 2015). Courts have applied the collateral source rule to medical monitoring. *See Donovan v. Phillip Morris USA, Inc.*, 65. F. Supp. 3d 251, 279 (D. Mass. 2014). That Adkins has some credit monitoring that lacks the expert recommended features does not support defendant's position that he cannot represent a class seeking premium credit and identity protection.

### B.    Issues Surrounding Facebook's Behavior Predominate

*1.    Facebook's Negligence Can be Proved Through Common Evidence.*

Plaintiff provided this Court with documentary and testimonial evidence supporting that Facebook's liability for negligence could be shown by common evidence. Doc. 198 at 12-13; 15-22. Facebook puts up token resistance, denying that the vulnerability exploited by the hackers was foreseeable or that Facebook acted tardily in responding to the breach. Opp. at 3-5. First, as to knowledge of pre-breach risks, Facebook minimizes the known dangers posed by unexpiring access tokens and aggrandizes the obscurity of the other vulnerabilities. *Id.* at 3. Its documents show that

---

[20] Doc. 198-30, Pls. Ex. 27, Van Dyke Decl. ¶ 3.
[21] *Id. See also* Pls. Ex. 32, Van Dyke Reply, ¶¶ 1.c.iii.iv.

1   had █████████████████████████████████████████████████

2   ████████████—the damages from the 2018 breach would have been greatly diminished.[22]

3   Indeed, the "three obscure bugs" story was trotted out soon after the breach, even though

4   Facebook's own press personnel internally recognized the facts did not support it. On October 21,

5   2018, John Lyle recited that Facebook had ████████████████████████████████

6   █████████████████████████. This included

7   ██████████ Facebook employees recognized ███████████████████

8   ███████████████████████████████████████████████████

9   ████████"[23] Jay Nancarrow added Neal Poole to the email, and noted:[24]

10
11
12          ███████████████████████████████████████████████
13

14          Second, Facebook pushes back on the negligence claim regarding its slow response to the

15   breach. Opp. at 4-5, n.3. The Facebook story told to the press *and* state investigators is that once

16   Facebook uncovered evidence of a spike on September 25, 2018, "Consistent with security

17   training and protocols, that finding was promptly escalated for further investigation."[25]

18   But this description omits much. In fact, Joe Adler of Facebook's Growth Team ████████████

19   ██████████████

20
21          ███████████████████████████████████████████████
22
23          ██████████[26]

─────────────────────────
24   [22] Pls. Ex. 39, FB-SCHMIDT-000052710.
     [23] Pls. Ex. 40, FB-SCHMIDT-000080882 at '83
25   [24] *Id.* at 000080882.
     [25] Doc. 198-26, Pls. Ex. 23 (FB-SCHMIDT-000000198 at '206 (Nov. 16, 2018 Letter from M.
26   Rubin to B. Wiseman, of the Office of the D.C. Attorney General). *See also* Opp. at 1 ("Within
     three days of discovering the attack, Facebook completely contained it.").
27   [26] Pls. Ex. 41, (T34185444 Help CG Investigate suspicious activity starting on 9/14/2018) at FB-

28                                              8

1   Discouraged by the lack of a response, Adler ████████████████ on September 24th:

2   ████████████████████████████████

3   ████████████████████████████████████████████████

4   ████████████████████████████████

5   ████████████████████████████████████████████████ [27]

6   Thus, Facebook's own properly described "not helpful" security personnel were told of a problem

7   but dawdled for days amidst a breach where hackers stole millions of user's PII.

                    *2.    The Damage Models Support 23(b)(3) Certification*

9           Facebook makes a frenzy of failed arguments against certifying the credit monitoring relief.

10  First, it pretends that this Court only recognized Mr. Adkins as possessing a viable negligence

11  complaint to seek time spent on the breach. Opp. at 12. This conflates a comment the Court made

12  about application of the economic loss doctrine, Doc. 153 at 18, with standing for a negligence

13  claim. It also ignores the Court's decision to permit Plaintiff to seek credit monitoring in the

14  amended complaint and that "Rule 56 will tease out whether they are unfounded." Doc. 185 at 6-7.

15  As stated, the request for credit monitoring is supported class-wide due to increased risk for every

16  class member.[28] Facebook's argument that the stolen PII here cannot immediately lead to identity

17  fraud (Opp. at 12) recycles the standing argument rejected by this Court as incongruent with *Zappos*.

18  It also deviates from what its own expert and employees have said about the PII taken here.[29]

19          Second, Facebook cites to *Krottner* and *Ruiz* to argue that precedent countermands class

20  treatment seeking credit monitoring damages. Opp. at 12 citing *Krottner v. Starbucks Corp.,* 406

21  F.App'x 129 (9th Cir. 2010) and *Ruiz v. Gap, Inc.,* 380 F. App'x 689 (9th Cir. 2010). But *Krottner*

22  involved Washington and not California law (which recognizes monitoring as relief for future

23  harms), and did not involve hackers that deliberately stole PII. In *Ruiz*, the plaintiffs failed to show

24  the defendant would reimburse him for credit monitoring, while Facebook has not offered, and

25  denied any basis for any credit monitoring.

26  ────────────
    SCHMIDT-00000851.
27  [27] Pls. Ex. 45, FB-SCHMIDT-000099941.
    [28] Pls. Ex. 32, Van Dyke Reply at 3-11.
28  [29] Pls. Ex. 30 (Lohr article), and Pls. Ex. 34(FB-SCHMIDT-00099557).

Third, Facebook asserts that differences between class members would predominate on causation. Opp. at 13. Plaintiff concedes there are "actual differences" among users – in terms of the PII stolen and their past history of breaches—but these are distinctions without a difference. Van Dyke's cited testimony referred to "small differences," Def. Ex. 4, and he maintained the risks created by the breach increased for every class member sufficient to warrant monitoring.[30]

Fourth, Facebook argues, without legal support, that differences in privacy settings or data already public determines the propriety of credit monitoring. Opp. at 15, 21. But this ignores (again) that this case does not involve a random person cyber-stalking Mr. Adkins to find some PII pertinent to him; instead it involved a sophisticated hacker who set out to, and did successfully, steal millions of pieces of PII. That LinkedIn could not stop hiQ Labs from scraping data off of LinkedIn's site[31] does not mean that users who happen to have information available at Facebook lose all privacy interests in that data[32] or face no risk now when a sophisticated criminal deliberately steals it.

Fifth, Facebook claims that because Adkins' social security number and other information not stolen in this attack are already on the Dark Web that means that class relief is unavailable. Opp. at 16. But this is no more than Facebook seeking to exculpate itself from its own negligence by claiming the victim was already injured. *Potter* (with respect to medical monitoring) is instructive here. There, defendants argued that differences in preexisting health conditions among those exposed seeking medical monitoring precluded class treatment, for example, for class members that smoked. The court held that "we see no reason why the defendant should not be held responsible for any increased or different monitoring of the preexisting condition (whether or not the preexisting condition is caused by the plaintiff's voluntary conduct) where necessitated as a direct result of the

---

[30] Pls. Ex. 42, Van Dyke Dep.at 37:3-21; 48:16-22; 116:22-118:25; Van Dyke Reply, ¶ 2.a. Facebook also derides Van Dyke for discussing the "average victim" and not establishing individualized injury assessments. Opp. at 18. Van Dyke did not compute an average amount of loss or risk; he only addressed the typical breach victim and found that those in the Facebook breach were at an increased risk over non-data breach victims for identity theft. Van Dyke Reply, ¶ 2.a.ii
[31] *hiQ Labs v. LinkedIn Corp.,* 2019 WL4251889 (Sept. 9th Cir. 2019), cited at Opp. 21.
[32] *In re Facebook Inc. Consumer Privacy User Profile Litig.,* 19-md-02843, 2019 WL 4261048, at *1, *7 (rejecting standing argument regarding lack of privacy interest in information shared with Facebook, and noting Facebook has elsewhere argued public posts regain a privacy interest if a customer changes his or her settings).

subsequent exposure." *Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th 965, 1009, n.27 (1993).

Sixth, Facebook rehashes its standing argument by derisively discussing how the PII stolen could (and could not) be used to create an imminent risk of identity theft. Opp. at 16. Facebook mangles Van Dyke's point that despite different PII taken, all class members faced a common elevated risk of identity theft compared to those outside this breach, thereby warranting a credit monitoring program; while monitoring could be adjusted to the PII at issue, it was his experience that such titrations would confuse users and reduce efficacy.[33] Facebook also misuses the Javelin data to extrapolate possible class member differences due to prior breaches increasing risk. Opp. at 16. But Van Dyke explained the data in his declaration supports that breaches are correlated with reports of increased identity theft. He did not calculate the quantum of risk.[34] His website, which involves use of a proprietary algorithm does provide a 6 out of 10 risk level, which is consistent with his opinion that class members are at risk and deserve premium credit monitoring.[35]

Finally, as to credit monitoring, Facebook has argued no injury has been shown. Opp. at 18. This is as nonsensical as arguing absence of physical injury in a medical monitoring case. Again, to be deserving of credit monitoring (like medical monitoring) one need only show an increased risk of harm (like identity theft) because sensitive data (like "names, home and email addresses") was stolen. *Corona v. Sony Pictures Entertainment, Inc.*, 2015 WL 3916744 at *4 (C.D. Cal. June 15, 2015). Van Dyke opines that the breach created a binary question where exposure supports the monitoring: if he is wrong, a class jury can hold otherwise. *See, e.g., Elsea v. U.S. Engineering Co*, 463 S.W.3d 409, 419 (Mo. Ct. App., 2015) (reversing denial of medical monitoring class action where expert testified even low-level exposure to asbestos – an issue common to all class members – increased risks; "whether that is true or whether only a higher concentration creates a danger is an

---

[33] Van Dyke Decl., ¶ 4.
[34] Van Dyke Dep. at 137:7-138:7; 183:8-184:21; Van Dyke Reply, ¶ 2.e. Facebook curiously cites the Court to its holding regarding former Plaintiff William Bass to assert Plaintiff's cannot trace the breach to an injury. Opp. at 17. But that was because Facebook presented evidence Bass was not one of the users affected by the Breach.
[35] *Id.,* 2.h.; Pls. Ex. 33.

1    issue common to all members of the putative class.").[36]

2          With respect to lost PII value damages, Facebook misrelies on the Court's order rejecting

3    Plaintiff's claims that the loss of PII was "lost money or property" for statutory standing under the

4    UCL. Opp. at 17, citing Doc. 185 at 3, 6. The Court was not asked to consider whether as to common

5    law negligence the lost value of PII presented a compensable injury. Ian Ratner provided expert

6    testimony as to the value of the PII taken, and how users lost that value.[37] Facebook argues that

7    individual assessments of each person's lost PII would be needed. Opp. at 17. But Ratner provided

8    a range for the differing groups.[38] As long as the damages are not arbitrary and bear some connection

9    to the liability theory, differences in damage calculations do not defeat class certification. *Pulaski*

10   *& Middleman, LLC v. Google, Inc.,* 802 F.3d 979, 988 (9th Cir. 2015).

11          3.      *The Economic Loss Rule Does Not Countermand Class Treatment.*

12          Facebook argues that the economic loss rule ("ELR") bars the negligence claim and requires

13   individual inquiry. Opp. at 12, 19.[39] First, even if applying the ELR required some individual

14   analysis, that would not doom class treatment. *Nitsch v. Dreamworks Animation SKG Inc.*, 315

15   F.R.D. 270, 313 (N.D. Cal. 2016) (certifying class where "defenses peculiar to some individual

16   class members" will "have to be tried separately.") But the inapplicability of the ELR can be

17   decided class-wide because of the special relationship that exists. Doc. 198 at 21-22 (noting

18   Facebook accepted sensitive data; knew the data's value, the potential for theft, and the likely harm

19   if it was stolen supporting special relationship as per *J'Aire Corp. v. Gregory*, 24 Cal.3d 799, 804

20   (1979); *In re Yahoo! Inc. Customer Data Sec. Litig.*, 313 F. Supp. 3d 1113, 1132 (N.D. Cal. 2018)

21   (rejecting ELR to bar negligence claims as Yahoo had accepted users' PII, knew its value and risks

---

[36] Facebook argues that differences in the class members' PII may support different results on the reasonableness of the monitoring program or its form. Opp. at 19. Van Dyke recognized differences in what kind of email addresses the user had stolen might impact whether a particular component of the monitoring program fits best; he did not back off the propriety of credit monitoring for U.S. users. Van Dyke Dep. at 225:8-226:8; Van Dyke Reply, ¶ 2.a.iv-v.
[37] Doc. 198-29, Pls. Ex. 26, Ratner Decl., ¶ 50.
[38] Ratner Decl., ¶¶ 54-59.
[39] Facebook argues that both damages for credit monitoring and the lost value of PII are precluded by the ELR, citing to this Court's order on the motion to dismiss. But in its order, this Court rejected applying the ELR due to lost time incurred. Doc. 153 at 18. The Court did not address whether a "special relationship" exists exempting Plaintiff's negligence claims from the rule.

1    if stolen, and the harm suffered was foreseeable).

2         Facebook did not address these cases in its opposition. Instead, Facebook cited to instances

3    where the plaintiffs could not show employees had not shown their employer could have anticipated

4    a breach, Opp. at 12 *citing Castillo v. Seagate Tech*, LLC, 2016 WL 9280242 (N.D. Cal. Sept. 14,

5    2016), or where the plaintiffs flat out ignored the *J'aire* test for a special relationship. *Id. citing*, *In*

6    *re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942 (S.D. Cal.

7    2012). In any event, the applicability of the defense is a common legal issue, and documents and

8    testimony support that Facebook recognized it had an obligation to protect user data.[40]

9         **C.      The Damages Class is Manageable**

10        Facebook claims manageability problems follow from a worldwide class, and that changing

11   the class definition from nationwide in the complaint to worldwide amounts to a due process

12   violation. Opp. at 3, 22. With regard to altering the class definition from that in the complaint, it is

13   well-recognized that "refining a class definition is a natural outcome of federal class action

14   practice." *Columbus Drywall & Insulation, Inc. v. Masco Corp.,* No. 1:04-CV-3066-JEC, 2009 WL

15   856306, at *20 (N.D. Ga. Feb. 9, 2009). Nevertheless, given the testimony regarding the damages

16   relief by Ratner and Van Dyke, Plaintiff will confine the class certification request under Rule

17   23(b)(3) to only the United States; the injunctive relief sought (regarding Facebook's measures to

18   preclude exploitation of access token) would still be applicable to the broader class.

19        Facebook also contends that there are too many uninjured class members in the class,

20   Opp. at 20. This blanket conclusion stems from Facebook's decision that Group 1 users who had

21   the "most basic information taken" cannot be injured. *Id*. As noted, this basic information

22   includes phone numbers, which both Van Dyke and Berglas found are sensitive PII.[41] Facebook

23   is again asking this Court to rule on the claims and injury as to all class members before the class

---

24   [40] Doc. 193 at ¶65 (quoting Facebook CEO Mark Zuckerberg that "We have a responsibility to
25   protect your data, and if we can't then we don't deserve to serve you."); *See also* Doc. 198-1 at 17.
     Wholly distinguishable is *Andrews v. Plains All Am. Pipeline, L.P.,* No. 18-55850, 2019 WL
26   2880970, at *1 (9th Cir. July 3, 2019), (Opp. at 20) where the court found a class that included
     "[i]ndividuals and entities who were employed, or contracted, to work on or to provide supplies,
27   personnel, or services for the operations of" the pipeline facilities presented great disparities as to
     injury, causation, and the applicability of the ELR.
28   [41] Van Dyke Reply, ¶ 4.a.i; Pls. Ex. 30 (Lohr, *supra*.)

jury can consider those of Mr. Adkins. It is also presuming a favorable answer. The Supreme Court has long directed otherwise on class certification. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178 (1974) (In determining whether class certification is appropriate, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.").

## III.   GROUNDS FOR CLASS-WIDE INJUNCTIVE RELIEF REMAIN FOR ALL USERS

Facebook claims that Plaintiff's Rule 23(b)(2) allegations consist of a "single operative sentence" with "no evidence" showing that declaratory relief is appropriate. Again, Facebook ignores Frantz's 43-page analysis of the flaws in Facebook's security practices and recommendations for change. That Frantz didn't search for specific vulnerabilities (a task beyond the scope of her engagement) is irrelevant: Facebook's own documents from before and after the breach show that Facebook's security practices still left PII at risk. This evidence shows that a judgment that Facebook's security practices are inadequate and should be changed would (1) clarify the "legal relations in issue" – i.e., whether Facebook's security practices still put PII at risk; and (2) "afford relief" because changing those practices would safeguard the PII. *See Bilbrey by Bilbrey v. Brown*, 739 F.2d 1462, 1470 (9th Cir. 1984).[42]

Facebook also claims that improving Facebook's deficient security practices would be "drastically broad" and "improperly intrusive." Opp. at 24. But Frantz's recommendations were tailored to specific security issues she identified from Facebook's own documents. *Compare with Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 (7th Cir. 2011) (denying injunction that would require Defendant to reinspect the class members' roofs pursuant merely to a "reasonable, uniform, and objective standard" without further detail). Nor is Facebook's colossal size and user base a reason for Facebook *not* to implement these changes—on the contrary, the "billions of users" (Opp. at 24) entrusting Facebook with their PII is precisely why Facebook *should* improve its security practices.[43]

---

[42] Relying on the complaint, Facebook argues that credit monitoring relief is better suited for Rule 23(b)(3) certification. Plaintiff agrees. *See* Doc. 198 at 19-21.

[43] If, as Facebook suggests, Facebook has already complied with Dr. Frantz's recommendations,

## VI.   THE COURT CAN CERTIFY LIABILITY UNDER 23(C)(4) FOR LOST TIME

Facebook contends that trying Adkins' claim as to negligence, including the time spent to determine liability issues, would not materially advance litigation because subsequent trials would be needed for other class members seeking to use the class ruling. Opp. at 25. But follow-on proceedings are not a flaw but a benefit offered by 23(c)(4), which allows an "action [to] retain its 'class' character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims." Adv. Com. Note, Fed. R. Civ. P. 23(c)(4) (1966), Deciding liability would allow the Court to resolve in "one fell swoop" all of the liability issues on Facebook's negligence. *Mejdrech v. Met-Coil Sys. Corp.,* 319 F.3d 910, 911 (7th Cir. 2003); *accord Frlekin v. Apple Inc.*, 309 F.R.D. 518, 526 (N.D. Cal. 2015) (Alsup, J.) (certifying class of employees subject to a bag-search policy, whether or not time spent waiting to be searched was compensable); *Cherry v. City Coll. of San Francisco*, No. C 04-04981 WHA, 2005 WL 6769124, at *7 (N.D. Cal. June 15, 2005) (Alsup, J.) ("At present, the Court finds that the issue of individual damages should be left to each student to assert as he or she wishes in subsequent proceedings, including separate lawsuits.").

The *Mejdrech* decision undercuts Facebook's other fallacious argument, that issue certification raises "Seventh Amendment concerns" of a later jury reexamining issues decided by the class jury. Opp. at 25 citing *Matter of Rhone-Poulenc Rorer, Inc.,* 51 F.3d 1293, 1303 (7th Cir. 1995). Judge Posner wrote *Mejdrech* six years after he authored *Rhone-Poulenc* and expressed no concern about jury re-examination. Facebook fails to specify its "Seventh Amendment concerns" and explain how it would have standing in a Seventh Amendment violation if a second jury reexamined the negligence finding of the class jury against it.[44] Certifying and trying the lost time claims as to negligence liability benefits litigants by resolving the most important common issue.

### CONCLUSION

For the reasons above, the Court should grant Plaintiff's Class Certification Motion.

---

Facebook could have submitted this evidence in its opposition brief or expert reports. It did not, nor seek to exclude Ms. Frantz's declaration.

[44] For more reading on the dicta in *Rhone*-Poulenc and the Reexamination Clause argument in issue certification, (albeit co-written by Plaintiff's Co-counsel) *See* D. McNamara et. al., "Reexamining the Seventh Amendment Argument Against Issue Certification," 34 Pace L. Rev. 1041, 1055 (2014).

15

1 | DATED: October 15, 2019

2 | Respectfully submitted,

3 | By: /s/ Andrew N. Friedman

4 | Andrew N. Friedman (*pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**

5 | 1100 New York Ave. NW, Fifth Floor
Washington, DC 20005

6 | Telephone: (202) 408-4600
Facsimile: (202) 408-4699

7 | afriedman@cohenmilstein.com

8 |
John A. Yanchunis (*pro hac vice*)

9 | jyanchunis@forthepeople.com
**MORGAN & MORGAN**

10 | **COMPLEX LITIGATION GROUP**
201 N. Franklin St., 7th Floor

11 | Tampa, FL 33602
Telephone: (813) 223-5505

12 | Facsimile: (813) 223-5402

13 |
Ariana J. Tadler (*pro hac vice*)

14 | atadler@tadlerlaw.com
**TADLER LAW LLP**

15 | One Penn Plaza
36th Floor

16 | New York, NY  10119
Telephone: (212) 946-9453

17 | Facsimile: (212) 273-4375

18 |
*Interim Co-Lead Counsel for Plaintiff*

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

1

2

3 **CAPSTONE LAW, APC**
Tarek H. Zohdy (SBN 247775)

4 Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (SBN 275553)

5 Cody.Padgett@capstonelawyers.com
Trisha K. Monesi (SBN 303512)

6 Trisha.Monesi@capstonelawyers.com
Capstone Law APC

7 1875 Century Park East, Suite 1000
Los Angeles, California 90067

8 Telephone: (310) 556-4811
Facsimile: (310) 943-0396

9

10

11 **CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD,**

12 **LLP**
David S. Casey, Jr. (SBN 060768)

13 dcasey@cglaw.com
Gayle M. Blatt (SBN 122048)

14 gmb@cglaw.com
Jeremy Robinson (SBN 188325)

15 jrobinson@cglaw.com
110 Laurel Street

16 San Diego, California 92101
Telephone: (619) 238-1811

17 Facsimile: (619) 544-9232 fax

18

19 **CLAYEO C. ARNOLD, A
PROFESSIONAL LAW**

20 **CORPORATION**
Clayeo C. Arnold (SBN 65070)

21 carnold@justice4you.com
Joshua H. Watson (SBN 238058)

22 jwatson@justice4you.com
865 Howe Avenue

23 Sacramento, California 95825
Telephone: 916-777-7777

24 Facsimile: 916-924-1829

25

26 **COHEN MILSTEIN SELLERS & TOLL
PLLC**

27 Douglas J. McNamara
dmcnamara@cohenmilstein.com

28

Karina G. Puttieva (SBN 317702)
kputtieva@cohenmilstein.com
1100 New York Ave. NW
East Tower, 5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

**FINKELSTEIN, BLANKENSHIP, FREI-PEARSON & GARBER LLP**
Jeremiah Frei-Pearson
Jfrei-pearson@fbfglaw.com
Andrew C. White
awhite@fbfglaw.com
445 Hamilton Ave., Suite 605
White Plains, New York 10601
Telephone: (914) 298-3281
Facsimile: (914) 908-6709

**FRANKLIN D. AZAR & ASSOCIATES**
Ivy Ngo (SBN 249860)
ngoi@fdazar.com
14426 East Evans Ave
Aurora, CO 80014
Telephone: 303-757-3300
Facsimile: 720-213-5131

**GLANCY PRONGAY & MURRAY LLP**
Marc Godino
mgodino@glancylaw.com
Brian Murray
bmurray@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: 310-201-9150
Facsimile: 310-432-1495

**JONES WARD PLC**
Jasper D. Ward
jasper@jonesward.com
1205 E Washington St, Suite 111
Louisville, Kentucky 40206

17

Telephone: 502-882-6000

**KANTROWITZ GOLDHAMER & GRAIFMAN, P.C.**
Gary S. Graifman
ggraifman@kgglaw.com
Jay Brody
jbrody@kgglaw.com
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
Telephone: (845) 356-2570
Facsimile: (845) 356-4335

**KOHN, SWIFT & GRAF, P.C.**
Jonathan Shub (SBN 237708)
jshub@kohnswift.com
Kevin Laukaitis
klaukaitis@kohnswift.com
1600 Market Street, Suite 2500
Philadelphia, PA 19103-7225
Telephone: (215) 238-1700
Facsimile: (215) 238-1968

**LAW OFFICE OF PAUL C. WHALEN, P.C.**
Paul C. Whalen
paul@paulwhelan.com
768 Plandome Road
Manhasset, NY 11030
Telephone: (516) 426-6870
Facsimile: (212) 658-9685

**LAW OFFICES OF CHARLES REICHMANN**
Charles Reichmann
Cpreichmann@yahoo.com
16 Yale Circle
Kensington, CA 94708
Telephone: (415) 373-8849

**LOCKRIDGE GRINDAL NAUEN PLLP**
Karen Hanson Riebel
khriebel@locklaw.com
Kate M. Baxter-Kauf
kmbaxter-kauf@locklaw.com
Arielle S. Wagner
aswagner@locklaw.com
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401

Telephone: (612) 596-4097
Facsimile: (612) 339-0981

**MIGLIACCIO & RATHOD LLP**
Nicholas A. Migliaccio
nmigliaccio@classlawdc.com
Jason S. Rathod
jrathos@classlawdc.com
412 H Street N.E., Ste. 302
Washington, DC 20002
Telephone: (202) 470-3520

**TADLER LAW LLP**
Ariana J. Tadler (*pro hac vice*)
ATadler@Tadlerlaw.com
One Penn Plaza
New York, New York
New York, NY  10119
Telephone: (212) 946-9453
Facsimile: (212) 273-4375

**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
Ryan J. McGee
rmcgee@ForThePeople.com
Jean S. Martin
jeanmartin@ForThePeople.com
Kenya J. Reddy
kreddy@forthepeople.com
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402

**ROBINSON CALCAGNIE, INC.**
Daniel S. Robinson (SBN 244245)
drobinson@robinsonfirm.com
Wesley K. Polischuk (SBM 254121)
wpolischuk@robinsonfirm.com
Michael W. Olson (312857)
19 Corporate Plaza Drive
Newport Beach, California 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

**STULL, STULL & BRODY**
Patrice L. Bishop (SBN 182256)
pbishop@ssbla.com
Melissa R. Emert

18

memert@ssbny.com
9430 W. Olympic Blvd., Suite 400
Beverly Hills, CA 90212
Telephone: (310) 209-2468                    *Other Plaintiff's Counsel*
Facsimile: (310) 209-2087

PLAINTIFF'S AMENDED REPLY ISO of CLASS CERTIFICATION
No.  C 18-05982 WHA (JSC)

**SIGNATURE ATTESTATION**

I am the ECF User whose identification and password are being used to file Plaintiff's Amended Reply Memorandum in Support of Plaintiff's Motion for Class Certification. I, Andrew N. Friedman, attest that service has been effectuated via ECF.

DATED:  October 15, 2019                     */s/ Andrew N. Friedman*