Ariana J. Tadler (*pro hac vice*)
atadler@tadlerlaw.com
**TADLER LAW LLP**
One Penn Plaza
36th Floor
New York, NY  10119
Telephone: (212) 946-9300

Andrew N. Friedman (*pro hac vice*)
afriedman@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

John A. Yanchunis (*pro hac vice*)
jyanchunis@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin St., 7th Floor
Tampa, FL  33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402

***Appointed Class Counsel***

# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

STEPHEN ADKINS, an individual and Michigan resident, on behalf of himself and all others similarly situated,

                    Plaintiffs,

          v.

FACEBOOK, INC.,

                    Defendant.

No.  C 18-05982 WHA (JSC)

**JOINT DECLARATION OF CLASS COUNSEL IN SUPPORT OF MOTION FOR FINAL APPROVAL OF THE SETTLEMENT AND AWARD OF ATTORNEYS' FEES, LITIGATION COSTS, AND SERVICE AWARD**

Date:     April 8, 2021
Time:     8:00 am
Court:    TBD Under Court Safety Protocols
Hon. William H. Alsup

We, Co-Lead Class Counsel Ariana J. Tadler, Andrew N. Friedman and John A. Yanchunis, hereby jointly declare and state as follows:

1. Ariana J. Tadler is an attorney duly licensed to practice law in the states of New York and New Jersey and admitted *pro hac vice* in this Court. She is the Founding Partner of Tadler Law LLP and counsel of record for the Plaintiff and the certified class in the above-captioned matter. The Court appointed Ms. Tadler as an Interim Counsel on February 14, 2019, ECF No. 79,[1] and then as Class Counsel on November 26, 2019, ECF No. 260. She has personal knowledge of the facts set forth below and, if called as a witness in a court of law, could and would testify competently hereto.

2. Andrew N. Friedman is an attorney duly licensed to practice law in Washington, D.C. and the State of New York and admitted *pro hac vice* in this Court. He is a partner with the law firm of Cohen Milstein Sellers & Toll PLLC, and counsel of record for the Plaintiff and the certified class in the above-captioned matter. The Court appointed Mr. Friedman as an Interim Counsel on February 14, 2019, ECF No. 79, and then as Class Counsel on November 26, 2019, ECF No. 260. He has personal knowledge of the facts set forth below and, if called as a witness in a court of law, could and would testify competently hereto.

3. John A. Yanchunis is an attorney duly licensed to practice law in the state of Florida and admitted *pro hac vice* in this Court. He is a partner with the law firm of Morgan & Morgan Complex Litigation Group, and counsel of record for the Plaintiff and the certified class in the above-captioned matter. The Court appointed Mr. Yanchunis as an Interim Counsel on February 14, 2019, ECF No. 79, and then as Class Counsel on November 26, 2019, ECF No. 260. He has personal knowledge of the facts set forth below and, if called as a witness in a court of law, could and would testify competently hereto.[2]

---

[1] Ms. Tadler was a Managing Partner of Milberg Tadler Phillips Grossman LLP ("MTPG") at the outset of this litigation.  In June 2019, Ms. Tadler and a number of lawyers who worked closely with her left MTPG to launch Tadler Law.

[2] Ms. Tadler, Mr. Friedman, and Mr. Yanchunis, and when applicable their respective firm teams, are referred to throughout this Joint Declaration as "the Undersigned," "Interim Counsel," and "Class Counsel," as appropriate.

**Background**

4. On September 28, 2018, Facebook, Inc. ("Facebook") announced that it experienced a data breach ("Breach") that is the subject of this litigation.

5. Facebook is a worldwide social media company that in 2019 reportedly had over 2 billion users worldwide.[3]

6. After Facebook announced the Breach, numerous plaintiffs filed over a dozen actions in the United States District Court for the Northern District of California. Plaintiffs brought these actions on behalf of all persons who registered for Facebook in the United States and whose personally identifiable information ("PII") was accessed, compromised, or stolen in the Data Breach as a result of Facebook's failure to: (i) adequately protect its users' PII, (ii) warn users of its inadequate information security practices, and (iii) effectively monitor and control nefarious actors on Facebook's networks and control known nefarious accounts, all within Facebook's knowledge. *See* ECF No. 61.

7. The compromised information included names, birthdates, current cities, hometowns, and other data points. *See* ECF No. 263, at ¶ 102; ECF No. 97, at ¶ 11. Attackers exploited vulnerabilities in Facebook's software that allowed them to generate and use highly-permissioned access tokens. ECF No. 263, at ¶ 95; ECF No. 97, at ¶ 9. Facebook's access tokens are digital credentials that can be used to query data from a user's account without reentering their username and password. ECF No. 193, at ¶¶ 95, 97; ECF No. 97, at ¶¶ 10, 17 n.8. The attackers then used the access tokens to retrieve information for those estimated 29 million people. ECF No. 263, at ¶¶ 95, 97; *see* ECF No. 97.

**Early Case Investigation by Class Counsel**

8. Prior to and following the initiation of litigation, the Undersigned conducted an extensive investigation of the facts relating to Facebook's lax information and data security practices,

---

[3] *See, e.g.*, Andrew Hutchinson, *Facebook Reaches 2.38 Billion Users, Beats Revenue Estimates in Latest Update*, Social Media Today (Apr., 24, 2019), https://www.socialmediatoday.com/news/facebook-reaches-238-billion-users-beats-revenue-estimates-in-latest-upda/553403/.

which became more prominent in early 2018 and continued to persist up to September 2018, when Facebook announced the Breach. Before the Breach, Facebook announced that many of its users had their information scraped from their accounts by Cambridge Analytica. Facebook became the subject of federal and international regulatory and Congressional scrutiny and investigations. These events resulted in Interim Counsel thoroughly investigating Facebook's privacy practices, including the identification of a number of potential witnesses. Testimony and interviews of Facebook executives were recorded and transcribed for review and use in the litigation.

9. This investigation was significantly bolstered by Morgan & Morgan's former Federal Bureau of Investigations ("FBI") agents (one of whom led the FBI's investigation of ENRON, among other cases). This included collecting present and historical information about Facebook's privacy policies and cyber practices, plus the collection of relevant Congressional testimony and media interviews.

10. The early investigation also was buttressed by the retention of prominent cyber experts who assisted in other high-profile data breach and privacy litigation, as well as seasoned damages experts. This Joint Declaration describes additional work those experts performed in support of this litigation in ¶¶ 12, 28-30, 35, 37, 44-49, 62, 72, 95.

11. Among other research and investigative techniques, the Undersigned performed the following to support the case investigation:

   a. Reviewed numerous news sources outlining technology firms' failures to safeguard their users' PII;

   b. Investigated potential legal claims against Facebook for its failure to safeguard PII;

   c. Analyzed numerous Facebook policies and documents, including past and present versions of Facebook's relevant Data Use Policies, Terms of Service, press releases, and frequently asked questions;

   d. Gathered statements of Facebook employees and other individuals who testified or publicly commented on issues and facts related to this case;

e.  Researched the types of personal user data Facebook collects and shares;

f.  Investigated the facts underlying the challenged conduct at issue here through the use of former FBI agents and by interviewing numerous Facebook users about their knowledge and understanding of Facebook's misconduct;

g.  Investigated the adequacy of the named Plaintiffs to represent the putative classes;

h.  Interviewed potential consulting experts regarding the technical aspects of Facebook's conduct;

i.  Interviewed potential consulting experts regarding the financial impact of Facebook's conduct;

j.  Retained consulting experts in industry-standard information security practices and financial analyses;

k.  Drafted and filed separate complaints, which contained allegations regarding Facebook's inadequate information security practices;

l.  Monitored and reviewed Facebook's CEO's and other officers' and employees' testimony before Congressional bodies concerning the company's information security practices;

m.  Monitored and reviewed Facebook's CEO's and other officers' and employees' testimony before foreign nations and GDPR bodies concerning its information security practices; and

n.  Continually monitored media and press coverage concerning the breadth and scope of the data breach.

**Early Case Management by Interim Counsel**

12. On November 2, 2018, the Court issued an Order requesting a Tutorial to inform the Court about the technical issues in the case. ECF. No. 29. Despite no cases having been consolidated yet at that point, and without formal appointment by the Court to lead the litigation, the Undersigned spearheaded the effort to prepare for and conduct the Tutorial and coordinated with all Plaintiffs' counsel to efficiently organize the litigation. To that end, Interim Counsel met with several experts, including Mary Frantz and Matthew Strebe.

13. Class Counsel also organized a meeting in Chicago with all Plaintiffs' counsel on December

12, 2018, to ensure that Plaintiffs' counsel avoided duplicative efforts and cooperated as a single team. The Undersigned distributed work and committee responsibility to various Plaintiffs' firms: class representative and client vetting, drafting pleadings and a consolidated complaint, expert retention and vetting, factual investigations, various discovery related tasks (including formal document discovery, construction and management of details relating to electronically stored and digital information ("ESI") and, depositions), and law and briefing. Respectful of the Court's championing of involving junior lawyers in crucial litigation roles, throughout the litigation, Class Counsel strived to staff depositions and hearings with junior lawyers at lower billing rates when possible. These junior attorneys had prominent roles— including helming the January 9, 2019 Tutorial, often taking depositions, or arguing before the Court.

14. Subsequent to the December 12, 2018 meeting, the Undersigned worked together closely to prepare for the presentation of the Tutorial and continued to organize work assignments.

15. On January 10, 2019, the day after the Tutorial, the Court consolidated the cases and established an initial schedule in its Case Management Order. ECF No. 67. Although the Court had not yet selected Interim Counsel, the Undersigned continued to manage Plaintiffs' litigation efforts (with the support of other Plaintiffs' counsel) since several key deadlines were just weeks away (Initial Disclosures due on January 23, 2019, and a Consolidated Complaint due on February 7, 2019).

**Post-Appointment Case Management**

16. After the Undersigned were appointed as Interim Counsel on February 14, 2019 (ECF No. 79), we (and our respective firms) worked on virtually every aspect of the litigation, either by internally distributing work or by coordinating with and overseeing other firms to ensure tasks were successfully completed.[4]

---

[4] Interim Counsel were ultimately appointed as Class Counsel by the Court as part of its Order governing class certification.  For ease of reference, from this point on, with rare purposeful exceptions, we use "Class Counsel" to refer to ourselves and our respective firm lawyers.

17. We held a standing weekly call throughout the course of the litigation among the three firms to discuss strategy, the assignments, and the progress of various tasks; and to address other case-related issues as the case progressed. On some occasions, we invited other Plaintiffs' counsel to join the weekly meeting to report on the status of their assignments. To keep all non-lead Plaintiffs' counsel apprised of the status of the litigation, we also held brief standing calls every other week. Separately, those involved in document review participated in regular calls to discuss the value of the information produced, deficiencies in production and privilege log related issues and to support the teams responsible for pursuing document discovery and depositions and working with experts.

**Creation of WiKi Database**

18. To ensure the voluminous investigative information was properly organized for use during discovery and substantive briefing, Class Counsel created a centralized repository (similar to and for their purposes referenced as a "Wiki" page). This repository hosted the investigative statements, relevant documents, witness information, and other factual background. The format for this repository was based on an investigative format employed by the FBI; and, in this case, we used the "Wiki" name to refer to this collection of information.

19. Information gathered and placed in the Wiki assisted in the factual development of the cases, including the preparation for depositions and other discovery, and was a resource for the factual foundation for expert reports and legal briefs.

**Early Class Representative/Client Vetting and Communications with Class Members**

20. At the outset of the litigation, Plaintiffs' counsel spent considerable time communicating with counsel and their clients in the 11 original complaints filed against Facebook for the Breach. We did so to make sure the most responsible, invested plaintiffs were named as the putative class representatives in the Consolidated Complaint.

21. To that end, more than 70 potential plaintiffs and their counsel were contacted and interviewed by Plaintiffs' Counsel. Beyond just the clients who filed cases, we included several people who were impacted by the Breach but had not yet filed complaints. The

interview process included an average of three phone calls with each client and their counsel.

22. In addition to gathering information about each potential Plaintiff, we went to great lengths to explain the duties and responsibilities of serving as a Named Plaintiff and Class Representative, including the extensive work that would be required to respond to Facebook's discovery requests.

23. In addition to providing factual details of each person's experience in the complaint, the key purpose of the multiple interview procedure Plaintiffs' counsel employed was to test for commitment to the litigation, or "staying power." Scheduling multiple phone calls and reviewing factual allegations multiple times can be a good indicator of commitment and ability to devote the time and attention required to serve as a class representative.

24. Class Counsel made sure that the vetting process included background checks performed by a former FBI investigator and others. We were intimately involved in coordinating and overseeing this important work.

25. After an intensive fact gathering collection, that information was employed to draft Rule 26 Initial Disclosures for 20 Plaintiffs and to draft the Consolidated Complaint which named five Plaintiffs. Of course, additional multiple, extensive telephone conferences were conducted with all Plaintiffs and potential Named Plaintiffs to review their initial disclosures and their allegations in the Consolidated Complaint.

26. This extensive vetting process was renewed in the summer of 2019 as Plaintiffs sought to amend their Complaint with additional Named Plaintiffs. While the Court ultimately denied Plaintiffs' motion to amend (ECF No. 185), the time spent interviewing and investigating additional class member plaintiffs was necessary to Plaintiffs' motion.

**Court Invitational Tutorial**

27. On November 2, 2018, the Court issued a Notice Re Tutorial. ECF No. 29. Specifically, the Court's Notice stated: "The Court invites counsel to conduct a public tutorial on the information generally related to this case, including the subject of data privacy and the technology used to both protect and attack it. Specifically, how encryption technology works,

how the industry protects databases of personal information, and how hackers are generally able to circumvent these protections and perform such widespread damage. Information as to the role of internet black markets — including the existence of the "dark web" as the marketplace for personal information — would also be welcomed. Each side will have sixty minutes." *Id.*

28. Immediately after the Breach was disclosed, the Undersigned engaged two industry-leading cyber experts to assist with understanding the intricacies of the publicly announced technologies involved in the Breach, including how access tokens function, measures employed to maintain their security, and research concerning any prior breaches of Facebook's and other companies' systems due to flaws in the security and maintenance of access tokens.

29. Class Counsel worked with these two cyber experts for the approximate two months between the Court's Notice Re Tutorial and the actual Tutorial to prepare for, develop, and ultimately present the 60-minute tutorial. Consistent with the Court's Notice, Class Counsel and our experts focused on how encryption technology works, how the industry protects databases of personal information, and how hackers are generally able to circumvent these protections and perform such widespread damage, as well as the role of the internet black markets, including the existence of the "dark web." ECF No. 29.

30. On January 9, 2019, the parties held the Tutorial to educate the Court and the public about the technical issues in this case. ECF Nos. 71. Plaintiffs' experts Mary Franz and Matthew Strebe presented at the tutorial. Under the supervision of Class Counsel John Yanchunis, Ryan McGee of Morgan & Morgan played a material role in the Tutorial.

**Pleadings and Initial Disclosures**

31. In October, November, and December 2018, the Court issued orders relating to the various filed cases. ECF Nos. 21, 23, 25, 28, 32, 36, 37, 41, and 42. The related cases were subsequently consolidated. ECF No. 67.

32. On February 7, 2019, Class Counsel filed a consolidated class action complaint. ECF No. 76.

33. Motion to dismiss practice ensued (¶¶ 51-55, below; ECF Nos. 96, 108, 113, 122, 135, 153), and on July 18, 2019, Plaintiff's counsel subsequently moved to amend and then filed an amended consolidated complaint (ECF Nos. 160, 173, 180, 185, 263). The motion to amend was met with resistance from Facebook, and additional Rule 12 motion practice ensued. *See* ¶¶ 55-56 below; ECF No. 173.

34. The Court's January 10, 2019 Order stated, "As stated at the initial case management conference, as soon as *all* plaintiffs supply their initial disclosures in full compliance with Rule 26, plaintiffs can begin propounding discovery. As soon as defendant supplies its initial disclosures in full compliance with Rule 26, it may begin to propound discovery." ECF No. 67, ¶ 21.

35. Consistent with the requirements of this Court, the Rule 26 disclosures were detailed, robust, and required extensive consultation and input with experts; as a result, they were time consuming.

36. As noted above, the factual data gathered from Plaintiffs' counsels' multiple interviews with potential Named Plaintiffs was used to draft Rule 26 Initial Disclosures for 20 Plaintiffs and to draft the Consolidated Complaint, which named five (5) Plaintiffs. Of course, additional multiple, extensive telephone conferences were conducted with all Plaintiffs and potential Named Plaintiffs to review their initial disclosures and their allegations in the Consolidated Complaint.

37. Class Counsel engaged in multiple meet-and-confer conferences with Facebook regarding the Plaintiffs' Initial Disclosures, necessitating further engagement with Plaintiffs' experts on the anticipated and potential damages to Plaintiffs and the putative class.

**Protective Order, ESI Negotiations, and Clawback Agreement**

38. Class Counsel Ariana Tadler and her team are repeatedly recognized for their breadth of experience in the pursuit, management, and mining of ESI and the use and further development of best practices to accomplish these tasks. Accordingly, Ms. Tadler's team was charged with the responsibility of negotiating various stipulations and protocols governing

discovery as well as the pursuit of discovery from Facebook and the negotiation of search terms and protocol terms to potentially govern Technology Assisted Review ("TAR").

*Protective Order and ESI Protocol*

39. Ms. Tadler's team negotiated the Protective Order (ECF No. 102) with defendant's counsel. The team began researching and drafting the Protective Order in January 2019. We considered the Northern District of California's Model Protective Orders and also modified and added important provisions relevant to this litigation. ("With the exception of Patent Local Rule 2-2, the Local Rules do not require the parties to use any of the model protective orders and counsel may stipulate to or move for another form of protective order." https://www.cand.uscourts.gov/forms/model-protective-orders/).

40. The Protective Order, filed by the parties on March 25, 2019, was ultimately approved by the Court on March 25, 2019, subject to the Court's Order Approving Stipulated Protective Order Subject to Stated Conditions. ECF No. 103.

41. In February 2019, Ms. Tadler began negotiations with Facebook's counsel (principally Melanie Blunschi and Andrew Bertolli) to discuss the details, scope, and language of the ESI Protocol. Ms. Tadler also communicated directly with Facebook's lead counsel, Andrew Clubok. The conversations focused, in particular, on source code and other topics deemed highly sensitive by Facebook.

42. We continued to revise provisions and meet and confer with defense counsel throughout February and most of March 2019. The ESI Protocol was ultimately entered by the Court on May 17, 2019. ECF No. 127 (signed by Judge Corley). The ESI Protocol sets forth the parameters governing the production of ESI, thereby facilitating a receiving party's receipt, management, review, and analysis, of data production by the producing party.

*Stipulated [Proposed] Federal Rules of Evidence 502(d) and Clawback Agreement*

43. Attentive to the Court's directive to move discovery expeditiously, Class Counsel were eager to receive early production of certain core documents without the delay often caused by a producing party's privilege review plus any scope or timing disagreements. To that end, in

conjunction with the Protective Order, Ms. Tadler's team simultaneously negotiated with Facebook's counsel to create a Federal Rules of Evidence 502(D) Order and Clawback Agreement, which the Court subsequently entered on March 29, 2019. ECF No. 106.

**Expert Retention and Analysis**

44. This case required extensive investigation to understand and appreciate the novelty of the technologies and other attendant issues in the Breach.

45. As explained above at ¶¶ 28-30, the Undersigned immediately engaged two industry-leading cyber experts after the Breach was announced.

46. Additionally, and in tandem with their work with the cyber experts Ms. Franz and Mr. Strebe, Class Counsel also retained Ian Ratner of B. Riley Advisors (formerly Glass Ratner) to analyze Facebook's publicly-available financial filings and develop economic and monetary damage models for the Class.

47. This early work with a damages expert was crucial from the outset, not only to focus discovery and litigation efforts, but also to comply with the rigors of Rule 26(a) Initial Disclosures (which required damage estimates prior to the initiation of formal discovery). With the Court's rigorous case management schedule, any deficiency in the Rule 26(a) Initial Disclosures would have placed Class Counsel's efforts in peril had a discovery dispute arisen.

48. Throughout the remainder of the litigation, Class Counsel worked closely with the retained experts to tailor focused discovery and further develop and refine the litigation strategy, as well as the testimony and evidence presented to the Court in support of Plaintiff's motion for class certification.

49. In sum, Class Counsel retained four experts to assist with preparing for offensive depositions and establishing liability and damages, whose efforts culminated in four declarations, three expert reports (served on Facebook in January 2020), and four depositions.

**Dispositive Motion Practice**

*Motions to Dismiss*

50. On February 7, 2019, Plaintiff Stephen Adkins, along with four other plaintiffs, filed a Consolidated Amended Complaint. ECF No. 76. Plaintiffs alleged several contract and quasi-contract claims, negligence and negligence per se, and statutory claims, and also sought declaratory relief. *Id.*

51. On March 14, 2019, Facebook filed an extensive motion under Rules 12(b)(1) and 12(b)(6) to dismiss all claims, as well as asserting that Plaintiffs lacked Article III standing. ECF No. 96. Facebook also filed a motion seeking judicial notice of the Terms and Conditions, in support of their argument that Plaintiffs were barred by a liability limitation clause in the Terms of Service. ECF No. 99. The opposition brief to the Motion to Dismiss was spearheaded by Douglas McNamara of Cohen Milstein Sellers & Toll, although other Plaintiffs' counsel were asked to respond to specific arguments. Class Counsel incorporated research and drafts from non-lead counsel, and then assembled, edited, and harmonized to prepare the full opposition.

52. Plaintiffs filed their opposition on April 4, 2019. ECF No. 108. Plaintiffs argued that they did possess Article III standing due to loss of value of PII and increased risk of identity theft, and that the liability limitation was unconscionable.

53. On May 2, 2019, the Court held a hearing on the motion. The 12(b)(1) and 12(b)(6) portions of the motion were separately argued by Class Counsel Andrew Friedman and his partner, Douglas McNamara. Before deciding the 12(b)(1) motion on standing, the Court ordered depositions of all Plaintiffs. ECF No. 116. Subsequently, three plaintiffs voluntarily dismissed their claims. ECF Nos. 140, 141, and 142.

54. Following the Court's order to proceed expeditiously with the named plaintiffs' depositions, the briefing team coordinated with the discovery teams to schedule and defend the depositions within eight days. Facebook filed subsequent briefing in support of its motions to dismiss. ECF No. 123. Class Counsel again quickly and efficiently wrote an opposition. ECF No. 135.

55. On June 21, 2019, the Court granted Facebook's Motion to Dismiss in part, and denied it in

part, with leave to amend. ECF No. 153. The Court found Plaintiff Adkins had standing and denied Facebook's Motion to Dismiss Plaintiff's claims for negligence and declaratory judgment. *Id.* at 16–17, 19. Class Counsel were provided a short window to try to amend the claims. Class Counsel crafted an extensive Amended Complaint that sought to, among other things, buttress contractual claims by targeting Facebook's disclaimers and limitations of liability, plead credit monitoring as a damage for the negligence claim, and support punitive damages. ECF No. 160 ("First Amended Consolidated Complaint").

56. Facebook again moved to dismiss on August 1, 2019. ECF No. 173. Class Counsel again mobilized to address Facebook's arguments less than a week later. ECF No. 180. Both motions required sealing motions due to the personal information and confidential documents discussed therein. ECF Nos. 172, 179. On August 9, 2019, the Court permitted the negligence and declaratory relief claims to proceed, but no other claims. ECF Nos. 185 (amended consolidated complaint due within seven days of the Court's Order). A revised Amended Complaint was filed on August 16, 2019. ECF No. 193.

**Class Certification Motion and *Daubert* Challenges**

57. The briefing team immediately turned to class certification briefing. Between August 29, 2019, and October 10, 2019, Interim Counsel fully briefed Plaintiff's motion for class certification pursuant to Rules 23(b)(3) (seeking a damages class for lost value of personal information and credit monitoring); issue certification under 23(c)(4) (regarding common liability issues); and 23(b)(2) (regarding injunctive relief on a host of Facebook's security procedures and authentication infrastructure). ECF No. 198. Douglas McNamara of Cohen Milstein Sellers & Toll ran point on the class certification briefing. The class claims were supported by several experts' declarations as to liability, the need for continued monitoring, and damages. Facebook responded by opposing all class certification, disputing Plaintiff's factual assertions, and revisiting its argument that Mr. Adkins lacked Article III standing.

58. Facebook also moved to exclude Plaintiff's two damage experts, Jim Van Dyke and Ian Ratner, but it did not seek to exclude Plaintiff's security expert, Mary Frantz. *Id.*; ECF Nos.

213–215, 231–233, 239, 242, 247. Again, due to the sensitive and private nature of much of the evidence submitted in the class certification briefing, Plaintiff filed accompanying administrative motions to seal portions of the record. ECF Nos. 220, 228, 234, 238, 239.

59. On November 6, 2019, the Court held in-person oral arguments on class certification and the *Daubert* motions. ECF No. 253. Interim Counsel divided up the arguments. On November 26, 2019, this Court granted Facebook's motion to exclude Plaintiff's expert, Jim Van Dyke, but denied the motion to exclude Ian Ratner. ECF No. 260. The Court denied the (b)(3) and (c)(4) certification but ultimately certified an injunctive relief class and appointed the Undersigned as Class Counsel. *Id*.

60. After the decision, the parties discussed the scope of the Class and on December 19, 2019, filed a joint motion to modify the November 26 Order to narrow it to United States Facebook users only and alter the notice to remove the requirement of first-class mail notification. ECF No. 270. On January 6, 2020, the Court granted the Parties' motion and certified the following class:

> All current Facebook users residing in the United States whose personal information was compromised in the data breach announced by Facebook on September 28, 2018.

**Offensive Discovery**

61. Class Counsel engaged in an independent investigation, negotiated with Facebook as to the early production of certain core documents, and served extensive written discovery during the course of this litigation, including 90 requests for production and four interrogatories.

62. Facebook released its first production of documents on April 1, 2019, and thereafter produced documents on a rolling basis through January 1, 2020, totaling tens of thousands of documents. Class Counsel developed a coding sheet for first level reviewers to facilitate efficient review and implemented a rigorous quality control process to ensure that all key pertinent information was isolated and escalated for case development. To expedite the process, produced materials were de-duplicated, and counsel ran searches against productions

to prioritize materials of potentially high relevance. First level reviewers were tasked with evaluating documents for relevance and import and categorizing such materials. All documents noted as "important" or "hot" on first level review were escalated for second level review analysis. Second level reviewers similarly ran searches across documents designated as low import to ensure no useful or highly relevant information was miscategorized. Documents that underwent the "quality control" process were gathered accordingly and further scrutinized by experts and attorneys for purposes of opinion formulation, depositions and pleading development. Review of the produced documents was a time-consuming endeavor, as Defendant's productions were highly technical in nature and required the analysis of code (programming language) and token provisioning used by Facebook to secure user data.

63. Exasperating the already labor-intensive review of highly technical documents, throughout the discovery period, Facebook failed to make timely and meaningful productions. Class Counsel engaged in numerous overtures with Defendant regarding its failure to meet discovery requests and drafted a motion to compel related to Facebook's delayed productions. While this motion was not ultimately filed due to Facebook's eventual compliance, the production delays posed logistical challenges, and the belated receipt of productions resulted in the "urgent" and concentrated review of large amounts of particularly dense materials. Depositions were well underway when Defendant endeavored to release substantial productions of custodial documents. Nevertheless, Plaintiffs successfully and diligently reviewed all discovery materials and were able to extract and compile a compelling set of documents that were used to bolster claim assertions.

64. Both sides aggressively pursued discovery and brought disputes to Magistrate Judge Corley when necessary. Magistrate Judge Corley commended the parties for their ability to resolve most disputes without need for Court intervention and encouraged the parties to seek her assistance as needed. *See, e.g.*, ECF No. 158 (July 1, 2019 transcript).

65. Several lawyers from Ms. Tadler's team, including Henry Kelston and Melissa Clark, as well as AJ de Bartolomeo, ran point on the pursuit of discovery responsive to plaintiff's discovery requests (Mr. Kelson departed from Tadler Law in September 2019). They regularly consulted with Ms. Tadler and collectively reported to Class Counsel throughout the negotiations and to discuss strategy, including, as issues unfolded, the prospect of motion practice.

66. As the parties met and conferred regarding document production, the negotiations intensified. Mindful of the discovery schedule set by the Court, Class Counsel worked in the spirit of the Advisory Committee Note to Rule 1 of the Federal Rules of Civil Procedure to cooperate with Facebook's counsel to resolve as many discovery issues as possible. In most instances, they were successful.

67. Beginning in June 2019, Class Counsel began to identify issues that might warrant the filing of a motion to compel. Those issues were further refined in July 2019 as the parties continued to meet and confer. Ms. Tadler and her team ran point and regularly reported to Co-Class Counsel regularly consistent with Class Counsel's case management protocol.

68. In July 2019, Ms. Tadler communicated multiple times directly with Facebook's lead counsel, Mr. Clubok, about certain issues in dispute.

69. On July 29, 2019, in accordance with Magistrate Judge Corley's Civil Standing Order and this Court's Case Management Order, ECF No. 67, Plaintiffs and Facebook submitted a joint letter regarding a discovery dispute concerning twelve document requests as to which they were unable through the meet and confer process to reach a resolution. ECF No. 170.

70. Magistrate Judge Corley conducted a hearing on August 8, 2019. Mr. Kelston traveled from New York and appeared in person to argue on behalf of Plaintiff at the hearing. Facebook presented two attorneys to appear and argue.

*Depositions*

71. Class Counsel prepared to take 18 depositions in this case, including of Facebook's current and former officers and employees, and two expert depositions. (A last-minute cancellation resulted in 17 depositions being taken.) The depositions necessitated travel to Menlo Park,

CA; Seattle, WA; New York, NY; Boston, MA; and London, UK.

72. Class Counsel, appreciating this Court's rules limiting depositions pursuant to Rule 30(b)(6), served an initial set of four discrete subjects of inquiry under Rule 30(b)(6). Along with the information Class Counsel gleaned through its investigations, consultation with its experts, and review of initial discovery production, Class Counsel identified a set of deponents and continued to refine those deponents as discovery proceeded.

73. Given the importance of these Rule 30(b)(6) depositions—involving designated corporate representatives to testify to Facebook's discovery, response to, and remediation of the Breach—substantial time was spent reviewing discovery provided to date, preparing "hot doc" document review and deposition outlines, and holding numerous conferences with Class Counsel (including by email and teleconference) to further develop the deposition strategy.

74. Class Counsel deposed the critical information security personnel who worked at Facebook during the relevant time periods, beginning with Facebook's first Rule 30(b)(6) corporate representative, Christopher Bream, Facebook's Security Engineering Director, on April 12, 2019, in Menlo Park, California. Mr. Bream's testimony focused on three of the four topics in the initial set of discrete subjects of inquiry under Rule 30(b)(6). Given the importance of this deposition, the fluid nature of the potentially relevant documents being reviewed, and to better use the information gained from depositions when preparing for and taking other depositions, with one exception, John A. Yanchunis and Ryan J. McGee of Morgan & Morgan prepared for and took the depositions of the corporate representative of Facebook and its employees. In transit to this deposition, both Messrs. Yanchunis and McGee used the travel time to further prepare for the deposition by reviewing and identifying additional documents for use at the deposition, and to discuss and further develop strategy for the deposition.

75. Mr. Bream's testimony helped Class Counsel construct the cornerstones of the factual foundation of Class Counsel's case, and assisted Class Counsel with identifying additional individuals for targeted custodial discovery and depositions. In particular, Class Counsel identified current and former officers and employees who were in charge of the information

security environment at Facebook during the relevant time periods, as well as current and former employees who were in charge of other relevant internal organizations within Facebook.

76. Before taking any further depositions, Class Counsel reviewed additional discovery and information obtained through informal means and advanced their investigation to ensure the efficient and effective remaining depositions would focus on the key current and former Facebook officers and employees.

77. The next deposition Class Counsel took was Facebook's second Rule 30(b)(6) corporate representative, Colin Greene, Facebook's security engineer manager for Facebook's Product Security Team, on June 6, 2019, in Seattle, Washington. Mr. Greene's testimony focused on the final of the four topics in the initial set of discrete subjects of inquiry under Rule 30(b)(6). Like with Mr. Bream, Messrs. Yanchunis and McGee attended the deposition. In transit to this deposition, both Messrs. Yanchunis and McGee used the travel time to further prepare for the deposition by reviewing and identifying additional documents for use at the deposition, and to discuss and further develop strategy for the deposition.

78. Mr. Greene's testimony advanced the factual foundation of Class Counsel's case, and assisted Class Counsel with identifying additional individuals for targeted custodial discovery and depositions and gain a deeper understanding of Facebook's information security environment.

79. Over the following months from July 3, 2019, to August 22, 2019, in support of the forthcoming motion for class certification, Messrs. Yanchunis and McGee took the depositions of Facebook's current and former officers and employees integral to its access tokens and the security framework: Neal Poole (software engineer at Facebook; New York, New York),  Gary Baalman (chief information security officer of Facebook Payments; Menlo Park, California), Christopher Palow (software engineer at Facebook; London, United Kingdom), Kyle Minshall (software engineer at Facebook; Menlo Park, California), Nathaniel Gleicher (head of cybersecurity policy at Facebook; Menlo Park, California), Bradley Hill (software engineer at Facebook; Seattle, Washington), Dimitri Anipko (software engineering

manager at Facebook; Seattle, Washington), and Alex Stamos (former chief security officer at Facebook during the Breach; Menlo Park, California). In transit to these depositions, the attorneys used the travel time to further prepare for the deposition by reviewing and identifying additional documents for use at the deposition, and to discuss and further develop strategy for the deposition.

80. Given the importance of these depositions—involving critical information security employees involved in discovering, responding to, and remediating the Breach—substantial time was spent reviewing the deponents' custodial files, preparing "hot doc" document review and deposition outlines, and holding numerous conferences with Class Counsel (including by email and teleconference) to further develop the deposition strategy.

81. The information gleaned from these depositions (from Mr. Bream's Rule 30(b)(6) deposition to Mr. Stamos' deposition) were used to focus discovery efforts and ultimately succeed on the motion for class certification demonstrating Facebook's liability for the Breach and achieving injunctive relief for the Class. See, e.g., ECF No. 208-2, at 7, 9, 10, 12, 18, (Bream); at 4–7, 9 (Poole); at 5, 9 (Minshall); at 17 (Hill); at 4 (Stamos).

*Post-Certification Depositions*

82. Following certification of the Rule 23(b)(2) class, and continuing their preparation for trial, Class Counsel John Yanchunis and Patrick Barthle of Morgan & Morgan deposed an additional current Facebook employee: Nolan Sandberg (software engineer at Facebook; Seattle, Washington); and Douglas McNamara of Cohen Milstein deposed Joseph Adler (tech lead for Facebook's data analytics; Menlo Park, California).

83. After the parties reached initial resolution, the parties agreed to confirmatory discovery with the deposition of John Lyle (engineering manager at Facebook) who manages Facebook's community integrity team from London, United Kingdom. Mr. Lyle's deposition took place on January 31, 2020. Messrs. Yanchunis and McGee, who took the deposition, consulted with their cyber expert Mary Frantz to prepare for and depose Mr. Lyle to ensure Class Counsel were intimately familiar with Facebook's Security Commitments and that the testimony

provided would ensure the sufficiency of those Security Commitments moving forward.

**Defensive Discovery**

84. Facebook aggressively pursued discovery in this litigation from Plaintiff Stephen Adkins and other class members.

85. In the first instance, during oral argument in support of its Motion to Dismiss, Facebook was successful in persuading the Court to permit early depositions of some of the initially named plaintiffs in the litigation. *See* ECF No. 116 (May 2, 2019 Minute Entry by Court ordering that defendant complete depositions of plaintiffs by May 10, 2019).

86. Later, after certain individuals withdrew as plaintiffs from the action, Facebook sought discovery from them; specifically, they had stated that they intended to serve document and deposition subpoenas upon them. Plaintiff argued that absent class member discovery was not appropriate. Unable to reach a resolution through the meet and confer process, on June 20, 2019, the parties submitted a joint letter to Magistrate Judge Corley regarding their dispute concerning Facebook's attempt to take discovery, including through the issuance of subpoenas in multiple jurisdictions, from 12 absent class members that filed complaints against Facebook and served initial disclosures. ECF No. 151. After an in-person hearing held on July 1, 2019, at which A.J. de Bartolomeo (San Francisco) of Tadler Law LLP and Kate Baxter-Kauf (Minneapolis) of Lockridge Grindal Nauen PLLP appeared on behalf of Plaintiff and these individuals and Melanie Blunschi and Sheridan Caldwell of Latham & Watkins appeared on behalf of Facebook, Magistrate Judge Corley denied Facebook's discovery requests.

87. To properly preserve all relevant data and information, and to appropriately respond to Facebook's discovery requests, all but one of the five originally named plaintiffs worked with counsel and a forensic data firm to image their mobile phones and laptop computers (if they owned them) and to image private email and social media accounts. This was an extensive, time-consuming, and invasive process, evidencing the named plaintiffs' commitment to the litigation. To image devices and accounts, the forensic data preservation firm sent each named

plaintiff a data collection kit and then spent hours on the telephone walking each individual through the process of completing the required images. Class Counsel, along with lawyers from Lockridge Grindal Nauen PLLP, allowed for agreed-upon search terms to be run against the imaged data and produced non-privileged, responsive data to Facebook.

88. Each original named plaintiff and his or her counsel also worked extensively with Class Counsel to respond to Facebook's discovery, which consisted of two sets of document requests, and one sets of interrogatories, and one set of requests for admissions. Class Counsel coordinated responses of 41 requests for production for the five named plaintiffs.

89. Each original named plaintiff was also deposed at least once; Plaintiff Adkins, the Class Representative, was deposed twice. Aside from Mr. Adkins, the other plaintiffs who were deposed produced voluminous documents in advance of their depositions: plaintiff Bass produced 1464 pages of documents; and plaintiff Brown-Wells produced 222 pages of documents. Dr. Schmidt was not deposed but produced 1179 pages of documents. The depositions were often contentious, time consuming and required significant preparation.

90. In September 2019, Facebook sought to depose Plaintiff Stephen Adkins for a second time. With authorization from Class Counsel, Karen Hanson Riebel of Lockridge Grindal Nauen PLLP met and conferred with Melanie Blunschi of Latham & Watkins and objected to any further deposition time. Unable to resolve the issue, the parties presented the issue by teleconference to Magistrate Judge Corley on September 9, 2019. Ms. Riebel presented on behalf of Mr. Adkins. Magistrate Judge Corley ultimately permitted Facebook four additional hours of deposition time with Mr. Adkins. *See* ECF Nos. 205 (Minute entry of proceedings) and 212 (Transcript of Proceedings held on September 9, 2019).

91. Plaintiff and Class Representative Stephen Adkins diligently responded to extensive discovery from Facebook, answering 24 interrogatories, 56 requests for production, and 63 requests for admission. He has also had his deposition taken *twice* and prepared extensively with counsel both times. Moreover, Mr. Adkins has produced a total of 7,142 pages of documents, which involved collecting records from third parties and considerable follow up. Mr. Adkins also

allowed his personal cell phone to be imaged. Finally, Mr. Adkins traveled to attend the January 8, 2020 mediation with Class Counsel in San Francisco.

92. In sum, Class Counsel defended six depositions, Plaintiff Adkins (*twice*), and Plaintiff's three experts (one expert *twice*), thus defending a total of 9 depositions.

**Mediation and Settlement Discussions**

93. On June 14, 2019, as part of a notice setting deadlines/hearings, a Settlement Conference was scheduled by the Court with Chief Magistrate Judge Spero for December 11, 2019. The December date was adjourned to January 8, 2020, to accommodate the Court's and the parties' respective schedules. ECF No. 258. ***With a class certified, and the parties preparing for trial scheduled to begin just 4 months later, on May 18, 2020***, ECF No. 69, the parties engaged in preliminary settlement discussions under the supervision of Chief Magistrate Judge Spero. To be clear, consistent with the Court's standing rules, the parties did not begin negotiations until after the Court certified a class, and they well understood the strengths and weaknesses of their respective positions. In advance of the mediation, Plaintiff sent a proposed term sheet to Judge Spero and Facebook's counsel.

94. After submitting mediation briefs to Chief Magistrate Judge Spero and exchanging the papers, the parties attended a settlement conference in San Francisco on January 8, 2020. Mediated by Chief Magistrate Judge Spero, the parties discussed potential security commitments Facebook could make as part of a settlement of the case.

95. Based on these discussions, and with the assistance of Plaintiff's expert Mary Frantz (and in communications directly with Facebook's engineers and in-house counsel), Class Counsel negotiated a set of security commitments that comprehensively address the security risks exposed in the Breach and provide strong protection against the risk of any similar attack in the future.

96. On January 17, 2020, the parties filed a joint motion for a continuance, ECF No. 276, in light of reaching an agreement in principle, with a detailed term sheet approved by the parties and signed by counsel. The parties requested February 14, 2020, as the date by which to file the

motion for preliminary approval. The Court set the deadline for filing for preliminary approval to February 7, 2020. ECF No. 278. Meanwhile, fact depositions continued in California and London while settlement discussions continued consistent with the Court's scheduling order.

97. The parties reached a formal Settlement Agreement as a result of extensive arm's length negotiations, expert input, and cooperative efforts to finalize the terms, develop a notice plan, and prepare and finalize the motion for Preliminary Approval and to permit notice to the class.

98. On February 7, 2020, Plaintiff Stephen Adkins filed a Motion for Preliminary Approval and to Direct Notice of Settlement. ECF No. 281.

99. On March 5, 2020, this Court held a hearing on the Motion for Preliminary Approval. Subsequently, this Court also issued an order instructing the Parties to address certain points raised at the hearing. ECF No. 291. Specifically, the Court ordered the following modifications and clarifications: (1) a sworn statement from Facebook regarding the security commitments that are part of the proposed settlement; (2) a clarification as to whether the Court will receive the results of the confidential, annual third-party assessments of Facebook's security; (3) a revised (less onerous) procedure for objecting to the proposed Settlement; and (4) an increase to twenty-eight days for Class members to object to Plaintiff's fee motion.

100.    On March 26, 2020, consistent with the Court's March 5 Order, Plaintiff filed a Supplemental Brief in Support of Plaintiff's Motion for Preliminary Approval and to Direct Notice of Settlement ("Supplemental Brief"), and the parties submitted an Amended Settlement Agreement which included minor modifications of the originally submitted settlement papers to address the Court's concerns. ECF No. 297. Facebook also submitted a declaration from Facebook's Security Engineering Director, Christopher Bream, detailing security practices Facebook implemented *not because they are required by any law or regulation but subsequent to the data breach and the instant litigation*. ECF No. 300.

101.    On November 2, 2020, the parties submitted a Joint Statement in advance of the status conference scheduled for November 4th. ECF No. 312.

102.    On November 4, 2020, the parties appeared before the Court for a telephone status conference. On November 15, 2020, the Court issued an Order Granting Preliminary Approval of the Parties' Settlement Agreement. ECF No. 314.

**Co-Lead Counsel's Management and Procedures for Time and Expense Review**

103.    The work undertaken by Class Counsel was consistent with a Timekeeping and Expense Protocol (the "Protocol") (ECF No. 72-6), filed with the Court. The Protocol made clear that only work authorized by Class Counsel would be compensable and only expenses incurred for the benefit of the coordinated case would be reimbursed. Further, the Protocol explicitly detailed how work and expenses would be reviewed and revised, consistent with the goals of avoiding overstaffing and excessive charges, and it also described how time and expenses must be recorded.

104.    Class Counsel required monthly detailed time and expense reports from all Plaintiffs' counsel throughout the litigation, pursuant to the Protocol.

105.    Consistent with the Protocol, Class Counsel reviewed all Plaintiffs' counsel's time and expense reports (including their own) and communicated with all Plaintiffs' counsel regarding the review of their time ("First-Tier Review"). To the extent any line-item entries were inconsistent with the Protocol or Class Counsel's expectations, Class Counsel required corrections or rejected certain entries that failed to meet the standards for specificity, authority, or reasonableness.

106.    Class Counsel spent hundreds of attorney hours reviewing time entries and expense reports, communicating with co-counsel, and deleting entries that were duplicative, vague, inefficient, block-billed or lacking in sufficient detail.

107.    Class Counsel – specifically, Ms. Tadler, Mr. Friedman, and Mr. Yanchunis – decided that they would personally review the time post-First-Tier Review. They scheduled the meeting for February 4, 2020, in New York City ("Second-Tier Lead Counsel Review").

108.    Prior to the February 4th meeting, Co-Lead Counsel each reviewed electronic versions of

Excel spreadsheets containing aggregate detailed time records from case inception (September 2018) through December 2019. The Excel spreadsheets could be sorted and filtered by each column of data (e.g., date the work was performed, name and firm of the timekeeper, litigation code assigned to the task, narrative description of task performed, and number of hours spent). The Undersigned spent considerable time making themselves familiar with the Excel data, cross-referencing it and sorting it by task code and law firm's doing assigned work, and spot checking particularly difficult or labor-intensive work segments in the case.

109.    On February 4, 2020, Class Counsel met in New York City and performed a line-by-line review of the post-First-Tier Review time entries from September 2018 through December 2019. At the NYC meeting and as their follow up telephone conferences, Class Counsel raised questions and comments about Plaintiff counsel's time entries. We provided each reporting counsel with their firm's Excel spreadsheet with our comments and questions, and provided counsel with a reasonable time to clarify, further support and/or address Class Counsel's questions. The resulting Excel time spreadsheets from each firm following the Second-Tier Class Counsel Review constituted the Excel time spreadsheets "of record" for the case.

110.    Class Counsel also employed a detailed review and analysis of its aggregate expenses. Co-Lead Counsel had reviewed the aggregate expenses on a quarterly basis, communicating any questions or concerns about the expenses with each law firm. The expenses have been reviewed line by line, adjusting the expense codes to achieve full consistency, eliminating any duplicate entries, or expenses that did not comply with the Protocol.

111.    While we have strived to achieve a fully consistent expense spreadsheet, each time we have reviewed and filtered the data, we spot a lone expense that *could have been better classified*. (For example, the errant "parking" showed up in mileage instead of ground transportation.)  Striving to submit this and the corresponding filings on February 1 rather than February 8 (as per the Court's Order (ECF. No. 314)), to allow for 35 days between

filing and the deadline for objections, as preferred by the Court,[5] and recognizing that perfection is the enemy of the good, Class Counsel believe that their expenses have been tenaciously and diligently reviewed and challenged.

112.    Class Counsel have questioned individual expense line items that appear, on first blush, to be unreasonably high. Our investigation revealed several reasons for certain hotel and air fare expenses at particular times to be higher than expected:  the Court's Invitational Tutorial on January 9, 2019, took place during the NCAA National Championship between Alabama and Clemson at Levi Stadium in Santa Clara, California; the January 8, 2020 mediation in San Francisco was three days before the NFL Divisional Playoff game at Levi Stadium in Santa Clara, California. Additionally, there were occasions when the parties agreed to dates for depositions on very short notice that reduced the options for inexpensive air fares and/or hotels.

113.    In April 2020, Class Counsel retained Randi S. Ellis as a consulting expert to review Class Counsel's detailed aggregate time and expenses in preparation for the final approval and fee application filings. We asked Ms. Ellis to assess the reasonableness of the reported hours, lodestar, and expenses, and to ensure that our records conformed with Federal Rule of Civil Procedure 23 and the case law in the Ninth Circuit and the Northern District of California. The Undersigned retained Ms. Ellis to review and audit all time and expense detail reports submitted by all attorneys and staff and to make recommendations to us based on her review.

114.    Class Counsel agreed to pay Ms. Ellis $7,500.00 to perform this work. The Undersigned are not seeking reimbursement from the Court for the $7,500 fee, and it will not be included in the Motion for Attorneys' Fees and Expenses except for this disclosure.

115.    Class Counsel provided the updated and corrected Excel spreadsheets (following the Second-Tier Lead Counsel review) to Ms. Ellis.

---

[5] Based on the Court's statements during the November 4, 2020 status conference, Class Counsel understood that the Court preferred to allow 35 days, instead of 28 days, between the filing of this motion for fees and litigation costs and the date for Class members to file comments.  Accordingly, we have worked to file these papers earlier than the date ordered by the Court.

**Consulting Expert Randi Ellis's Review and Recommendations to Class Counsel**

116.   The Undersigned provided Ms. Ellis with the Protective Order and Exhibit A filed March 25, 2019. ECF No. 102. After she executed Exhibit A to the Protective Order, we provided her with documents filed under seal.

117.   We sent Ms. Ellis various documents in the case, including: the Consolidated Class Action Complaint (ECF No. 76), the Amended Consolidated Class Action Complaint (ECF No. 160), the Order Granting in Part and Denying in Part the Motion to Dismiss (ECF No. 153), the Order on Motion for Leave to File Amended Consolidated Complaint and Vacating Hearing (ECF Nos. 185, 193), Class Certification Motion and Court's order granting the Rule 23(b)(2) class (ECF Nos. 198, 260), and preliminary approval filing and Court's order (ECF Nos. 281, 297, and 314). The Undersigned also provided Ms. Ellis a schedule of all depositions taken in the case.

118.   Consulting Expert Ellis returned the electronic Excel spreadsheets to us with comments and questions in a newly-added Column K ("RSE Comments").

119.   Class Counsel's team provided each of the reporting law firms with their individual Excel spreadsheet with Ms. Ellis's comments and questions, and we directed each firm to review and consider her points so that we could address them fully. Class Counsel conducted a Zoom video conference with each law firm and addressed the RSE Comments from Column K comments *line by line*, modifying the description, adjusting the time, changing the Task Code, or eliminating the line-item entry altogether.

120.   We sent the updated electronic Excel spreadsheets to Ms. Ellis for final review, with a particular eye toward the entries corresponding to the RSE Comments.

**Class Counsel's Management of the Case's Litigation Fund**

121.   Class Counsel Andrew Friedman of Cohen Milstein established a business non-interest-bearing account with Eagle Bank to serve as a litigation fund in this case. The Litigation Fund received contributions from specific Plaintiffs' firms (either by check or via wire transfer). The Litigation Fund was primarily funded from contributions – in equal amounts – from the

three Class Counsel firms. During 2020, two other law firms, Casey Gerry and Lockridge Grindal, each made a single contribution.

122.    When invoices for certain approved common expenses (e.g., for experts or court reporting services) were sent to Cohen Milstein, Mr. Friedman would review those invoices, verify that they should be paid from the Litigation Fund, and if confirmed, make a check request for payment from the Litigation Fund. After receipt of the check request, the funds necessary to pay each invoice would be moved into a clear escrow disbursement account, and a check would be sent to the vendor in payment of the invoice.

123.    Many of the payments to experts were made from the Litigation Fund, while some were made directly from Class Counsel John Yanchunis' firm, Morgan & Morgan. On one occasion, where a payment made to an expert was made by Morgan & Morgan, the Litigation Fund reimbursed Morgan & Morgan for $31,963.33, which was the amount Morgan & Morgan had paid that expert, minus Morgan & Morgan's proportionate share of that bill.

124.    A summary of the Litigation Fund's cash flow, contributions to, and distributions from, is attached as Exhibit 1. To date, Class Counsel have advanced costs totaling $740,890.50 from the Litigation Fund, in addition to their and the supporting firms' expenditures outlined further below.

**Class Counsel's Individual Hours, Lodestar and Expenses**

**Tadler Law LLP**

125.    The Tadler Law LLP attorneys and legal professionals who worked on this matter, their titles, years of experience, and 2019 hourly billable rates are set forth in the chart directly below:

| Firm: Tadler Law | | | |
|---|---|---|---|
| Name | Title | Yrs. of Exp. | 2019 Billable Rate |
| Ariana J. Tadler | Partner | 26+ | $925 |
| A.J. de Bartolomeo | Partner | 30+ | $875 |
| Melissa Clark | Partner | 11+ | $725 |

| Henry Kelston | Partner | 30+ | $850 |
|---|---|---|---|
| Brian Morrison | Senior Counsel | 7+ | $525 |
| Brooke Achua | Associate | 2 | $325 |
| Jason Joseph | Paralegal | N/A | $325 |

A copy of the Tadler Law LLP firm resume is attached as Exhibit 2, Tab A.[6]

126.    After time entry reductions described herein, Tadler Law attorneys spent a total number of 1956.30 hours on the Litigation. A breakdown of the lodestar at 2019 rates is provided in the attached Exhibit 2, Tab B. The lodestar amount for attorney/paraprofessional time based on Tadler Law's 2019 billable rates is $1,532,382.50. The 2019 billable rates shown in the chart above in ¶125 above were the usual and customary rates set by Tadler Law for each individual.

127.    These rates have been found reasonable and approved by federal courts in recent cases, including most recently in the following in which Class Counsel Ariana Tadler serves or served among plaintiffs' counsel in a leadership role:

- *In re Yahoo! Inc. Customer Data Breach Security Litig.,* No. 16-md-02752-LHK, 2020 WL 4212811, *26 (N.D. Cal. July 22,2020) (Ms. Tadler serves on the Plaintiffs' Executive Committee with Mr. Yanchunis).

- *In re: Equifax, Inc., Customer Data Sec. Breach Litig.*, No. 1:17-md-02800 (N.D. Ga.) (ECF. No. 956) (January 13, 2020) ("Class counsel supplied substantial evidence that the prevailing rates for complex litigation in Atlanta and around the country are commensurate with or even in excess of the rates applied here and none of the objectors have presented any evidence to the contrary. The Court therefore finds class counsel's rates are reasonable and well supported, including specifically the hourly rates charged by [lead counsel] Mr. Barnes ($1050); Mr. Canfield ($1000); Ms. Keller ($750), and Mr. Siegel ($935).") (Ms. Tadler serves on the Plaintiffs' Steering Committee).

---

[6] Prior to June 15, 2019, certain Tadler Law LLP attorneys and legal professionals worked with Ms. Tadler, including on this case, while at MTPG.  *See supra* n. 1.

- *Briseño v. Conagra Foods, Inc.*, No. 2:11-cv-05379 (C.D. Cal.) (ECF No. 695) (October 8, 2019) ("The Court finds this amount is both fair and reasonable given factors including the amount of hours reasonably spent on the litigation, counsel's efforts in litigating this years-long complex action, the results achieved, and the risks inherent in continued litigation.") (Ms. Tadler serves as Co-Lead Counsel).

- *In re Intuit Data Litig.*, No. 5:15-cv-01778 (N.D. Cal.) (ECF No. 196) (May 15, 2019) ("The Court finds that the requested fees are reasonable and appropriate under the circumstances and under applicable standards, given *inter alia* the novelty and complexity of the issues in this case, the results achieved, Class Counsel's commitment of time and resources in this case; and the risks that Class Counsel assumed in litigating this case on a contingency basis.").

- *In re Anthem, Inc. Data Breach Litig.*, 15-md-02617 (ECF No. 1047) (N.D. Cal. August 16, 2018) – approving fees including hourly rates of relevant lawyers and staff from MTPG and Milberg LLP (A. Tadler approved rate at $825 for billing during 2015-2017).

128.    After expense reductions described herein, Tadler Law's aggregate expenses, exclusive of Litigation Fund contributions, are $19,130.12. A breakdown of the Tadler Law expenses by category is provided in the attached Exhibit 2, Tab C.[7]

**Cohen Milstein**

129.    The Cohen Milstein attorneys and legal professionals who worked on this matter, their titles, years of experience, and 2019 hourly billable rates are set forth in the chart directly below:

---

[7] Of the $19,130.12 in expenses reported here by Tadler Law, exclusive of the Litigation Fund, $6,006.31 was incurred by Tadler Law LLP (June 15, 2019 to the present) and $13,123.81 was incurred while Ms. Tadler was at MTPG (Pre-June 15, 2019).

| Firm: Cohen Milstein Sellers & Toll, PLLC | | | |
|---|---|---|---|
| Name | Title | Yrs. of Exp. | 2019 Billable Rate |
| Andrew Friedman | Partner | 35+ | 940 |
| Geoffrey Graber | Partner | 19 | 790 |
| Douglas McNamara | Partner | 20+ | 770 |
| Julia Horwitz | Associate | 7 | 575 |
| Sally Mae Handmaker-Guido | Associate | 8 | 570 |
| Eric Kafka | Associate | 5 | 505 |
| Karina Puttieva | Associate | 2 | 400 |
| Brian Johnson | Staff Attorney | 7 | 395 |
| Paul Stephan | Associate | 1 | 380 |
| Vidya Dindiyal | Law Clerk | 1 | 375 |
| Jennifer Horowitz | Paralegal | N/A | 300 |
| Jennifer Kim | Paralegal | N/A | 300 |
| Mariah Wozniak | Paralegal | N/A | 300 |
| Shireen Hamdan | Paralegal | N/A | 300 |

A copy of the Cohen Milstein firm resume is attached as Exhibit 3, Tab A.

130.    PARAGRAPH NOT USED

131.    After the time entry reductions referred to herein, the number of Cohen Milstein hours spent on the Litigation is 2,946.50 hours. A breakdown of the lodestar at 2019 rates is provided in the attached Exhibit 3, Tab B The lodestar amount for attorney/paraprofessional time based on Cohen Milstein's 2019 billable rates is $1,941,292.50. The 2019 billable rates shown in the chart in ¶129 above were the usual and customary rates set by Cohen Milstein for each individual.

132.    Cohen Milstein's hourly rates are regularly evaluated by courts in California and across the country and have been consistently approved as reasonable in recent years:

- *LLE One, LLC v. Facebook Inc.,* No. 4:16-cv-06232-JSW, ECF No. 211 at 2-3 (N.D. Cal. Jun. 26, 2020) (finding Cohen Milstein's hourly rates "reasonable and in line with prevailing rates in the community for complex class action litigation," where the billing rates were as follows: Partners: $740 - $940, Associates: $505 - $545, Staff Attorney: $395, Law Clerk: $290, Contract attorneys: $250,

Investigator: $490, Paralegals: $300 - $315).

- *In re: Resistors Antitrust Litig.*, Case No. 3:15-cv-3820-JD, Order, ECF 584 (N.D. Cal. Mar. 24, 2020) (finding that Cohen Milstein's hourly rates were reasonable, where the billing rates were as follows: Partners: $500 - $975, Associates: $405 - $570, Discovery Counsel / Staff Attorneys: $395 - $525, Contract Attorneys: $350 - $405, Law Clerks: $270 - $290, Paralegals: $260 - $300, Investigator: $450 - 490).

- *In re: Google LLC Street View Electronic Comm'ns Litig.*, Case No. 3:10-md-2184-CRB, Order, ECF 211 (N.D. Cal. Mar. 19, 2020) (finding that Cohen Milstein's hourly rates were reasonable, where the billing rates were as follows: Partners: $630 - $940, Associates: $370 - $570, Staff Attorney: $525, Investigator: $490, Paralegals: $245 - $300).

- *In re Anthem, Inc. Data Breach Litig.,* 2018 WL 3960068, at *17 (N.D. Cal. Aug. 17, 2018) (approving Cohen Milstein' billing rates of $400 - $970 for partners, billing rates for nonpartner attorneys, including senior attorneys, of counsel, and associates, ranging from about $185.00 to $850.00, and billing rates for paralegals, law clerks, and litigation support staff ranging from about $95.00 to $440.00).

- *In re: Lidoderm Antitrust Litig.*, Case 3:14-md-2521-WHO, Order, ECF 1055 (N.D. Cal. Sept. 20, 2018) (finding Cohen Milstein's hourly rates reasonable, where the billing rates were as follows: Partners: $540 - $885, Of Counsel: $710 - $805, Special Counsel: $580, Associates: $415 - $530, Staff Attorneys: $345 - $475, Contract Attorneys / Document Review: $250 - $500, Paralegals: $260 - $300).

133.     After the expense reductions referred to herein, Cohen Milstein's aggregate expenses, exclusive of Litigation Fund contributions, are $58,507.43. A breakdown of the Cohen Milstein expenses by category is provided in the attached Exhibit 3, Tab C.

**Morgan & Morgan**

134.     The Morgan & Morgan attorneys and legal professionals who worked on this matter, their

titles, years of experience, and 2019 hourly billable rates are set forth in the chart directly

below:

A copy of the Morgan & Morgan firm resume is attached as Exhibit 4, Tab A.

| Firm: Morgan & Morgan Complex Litigation Group | | | |
|---|---|---|---|
| Name | Title | Yrs. of Exp. | 2019 Billable Rate |
| John A. Yanchunis | Partner | 40 | $950 |
| Jean S. Martin | Partner | 22 | $894 |
| Kenya M. Reddy | Attorney | 20 | $742 |
| Ryan J. McGee | Attorney | 11 | $742 |
| Patrick A. Barthle | Attorney | 8 | $658 |
| Jonathan B. Cohen | Attorney | 13 | $742 |
| Francesca Kester | Attorney | 3 | $371 |
| Jennifer Cabezas | Paralegal | N/A | $202 |
| Lorraine Carreiro | Paralegal | N/A | $202 |
| Lourdes Pajak | Paralegal | N/A | $202 |
| David Reign | Investigator | Former FBI; 20+ | $300 |
| Lee Walters | Investigator | Former FBI; 20+ | $300 |

135.     After the time entry reductions referred to herein, the number of Morgan & Morgan's

hours spent on the Litigation is 3,579.50 hours. A breakdown of the lodestar at 2019 rates is

provided in the attached Exhibit 4, Tab B. The lodestar amount for attorney/paraprofessional

time based on Morgan & Morgan's 2019 billable rates is $2,808,245.40. The 2019 billable

rates shown in the chart in ¶ 134 above were the usual and customary rates set by Morgan &

Morgan for each individual.

136.     Morgan & Morgan's hourly rates are regularly evaluated by courts in California and

across the country and have been consistently approved as reasonable in recent years:

- *In re Google Plus Profile Litigation*, No. 5:18-cv-061640EJD (VKD) (Docket 110)

   (January 25, 2021);

- *In re Yahoo!, Inc. Customer Data Sec. Breach Litig.*, 2020 WL 4212811, *26 (N.D. Cal. July 22, 2020) (Mr. Yanchunis served a Chair of the Plaintiffs' Executive Committee).

- *In re: Equifax, Inc., Customer Data Sec. Breach Litig.*, No. 1:17-md-02800 (N.D. Ga.) (ECF. No. 956) (January 13, 2020) (discussed above at ¶127) (Mr. Yanchunis is a member of the Plaintiffs' Executive Committee).

- *In re Intuit Data Litig.*, No. 5:15-cv-01778 (N.D. Cal.) (ECF No. 196) (May 15, 2019) (discussed above at ¶127).

137.   After the expense reductions referred to herein, Morgan & Morgan's aggregate expenses, exclusive of Litigation Fund contributions, are $362,505.10. A breakdown of the Morgan & Morgan expenses by category is provided in the attached Exhibit 4, Tab C.

The 14 Non-Lead Reporting Firms

138.   Attached to this motion as Exhibits 5 through 18 are the declarations submitted by the 14 non-Co-Lead law firms who performed work in this litigation. Each declaration includes a description of the work performed, names, titles, years of experience, and hourly billing rates for all personnel, and an accounting of fees and expenses incurred by each firm for this litigation. The attached exhibits are:

| Exhibit 5 | Declaration of Joshua H. Watson for Arnold Law Firm |
| Exhibit 6 | Declaration of Raul Perez for Capstone Law APC |
| Exhibit 7 | Declaration of Gayle M. Blatt for Casey Gerry Schenk Francavilla Blatt & Penfield, LLP |
| Exhibit 8 | Declaration of Jeremiah Frei-Pearson for Finkelstein, Blankinship, Frei-Pearson & Garber, LLP |
| Exhibit 9 | Declaration of Paul R. Wood for Franklin D. Azar & Associates, PC |
| Exhibit 10 | Declaration of Brian P. Murray for Glancy Prongay & Murray LLP |
| Exhibit 11 | Declaration of Jasper D. Ward for Jones Ward PLC |
| Exhibit 12 | Declaration of Gary S. Graifman for Kantrowitz, Goldhamer & Graifman, PC |
| Exhibit 13 | Declaration of Joseph C. Kohn for Kohn, Swift & Graf, PC |
| Exhibit 14 | Declaration of Paul C. Whalen for The Law Office of Paul C. Whalen, PC |
| Exhibit 15 | Declaration of Karen Hanson Riebel for Lockridge Grindal and Nauen PLLP |

| Exhibit 16 | Declaration of Nicholas A. Migliaccio for Migliaccio & Rathod LLP |
| Exhibit 17 | Declaration of Daniel S. Robinson for Robinson Calcagnie |
| Exhibit 18 | Declaration of Melissa R. Emert for Stull, Stull & Brody |

### Aggregate Hours and Lodestar

139.     After all the time entry reductions referred to herein, Class Counsel, complemented by other lawyers in the case, spent over **12,335.70 hours** litigating this case since inception (with most of the work conducted during 2019), calculating to **$8,536.172.70** in lodestar.

### Expenses by Category

140.     The expenses pertaining to this case are reflected in the books and records of Class Counsel. The books and records are prepared from receipts, expense vouchers, check records, and other documents and are an accurate record of the expenses.

141.     **Federal Express/Courier.** These expenses include charges for express delivery of materials requiring urgent transmission. In most instances, these charges relate to deliveries of courtesy copies to the Court and depositions or hearings. The total of these charges as incurred by all firms is $1,795.87, and $1,317.17 of this total was incurred by Class Counsel. The dates and details associated with the Federal Express/Courier fees incurred are attached as Exhibit 19, Tab 1.

142.     **Hotels.** In connection with the prosecution of this litigation, Class Counsel and certain other firms that participated in the prosecution of the case, paid for hotel stays to, among other things, attend court hearings and depositions; meet with plaintiffs and witnesses, including experts; attend a mediation session with Chief Magistrate Judge Spero and opposing counsel; and meet among Class Counsel for in-person strategy sessions. Details for hotel stays submitted as litigation costs include the date, length of stay, location, context of the relevant billing task, and, if applicable, special circumstances that would explain higher than usual rates (e.g., conventions, playoff games, etc.). In some instances, Class Counsel stayed in a private residence of a colleague to defray costs. The total of these charges as incurred by all firms is $84,402.78, and $72,010.49 of this total was incurred by Class Counsel. The date, description and amount of the Hotel fees incurred as litigation costs are attached as Exhibit

19, Tab 2.

143. **Meals.** Charges for meals are included among litigation costs to the extent the meals related to case-related travel, including generally for hearings, depositions, meetings among counsel and/or experts. Charges for meals for multiple individuals in a single charge included contextual detail of who participated in the meal. The total of these charges as incurred by all firms is $18,510.75, and $15,482.55 of this total was incurred by Class Counsel. The details relating to Meal charges incurred as litigation costs are attached as Exhibit 19, Tab 3.

144. **Mileage.** Charges for mileage relate to car travel and the cost of parking. The total for these charges is $878.23, and $170.99 of this total was incurred by Class Counsel. The details associated with the Mileage costs incurred as part of the litigation are attached as Exhibit 19, Tab 4.

145. **Air Travel.** Charges in this category include the cost of airfare for trips made by air; travel agency, ticket booking, change, cancellation, and baggage fees; and other charges relating to travel by airplane, including, for example, WIFI access while in the air. Details cross-checked for air travel submitted as litigation costs include the date, destination, and purpose of travel including context of the related billing task, and, if applicable, special circumstances that would explain higher than usual rates (e.g., conventions, playoff games, etc.). The total of these charges as incurred by all firms is $92,951.27, and $74,000.43 of this total was incurred by Class Counsel. The date, description and amount of the Air Travel costs incurred as part of the litigation are attached as Exhibit 19, Tab 5.

146. **Deposition Costs**. Charges in this category include the cost of deposition transcripts and, in one instance, printing charges associated with a deposition. Class Counsel and the other firms paid a total of $134,848.21 in Deposition Costs, with $6,713.92 reported by Class Counsel and the individual firms plus $128,134.29 from the Litigation Fund. The details associated with the Deposition Costs incurred are attached as Exhibit 19, Tab 6.

147. **Bloomberg/ Pacer/ Westlaw/ Lexis.** This category includes vendors such as LexisNexis Products, PACER, Thomson Financial, and Westlaw. These resources were used to obtain

access to factual databases, legal research, and for cite-checking of briefs. This expense represents the expenses incurred by Class Counsel for use of these services in connection with this Litigation. The charges for these vendors vary depending upon the type of services requested. The total for these charges is $17,264.59, and $12,408.17 of this total was incurred by Class Counsel. The details associated with the Bloomberg/ Pacer/ Westlaw/ Lexis litigation costs incurred are attached as Exhibit 19, Tab 7.

148.    **Witness and Expert Expenses.**

    a.  **Enterprise Knowledge Partners, LLC ("EKP")/Mary Frantz.** Mary Frantz, of EKP, was one of two cyber experts retained in this case. Mary Frantz and her team at EKP were crucial for developing a solid foundation for understanding and appreciating the subject matter at issue in the Breach and this litigation. This included not only the technical bases underlying how the Breach occurred, but also appreciating the remediation. With this robust foundational knowledge, Mary Frantz was one of the two cyber experts who presented testimony at the January 9, 2019 Tutorial. Mary Frantz and her team at EKP consulted on drafting and reviewing discovery, including thousands of documents containing highly technical computer code, preparing for and reviewing the numerous deposition transcripts of Facebook's software and security engineers, and ultimately opining on Facebook's security practices to support and obtain the Rule 23(b)(2) injunction class in this case.

    b.  **Futurion Digital, Inc./Jim Van Dyke.** Jim Van Dyke of Futurion was retained to assist in showing how all class members faced an increased risk of identity fraud as a result of the breach as well as remedial measures necessary to reduce that risk. Gary Parilis (Quant Results) and Alphonse Pascual were independent contractors that assisted Mr. Van Dyke in his conclusions.

    c.  **Glass Ratner Advisory & Capital. B. Riley Advisors/Ian Ratner.** Ian Ratner, now with B. Riley Advisors (formerly known as Glass Ratner), was retained to provide and opine on the damages models presented to the Court. Ian Ratner and his team (at then

Glass Ratner) reviewed numerous Facebook financial filings, regulatory filings, and financial market activity to develop initial monetary damages models for the information accessed and exfiltrated in the Breach. This work was vital to advancing the litigation due to the rigorous requirements of Rule 26(a) Initial Disclosures. Ian Ratner and his team (at then Glass Ratner) consulted on drafting and reviewing discovery, preparing for key depositions of Facebook's officers, and ultimately opining on the value of the information accessed and exfiltrated in the Breach.

 d.  **Mitnick Security Consulting LLC.** Kevin Mitnick was retained to analyze the PII exfiltrated in the breach and to determine if and how the data could be used to cause injury or harm to victims of the breach.

 e.  **Zaxya Corp./Matthew Strebe.** Matthew Strebe of Zaxya was one of two cyber experts retained to analyze how the breach occurred and what errors Facebook made in permitting the breach. Mr. Strebe gave testimony at the January 9, 2019 Tutorial.

Class Counsel have incurred $813,611.67 in litigation costs associated with Consultants and Experts, $228,760.74 paid by Morgan & Morgan and $584,850.93 paid from the Litigation Fund. The details associated with the Witness and Expert Expenses are attached as Exhibit 19, Tab 8.

149.  **Court Fees.** Charges for Court Fees include court filing fees relating to complaint filings and pro hac vice applications. The total for these charges is $3,125.00. The details associated with the Court Fees incurred are attached as Exhibit 19, Tab 9.

150.  **Service of Process Fees.** The total for these charges is $428.78. The details associated with the Service of Process Fees incurred are attached as Exhibit 19, Tab 10.

151.  **Hearing and Trial Transcripts.** Charges in this category pertain to the order and purchase of hearing transcripts. The total for these charges is $912.45. The details associated with the Hearings and Trial Transcript costs incurred are attached as Exhibit 19, Tab 11.

152.  **Ground Transportation/ Parking.** In connection with the prosecution of this case, the Firm has paid for travel expenses to, among other things, attend court hearings, meet with

witnesses, mediators and opposing counsel and take or defend depositions. The total for these charges is $22,072.31, and $17,375.83 was incurred by Class Counsel. The date, description, and amount of each trip is set forth in the attached Exhibit 19, Tab 12.

153. **Miscellaneous.** The charges in this category are principally comprised of printing and copy costs, with a few additional entries relating to teleconferencing services. The total for these charges is $6,770.50. The date and description of each Miscellaneous cost incurred is set forth in the attached Exhibit 19, Tab 13.

154. **Common Benefit.** The charges in this category are principally comprised of teleconferencing services and the total for these charges is $2,331.06. The date and description of each Common Benefit cost incurred is set forth in the attached Exhibit 19, Tab 14.

155. **E-Discovery Database Hosting**. Charges in this category include the cost for data hosting, management and consulting services associated with documents received and produced in discovery. After vetting several service providers, Class Counsel ultimately selected and negotiated terms of service with JND Legal Administration, resulting in further refinement of the original bid. The total of these charges, all of which were incurred by Class Counsel, and paid for from the Litigation Fund, total $27,077.28. The date and amount Class Counsel paid JND for each of these expenses is set forth in the attached Exhibit 19, Tab 15.

156. **IP Legal Opinion.** Facebook sought the underlying computer code and technical foundation for Breach Clarity, a product developed by expert Jim Van Dyke and referenced during his deposition testimony. Class Counsel advanced the attorneys' fees and costs for Quinn IP to assist in determining whether Facebook's request was supported by the law and the legal protections necessary to disclose this intellectual property to Facebook. The total of these charges, all of which were incurred by Class Counsel, and paid for from the Litigation Fund, total $828.00. The date, payee, and amount of the expense is set forth in the attached Exhibit 19, Tab 16.

157. **Aggregate Expenses**. After all the expense reductions, as discussed above, the total expenses incurred and sought for reimbursement in this litigation is $1,228,008.75, with $486,918.25 reported by Class Counsel and the various supporting firms, and $740,890.50 paid through the Litigation Fund.

158. **Projected Fees and Expenses.** Under the Amended Settlement, Class Counsel will have a 5-year continuing legal obligation to the Class in its post-settlement oversight of Facebook's Security Commitments. ECF No. 297-7. Class Counsel estimate this ongoing obligation will require as much as $50,000 in additional lodestar and $15,000 in additional expert costs.

159. **Declaration of Randi S. Ellis.** A true and correct copy of the Declaration of Randi S. Ellis in Support of Plaintiff's Motion for Attorney's Fees and Litigation Costs is attached hereto as Exhibit 20.

160. **Declaration of Class Representative Stephen Adkins.**  A true and correct copy of the Declaration of Stephen Adkins in Support of Plaintiff's Motion for Attorney Fees, Litigation Costs, and Service Award is attached hereto as Exhibit 21.

1    Class Counsel Ariana J. Tadler, Andrew N. Friedman and John A. Yanchunis jointly declare

2    under penalty of perjury under the laws of the United States of America that the foregoing is true

3    and correct.

4          EXECUTED on February 2, 2021, in Manhasset, NY.

5                                              */s/ Ariana J. Tadler*
6                                              Ariana J. Tadler (*pro hac vice*)
                                               **TADLER LAW, LLP**
7                                              One Penn Plaza
                                               36th Floor
8                                              New York, NY  10119
                                               Telephone: (212) 946-9300
9                                              atadler@tadlerlaw.com

10
          EXECUTED on February 2, 2021, in Washington, DC.
11
12                                             */s/ Andrew N. Friedman*
                                               Andrew N. Friedman (*pro hac vice*)
13                                             **COHEN MILSTEIN SELLERS & TOLL PLLC**
                                               1100 New York Ave. NW, Fifth Floor
14                                             Washington, DC 20005
                                               Telephone: (202) 408-4600
15                                             Facsimile: (202) 408-4699
                                               afriedman@cohenmilstein.com
16

17        EXECUTED on February 2, 2021, in Tampa, FL.

18                                             */s/ John A. Yanchunis*
                                               John A. Yanchunis (*pro hac vice*)
19                                             **MORGAN & MORGAN**
                                               **COMPLEX LITIGATION GROUP**
20                                             201 N. Franklin St., 7th Floor
                                               Tampa, FL  33602
21                                             Telephone: (813) 223-5505
                                               Facsimile: (813) 223-5402
22                                             jyanchunis@forthepeople.com

23

24

25

26

27

28

---