Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CARLA ECHAVARRIA, an individual and California Resident, and DERRICK WALKER, an individual and Virginia Resident,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.<br><br>Defendant. | No. C 18-05982 WHA<br><br>*Related to:*<br>No. C 18-06022 WHA<br>No. C 18-06172 WHA<br>No. C 18-06246 WHA<br>No. C 18-06263 WHA<br>No. C 18-06511 WHA<br>No. C 18-06583 WHA<br>No. C 18-06657 WHA<br>No. C 18-06887 WHA<br>No. C 18-06953 WHA |

## PLAINTIFFS' AMENDED INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P 26(a)(1)(A)

1    Pursuant to Rule 26(a)(1)(A) of the Federal Rules of Civil Procedure, Plaintiffs William

2   Bass, Jr., Jill Herr, Jasper Schmidt, Stephen Adkins, and Denise Brown-Wells on behalf of

3   themselves and all others similarly situated, through their attorneys, provide these Initial

4   Disclosures.

5    These disclosures are made without waiver of, and with reservation of, the following:

6    1.    All issues as to the competency, relevancy, undue burden, materiality, privilege and

7   admissibility of information disclosed herein (and the subject matter of such information), as

8   evidence for any purposes in any further proceeding in this action (including the trial of this

9   action), and any other action;

10    2.    The right to object on any ground at any time to a demand or a request for further

11   disclosure of matters identified here, including but not limited to, requests for documents,

12   interrogatories, depositions or other discovery proceedings involving or relating to the subject

13   matter of this controversy;

14    3.    Plaintiffs have not completed their investigation of this case and these disclosures

15   are based on information reasonably available to Plaintiffs as of this date. Some of the information

16   will be subject to ongoing expert analysis, but it is not yet time for expert disclosures. Plaintiffs

17   reserve the right, and these disclosures should not be construed to limit the ability of Plaintiffs, to

18   introduce additional evidence or legal theories as such evidence and theories are uncovered and

19   developed through the discovery process and exchange of disclosure statements among the parties,

20   in accordance with Rule 26(e). Plaintiffs further reserve the right to clarify, amend, modify or

21   supplement the information contained in these initial disclosures at any time before trial.

22   **I.    INDIVIDUALS BELIEVED TO HAVE DISCOVERABLE INFORMATION
          THAT PLAINTIFFS MAY USE TO SUPPORT THEIR CLAIMS UNDER FED.**
23        **R. CIV. P. 26(a)(1)(A)(I)**

24    Subject to the reservations, objections and retention of rights to object, collectively herein,

25   including Plaintiffs' right to modify, supplement, or clarify these disclosures, Plaintiffs believe the

26   following are the names, and if known, the addresses and telephone numbers, of each individual or

27   entity likely to have discoverable information that Plaintiffs may use to support their claims

28   (unless the use would be solely for impeachment).

Plaintiffs' Amended Initial Disclosures

By making the below disclosures, Plaintiffs preserve and do not waive any applicable privileges or other objections to the use or production of information or knowledge held by these people or entities. Plaintiffs make no representations as to the extent of knowledge of any individual or entity listed below, or lack thereof.

In addition to the below individuals, Plaintiffs reserve the right to use information known by any individual or entity identified:

1.      in Plaintiffs' complaints and any amendments thereto, including all members of the Classes;

2.      by any other party in an initial or supplemental disclosure or pleading;

3.      in any answer or response to an Interrogatory or other form of discovery; and

4.      in any document produced in response to any Request for Production, third-party subpoena or obtained through investigation.

**A.      Plaintiffs[1]**

The individuals listed below are named Plaintiffs in the above captioned and related actions.

1.      William Bass, Jr., California;

2.      Jill Herr, New York;

3.      Jasper Schmidt, Jenner, California;

4.      Stephen Adkins, Michigan; and

5.      Denise Brown-Wells, Florida.

Plaintiffs may possess discoverable information relating to (1) their respective account relationship with Defendant Facebook, Inc. ("Facebook"), including, but not limited to, the time period during which Plaintiffs were customers or users of Facebook's services; (2) the Personal Information Plaintiffs provided to Facebook; (3) their experiences in the aftermath of the data breach disclosed by Defendant on September 28, 2018 (the "Facebook Data Breach"); and (4)

---

[1] Attachments A, E, N, Q, and R contain Plaintiffs' addresses and telephone numbers.

Plaintiffs' Amended Initial Disclosures

1    their own damages, losses and injuries resulting from the Facebook Data Breach. Each of the

2    Plaintiffs are represented by counsel and may only be contacted through Plaintiffs' counsel.

3          **B.**      **Defendant's Current and Former Employees and Board Members**

4         Defendant Facebook is in the best position to identify its current and former officers,

5    directors, employees, or agents with discoverable information relevant to Plaintiffs' claims.

6    Defendant is also in the best position to know, and have possession of, the current addresses and

7    telephone numbers of Defendant's officers, directors, employees, and agents. Plaintiffs, however,

8    have identified certain of Defendant's current or former officers, directors, employees, and agents

9    and believe they may have discoverable information Plaintiffs may use to support their claims,

10   other than information to be used solely for impeachment.

11       Plaintiffs reserve the right to use the knowledge of any and all individuals referenced or

12   identified in the complaints and any amendments thereto, including, but not limited to Defendant's

13   officers and employees likely to have discoverable information that Plaintiffs may use to support

14   their claims.

15       The individuals identified below may possess knowledge relating to the facts and

16   circumstances relating to the Facebook Data Breach, including without limitation information

17   concerning: development and pre-implementation testing of Facebook software including the

18   "View As" token; the video upload tool that went online in July 2017 that allowed hackers to

19   improperly access Personal Information and/or take over millions of its users' accounts; whether

20   warnings, unusual activity, or other indications of a breach of data security at Facebook occurred

21   prior to September 14, 2018; how and when Defendant became aware of the Facebook Data

22   Breach; when and how Defendant identified the root cause of the Facebook Data Breach; initial

23   disclosures of the Facebook Data Breach to law enforcement, government officials and regulators,

24   initial disclosure of the Facebook Data Breach to Facebook users and the public; when the

25   Facebook Data Breach began; the extent and nature of user Personal Information accessed and/or

26   exfiltrated during the Facebook Data Breach; when and how the Facebook Data Breach ended; the

27   identity or suspected identity of the hackers; how Defendant determined the affected users or

28   entities; any steps taken by Defendant to contain and/or remediate the Facebook Data Breach;

whether users' Personal Information that remains on the Facebook system is safe from further security breach; Defendant's data security systems, practices, and procedures; Defendant's obligations and protocols to safeguard user Personal Information; any prior breaches of Defendant's systems; measures Defendant may have taken or considered taking to attempt to safeguard user Personal Information; internal and external evaluations, analyses, investigations and reports related to the Facebook Data Breach; information concerning notices or disclosures that may have been provided by Defendant concerning the Facebook Data Breach; information and materials Defendant provided to, and requests or demands for information received from, investigating federal and state agencies relating to the Facebook Data Breach; information, including communications, provided by Defendant to the public concerning safeguarding customer data; information concerning Board of Directors' meetings, minutes, oversight or communications relating to Defendant's data security measures, vulnerabilities, staffing and budget devoted to safeguarding user data; any efforts to comply with industry and other standards for safeguarding user data; information concerning Defendant's practices in obtaining, retaining, purging or deleting Personal Information; information concerning third-party vendors including vendors with credentials to access Defendant's computer systems; and other information relating to the Facebook Data Breach. Contact information available to Plaintiffs as to certain of the following individuals is provided below. Contact information has not been provided as to certain individuals because that information is in the possession of Defendant. The job titles and businesses associated with these individuals may have changed. Plaintiffs retain the right to modify or supplement this list as the circumstances, further investigation, and discovery may warrant, and as otherwise permitted by the Court.

The identities of all current and former officers, directors, employees or agents of Defendant who are likely to possess relevant information that Plaintiffs may use to support their claims are unknown to Plaintiffs at this time. Plaintiffs believe that ongoing investigation and commencement of formal discovery will identify additional individuals Plaintiffs may use to support their claims. The below list of individuals is not, nor could it be exhaustive and is offered without prejudice to Plaintiffs' right to obtain information from Defendant that is reasonably

Plaintiffs' Amended Initial Disclosures

further security breach; Defendant's data security systems, practices, and procedures; Defendant's obligations and protocols to safeguard user Personal Information; any prior breaches of Defendant's systems; measures Defendant may have taken or considered taking to attempt to safeguard user Personal Information; internal and external evaluations, analyses, investigations and reports related to the Facebook Data Breach; information concerning notices or disclosures that may have been provided by Defendant concerning the Facebook Data Breach; information and materials Defendant provided to, and requests or demands for information received from, investigating federal and state agencies relating to the Facebook Data Breach; information, including communications, provided by Defendant to the public concerning safeguarding customer data; information concerning Board of Directors' meetings, minutes, oversight or communications relating to Defendant's data security measures, vulnerabilities, staffing and budget devoted to safeguarding user data; any efforts to comply with industry and other standards for safeguarding user data; information concerning Defendant's practices in obtaining, retaining, purging or deleting Personal Information; information concerning third-party vendors including vendors with credentials to access Defendant's computer systems; and other information relating to the Facebook Data Breach. Contact information available to Plaintiffs as to certain of the following individuals is provided below. Contact information has not been provided as to certain individuals because that information is in the possession of Defendant. The job titles and businesses associated with these individuals may have changed. Plaintiffs retain the right to modify or supplement this list as the circumstances, further investigation, and discovery may warrant, and as otherwise permitted by the Court.

The identities of all current and former officers, directors, employees or agents of Defendant who are likely to possess relevant information that Plaintiffs may use to support their claims are unknown to Plaintiffs at this time. Plaintiffs believe that ongoing investigation and commencement of formal discovery will identify additional individuals Plaintiffs may use to support their claims. The below list of individuals is not, nor could it be exhaustive and is offered without prejudice to Plaintiffs' right to obtain information from Defendant that is reasonably calculated to lead to the discovery of admissible evidence. Individuals likely to have discoverable

Plaintiffs' Amended Initial Disclosures

information including but not limited to the above subject matters that Plaintiffs may use to support their claims are:

### i.      Facebook's Information and Data Security Personnel

Although Plaintiffs' investigation continues, Plaintiffs reasonably believe the following individuals are likely to have discoverable information including but not limited to the development and pre-implementation testing of Facebook software including the "View As" token; the video upload tool that went online in July 2017 that allowed hackers to improperly access Personal Information and/or take over millions of its users' accounts; whether warnings, unusual activity, or other indications of a breach of data security at Facebook occurred prior to September 14, 2018; how and when Defendant became aware of the Facebook Data Breach; when and how Defendant identified the root cause of the Facebook Data Breach:

1.   Pedro Canahuati, Vice President of Engineering, Security and Privacy, Facebook, Inc., 1601 Willow Road, Menlo Park, CA 94025. Upon reasonable investigation, Mr. Canahuati is also likely to have information and knowledge concerning the details of the "View As" vulnerabilities that permitted the Data Breach to occur, including how Access Tokens were impermissibly created, how those Access Tokens were used to impermissibly access Facebook users' Personal Information, the security review of the "View As" function, and Facebook's alleged remedial measures employed to prevent future vulnerabilities with Access Tokens;

2.   Christopher K. Cox, Chief Product Officer, Facebook, Inc., 1601 Willow Road, Menlo Park, CA 94025. Upon reasonable investigation, Mr. Cox is also likely to have information and knowledge concerning the Facebook application for mobile devices, the implementation of products and services on the Facebook platform, including the "View As" function and its associated vulnerabilities, and testing and implementation protocols at Facebook;

3.   Erin Egan, Chief Privacy Officer, Facebook, Inc., 1601 Willow Road, Menlo Park, CA 94025. Upon reasonable investigation, Ms. Egan is also likely to have information and knowledge concerning Facebook's internal review of Facebook's

Plaintiffs' Amended Initial Disclosures

products and services and privacy controls related thereto, Facebook's handling of Personal Information, and interactions with federal, state, and other regulatory government agencies and law enforcement agencies;

4.     Nathaniel Gleicher, Head of Cybersecurity Policy, Facebook, Inc., 1601 Willow Road, Menlo Park, CA 94025. Upon reasonable investigation, Mr. Gleicher is also likely to have information and knowledge concerning the details of the "View As" vulnerabilities that permitted the Data Breach to occur, and Facebook's alleged remedial measures employed to prevent future vulnerabilities and exploitations thereof to exfiltrate Facebook users' Personal Information, including Facebook's cyber security resources, evaluations concerning the sufficiency thereof, and efforts to expand and fortify Facebook's cyber security programs and practices at Facebook to protect users' Personal Information;

5.     Jonathan Millican, Software Engineer, Facebook, Inc., 1601 Willow Road, Menlo Park, CA 94025. Upon reasonable investigation, Mr. Millican is also likely to have information and knowledge concerning Facebook's cyber security practices and alleged efforts to secure Facebook users' Personal Information from unauthorized disclosure to third parties, as well as anticipate and detect cyber attacks on Facebook's information and data security computers and networks;

6.     Mike Schroepfer, Chief Technology Officer, Facebook, Inc., 1601 Willow Road, Menlo Park, CA 94025. Upon reasonable investigation, Mr. Schroepfer is also likely to have information and knowledge concerning Facebook's cyber security practices and alleged efforts to secure Facebook users' Personal Information from unauthorized disclosure to third parties, as well as anticipate and detect cyber attacks on Facebook's information and data security computers and networks, Facebook's cyber security resources, evaluations concerning the sufficiency thereof, and efforts to expand and fortify Facebook's cyber security programs and practices at Facebook to protect users' Personal Information; and

Plaintiffs' Amended Initial Disclosures

7.      Alex Stamos, former Chief Security Officer, Facebook, Inc., now at Stanford University. 450 Serra Mall, Stanford, CA 94305. Upon reasonable investigation, Mr. Stamos is also likely to have information and knowledge concerning Facebook's cyber security practices and alleged efforts to secure Facebook users' Personal Information from unauthorized disclosure to third parties, as well as anticipate and detect cyber attacks on Facebook's information and data security computers and networks, Facebook's cyber security resources, evaluations concerning the sufficiency thereof, and efforts to expand and fortify Facebook's cyber security programs and practices at Facebook to protect users' Personal Information.

ii.      **Facebook's Current and Former Executive Officers and Senior Management**

Although Plaintiffs' investigation continues, Plaintiffs reasonably believe the following individuals are likely to have discoverable information including but not limited to development and pre-implementation testing of Facebook software including the "View As" token; the video upload tool that went online in July 2017 that allowed hackers to improperly access Personal Information and/or take over millions of its users' accounts; whether warnings, unusual activity, or other indications of a breach of data security at Facebook occurred prior to September 14, 2018; how and when Defendant became aware of the Facebook Data Breach; when and how Defendant identified the root cause of the Facebook Data Breach; initial disclosures of the Facebook Data Breach to law enforcement, government officials and regulators, initial disclosure of the Facebook Data Breach to Facebook users and the public; when the Facebook Data Breach began; the extent and nature of user Personal Information accessed and/or exfiltrated during the Facebook Data Breach; when and how the Facebook Data Breach ended; the identity or suspected identity of the hackers; how Defendant determined the affected users or entities; any steps taken by Defendant to contain and/or remediate the Facebook Data Breach; whether users' Personal Information that remains on the Facebook system is safe from further security breach; Defendant's data security systems, practices, and procedures; Defendant's obligations and protocols to safeguard user

Plaintiffs' Amended Initial Disclosures

Personal Information; any prior breaches of Defendant's systems; measures Defendant may have taken or considered taking to attempt to safeguard user Personal Information; internal and external evaluations, analyses, investigations and reports related to the Facebook Data Breach; information concerning notices or disclosures that may have been provided by Defendant concerning the Facebook Data Breach; information and materials Defendant provided to, and requests or demands for information received from, investigating federal and state agencies relating to the Facebook Data Breach; information, including communications, provided by Defendant to the public concerning safeguarding customer data; any efforts to comply with industry and other standards for safeguarding user data; information concerning Defendant's practices in obtaining, retaining, purging or deleting Personal Information; information concerning third-party vendors including vendors with credentials to access Defendant's computer systems; and other information relating to the Facebook Data Breach:

1.   Brian Acton, founder and former executive at WhatsApp, Inc., and Facebook, Inc., last known address 1601 Willow Road, Menlo Park, CA 94025. Upon reasonable investigation, Mr. Acton is also likely to have information and knowledge concerning Facebook's handling of its users' Personal Information and Facebook's weakened data encryption practices and policies;

2.   Jan Koum, founder and former executive at WhatsApp Inc., and Facebook, Inc., last known address 1601 Willow Road, Menlo Park, CA 94025. Upon reasonable investigation, Mr. Koum is also likely to have information and knowledge concerning Facebook's handling of its users' Personal Information and Facebook's weakened data encryption practices and policies;

3.   Adam Mosseri, head of Instagram, former head of the News Feed and Product Interfaces management teams at Facebook, Inc., 1601 Willow Road, Menlo Park, CA 94025. Upon reasonable investigation, Mr. Mosseri is also likely to have information and knowledge concerning Facebook's handling of its users' Personal Information, how that Personal Information is shared and secured on Facebook's platform, and third parties' access to that Personal Information;

4.   Sheryl K. Sandberg, Chief Operating Officer and Director, Facebook, Inc., 1601 Willow Road, Menlo Park, CA 94025. Upon reasonable investigation, Ms. Sandberg is also likely to have information and knowledge concerning Facebook's efforts to monitor network activity and computer systems to identify network activity irregularities and unauthorized exfiltration of Personal Information;

5.   Colin S. Stretch, Vice President and General Counsel, Facebook, Inc., 1601 Willow Road, Menlo Park, CA 94025. Upon reasonable investigation, Mr. Stretch is also likely to have information and knowledge concerning Facebook's cyber security resources, evaluations concerning the sufficiency thereof, and efforts to expand and fortify Facebook's cyber security programs and practices at Facebook to protect users' Personal Information;

6.   David M. Wehner, Chief Financial Officer, Facebook, Inc., 1601 Willow Road, Menlo Park, CA 94025. Upon reasonable investigation, Mr. Wehner is also likely to have information and knowledge concerning Facebook's financial evaluations of data breaches, Facebook's budgets, and requests for financial resources to expand and fortify Facebook's cyber security programs and practices at Facebook to protect users' Personal Information; and

7.   Mark Zuckerberg, Chairman and Chief Executive Officer, Facebook, Inc., 1601 Willow Road, Menlo Park, CA 94025. Upon reasonable investigation, Mr. Zuckerberg is also likely to have information and knowledge concerning Facebook's cyber security resources, evaluations concerning the sufficiency thereof, Facebook's efforts to expand and fortify Facebook's cyber security programs and practices at Facebook to protect user's Personal Information, as well as detailed information and knowledge of The Breach that targeted and personally affected Mr. Zuckerberg's Facebook profile.

### iii.   Facebook's Communications and Product Management Personnel

Although Plaintiffs' investigation continues, Plaintiffs reasonably believe the following individuals are likely to have discoverable information including but not limited to development

and pre-implementation testing of Facebook software including the "View As" token; the video upload tool that went online in July 2017 that allowed hackers to improperly access Personal Information and/or take over millions of its users' accounts; whether warnings, unusual activity, or other indications of a breach of data security at Facebook occurred prior to September 14, 2018; how and when Defendant became aware of the Facebook Data Breach; when and how Defendant identified the root cause of the Facebook Data Breach; initial disclosures of the Facebook Data Breach to law enforcement, government officials and regulators, initial disclosure of the Facebook Data Breach to Facebook users and the public; when the Facebook Data Breach began; the extent and nature of user Personal Information accessed and/or exfiltrated during the Facebook Data Breach; when and how the Facebook Data Breach ended; the identity or suspected identity of the hackers; how Defendant determined the affected users or entities; any steps taken by Defendant to contain and/or remediate the Facebook Data Breach; whether users' Personal Information that remains on the Facebook system is safe from further security breach; Defendant's data security systems, practices, and procedures; Defendant's obligations and protocols to safeguard user Personal Information; any prior breaches of Defendant's systems; measures Defendant may have taken or considered taking to attempt to safeguard user Personal Information; internal and external evaluations, analyses, investigations and reports related to the Facebook Data Breach; information concerning notices or disclosures that may have been provided by Defendant concerning the Facebook Data Breach; information and materials Defendant provided to, and requests or demands for information received from, investigating federal and state agencies relating to the Facebook Data Breach; information, including communications, provided by Defendant to the public concerning safeguarding customer data; any efforts to comply with industry and other standards for safeguarding user data; information concerning Defendant's practices in obtaining, retaining, purging or deleting Personal Information; information concerning third-party vendors including vendors with credentials to access Defendant's computer systems; and other information relating to the Facebook Data Breach:

       1.      Will Castleberry, Facebook Public Policy, Facebook, Inc., 1601 Willow Road, Menlo Park, CA 94025. Upon reasonable investigation, Mr. Castleberry is also

likely to have information and knowledge concerning investigations and/or inquiries from federal and state government entities and law enforcement, disclosures to federal and state government entities and law enforcement, the extent to which Facebook cooperated with those investigations, and the decision to issue data breach notifications to federal and state government entities;

2. Guy Rosen, Vice President of Product Management, Facebook, Inc., 1601 Willow Road, Menlo Park, CA 94025. Upon reasonable investigation, Mr. Rosen is also likely to have information and knowledge concerning the details of Facebook's policies and procedures related to cyber security and safety at Facebook, as well as the Data Breach, the types and categories of Personnel Information accessed and exfiltrated in the Data Breach and how Facebook determined the types and categories of Personal Information was accessed and exfiltrated in the Data Breach, and when the Data Breach began, when Facebook first detected the Data Breach, how Facebook first detected the Data Breach, when the Data Breach ended, and how Facebook remediated and otherwise fixed the vulnerabilities in the "View As" feature that permitted the Data Breach to occur; and

3. Tom Reynolds, Facebook Communications, Facebook, Inc., 1601 Willow Road, Menlo Park, CA 94025. Upon reasonable investigation, Mr. Reynolds is also likely to have information and knowledge concerning the details of Facebook's policies and procedures related to cyber security and safety at Facebook, as well as the Data Breach, the types and categories of Personnel Information accessed and exfiltrated in the Data Breach and how Facebook determined the types and categories of Personal Information was accessed and exfiltrated in the Data Breach, and when the Data Breach began, when Facebook first detected the Data Breach, how Facebook first detected the Data Breach, when the Data Breach ended, and how Facebook remediated and otherwise fixed the vulnerabilities in the "View As" feature that permitted the Data Breach to occur.

### iv.     Non-Employee Members of the Board of Directors for Facebook

Although Plaintiffs' investigation continues, Plaintiffs reasonably believe the following individuals are likely to have discoverable information including but not limited to development and pre-implementation testing of Facebook software including the "View As" token; the video upload tool that went online in July 2017 that allowed hackers to improperly access Personal Information and/or take over millions of its users' accounts; whether warnings, unusual activity, or other indications of a breach of data security at Facebook occurred prior to September 14, 2018; how and when Defendant became aware of the Facebook Data Breach; when and how Defendant identified the root cause of the Facebook Data Breach; initial disclosures of the Facebook Data Breach to law enforcement, government officials and regulators, initial disclosure of the Facebook Data Breach to Facebook users and the public; when the Facebook Data Breach began; the extent and nature of user Personal Information accessed and/or exfiltrated during the Facebook Data Breach; when and how the Facebook Data Breach ended; how Defendant determined the affected users or entities; any steps taken by Defendant to contain and/or remediate the Facebook Data Breach; whether users' Personal Information that remains on the Facebook system is safe from further security breach; Defendant's data security systems, practices, and procedures; Defendant's obligations and protocols to safeguard user Personal Information; any prior breaches of Defendant's systems; measures Defendant may have taken or considered taking to attempt to safeguard user Personal Information; internal and external evaluations, analyses, investigations and reports related to the Facebook Data Breach; information concerning notices or disclosures that may have been provided by Defendant concerning the Facebook Data Breach; information and materials Defendant provided to, and requests or demands for information received from, investigating federal and state agencies relating to the Facebook Data Breach; information, including communications, provided by Defendant to the public concerning safeguarding customer data; information concerning Board of Directors' meetings, minutes, oversight or communications relating to Defendant's data security measures, vulnerabilities, staffing and budget devoted to safeguarding user data; any efforts to comply with industry and other standards for safeguarding user data; information concerning Defendant's practices in obtaining, retaining,

purging or deleting Personal Information; information concerning third-party vendors including vendors with credentials to access Defendant's computer systems; and other information relating to the Facebook Data Breach:

      1.    Erskine B. Bowles, University of North Carolina, 910 Raleigh Rd., Chapel Hill, NC 27515. Upon reasonable investigation, Mr. Bowles is also likely to have information and knowledge concerning audits and other internal and external reviews Facebook has undertaken related to its cyber security practices; and

      2.    Reed Hastings, Netflix, Inc., 100 Winchester Circle, Los Gatos, CA 95032; Upon reasonable investigation, Mr. Hastings is also likely to have information and knowledge concerning the interaction between Facebook and third-party applications, such as Netflix, wherein Access Tokens are used to login to those third-party applications, such as Netflix, and what information a nefarious actor could glean from the third-party applications accounts, such as credit card, PayPal, iTunes, and other payment methods.

## II.    ADDITIONAL INDIVIDUALS AND ENTITIES BELIEVED TO HAVE DISCOVERABLE INFORMATION UNDER FED. R. CIV. P. 26(a)(1)(A)(I)

The following may have information regarding the value to Defendant of the average Facebook user in terms of company revenue and profit.

      1.    Ernst & Young LLP, 560 Mission Street, #1600, San Francisco, CA 4105, (415) 894-8000

Plaintiffs believe that the following government entities and personnel may have discoverable information that Plaintiffs may use to support their claims. The particular personnel within these government agencies with such information are mostly unknown to Plaintiffs, but may be known to and in the possession and control of Defendant. The subject matter of the discoverable information these government agencies may have is the result of inquiries and investigations conducted by the agencies, including information requested and obtained from Defendant and non-parties, and relates to the Facebook Data Breach and/or online data privacy at Facebook. These government agencies include without limitation the following:

Plaintiffs' Amended Initial Disclosures

1.    Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580, (877) 382-4357. Upon reasonable investigation, the FTC may have discoverable information related to its investigation of the Facebook Data Breach.

2.    United States Senate, Members of the Committee on Commerce, Science and Transportation, 512 Dirksen Senate Building, Washington, DC 20510, (202) 224-1251. Upon reasonable investigation, the Committee on Commerce, Science and Transportation and its members may have discoverable information related to its investigation of online data privacy at Facebook.

3.    United States House of Representatives, Members of the United States House of Representatives Commerce and Energy Committee, 2322A Rayburn House Office Building, Washington, DC 20515, (202) 225-3641. Upon reasonable investigation, the United States House of Representatives Commerce and Energy Committee and its members may have discoverable information related to its investigation of the transparency and use of consumer data at Facebook, including Facebook's written responses to written questions.

4.    Josh Stein, North Carolina Attorney General, North Carolina Department of Justice, 114 W Edenton Street, Raleigh, NC 27603, (919) 716-6400. Upon reasonable investigation, the Attorney General and his office may have discoverable information related to its investigation of the Facebook Data Breach.

5.    Irish Data Protection Commission, Canal House, Station Road, Portarlington R32 AP23, Co. Laois, Ireland. Upon reasonable investigation, the Irish Data Protection Commission may have discoverable information related to its investigation of the Facebook Data Breach.

Plaintiffs further identify the following reporters or investigators who may have discoverable information that Plaintiffs may use to support their claims:

1.    Catalin Cimpanu, Security Reporter, ZDNet. Upon reasonable investigation, Mr. Cimpanu may have discoverable information related to the Facebook Data Breach as Mr. Cimpanu is an investigative reporter who participated in numerous

1    Facebook conference calls with Mark Zuckerberg and other Facebook executives

2    who provided information about the Facebook Data Breach and published articles

3    on September 28, 2018, October 1, 2018 and October 12, 2018 regarding the

4    breach.

5    2.   Heather Kelly, San Francisco Tech Editor, CNN, San Francisco, California. Upon

6    reasonable investigation, Ms. Kelly is an investigative reporter and may have

7    discoverable information related to the Facebook Data Breach. Ms. Kelly has

8    published and continues to publish articles related to data privacy at Facebook and

9    Facebook management's approach to data privacy including a September 28, 2018

10   CNN article titled Facebook hack exposed 50 million users' info -- and accounts on

11   other sites.

12   3.   Issie Lapowsky, Senior Writer, WIRED Magazine, New York, New York. Upon

13   reasonable investigation, Ms. Lapowsky is an investigative reporter and may have

14   discoverable information related to the Facebook Data Breach. Ms. Lapowsky has

15   published and continues to publish articles related to the Facebook Data Breach

16   including the October 2, 2018 WIRED article titled The Facebook Hack Exposes

17   an Internet-Wide Failure discussing ways that hackers could abuse Facebook's

18   Single Sign-On tool.

19   4.   Kurt Wagner, Senior Editor, Recode. Upon reasonable investigation, Mr. Wagner is

20   an investigative reporter and may have discoverable information related to the

21   Facebook Data Breach. Mr. Wagner has published and continues to publish articles

22   related to data privacy at Facebook and Facebook management's approach to data

23   privacy including a September 28, 2018 Recode article titled Why should anybody

24   trust Facebook with their personal data? We asked CEO Mark Zuckerberg that

25   same question.

26   Plaintiffs also identify the following individuals and entities from the security and privacy

27   industry who may have discoverable information that Plaintiffs may use to support their claims:

28

No. C 18-05982 WHA

1.      Anna Brading, Editor-in-Chief, Nakedsecurity.sophos.com. Upon reasonable investigation, Ms. Brading is consumer privacy analyst and may have discoverable information related to the Facebook Data Breach and Facebook's attempts to contain the damage from the Facebook Data Breach as stated in several podcasts and postings to https://nakedsecurity.sophos.com, including information related to https://nakedsecurity.sophos.com/2018/09/28/big-facebook-breach50-million-accounts-affected/.

2.      Brian Krebs, Krebs on Security LLC, P.O. Box 3073, Merrifiled, VA 22166. Upon reasonable investigation, Mr. Krebs is consumer privacy analyst and may have discoverable information related to the Facebook Data Breach and Facebook's attempts to contain the damage from the Facebook Data Breach, including information related to https://krebsonsecurity.com/tag/facebook-view-as-bug/.

3.      Simon Migliano, Digital Privacy and Cybersecurity Research, London, United Kingdom. Upon reasonable investigation, Mr. Migliano is consumer privacy analyst and may have discoverable information related to the Facebook Data Breach and Facebook's attempts to contain the damage from the Facebook Data Breach, including black market prices for Facebook logins as related in https://www.top10vpn.com/privacy-central/privacy/dark-web-market-price-index-feb-2018-us/.

4.      Corey Milligan, Senior Threat Intel Analyst, Armor Inc., 2360 Campbell Creek Blvd., Suite 535, Richardson, Texas 75082. Upon reasonable investigation, Mr. Milligan is consumer privacy analyst and may have discoverable information related to the Facebook Data Breach and Facebook's attempts to contain the damage from the Facebook Data Breach. Mr. Milligan has been interviewed by, *inter alia*, Reuters regarding how much data companies learn about users, how companies track users, and how companies monetize that data.

The following credit bureaus may have information regarding all Plaintiffs' credit in the aftermath of the Facebook Data Breach:

Plaintiffs' Amended Initial Disclosures

1.    Experian Credit Reporting, 475 Anton Blvd., Costa Mesa, CA 92626, Tel: 714-830-7000

2.    TransUnion, 1510 Chester Pike, Crum Lynne, PA 19022, Tel: 800-888-4213

3.    Equifax, P.O. Box 740241, Atlanta, GA 30374, Tel: 800-685-5000

**III.    CATEGORIES OF DOCUMENTS PURSUANT TO FED. R. CIV. P. 26(a)(1)(A)(II)**

Subject to the above reservations and objections, including Plaintiffs' right to modify, supplement, or clarify this response, Plaintiffs (and/or their counsel) represent that they have in their possession, custody, or control the following categories of documents, electronically stored information and tangible things that may support their claims:

1.    Documents from Plaintiffs' files and records, which may include documents regarding: (a) Plaintiffs' contracts and interactions with Defendant; (b) Personal Information supplied by Plaintiffs to Defendant; (c) fraudulent activity that utilized Plaintiffs' Personal Information, acquired in the Facebook Data Breach (including communications from credit card companies and the IRS and state and local tax board equivalents); (d) Plaintiffs' losses and injuries, including to their money or property resulting from the Facebook Data Breach; (e) Plaintiffs' costs or time expended dealing with the aftermath of the Facebook Data Breach (including credit card statements and hard-copy receipts); (f) Plaintiffs' communications with Defendant relating to the Facebook Data Breach; (g) Plaintiffs' communications with third parties relating to the Facebook Data Breach, including banks, credit issuers, credit bureaus, law enforcement agencies, other government agencies, and credit monitoring companies; and (h) Defendant Facebook's communications to Plaintiffs relating to the Facebook Data Breach.[2]

2.    Publicly available documents, including, without limitation, reports and disclosures made by Defendant, press releases, 10Ks, annual reports, news articles, and information from the Defendant's websites.

Additionally, Plaintiffs believe that Defendant and numerous third parties have in their possession, custody, and control additional documents, analyses, and compilations that Plaintiffs

_____

[2] Attachments A, E, N, Q, and R set forth Plaintiffs' category of documents.

may use to support their claims and/or controvert Defendant's defenses. Descriptions and location of such documents are not known to Plaintiffs and will be identified in the course of discovery and investigation. Accordingly, Plaintiffs reserve the right to supplement this initial disclosure.

## IV.        DAMAGE COMPUTATION PURSUANT TO FED. R. CIV. P. 26(a)(1)(A)(III)

Plaintiffs request, on behalf of themselves and the Classes they seek to represent, actual, compensatory, consequential, statutory and punitive damages, restitution, disgorgement, pre-judgment and post-judgment interest, and reasonable attorneys' fees costs and expenses, and such other and further relief as is just and proper. As described below, Plaintiffs and the Classes continue to incur additional damage as a result of the Facebook Data Breach, and the initial damages calculations set forth below are all subject to further investigation, discovery, and expert analysis. Plaintiffs will update their damages calculations prior to trial.

Subject to the above reservations, including Plaintiffs' right to modify, supplement, or clarify these disclosures, Plaintiffs provide the following computations for each of their categories of damages:

### A.        Individualized Damages[3]

All Plaintiffs and Class Members are entitled to compensation for the money and time that Plaintiffs and Class Members have spent addressing issues related to the Facebook Data Breach, including, but not limited to, the time, loss of productivity, and costs associated with the detection and prevention of identity theft and unauthorized use of their Personal Information, and the stress, nuisance, inconvenience and annoyance of dealing with issues resulting from the Facebook Data Breach. These damages are ongoing, as the threat of continuing and future acts of fraud by persons who acquired their Personal Information as a result of the Facebook Data Breach has not abated, and Plaintiffs and Class Members must continue to spend time and money addressing issues related to the Facebook Data Breach. Further discovery, investigation, and expert analysis are needed to calculate these damages. Each of the individual Plaintiffs will also seek nominal damages which will be determined by a jury.

---

[3] Attachments A, E, N, Q, and R include descriptions of damages per individual Plaintiffs.

B.      **Class-wide Damages**

Aside from any individual damages that may occur for each Plaintiff listed herein due to identity theft activities that may not yet be detected or have not yet occurred, Plaintiffs seek damages common to all members of the Class. The estimates described below are based on Facebook's public statements regarding the size and breadth of the Data Breach. Plaintiffs reserve the right to amend these damage estimates as they receive discovery in this litigation.

The Data Breach resulted in the exposure of sensitive and valuable personally identifiable information ("PII"). Revenue for data industry companies and the underlying PII maintained by data industry companies are inextricably linked.[4] In other words, if Facebook doesn't maintain the privacy of its users' PII, it risks losing those customers and the ability to generate revenue from those customers. Although Facebook does not pay its users for the PII that its users contribute, it would be incorrect to conclude that users contribute their data for free. Rather, the data provided by Facebook's users is the modern-day currency used in the transaction for the services that Facebook provides. PII is unquestionably a valuable asset to both Facebook and its users. In a simple sense, if it were not valuable, companies would not spend the funds they do to secure it.

Subject to further discovery and refinement of the damage models, each class member suffered damages, as described below:

i.      **The Loss of Value of PII: $15 to $1,200 per class member**

A market exists for stolen PII because malicious actors are able to monetize that information by gaining access to both metadata attached to the PII and by harvesting valuable information from the users' accounts themselves. An individual's entire portfolio of PII has been valued as high as $1,200 per person.[5] Based solely on the type of PII that Facebook has publicly asserted was taken in the Data Breach, the value of that information on the Dark Web ranges from

---

[4] Glikman, Pauline and Glady, Nicolas, *What's the Value of Your Data?* TechCrunch, October 13, 2015. https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/.

[5] Migliano, Simon, *Dark Web Market Price Index (US Edition),* February 27, 2018. https://www.top10vph.com/privacy-central/privacy/dark-web-market-price-index-feb-2018-us/.

Plaintiffs' Amended Initial Disclosures

$15-$30 per person. Until Plaintiffs can confirm the type of PII taken in the Data Breach, they cannot be more precise on the loss of value of PII taken here.

However, Facebook's acquisitions of Instagram and WhatsApp indicate that Facebook, at a minimum, put a value of $33 or $42 for each class member's PII. In April 2012, Facebook acquired Instagram (a photo sharing app) for $1 billion, paying the equivalent of $33 per Instagram user. In February 2014, Facebook paid approximately $19 billion for WhatsApp (a smartphone app that allow you to send text messages, photos and videos) or $42 per user.

### ii. The Amount of Money Saved by Facebook by Failing to Provide Adequate Cybersecurity: $11.49 to $15.63 per class member

An alternative approach to valuing PII here would be to analyze the value of the services and customer experience received by Facebook users in exchange for providing their PII. This analysis would further confirm the value of PII even though it is provided voluntarily to Facebook and not paid for in the traditional sense.

Facebook itself has publicly acknowledged that it has not adequately provided appropriate security protections for its users' PII. In fact, before the Senate Judiciary Committee, Colin Stretch, General Counsel for Facebook, testified that in response to data security threats, Facebook would double the number of personnel working on safety and security concerns from 10,000 to 20,000 by the end of 2018.[6] This means that had Facebook spent more appropriate amounts to secure its users' PII, the Data Breach might have been avoided, as would the damage to the Class. As a result of not spending sufficiently on data security, Facebook enjoyed greater profits than it otherwise would have.

Using Facebook's estimates of an additional 10,000 safety and security personnel, it is possible to estimate the amount saved by Facebook and thus the increased profit that it wrongfully retained. Based on a fully burdened labor cost to Facebook of between $117,000 (the "low-salary scenario") and $159,000 (the "high-salary scenario") per data security employee, Facebook saved

---

[6] Hearing before the United States Senate Committee on the Judiciary Subcommittee on Crime and Terrorism: Testimony of Colin Stretch, General Counsel, Facebook, October 31, 2017.

between $1.2 billion and $1.6 billion in 2017.[7] However, these amounts were not just saved in 2017, but in prior years as well. In total, between 2012 and 2017, Facebook saved between $5.0 billion and $6.8 billion in costs by not adequately protecting its users' PII. This compares to the $34.3 billion in profit that Facebook actually made. Had it spent the appropriate amounts on data security, Facebook would have made between $27.5 billion and $29.3 billion in profit over this period.

From 2012 to 2017, Facebook generated nearly $17 billion in net income in the U.S. and saved between $2.5 billion and $3.4 billion by not spending appropriate amounts on safety and security personnel. Based upon the preceding, Plaintiffs presently calculate excess profit per user of **$15.63.** A similar calculation for the low-salary scenario results in excess profit per U.S. user of **$11.49**. Assuming approximately 30 million Class members, class damages conservatively[8] would be in the range of $306 million to $416 million.

### iii.   Damages to Class Members as Calculated by the Decline in Market Capitalization: $25.30 to $422 per class member

After the announcement of the Data Breach, Facebook's market capitalization decreased by $12.6 billion as Facebook's underlying assets that support its market capitalization had declined.[9] To this day, Facebook's market capitalization has not recovered—indicating that this asset impairment has continued to linger.[10] Based on the asset book value (approximately $150 billion) from Facebook's publicly disclosed financial information and its market capitalization

---

[7] Based on Bureau of Labor Statistics News Release, "Employer Costs for Employee Compensation - June 2018", Page 4, dated September 18, 2018. See also, www.ziprecruiter.com/Salaries/Entry-Level-Cyber-Security-Analyst-Salary, accessed 11/28/18. The majority of salaries range from $54,400 (25th percentile) to $120,000 (75th percentile) across the United States. Also see www.glassdoor.com/Salary/Facebook-Salaries, accessed 11/28/18.

[8] The numbers utilized above are estimates and, prior to discovery, it cannot be determined whether even Facebook's highest paid employees would be sufficient to rectify the security issues. Moreover, those estimated costs exclude the costs of infrastructure necessary to accommodate those additional personnel.

[9] There does not appear to be any other significant announcement activity on September 28, 2018 that would explain Facebook's stock price decline.

[10] Capital IQ. Facebook's stock traded at $168.84 on September 27, 2018. As of January 19, 2018, Facebook's stock price traded at $150.04 and has never traded above $168 per share since September 27, 2018.

($487.5 billion), it is clear that the majority of Facebook's value is attributable to its underlying intangible assets—which is primarily the user database built on the PII provided by Facebook's users.[11] The decline in Facebook's market capitalization ($12.6 billion) on September 28, 2018 would be isolated to just this user database asset because the Data Breach relates to the security of that asset whose value is tied to the exclusivity of the PII. The value of Facebook's cash, receivables, fixed assets, and other intangibles remained unchanged after this announcement. Thus, the market decided that the Data Breach decreased the value of Facebook's most valuable asset by $12.6 billion.

There are several possible ways to interpret the market's behavior. First, one could attribute the entire decline of $12.6 billion to the accounts directly affected by the Data Breach as the Class PII contribution to Facebook's user data base was the one directly impacted by the breach and thus impaired. Assuming a Class of 30 million members, the loss in value per Class member would be **$422** per user.[12] Alternatively, one could consider the difference in profit contribution between U.S. users and non-U.S. users. Despite comprising just 11% of total users, U.S. users provided nearly 50% of Facebook's total profit. If approximately 50% of the total decline in Facebook's user base asset was attributable to U.S. users (approximately 240 million), then the loss in asset value would be **$25.30** per U.S. user.

### iv.    Time Value of Dealing with Consequence of the Data Breach: $18.70 per hour per class member

Plaintiffs seek damages to all members of the Class for the time spent as a direct result of the Data Breach. This time spent includes, but is not limited to, the following: time spent restoring Facebook settings which includes the ability to log on and completely recover Facebook accounts; dealing with impersonation activities which would include responding to phone calls, text

---

[11] Other intangible assets would include the technology on which Facebook's platform is based and relationships with advertisers. However, it is the user data base that is the primary revenue generating asset for Facebook.

[12] To the extent the $12.6 billion decline was applied to more than the 30 million Facebook users, that loss per user number would be adjusted.

messages, emails and friend requests; reviewing credit reports; scanning financial information; mitigating potential losses; detecting identity theft and changing passwords.

A relevant per-hour value of time for the typical American is $18.70, based on Bureau of Labor Statistics figures for median average weekly income of $897[13] and 48 total weekly work hours (or 2,500[14] per year divided by 52 weeks).

The formula for calculating the value of time spent by Class members on dealing with the consequences of the Data Breach would be as follows: (1) the total number of hours spent per Class member, multiplied by the hourly rate for the value of that time spent ($18.70 per hour), multiplied by (3) the number of Class members. As an example, if the average time spent per class member were 68.2 hours, which is the average time spent per named Plaintiffs, the total individualized damages for this category would be between **$1275.34** per Class member.

The hourly rate of $18.70 can be applied to each member of the class for the time they spent dealing with the consequences of the breach.

> **v.      Value of Increased Risk of a Future Identity Theft and the Stress, Nuisance, Inconvenience, and Annoyance Associated with that Risk: $1900 to $2900 per Class member**

As a result of the Data Breach, the risk of identity theft has increased for each Class member. These individuals will, for the foreseeable future, have to worry about the exposure of their PII. The stress of possible identity theft will be a constant worry and will likely require the future expenditure of time and resources. One way for the Class members to minimize this risk and stress is to procure credit-monitoring services that have insurance clauses to help offset future losses.

Currently, there are third-party credit-monitoring services that perform identity monitoring, identity recovery services and provide identity theft insurance.[15] Notably, many of these services provide insurance or reimbursement (as much as $1,000,000) against future potential losses.[16]

---

[13] https://www.bls.gov/news.release/pdf/wkyeng.pdf

[14] https://jamesclear.com/value-of-time

[15] Identity Theft Protection Services, Federal Trade Commission: Consumer Information.

Because the Class members will need this coverage for the foreseeable future, a temporary period of coverage would not suffice—the Class members will need coverage over the entire future period during which their PII will continue to be exposed. Annual subscriptions for credit monitoring plans range from $219 to $329 per year. The service provided by ID Watchdog Platinum ($219 per year) is described as a basic, no-frills credit monitoring that provides assistance for existing data-breach victims.[17]

To calculate the value required to alleviate the stress of the Data Breach victims we first, determined the appropriate value of the subscription and insurance (between $219 and $329 per year). Second, we determined the appropriate time period for which the Data Breach victims will require coverage. Potentially, the value of hacked information decreases over time; however, once the PII is exposed, it is available to malicious actors indefinitely. (Further, the issue in this analysis is not necessarily the actual risk that the data is used but the stress of a perceived risk that it will be used) Third, we discounted the future amounts back to present values to determine the current value of increased risk and stress caused by the Data Breach. We used the discounted rate of a 10-Year Treasury rate of 2.64%, assuming the calculation will involve a similar time period.[18] The underlying theory is that the purchase of the credit monitoring service and insurance acts a risk mitigation and device to alleviate the increased risk of a future identity theft and the stress, nuisance, inconvenience, and annoyance associated with that risk.

If the appropriate period is determined to be 10 years, the present value the Class's increased risk and stress would be between **$1,900** and **$2,900** per Class member.[19] This same range can be applied to each member of the class for these injuries.

---

https://www.consumer.ftc.gov/articles/0235-identity-theft-protection-services

[16] https://www.lifelock.com/.

[17] Do you Need Identity Theft Protection Services? Sean Pyles, Nerdwallet, February 4, 2019. https://www.nerdwallet.com/blog/finance/comparing-identity-theft-protection-services/

[18] https://www.bankrate.com/rates/interest-rates/treasury.aspx

[19] Calculated as 10 annual payments of $219 or $329 and discounted back at 2.64%.

1
2

**V.      INSURANCE AGREEMENT UNDER WHICH AN INSURANCE BUSINESS MAY BE LIABLE TO SATISFY ALL OR PART OF THE DAMAGES PURSUANT TO FED. R. CIV. P. 26(A)(1)(A)(IV)**

3

Plaintiffs state that Fed. R. Civ. P. 26(a)(1)(A)(iv) is not applicable to any of them.

4

Dated: March 7, 2019                              Respectfully submitted,

5

/s/ *John A. Yanchunis*
John A. Yanchunis (*Pro Hac Vice*)

6

*JYanchunis@ForThePeople.com*

7

**MORGAN & MORGAN COMPLEX LITIGATION GROUP**

8

201 N. Franklin Street, 7th Floor
Tampa, Florida 33602

9

T: 813-223-5505
F: 813-223-5402 (fax)

10

11

Andrew N. Friedman (*Pro Hac Vice*)
*AFriedman@CohenMilstein.com*

12

**COHEN MILSTEIN SELLERS & TOLL, PLLC**

13

1100 New York Ave, 5th Floor
Washington, DC 20005

14

T: 202-408-4600
F: 202-408-4699

15

16

Ariana Tadler (*Pro Hac Vice*)
*ATadler@Milberg.com*

17

**MILBERG      TADLER      PHILLIPS GROSSMAN LLP**

18

One Penn Plaza
New York, New York

19

T: 212-594-5300
F: 212-868-1229

20

21

**STULL, STULL & BRODY**

22

Melissa R. Emert (Pro Hac Vice)
*MEmert@ssbny.com*

23

6 East 45th St, 4th Floor
New York, New York 10017

24

T: 212-687-7230
F: 212-490-2022

25

26

**LOCKRIDGE GRINDAL NAUEN PLLP**
Karen H. Riebel (Pro Hac Vice)

27

*KHRiebel@LockLaw*
100 Washington Ave. S, Suite 2200

28

Plaintiffs' Amended Initial Disclosures

Minneapolis, MN 55401
T: 612-339-6900
F: 612-339-0981

### PROOF OF SERVICE

On March 7, 2019, I caused the PLAINTIFFS' AMENDED INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P 26(a)(1)(A) to be served to upon all persons listed on the following Service List.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  March 7, 2019

/s/ *John A. Yanchunis*
John A. Yanchunis (*Pro Hac Vice*)
jyanchunis@ForThePeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
T: 813-223-5505
F: 813-223-5402 (fax)

Plaintiffs' Amended Initial Disclosures

1

**SERVICE LIST**

2

**Elizabeth L. Deeley**
Latham & Watkins LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
(415) 391-0600
Fax: (415) 395-8095
Email: elizabeth.deeley@lw.com

**Andrew Brian Clubok**
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
(202) 637-2200
Fax: (202) 637-2201
Email: andrew.clubok@lw.com

**Melanie Marilyn Blunschi**
Latham & Watkins LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
415-395-8129
Fax: 415-395-8095
Email: melanie.blunschi@lw.com

**Michael H. Rubin**
Latham & Watkins LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
415-391-0600
Fax: 415-395-8095
Email: michael.rubin@lw.com

**Serrin A Turner**
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
212-906-1200
Email: serrin.turner@lw.com

**Susan E. Engel**
Latham & Watkins LLP
555 Eleventh Street, N.W.
Suite 1000
Washington, DC 20004
202-637-2200
Email: susan.engel@lw.com

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

No. C 18-05982 WHA
Plaintiffs' Amended Initial Disclosures